1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA

2
                       CASE NO:  21-CV-23995

3

4

5    SAMUEL SCOTT, JR.,

6          Plaintiff,

7    vs.

8    CITY OF MIAMI, a political subdivision of the State of
     Florida, JONATHAN GUZMAN, MICHAEL BLOOM, BRANDON

9    WILLIAMS, MIGUEL HERNANDEZ, RANDY CARRIEL, sued in their
     individual capacity,

10

          Defendants.

11   _____/

12

13                      TAKEN REMOTELY

14

15              Wednesday, December 28, 2022

16              10:00 a.m. - 4:56 p.m.

17

18           VIDEOCONFERENCE DEPOSITION OF

19                   JONATHAN GUZMAN

20

21        Taken before Tyesha Scott, Reporter, a Notary

22   Public for the State of Florida at Large, pursuant

23   to Notice of Taking Deposition filed in the

24   above-styled cause.

25

**PLAINTIFF'S EXHIBIT**

**3**

```
 1                  APPEARANCES OF COUNSEL

 2   On Behalf of the Plaintiff:

 3        PIERRE SIMON
          600 Southwest 4th Avenue
 4        Fort Lauderdale, Florida 33315
          305-336-9193
 5        fplaw08@yahoo.com
          BY:  FAUDLIN PIERRE, ESQUIRE
 6        (Appearing via Zoom)

 7   On Behalf of Officer Guzman, the City of Miami, Officer
     Carriel and Officer Williams and Officer Bloom:
 8
          CITY OF MIAMI, OFFICE OF CITY ATTORNEY
 9        444 Southwest 2nd Avenue
          Miami, Florida 33130
10        305-416-1800
          bfernandez@miamigov.com
11        BY:  BRANDON L. FERNANDEZ, ESQUIRE
          (Appearing via Zoom)
12
     On Behalf of Miguel Hernandez:
13
          MARRERO & WYDLER
14        2600 South Douglas Road, Floor 4
          Coral Gables, Florida 33134
15        305-446-5528
          lew@marrerolegal.com
16        BY:  LOURDES E. WYDLER, ESQUIRE
          (Appearing via Zoom)
17

18

19

20

21

22

23

24

25
```

1                          INDEX OF PROCEEDINGS

2     Deposition of Jonathan Guzman                      Page

3     Direct Examination by Mr. Pierre                      5
      Cross Examination by Mr. Fernandez                  143
4     Cross Examination by Ms. Wydler                     200
      Redirect Examination by Mr. Pierre                  209

5
      Certificate of Oath                                 248
6     Certificate of Reporter                             249
      Errata Pages                                        250

7

8                          INDEX OF EXHIBITS

9     PLAINTIFF'S            DESCRIPTION                  PAGE

10    Exhibit 1             Arrest Report                   75

11    Exhibit 2             Citations                      106

12    Exhibit 3             Incident Detail                112

13    Exhibit 4             Incident Detail                114

14    Exhibit 5             Officer Worksheet              116

15    Exhibit 6             Report                         117

16    Exhibit 7             Report                         124

17

18    DEFENDANTS'            DESCRIPTION                  PAGE

19    Exhibit 1             Google Images                  144

20    Exhibit 2             Crash Report                   168

21    Exhibit 3             Property Receipt               172

22    Exhibit 4             Camera Footage                 180

23    Exhibit 5             Camera Footage                 192

24    Exhibit 6             Screenshot                     193

25

```
1                    (The deposition commenced at 10:02 a.m.)

2               THE REPORTER:  Good morning.  My name is

3          Tyesha Scott.  Today's date is Wednesday, December

4          28, 2022.  The time is now 10:02 a.m., and the

5          deposition of Officer Jonathan Guzman will be

6          recorded, and the oath will be administered

7          remotely under the Florida Supreme Court

8          Administrative Order Number 2023.

9               Will counsel please indicate their agreement

10         by stating your name and your agreement on the

11         record?

12              MR. PIERRE:  Faudlin Pierre on behalf of the

13         Plaintiff, Samuel Scott, Jr.  We agree.

14              MS. WYDLER:  Lourdes Wydler --

15              MR. FERNANDEZ:  Go ahead, Lourdes.

16              MS. WYDLER:  Lourdes Wydler on behalf of

17         Miguel Hernandez, agreed.

18              MR. FERNANDEZ:  And Brandon Fernandez on

19         behalf of Officer Guzman, the City of Miami,

20         Officer Carriel and Officer Williams and Officer

21         Bloom.

22    THEREUPON:

23                    JONATHAN GUZMAN

24         Having been first duly sworn, testified as follows:

25                    DIRECT EXAMINATION
```

1   BY MR. PIERRE:

2        Q.   Good morning, Officer.  How are you today?

3        A.   Good morning, sir.  How are you?

4        Q.   I'm good.  I'm good.  So I'm sure you've been

5   in a deposition before?

6        A.   Yes, sir.

7        Q.   Have you?  Okay.  I think there's some --

8   we're having some connection issues.  Just give me a

9   second.  Okay.  Can you hear me?

10       A.   I hear you.

11       Q.   Okay.  So I'm assuming that you've done a

12   deposition before.

13       A.   Yes.

14       Q.   Have you done a deposition in any civil cases,

15   or this is your first one?

16       A.   This is the first one.

17       Q.   Okay.  This operates more like it does in

18   criminal cases.  The rules of evidence are the same or

19   essentially the same.  I'm going to ask you a series of

20   questions.  You are to answer them truthfully.  Can you

21   do that?

22       A.   Yes, sir.

23       Q.   I'm going to ask you a series of questions.

24   You are to answer them completely.  Can you do that?

25       A.   Yes, sir.

```
 1        Q.   Do you understand that you've just taken an

 2   oath to tell the truth?  Is there any reason why you

 3   can't tell the truth today?

 4        A.   No.

 5        Q.   Have you taken any medication in the past 24

 6   hours that would affect your ability to provide truthful

 7   and accurate testimony?

 8        A.   No.

 9        Q.   If you don't hear a question, please tell me

10   and I will repeat it.  Do you understand?

11        A.   Okay.

12        Q.   If you don't understand a question, please let

13   me know and I will try to rephrase it.  Do you

14   understand?

15        A.   Yes, sir.

16        Q.   Only one of us can speak at a time, so it's

17   important that you let me finish m y question and you'll

18   see I have a slow draw, and then you can respond once

19   I'm finished.  Can you do that?

20        A.   Yes, sir.

21        Q.   And I will try to do the same.  The court

22   reporter is going to attempt to take down everything

23   that you say, but she cannot take down non-verbal

24   communication such as head nods and uh-huh.  Do you

25   understand?
```

 1        A.   Yes, sir.

 2        Q.   So please refrain from using non-verbal

 3   communications in your responses to my questions.

 4        A.   Will do.

 5        Q.   If you need a break, just let me know and we

 6   will take a break.   It just can't be in the middle of

 7   the question.   Do you understand?

 8        A.   Yes.

 9        Q.   Do you understand that your testimony may be

10   used at trial or a summary judgment proceeding to

11   dispose of this matter?

12        A.   Yes.

13        Q.   Your attorney will object to questions asked,

14   but you have to answer unless your attorney instructs

15   you not to answer.   So, typically, it goes like this.

16   The sky is blue.   Your attorney says objection.   I need

17   an answer from you saying whether the sky is blue.   Do

18   you understand?

19        A.   I understand.

20        Q.   When I refer to incident, I am referring to

21   the incident that led to the arrest of my client, Samuel

22   Scott, Jr. on June 1, 2018.   Do you understand?

23        A.   Yes, sir.

24        Q.   And I will refer to scene, but in this case,

25   there's two different scenes.   One is the crash scene,

1    which is located in the City of Miami at approximately

2    71st Street, and the other is the scene where you found

3    my client, which is on 48th Street and Northwest 6th

4    Avenue approximately.  Do you understand?

5        A.   Correct.

6        Q.   So any time I say crash scene, I'm talking

7    about where the car was crashed, and any time I say

8    scene, I'm simply speaking of where you found my client.

9    Do you understand?

10       A.   Correct.

11       Q.   Okay.  With all the preliminary background out

12   of the way, please state your full name for the record.

13       A.   Jonathan Guzman.

14       Q.   Can you spell that, please?

15       A.   J-O-N-A-T-H-A-N, last name, G-U-Z-M-A-N.

16       Q.   And how old are you?

17       A.   Thirty-five years old.

18       Q.   What is your highest education level?

19       A.   High school.

20       Q.   Where did you attend high school?

21       A.   New York.

22       Q.   Okay.  And do you have any certificates?  Do

23   you have any licenses?

24       A.   Like reference -- no, no, not really.

25       Q.   No.  Okay.  Did you go to the academy?

```
1        A.   Yes, I did.

2        Q.   Where did you go to the academy?

3        A.   DLE.

4        Q.   What's DLE?

5        A.   Miami-Dade County.

6        Q.   Okay.  So that's different from the Miami-

7   Dade College one?

8        A.   That's the one, yes.

9        Q.   Okay.  And when did you attend the academy?

10        A.   2015.

11        Q.   Okay.  And I know they changed the time that

12   you guys have to do it.  It used to be a six-month

13   academy.

14        A.   I did part time, so I did a year.

15        Q.   Okay.  You did a year.  Okay.  And in the

16   academy, if you can recall, what were the area courses

17   that you took?

18        A.   The areas of what?

19        Q.   What did you learn in the academy in broad

20   strokes?

21        A.   Preliminary police work, criminal, and the

22   basis of a police officer.

23        Q.   Okay.  So let me see if I can break that down.

24   I know there's actual field training in the academy, but

25   regarding -- were you taught about the law --
```

1        A.    Yeah.

2        Q.    -- in some respects?

3        A.    Of course.

4        Q.    Okay.  Were you taught about how to effectuate

5   an arrest?

6        A.    More likely, yeah.

7        Q.    Were you taught about the concept of

8   investigatory detentions?

9        A.    Correct.

10        Q.    Were you taught about the difference between

11   probable cause and reasonable suspicion?

12        A.    Yes.

13        Q.    Were you taught about searches and seizures

14   generally?

15        A.    Yes.

16        Q.    Okay.  So once you went through the academy,

17   do they issue you a certificate?

18        A.    Yes.

19        Q.    Okay.  And then I'm assuming once -- actually,

20   let me not assume.  What happens after you receive your

21   certificate from the academy?

22        A.    I applied to police departments.

23        Q.    Okay.  So you applied to several police

24   departments, or did you just apply to the City of Miami?

25        A.    I applied to Miami-Dade County and the City of

1   Miami.

2         Q.   Okay.  Do you have to be certified by the

3   Florida Department of Law Enforcement before you apply,

4   or do you apply and then get certified?

5         A.   You can do both.

6         Q.   Okay.  In your case, what happened?

7         A.   In my case, I applied by academy -- after I

8   completed the academy, and then I applied to the City of

9   Miami and Miami-Dade County.

10        Q.   Okay.  And then once you got hired by the City

11  of Miami, then you apply for certification by Florida

12  Department of Law Enforcement, and from here on out,

13  I'll just say FDLE, correct?

14        A.   Correct.

15        Q.   Okay.  So before we get to the City of Miami,

16  let's talk about your work history before then.  Prior

17  to being employed by the City of Miami, what did you do

18  for work?

19        A.   Target, management.

20        Q.   Okay.  How long did you work -- oh, I forgot

21  to ask you how old are you?

22        A.   You asked me already that.  Thirty-five years

23  old.

24        Q.   Oh, did I?  You see, I'm getting old because I

25  forgot.

1           Okay.  I'm going to see if we can do a history

2    of your work -- I mean, a brief summary of your work

3    history from the time you're 18 to 35.  So we know from

4    2015 approximately to present, you've been a law

5    enforcement officer, correct?

6        A.   Correct.

7        Q.   Before City of Miami, you worked for Target,

8    and you were in management.  How long did you work for

9    management.

10       A.   For ten years.

11       Q.   Okay.  So that would take us to 25 years old

12   approximately.

13       A.   Approximate.

14       Q.   Okay.  So before Target, what did you do?

15       A.   I worked for the U.S. Open Tennis Association

16   in New York.

17       Q.   Okay.  And what was your job responsibilities

18   with the U.S. Open?

19       A.   Grounds maintenance.

20       Q.   Okay.  And then before -- and how long were

21   you with the U.S. Open?

22       A.   Since I left high school.

23       Q.   Okay.  So we got it.  So since you left high

24   school, you've only worked as a grounds -- in grounds

25   with the U.S. Open, in management with Target, and a

```
 1   police officer with the City of Miami.  Is that a
 2   correct summary of your work history?
 3        A.   That is correct.
 4        Q.   Okay.  Let's talk about once you got hired as
 5   a police officer with the City of Miami.  So were you
 6   hired as a police officer immediately, or were you in
 7   field training?
 8        A.   I mean, you have to get hired before you go to
 9   field training.
10        Q.   Okay.  What I'm trying to get at -- I think I
11   phrased it wrong -- were you placed in patrol, or were
12   you in field training?
13        A.   We have to go to field training before you go
14   to patrol.
15        Q.   Okay.  So take me through the process.  How
16   long were you in field training?
17        A.   You do four months with a field training
18   officer, and then you do the rest of that year as
19   probation on your own after those four months.
20        Q.   Okay.  So the first year, you're technically
21   on probation, correct?
22        A.   Correct.
23        Q.   Four months is spent with another officer
24   learning the field, correct?
25        A.   Correct.
```

1      Q.   And then the remaining eight months, you're on

2   your own patrolling similarly like you're regular.

3      A.   Yeah.

4      Q.   I mean, you're not really different than

5   another officer, correct?

6      A.   Correct.

7      Q.   It's just there are certain -- how would you

8   say -- employment differences, meaning some of your

9   rights are invested before the year is up.  Would that

10  be a proper summary?

11     A.   Something like that, yeah.

12     Q.   Okay.  So in your job, are you currently a

13  patrol officer, or have you been assigned any other

14  positions with the City of Miami?

15     A.   I've been in multiple units.

16     Q.   Okay.  Tell me about the units that you've

17  been with since you've been with the City of Miami.

18     A.   I've been in the problem-solving team and a

19  beat officer, which is a support officer for the --

20  office, whichever that I'm working.

21     Q.   Okay.  So you've been a patrol officer.

22  You've been a beat officer, and what other officer have

23  you been?

24     A.   It's called the problem-solving team.

25     Q.   And what does the problem-solving team do?

1       A.   Any issues the community has, we take care of,

2  whether it's narcotics, car-jackings, any issue.

3       Q.   So are you -- how is that different than a

4  detective?

5       A.   It's because you're in a marked unit and full

6  uniform.  It's, you know, you do investigative stuff.

7  You do a little bit of everything, but you're still in

8  police uniform and marked unit.

9       Q.   Okay.  And then as a beat --

10      A.   We're at the discretion of the commander.

11 What was that?

12      Q.   Oh, I'm sorry.  I'm sorry.

13      A.   No, no problem.

14      Q.   No, we're at the discretion of the commander

15 of the net.

16      A.   Okay.

17      Q.   And as a beat officer, what's your -- what's

18 the difference between a patrol officer and beat

19 officer?

20      A.   It's connecting the community with the police,

21 meetings, events, business contacts, just combining the

22 community with the police.

23      Q.   Okay.  So how long were you a patrol officer?

24      A.   I was in patrol for two years.

25      Q.   Okay.  And when were you in patrol?

1      A.    Where, you said?

2      Q.    When?

3      A.    When?  When I -- my probational year and then

4    the year after that, which was 2015, 2016, 2017.  I

5    don't know.

6      Q.    Okay.  And in 2018, what was your position?

7      A.    I was the problem-solving team for

8    (indiscernible).

9      Q.    Okay.  Besides the beat officer, the

10   problem-solving officer, and the patrol officer, are

11   there any other positions or units that you've been a

12   part of with the City of Miami?

13     A.    No.

14     Q.    Let's see.  And in your field, do you -- are

15   you obligated to take continuing education courses?

16     A.    Yeah, we take training.

17     Q.    And who offers those trainings?

18     A.    The department, Miami-Dade County.

19     Q.    Okay.  And what topics do those trainings

20   generally involve?

21     A.    It depends.  All kinds of topics.

22     Q.    Do you ever take trainings on effectuating an

23   arrest on a citizen?

24     A.    That's -- I mean, that wouldn't be a topic,

25   but since the academy and what you do on the streets

1    every day, no, that's not a training that's offered.

2         Q.   Okay.  Are you -- in your field, are you

3    updated on the changes in laws as it effects your

4    ability to arrest an individual?

5         A.   Yeah.

6         Q.   Okay.  And in -- besides the academy, have you

7    had any training or courses, formal or informal, where

8    it requires you to educate yourself on probable cause or

9    reasonable suspicion?

10        A.   No, I mean, that's what we do every day.

11        Q.   On June 1, 2018, where were you assigned?

12        A.   The problem-solving team.

13        Q.   Okay.  And how long were you on that

14   assignment on June 1, 2018?

15        A.   How long was I on that assignment?  I was

16   there for three years or so.

17        Q.   Okay.  And what were your job

18   responsibilities?

19        A.   Like I explained earlier, just any community

20   issues, narcotics, car-jacking, robbery.  Anything that

21   the community was having issues with.

22        Q.   And during the course of your employment in

23   law enforcement, have you ever been -- have you ever

24   made false statements in which you were disciplined?

25             MR. FERNANDEZ:  Form.  Go ahead.

```
 1              THE WITNESS:  No.
 2    BY MR. PIERRE:
 3         Q.   Do you use social media?
 4         A.   Do I use social media?  Yes.
 5         Q.   Yeah.  Which social media do you use?
 6         A.   Instagram, Facebook.
 7         Q.   And what is your Instagram and Facebook
 8    handles?
 9         A.   What do you mean by that?
10         Q.   Meaning, what is the name that's associated
11    with your Instagram account?
12         A.   Isn't that kind of personal?
13         Q.   No, it's not.
14         A.   All right.  My name, Jonathan Guzman.
15         Q.   Okay.  And for your Instagram account, is it
16    your name, Jonathan Guzman?
17         A.   Should be, yeah.
18         Q.   Regarding the incident or the events in this
19    lawsuit, have you provided any statements, excluding
20    statements you've given to your counsel?
21         A.   No, just to my counsel.
22         Q.   In preparation for this deposition, excluding
23    communications you have done with your counsel, what did
24    you do?
25         A.   For preparation today, just look through all
```

1    the paperwork.

2         Q.   Okay.

3         A.   A-form, pictures, body-worn camera.

4         Q.   Okay.  So who is Samuel Scott, Jr.?

5         A.   He was an offender that I arrested back in

6    2018.

7         Q.   Okay.  I'm going to ask about several people.

8    Do you know a person by the name of Michael Bloom?

9         A.   An officer with the City of Miami Police

10   Department.

11        Q.   Okay.  And how long have you known Officer

12   Michael Bloom?

13        A.   I don't know him.  He's just a coworker.  I

14   don't personally know him.

15        Q.   Have you interacted with him besides on the

16   June 1, 2018, event?

17        A.   Work-related, yeah.

18        Q.   Okay.  And is Officer Bloom known as Officer

19   Blood?

20             MR. FERNANDEZ:  Form.  Go ahead.

21             THE WITNESS:  I have no idea.

22   BY MR. PIERRE:

23        Q.   Okay.  Do you know a person by the name of

24   Brandon Williams?

25        A.   Correct.  I do.

```
 1        Q.    And how do you know Brandon Williams?

 2        A.    Coworker here in the Department, City of

 3   Miami.

 4        Q.    Okay.  Do you know a person by the name of

 5   Randy Carriel?

 6        A.    I do.

 7        Q.    And how do you know Mr. Carriel?

 8        A.    I know him from work.

 9        Q.    Is Mr. Carriel an officer?

10        A.    Yes.

11        Q.    And do you know a person by the name of Miguel

12   Hernandez?

13        A.    Yes, he's a former officer here in the City of

14   Miami.

15        Q.    Okay.  So let me ask you this generally.  Do

16   you know what this lawsuit is about?

17        A.    I mean, preliminarily about false arrests or

18   lost property.  Stuff like that.

19        Q.    Okay.  So take me back on June 1, 2018.  When

20   did you start your shift?

21        A.    I don't remember the time, but I started my

22   shift in the morning.  I don't remember exactly what

23   time.

24        Q.    And do you guys do 12-hour shifts?  Do you

25   guys do 8-hour shifts?
```

1       A.   We do 10-hour.

2       Q.   Okay.  So you start your shift approximately

3   in the morning.  Do you know what time approximately, or

4   does it change?

5       A.   Our shifts in that unit, we come in at

6   different times of the day.  It all depends on what kind

7   of job we're doing, what kind of work are we doing that

8   day.  We have a secured schedule.

9       Q.   Okay.  You started in the morning, and let's

10   see if we can fast forward towards the day.  At

11   approximately five o'clock, what were you -- where were

12   you?

13       A.   I was conducting radar at 12th Avenue and 67th

14   Street.

15       Q.   And were you in your police vehicle?

16       A.   I was in my police vehicle, yes.

17       Q.   And what was your badge number on that day?

18       A.   42843.

19       Q.   42843, correct?

20       A.   Correct.

21       Q.   Okay.  And what was your unit number on that

22   day?

23       A.   I believe if I'm not mistaken, 1191 if I'm not

24   mistaken.

25       Q.   Okay.  Were you a one-person unit or a two-

1   person unit?

2          A.   One-person unit.

3          Q.   And you were in your police vehicle.  Were you

4   in police uniform attire?

5          A.   Yes, I was.

6          Q.   Okay.  And as a problem-solving unit, this is

7   one of your roles in conducting radar, correct?

8          A.   Correct.

9          Q.   What do you do typically in that situation?

10         A.   In conducting radar?

11         Q.   Yeah.

12         A.   I just watch out for speeders, cite them.

13         Q.   Okay.  In what location were you at

14   specifically, the street and avenue?

15         A.   It's 12th Avenue and 67th Street.

16         Q.   Okay.  So while you were conducting radar, did

17   you ever have an opportunity to observe a black Jeep?

18              MR. FERNANDEZ:  Form.  Go ahead.

19              THE WITNESS:  Black Jeep what?

20   BY MR. PIERRE:

21         Q.   Oh, let me see if I can -- I want to say it's

22   a Jeep Cherokee, but it might be a Compass.  Okay.

23   There it goes.

24              In conducting your radar, did you have an

25   opportunity to observe 2007 Jeep Compass, black?

1        A.    Yes.

2        Q.    Okay.  Approximately what time did you observe

3   this?

4        A.    I can't recall the exact time.  It was too

5   long ago.

6        Q.    Okay.  Do you know if it was 5:00, if it was

7   6:00, if it was 7:00?

8        A.    I can't recall that exact time because it was

9   too long ago.

10        Q.    Okay.  Did you know at one point?

11        A.    I'm assuming at that day, I knew what time it

12   was.

13        Q.    Okay.  So you observed this 2007 black Jeep

14   Compass.  Tell us what you saw.

15        A.    I was conducting the radar.  I saw it

16   speeding.  It was coming southbound on 12th Avenue right

17   over the bridge on the right lane towards me as I was

18   parked facing the opposite direction on the median.

19        Q.    Okay.  So you were on the median?

20        A.    Yes, on the grass median behind the tree.

21        Q.    Okay.  Kind of describe that area for us.

22        A.    Describe it in which way?

23        Q.    I mean, what buildings are around?  What's the

24   intersection like?

25        A.    Liberty City Square is next to it on the left

1  side, on the east side -- on the west side.  On the east

2  side, you have housing and apartment buildings -- well,

3  actually, complexes.  They're not buildings.  It's a

4  four- lane street, avenue.  Anything else?  It's a

5  median with grass and trees.

6      Q.  Okay.  So you were on the median, grass and

7  trees, correct?

8      A.  Yes.

9      Q.  And you see this black Jeep Compass.  Which

10  direction is it going in?

11     A.  It's going south on 12th Avenue.

12     Q.  So the black Jeep Compass is going south on

13  12th Avenue.  What do you -- and I'm assuming you're

14  clocking the black Jeep Compass, correct?

15     A.  Correct.

16     Q.  And what does the clock reveal?

17     A.  I don't remember the exact speed.

18     Q.  Okay.  But you remember that it was going

19  above the speed limit.

20     A.  Yes, yes, 35 miles an hour is the speed limit

21  in that area.  He was going way above that.

22     Q.  Okay.  So was the black Jeep Compass tinted,

23  or was it clear?

24     A.  The front windshield was clear as day.

25     Q.  Okay.  So when he's coming, you can actually

1    see his face when he's going south.

2         A.   Correct.

3         Q.   Okay.  So you could see there was nothing

4    obstructing your view as to the driver of the vehicle.

5         A.   Nothing.

6         Q.   Okay.  And then -- so once you see him going

7    -- what do you see?  What does the driver look like?

8         A.   It's a heavyset, bald black male with a white

9    tank top.

10        Q.   Okay.  So is the heavyset black bald male

11   wearing glasses?

12        A.   Glasses, no.

13        Q.   Okay.  Did the heavyset black male have

14   braces?

15        A.   I couldn't see that.

16        Q.   Okay.  I just wanted to see if your vision is

17   better than mine.

18             So you see a heavyset black male.  Did he have

19   hair, or was he bald?

20        A.   Bald.

21        Q.   So once he -- once you clock him and it shows

22   that he's going above the speed limit, what do you do

23   next?

24        A.   I wait for him to pass me.  That's when I have

25   a full vision of the driver.  As he passes me next to

1   me, I make a U-turn and start heading southbound on 12th

2   Avenue behind the vehicle.

3       Q.   And is your vehicle recording any of these

4   events?

5       A.   No.

6       Q.   Do you have a dash camera?

7       A.   We do not.

8       Q.   Okay.  And on that date, were you wearing a

9   body cam?

10       A.   I was.

11       Q.   And under City of Miami Police Department

12   rules and regulations, when are you required to turn on

13   the body camera?

14       A.   Any time you make contact with a citizen.

15       Q.   Okay.  And when are you required to turn off

16   the body camera?

17       A.   Whenever you stop the incident.

18       Q.   Okay.  So at all times, once you make contact

19   with the citizen, you're supposed to have the body cam

20   on?

21       A.   Correct.

22       Q.   And then once the incident is completed, there

23   is no need for a body camera, correct?

24       A.   Correct.

25       Q.   So you make a U-turn.  What happens next?

1          A.    I continue to catch up to the vehicle, then he

2     makes a left turn on 64, if I'm not mistaken.

3          Q.    On 64th Street?

4          A.    Correct.

5          Q.    So he makes -- so the vehicle makes a left

6     turn on 64th Street.

7          A.    Correct.

8          Q.    What do you do?  Do you call for backup, or do

9     you --

10         A.    No, no, I advised my peers -- we're in a

11    separate channel.  We're in a private channel.  We're

12    not on a working channel.  I advised them of the

13    direction I'm traveling.  That's about it.

14         Q.    Okay.  So when you say we're in a separate

15    channel, can you explain that for the jury?

16         A.    We have different channels.  We have the

17    primary channels, and then we have our specialized unit

18    channels.

19         Q.    Okay.  So your specialized unit channel would

20    receive communications that, for example, the patrol

21    wouldn't receive.  Is that a correct assessment?

22         A.    Correct, yeah.  I mean, we usually have two

23    radios, and we monitor both channels, but we only speak

24    on our private channel.

25         Q.    Okay.  And are you monitoring what's going on

1    in the primary channel, which I'm assuming is the

2    general --

3         A.   I mean, we have radio per unit.  I don't know

4    if I had that radio or the sergeant had the radio off,

5    but usually, one of the members of the unit, including

6    the sergeant, will have the secondary radio.

7              MR. FERNANDEZ:  Just wait for him to ask his

8         question.

9    BY MR. PIERRE:

10        Q.   So this black Jeep Compass with a heavyset

11   black male with a bald head wearing a white tank top

12   makes a left on 64th Street.  What do you do next?

13        A.   I continue to follow the vehicle.

14        Q.   Do you turn on your lights at any point?

15        A.   Yes.

16        Q.   Okay.  So you turn on your lights, and in

17   response to turning on your lights, does the vehicle

18   slow down?  Does it go faster?  What's happening?

19        A.   It takes -- you know, faster.

20        Q.   Okay.  So the black Jeep Compass vehicle picks

21   up speed, and what happens next?

22        A.   I continue to follow it.

23        Q.   So is this like -- what I'm trying to get at

24   is this is a high-speed car chase at this point?

25        A.   High speed?  I mean, I don't know how you want

1   to call it high speed, but I mean, yeah, I guess it was

2   a chase.

3        Q.   Okay.

4        A.   He was fleeing from police.

5        Q.   Okay.  And then do you call for backup at any

6   point?

7        A.   Yes, my team was notified, obviously, of what

8   I was doing, so they were driving towards my direction.

9        Q.   Okay.  And who is on your team on June 1,

10  2018?

11       A.   Brandon Williams, Officer Carriel.  I'm not

12  sure if there was any other team member at that time and

13  Sergeant Sampson.

14       Q.   Okay.  And is Brandon Williams known as Batman

15  in the force?

16            MR. FERNANDEZ:  Form.

17            THE WITNESS:  I mean, I wouldn't know.  I

18       don't know him personally.  I know him.

19  BY MR. PIERRE:

20       Q.   Okay.  I just wanted to know if that's what he

21  was known as.

22            So is there any other officers pursuing this

23  black Jeep Compass on 64th Street besides yourself?

24       A.   No, just myself.

25       Q.   Okay.  So what happens after he picks up

1   speed?

2       A.   He continues traveling northbound on 10th

3   Avenue.

4       Q.   So he hasn't made a left or right.  He's still

5   going --

6       A.   No, he made a left on 64, and then on 10th

7   Avenue, he makes another left going northbound.

8       Q.   Okay.  So on 10th Avenue, he makes a left

9   going northbound, correct?

10      A.   Correct.

11      Q.   Okay.  And how long is he on 10th Avenue?

12      A.   All the way to 71st Street.

13      Q.   So he's still driving at a steady rate of

14  speed that's above the speed limit, and he gets to 71st

15  Street, meaning the vehicle.

16          MR. FERNANDEZ:  Form.  Go ahead.

17          THE WITNESS:  Correct.

18  BY MR. PIERRE:

19      Q.   Right.  And your counsel said form, so I

20  recognize what was the mistake, so I'll re-ask the

21  question.

22          Did the vehicle, after making a left turn on

23  10th Avenue, continue picking up speed as it got to 71st

24  Street?

25      A.   I believe so.  I mean, I wasn't looking at the

1    meter.  I mean, I was just following the vehicle, and he

2    wasn't stopping by my lights and siren.

3         Q.   And does your vehicle have a tracking system,

4    meaning --

5         A.   Not at that time.

6         Q.   Okay.  So at that time, your vehicle did not

7    have a tracking system.

8         A.   Not at the time, no.

9         Q.   Okay.  And at that time, did your vehicle have

10   a -- I know buses have this where it gauges or records

11   the rate of speed that the vehicle was going.  Did it

12   have any sort of mechanism or equipment that would do

13   such a thing?

14        A.   I wouldn't know that.

15        Q.   Okay.  So you -- and how far are you behind

16   this 2007 black Jeep Compass?

17        A.   About half a block away.

18        Q.   Okay.  And then once the vehicle gets to 71st

19   Street, what happens?

20        A.   It makes a right turn going eastbound on 71st.

21        Q.   So he makes a right turn going eastbound on

22   71st Street.  What do you do in response?

23        A.   I do the same.

24        Q.   Okay.  And how long are you guys on 71st

25   Street?

```
 1        A.    Seconds.

 2        Q.    Okay.  So what happens on 71st Street?

 3        A.    He makes a right turn.

 4        Q.    And then does he stay on 71st Street, or he

 5   makes another --

 6        A.    He goes east.

 7        Q.    Okay.  All right.  That's what I'm trying to

 8   get at.  So he makes -- he goes east on 71st Street for

 9   how long?  Seconds?

10        A.    What was that?  He keeps driving what?

11        Q.    He goes east on 71st Street for how long?

12        A.    Right.

13        Q.    A few seconds?

14        A.    He keeps driving all the way to 54, 5 Place,

15   whatever that street is -- Avenue.

16        Q.    Okay.  Okay.  So somewhere approximately on

17   Northwest 5th Avenue, this individual goes east on 71st

18   Street.  Does he make a left on that avenue or right on

19   that avenue?

20        A.    He makes a left on 5 Place or 5 Avenue,

21   whatever that avenue is.

22        Q.    Okay.  So he makes a left on, we'll just call

23   it Avenue --

24        A.    5 Avenue.

25        Q.    -- yeah, for the sake of -- I know what you
```

1    mean.  It's not a street.

2         A.   Got you.

3         Q.   So he makes a left on that avenue.  What

4    happens next?

5         A.   I make a left behind him, and then I see the

6    car crashed into a F-150 burgundy in color.

7         Q.   Okay.  So you make a -- so he -- how does the

8    crash occur?

9         A.   I don't know.  When I make the left turn, I

10   observe the vehicle already crashed.

11        Q.   Okay.  And was someone else in the burgundy

12   car?

13        A.   No.  According to the statement of the body

14   shop where it was, there was nobody inside the vehicle.

15        Q.   Okay.  So what I'm asking is not what the body

16   shop stated but what you actually saw.  Did you see

17   anyone in the --

18        A.   Correct.  There was nobody inside the vehicle.

19        Q.   Okay.  So there's a -- so the vehicle crashes.

20   Did the crash occur before you got there?

21        A.   Yes.

22        Q.   Okay.  And at the time of the crash, was the

23   black heavyset male with a white tank top already -- had

24   he already exited the vehicle?

25        A.   He was exiting the vehicle when I made the

1   left turn.

2        Q.   So he was exiting the vehicle as you made the

3   left turn.  And what did you -- what did you see?

4        A.   Same thing, heavyset black male, bald head,

5   wearing a white tank top.

6        Q.   Okay.  What direction was that individual

7   going?

8        A.   He was traveling, that would be west.

9        Q.   He was traveling west.  What did you do in

10  response to him traveling west?

11       A.   I started to run towards him.  I mean,

12  obviously, I had to put my car in park and started to

13  run towards him.

14       Q.   And what did you -- so, now, we're no longer

15  in a car chase.  We're on a foot chase.

16       A.   For a short period of time, yes, because I

17  lose visual of him.

18       Q.   Okay.  So he's running.  I mean, he's running

19  westward, and you're running after him westward.

20       A.   Correct.

21       Q.   Okay.  Do you tell him to stop?

22       A.   Yeah.  Well, I mean, I don't know if he heard

23  me or not, but yes, I said stop and he ran northbound

24  under the I-95, and that's where I lost visual.

25       Q.   Okay.  So he starts running northbound under

1    I-95, and we're on 71st Street.

2         A.   Yes, 71st Street somewhere between 5th Avenue

3    and 5 Avenue.

4         Q.   Okay.  So the last time you see him, he's

5    running northbound under the I-95 bridge on 71st Street,

6    correct?

7         A.   Correct.

8         Q.   Okay.  And how long were you running after

9    him?

10        A.   Seconds.

11        Q.   Okay.  How fast was this individual?

12        A.   Not too fast.  He just had a distance on me

13   because I wasn't right behind him when he crashed.

14        Q.   Okay.  So I'm trying to place it.  When he

15   crashed, how far was he?

16             MR. FERNANDEZ:  Form.  Go ahead.

17             THE WITNESS:  How far was he from where?

18   BY MR. PIERRE:

19        Q.   From you.

20        A.   I wouldn't -- I mean, a distance.  I was not

21   behind him when he crashed.

22        Q.   Okay.  Do you play football or play --

23        A.   I do.

24        Q.   And I'm not talking about soccer.

25        A.   Well, I do play soccer, but I play --

 1      Q.   Okay.  That's great because I love soccer.  So

 2  in American football, if we had to approximate from the

 3  time you got out of your vehicle to the distance he was

 4  from you, how much would you say --

 5      A.   About 20 yards.

 6      Q.   Okay.  So he's about 20 yards ahead.

 7      A.   Yeah.

 8      Q.   And you see him.  At this point, I'm thinking

 9  you're seeing his back because he's not running towards

10  you, correct?

11      A.   Correct, correct.

12      Q.   So you see this heavyset black male with a

13  bald head around six foot two?

14      A.   I can't tell you how tall he was.

15      Q.   Okay.  What color jeans was he wearing?

16      A.   I believe they were black in color or dark.

17      Q.   Okay.  So he had about 20 yards ahead of you,

18  then you start to run after him, correct?

19      A.   Correct.

20      Q.   And then you lose him as he goes northbound on

21  71st Street beneath the I-95 bridge.

22      A.   Correct.

23      Q.   Okay.  Were there any other officers that were

24  present that you knew of --

25      A.   No.

1     Q.   -- during the car chase and the foot chase?

2     A.   No, just myself.

3     Q.   Okay.  This may be a stupid question.  I'm

4     known to ask them.  Why didn't you keep running after

5     him?

6     A.   Because I didn't have any visual.  I didn't

7     know where he ran to.

8     Q.   Okay.  So speaking about visual, on June 1,

9     2018, what was your vision?

10    A.   20/20, I guess.

11    Q.   Okay.  And prior to that, when was the last

12    time you had your vision checked?

13    A.   We do it every year per the department.

14    Q.   Okay.  So the department keeps your vision

15    records.

16    A.   I am assuming.  I hope so.

17    Q.   Okay.  So have you ever had any issues with

18    vision?

19    A.   Yeah, I had eye surgery.

20    Q.   When did you have eye surgery?

21    A.   When I was 18 years old.

22    Q.   And was it corrective?  What was the form of

23    the surgery?

24    A.   Corrective.

25    Q.   So you could still see.  It wasn't like it was

1    a necessary surgery.

2         A.    Yeah, I couldn't see from far, so that's why I

3    got the eye surgery.

4         Q.    Okay.  And was it Lasik or if you can explain

5    it?

6         A.    Lasik.

7         Q.    So that's when you were 18 years old.

8         A.    Correct.

9         Q.    So besides the surgery that you did at 18

10   years old, were there anything you did medically to

11   repair your vision?

12        A.    No.

13        Q.    Okay.  So in June 1, 2018, you had 20/20

14   vision.

15        A.    Yeah.

16        Q.    Are you color blind by chance?

17        A.    No, no.

18        Q.    So, now, we're at the point of the story where

19   you essentially have lost this heavyset black male with

20   a white tank top, correct?

21        A.    Correct.

22        Q.    So what happens next?

23        A.    I set up perimeter.

24        Q.    And how do you set up the perimeter?

25        A.    7th Avenue to 5th Avenue from 71 to 75.

1       Q.    Okay.  7th Avenue to 71 to 6th Avenue to 75,

2   correct?

3       A.    Correct.

4       Q.    Why did you choose that perimeter?

5       A.    Because that was the last are that I observed

6   him running towards.

7       Q.    Okay.  And did you have other officers assist

8   you in setting up that perimeter?

9       A.    Yeah.  Now, we went to the working channel,

10  and we had advised of that perimeter.

11      Q.    Okay.  And who were the other officers that

12  were assisting you with that perimeter?

13      A.    I have no idea.  They were patrol officers.

14      Q.    Okay.  So you set up this perimeter, and just

15  for the jury, what is a perimeter?

16      A.    It's the coordinates of where an individual

17  may be inside of that box.

18      Q.    Okay.  And why didn't you set up the perimeter

19  for a larger location?

20      A.    Because there was no other way that he could

21  have gotten out through 75 Street because it's under I-

22  95.  The only way out was through 75 Street.

23      Q.    Okay.  So you set up this perimeter.  What do

24  you do next?

25      A.    That's it.  I stand by where the scene is, the

1    crash scene, and then it was traffic-related, so we just

2    dismantled the perimeter after we weren't able to locate

3    anybody.

4        Q.   How long was the perimeter intact?

5        A.   Fifteen minutes maybe.

6        Q.   Okay.  So you couldn't find anyone within 15

7    minutes, so you shut down that perimeter.

8        A.   Well, that wasn't my directive.  It was my

9    sergeants.  Not mine.

10       Q.   Okay.  What do you do next after the perimeter

11   is shut down?

12       A.   I continue to -- I start searching the

13   vehicle.

14       Q.   Okay.  And when you searched the vehicle, I'm

15   assuming it's in the crash, correct?

16       A.   Correct.  The crashed vehicle.

17       Q.   Okay.  So we're on the crash scene.  You start

18   investigating the vehicle.  What do you see?

19       A.   I find the cannabis in the center console, a

20   firearm, and then some ammo in the trunk.

21       Q.   Okay.  So let me get that straight.  You said

22   you found some cannabis in the center console, a

23   firearm.  Where is that located?

24       A.   I believe on the floor, passenger side, I

25   believe, or driver's area.

 1          Q.   Okay.  And then you saw ammo in the trunk.

 2          A.   Correct.

 3          Q.   And when you find this ammo, how many --

 4     strike that.

 5               When you see the vehicle, is it disheveled?

 6          A.   You mean the crash?

 7          Q.   Yeah, the crashed vehicle.

 8          A.   Yeah, the front -- it has front damage.

 9          Q.   Okay.  No, I mean, inside the vehicle.  Is

10     like everything kind of out of place?

11          A.   Yes.  No, I mean, the front was fine.  The

12     back was just full of stuff like random.

13          Q.   So the vehicle is crashed up front, correct?

14          A.   Correct.

15          Q.   And you're saying the back, there was just a

16     lot of stuff in there, the backseat?

17          A.   No, the trunk.

18          Q.   The trunk.  Okay.  So the trunk, there was a

19     lot of stuff in there.

20          A.   Yes.

21          Q.   Okay.  And then the actual seating areas,

22     everything was fine.

23          A.   Yeah, I don't see anything out of the

24     ordinary.

25          Q.   So even though it was in a crash, there was

1    nothing that was out of place.

2              MR. FERNANDEZ:  Form.

3              THE WITNESS:  I mean, nothing out of the

4         ordinary.

5    BY MR. PIERRE:

6         Q.   Okay.  Did you take any pictures?

7         A.   I didn't, no.

8         Q.   Okay.  Did you turn on your body cam?

9         A.   Not at the crash scene, no.

10        Q.   Okay.  Prior to exiting your vehicle, did you

11   turn on your body cam footage for chasing this heavyset

12   black male with a white tank top?

13        A.   No.

14        Q.   Okay.  And why didn't you?

15        A.   The heat of the moment.  I just got out of the

16   car real quick and tried to catch up to him.

17        Q.   Okay.  So what's the protocol when a crash

18   happens?

19        A.   What do you mean the protocol?

20        Q.   Meaning what do you do after someone is

21   engaged in a crash and the vehicle has to be -- I'm

22   assuming it's no longer operable.  What do you do in

23   that situation?

24        A.   We have to searching it to towing it.

25        Q.   Okay.  And did you conduct that search?

1        A.    What was that?

2        Q.    Did you conduct that search?

3        A.    Correct.  That's where I found those items.

4        Q.    Okay.  And in the item, did you see or find

5   Mr. Scott's work ID?

6        A.    I believe they was inside the car, yes.

7        Q.    Okay.  So you had an image of Mr. Scott from

8   the work ID, correct?

9        A.    Correct.

10       Q.    Okay.  Then after you conduct your inventory,

11  what did you do next?

12       A.    As I'm conducting the inventory, I hear over

13  the radio the same exact vehicle that I'm searching

14  being reported stolen.

15       Q.    Okay.  And who's making that report?

16       A.    At that moment, I didn't know who it was.  I

17  just heard the BOLO out for that vehicle.

18       Q.    Okay.  And was that on the general channel, or

19  was that on the private channel?

20       A.    On the general channel.

21       Q.    Okay.  So someone has called in their vehicle

22  being stolen, correct?

23       A.    I'm assuming, yes.

24       Q.    And you are searching a vehicle that matches

25  the description that was called in as a stolen vehicle.

 1        A.    Correct.

 2        Q.    And what do you do upon receiving this

 3   notification?

 4        A.    I tell my sergeant that I'm going to go to

 5   that location and take a look at whoever is reporting

 6   that stolen vehicle.

 7        Q.    Okay.  We keep talking about your sergeant,

 8   but I haven't gotten his name or her name.

 9        A.    I did.  I mentioned it earlier, Sergeant

10   Sampson.

11        Q.    Sergeant Sampson.  And what's Sergeant

12   Sampson's first name?

13             MR. FERNANDEZ:  If you recall.

14             THE WITNESS:  I don't recall.  I should.

15   BY MR. PIERRE:

16        Q.    That's fine.  Do you still work with Sergeant

17   Sampson because if you do, that might be an issue?

18        A.    Yeah, but no, I haven't worked with him for a

19   couple years.

20        Q.    Okay.  Okay.  So you notified Sergeant Sampson

21   that you're going to head to the scene.

22        A.    Yes, I told him I was going to go to the other

23   scene.

24        Q.    Okay.  So you leave the crash scene to go to

25   the scene, and how long does it take you by car to get

 1  there?

 2      A.   Five minutes maybe.

 3      Q.   Okay.

 4      A.   Around 5:41 and the other incident is on 548.

 5  Not even.  Less than five minutes.

 6      Q.   Okay.  So how long were you on the crash scene

 7  from the time you exited until the time that you left

 8  for the scene where you found my client?

 9      A.   Thirty minutes.

10      Q.   Okay.  So you were approximately 20 minutes to

11  30 minutes at the crash scene, correct?

12      A.   About.

13      Q.   So you arrive at the scene and who's present?

14      A.   Officer Bloom is, Officer Hernandez, his

15  trainee, and Mr. Scott.

16      Q.   Okay.  And who is this trainee?

17      A.   I think her last name is Carriel.

18      Q.   Okay.  And is she married to Mr. Carriel,

19  Randy Carriel, Officer Carriel?

20      A.   I believe so, yeah.

21      Q.   Okay.  So you get there.  There is --

22      A.   What was that?

23      Q.   I'm trying to --

24      A.   Oh, sorry.

25      Q.   -- rephrase your question.  So you arrive at

1    the scene where my client is located, which is on 48th

2    Street and Northwest 6th Avenue approximately, correct?

3         A.   Correct.

4         Q.   And the individuals that you see present on

5    the scene are Officer Bloom, correct?

6         A.   Yes.

7         Q.   Officer Randy Carriel, correct?

8         A.   Correct.

9         Q.   Officer Miguel Hernandez, correct?

10        A.   Correct.

11        Q.   And then there's a field training officer by

12   the name of -- I don't know her last name.  I mean, I

13   don't know her first name, but by the name of Carriel.

14        A.   Correct.

15        Q.   Okay.  And then there's also yourself.

16        A.   Correct.

17        Q.   Okay.  At any point prior to arriving on the

18   scene, did you communicate with any of the officers who

19   were at the scene?

20        A.   At the scene, no.

21        Q.   Okay.  So you went there.  You didn't make any

22   phone calls.  You didn't send any text messages or

23   emails to any of the officers.

24        A.   No.

25        Q.   So you arrive on the scene, and what's the

1   first thing you do?

2        A.   I observed Defendant, and I immediately

3   recognized him.

4        Q.   Okay.  You immediately recognized him, and

5   when you say immediately recognized him, what do you

6   mean by that?

7        A.   He matched the description of the male that

8   was driving the Jeep Compass that drove next to me.

9        Q.   Okay.  From the individual who was -- that you

10   allege was driving in the Jeep Compass, what's the

11   closest distance that you were near that individual?

12           MR. FERNANDEZ:  Form.  Go ahead.

13           THE WITNESS:  Ten feet when he drove by me.

14   BY MR. PIERRE:

15        Q.   Okay.  So ten feet is the closet that you were

16   near him when he drove by you.

17        A.   Yeah, about.

18        Q.   And he was going at approximately 50 miles as

19   he drove by you?

20        A.   I don't recall the speed, but yes.

21        Q.   Okay.  So you see this guy from at any point

22   is ten feet -- the closest he is from you is about ten

23   feet away.  He's driving past you at about 50 miles per

24   hour, and once you get on the scene, meaning where my

25   client is, you say that's the heavyset black man who was

1   wearing a white tank top that I was chasing after,

2   correct?

3        A.   Let me -- I mean, I don't know if I can do

4   this, but let me clarify a little bit.

5        Q.   Okay.

6        A.   You said the closest was ten feet, but

7   remember, the vehicle is driving towards me, okay?  So I

8   have a visual of 30, 20, 15, 10 feet, and then he passes

9   me.  So I looked at him for a long period of time as he

10  was driving towards me just so the jury can have a

11  visual of what I saw, right?

12       So it wasn't like I saw him ten feet away and

13  then he disappeared.  No.  I looked at him coming,

14  driving southbound on 12th Avenue towards my direction

15  on the same side because I'm parked facing north.  So

16  I'm facing him directly.  So he's driving within 30, 20,

17  25, 15, 10 feet, and then he passes me.

18       Q.   Okay.  What I'm getting at is, and thank you

19  for the clarification, you would agree with me it's

20  harder to determine details from farther away, correct?

21            MR. FERNANDEZ:  Form.

22            THE WITNESS:  But he wasn't farther away.

23            MS. WYDLER:  Join.

24            THE WITNESS:  He was closer to me.

25  BY MR. PIERRE:

```
 1       Q.   I understand that, but follow me, Officer.  If

 2  someone is 30 feet away, is it easier to identify the

 3  details that, that person is 10 feet away or 30 feet

 4  away?

 5            MR. FERNANDEZ:  Object to the form.

 6            MS. WYDLER:  Objection, form.

 7  BY MR. PIERRE:

 8       Q.   I'll rephrase it because I think this is an

 9  important question.

10            Is it easier to determine the physical

11  features of an individual if they're 10 feet away or 30

12  feet away?

13            MR. FERNANDEZ:  Object to the form.

14            MS. WYDLER:  Form.

15            THE WITNESS:  So he's getting closer.  Not

16       further.  So the image gets better as he gets

17       closer.  I'm not an eye doctor, but if he's getting

18       closer towards me, his image is getting clearer and

19       clearer until he passes me.

20  BY MR. PIERRE:

21       Q.   Okay.  And I necessarily agree with you.  What

22  I'm saying is your best view of this individual was ten

23  feet away going at 50 miles per hour, correct?

24            MR. FERNANDEZ:  Form.

25            THE WITNESS:  I mean, I'm repeating -- I'm
```

```
1          answering the same question.  Do you want me to

2          give the same answer?

3    BY MR. PIERRE:

4          Q.   I --

5          A.   Okay.  I mean --

6          Q.   My questioning calls for a yes or no.

7          A.   -- again, he's getting closer -- he's getting

8    closer to me and the distance that he comes closer to me

9    is somewhere between ten feet because he drove by me.

10         Q.   And what I'm asking, at that ten feet, was

11   that your best view of him while he's going 50 miles per

12   hour?

13         A.   Yes.

14         Q.   Okay.  So based off of that view, you stated

15   that this individual was the same individual that you

16   saw at the scene where you found my client.

17              MR. FERNANDEZ:  Form.  Go ahead.

18              THE WITNESS:  Yes.

19              MS. WYDLER:  Join.

20              Madam Court Reporter, are you getting Mr.

21         Fernandez's objections because he's not mic'd up?

22              THE REPORTER:  Yes, I am.

23              MR. PIERRE:  I can hear him.

24              MS. WYDLER:  Okay.  Just making sure.  Okay.

25              MR. PIERRE:  Yeah, I can hear him clearly.
```

1       Brandon likes to object.

2  BY MR. PIERRE:

3       Q.   Okay.  Let's get back to the scene.  You

4  arrive at the scene.  You see Officer Carriel, field

5  training Officer Carriel, retired -- wasn't retired at

6  the point, but Officer Hernandez, and you see Officer

7  Bloom.

8            Do you speak with any of the officers when you

9  arrive there?

10      A.   After, yes.  I mean, I go straight to Bloom to

11  make sure that our stolen affidavit was completed.

12      Q.   Okay.  How did you know that the stolen

13  affidavit was going to be completed?

14      A.   Because that's a procedure when you report a

15  stolen vehicle.

16      Q.   Okay.  And did you see this stolen affidavit?

17      A.   Correct, yes.  Officer Bloom had it in his

18  hand.

19      Q.   In who's custody was the stolen affidavit?

20  Did it ever transfer custody from Officer Bloom to

21  yourself?

22      A.   No, because he completed that report so he had

23  to submit that.

24      Q.   Okay.  So Officer Bloom completed the report,

25  and he submitted the paperwork.

1    A.   Correct.

2    Q.   Okay.  And then you reviewed the stolen

3  affidavit.

4    A.   On scene.

5    Q.   On scene.  And what did it say?

6    A.   I just looked, made sure that everything was

7  completed.  I didn't read it exactly word by word, but I

8  just made sure that it was dated, the vehicle

9  information was on it, and that it was signed.

10    Q.   And when did you conclude that it was my

11  client who stole his own vehicle?

12         MR. FERNANDEZ:  Object to form.

13         MS. WYDLER:  Join.

14         THE WITNESS:  I just ID'd the offender.

15    That's all I did.

16  BY MR. PIERRE:

17    Q.   Okay.  But you -- what I'm getting at is --

18  wait.  I will let you walk us through, but when did you

19  conclude that there was probable cause to arrest my

20  client?

21    A.   Because he just fled from me, and then he's

22  falsifying a police report.

23    Q.   So you saw this heavyset black male wearing a

24  white tank top on the scene?

25    A.   Yeah.

1          Q.   And you said that's the guy.

2          A.   Yeah.

3          Q.   And as soon as you exited your vehicle or once

4     you got closer to him?

5          A.   I mean, once I walked up to the scene and he

6     was there.

7          Q.   Okay.  Okay.  Did you talk to my client to get

8     an ID -- did you talk to my client?

9          A.   Yeah, at the scene, yes.

10         Q.   Because I know you spoke to Officer Bloom

11    first, right?

12         A.   Correct.

13         Q.   All right.  So what did you -- when did you

14    decide to speak to my client to get maybe his side of

15    the story?

16              MS. WYDLER:  Objection, form.

17              THE WITNESS:  When I was about to --

18              MS. WYDLER:  Go ahead.

19              THE WITNESS:  When I was going to read him

20         Miranda, he decided to just talk.  He didn't even

21         give me the opportunity to read him Miranda.

22    BY MR. PIERRE:

23         Q.   Yeah.  And as you know, this case is not about

24    the Miranda, so my client -- after you get the stolen

25    vehicle affidavit from Officer Bloom, prior to going to

1    my client, do you notify Officer Bloom, here's our guy?

2         A.   I didn't.

3         Q.   Okay.

4         A.   I mean, that was irrelevant to Officer Bloom.

5         Q.   So why did you need the stolen affidavit?

6         A.   Because he was reporting a stolen vehicle.

7         Q.   Okay.  So you didn't need to know that he

8    actually reported the stolen vehicle?

9         A.   Yeah, that's falsifying a report.  If I just

10   saw you in the vehicle, crashed, fled from me, and now,

11   you report it stolen, that's falsifying a report.

12        Q.   Okay.  So you simply needed Officer Bloom's

13   stolen affidavit to give you a basis to support your

14   falsifying the report charge?

15            MR. FERNANDEZ:  Object to the form.

16            MS. WYDLER:  Join.

17            THE WITNESS:  I mean, to charge him with that,

18        yes.  I wouldn't have to charge him with falsifying

19        a report if he wouldn't have done -- if he wouldn't

20        try to report his vehicle was stolen.

21   BY MR. PIERRE:

22        Q.   Okay.  So you -- did you let anyone else on

23   the scene know, meaning, Officer Carriel or Officer

24   Hernandez or even the field training officer Carriel,

25   that this was the guy who ran away from the scene on

1   71st Street?

2        A.   Officer Carriel was the only one I spoke to.

3        Q.   Okay.

4        A.   Because he was with me at the scene of 71st

5   Street.

6        Q.   And did Officer Carriel ever see this guy who

7   was in my client's vehicle?

8        A.   Can you repeat that?

9        Q.   Yeah.  Did Officer Carriel -- if you know, if

10  Officer Carriel ever saw the individual who fled the

11  crash scene?

12            MR. FERNANDEZ:  Object to form.

13            THE WITNESS:  Before the scene on 6 and 4?

14  BY MR. PIERRE:

15       Q.   Say that again.

16       A.   I just don't understand your question.

17       Q.   Okay.  So what I'm saying is before you guys

18  get to the -- where my client is --

19       A.   Okay.

20       Q.   -- did Officer Carriel see the individual who

21  fled the crash scene?

22       A.   No, he was never -- Carriel got there way

23  after the incident.

24       Q.   Okay.  And you said you spoke to him before

25  you got to the scene where you saw my client.

```
 1        A.    Yeah, because he was at the scene of the

 2   crash, so we spoke there, yes.

 3        Q.    And what did you tell him?

 4        A.    What did I tell him?  Nothing.  I told him

 5   what was going on with the incident.

 6        Q.    Okay.  So you saw -- we are now at the point

 7   where you get the stolen affidavit and then you -- I

 8   think you approach my client, correct?

 9        A.    I mean, I do other stuff, but yes, I contact

10   my sergeant.  I speak to Bloom, and then I speak to your

11   client.

12        Q.    Right.  And why did you contact the sergeant?

13        A.    Because I had to inform him with what I found

14   at my scene because he was at the other scene.

15        Q.    Okay.  And what did you tell him?

16        A.    What I had, the completed stolen affidavit,

17   the driver matches -- the person reporting the stolen

18   vehicle matches my driver.

19        Q.    Okay.  And then after you informed your

20   sergeant, is that when you speak to my client, or do you

21   do something else?

22        A.    No, I talked to your client after that, or I

23   proceed to put him in handcuffs, and then I talk to him.

24        Q.    Okay.  So you proceed to put him in handcuffs.

25   Do you ask him his side of the story before you do that?
```

```
 1              MR. FERNANDEZ:  Object to form.
 2              THE WITNESS:  No.  I mean, he was detained,
 3          and then I was going to read him Miranda, like I
 4          said earlier, and he just started talking.
 5     BY MR. PIERRE:
 6          Q.   I got it.  And what did he start saying to
 7     you?
 8          A.   That he was in a previous location.  He was at
 9     work, that he was with his kids, multiple things that
10     did not match.  He didn't give me a specific answer of
11     where he was before.
12          Q.   Okay.  So let's see.  And then you say -- do
13     you do anything afterwards, basically saying, hey,
14     you've got the wrong guy?  Did he ever tell you that?
15          A.   Yes, he kept saying that.
16          Q.   Okay.  And what was your thoughts as he said
17     you've got the wrong guy?
18          A.   My thoughts?
19              MR. FERNANDEZ:  Object to form.
20     BY MR. PIERRE:
21          Q.   Yeah.
22          A.   I mean, I don't think -- I mean, I don't go on
23     my thoughts.  I go on my evidence.
24          Q.   And your evidence at this point is you had a
25     heavyset black male wearing a white tank top.
```

1        A.   And he couldn't --

2             MS. WYDLER:  Objection, form.

3             THE WITNESS:  He couldn't dispel my alarm of

4        where he was before.  If he would have been concise

5        and given me a place, time, or a witness or

6        somewhere.  I think I asked him like twice who were

7        you with, and he couldn't give me that answer.

8   BY MR. PIERRE:

9        Q.   Okay.  So he didn't tell you he was with his

10  kids?

11       A.   That's the only thing he was saying.  He was

12  with his kids, but I was asking him who -- because he

13  said aunt or something.  Can we get in contact with your

14  aunt?  He never gave me any information.

15       Q.   Did he ever tell you that he was -- you guys

16  were directly in front of his aunt's house?

17       A.   He said that, but nobody came out.  He didn't

18  call nobody.  He didn't point to nobody.  Again, I

19  needed somebody to tell me yes, he was -- I didn't have

20  no witness to collaborate with his statement.

21       Q.   And did you guys ever decide to knock on the

22  aunt's door?

23       A.   He didn't give me an address.

24            MR. FERNANDEZ:  Wait for him to finish his

25       question.

```
 1            Sorry, Faudlin.  Go ahead.

 2            MR. PIERRE:  No, no worries.

 3  BY MR. PIERRE:

 4       Q.   So did you guys ever decide to knock on the

 5  aunt's door?

 6       A.   He didn't give me an address of where she

 7  lived.

 8       Q.   So did you at any point instruct Hernandez and

 9  Bloom to search Mr. Scott?

10            MS. WYDLER:  Form.

11            THE WITNESS:  I believe Officer Hernandez just

12       started searching him without me telling him so,

13       and I told him to stop.

14  BY MR. PIERRE:

15       Q.   Okay.  So Officer Hernandez -- before you

16  actually said, hey, you're under arrest, Officer

17  Hernandez began searching him.

18       A.   I don't know if he was searching him --

19            MR. FERNANDEZ:  Object to form.

20            MS. WYDLER:  Join.

21            THE WITNESS:  -- or patting him down, but I

22       told him to stop because he was detained, so I

23       didn't want nobody else but me dictating what was

24       going on.

25  BY MR. PIERRE:
```

1      Q.   Okay.  Okay.  So did you discuss with Officer

2   Hernandez prior to him searching, patting him down what

3   was going on?

4      A.   No.

5           MS. WYDLER:  Objection, form.

6   BY MR. PIERRE:

7      Q.   So Officer Hernandez decided on his own

8   initiative to conduct his search of my client, Mr.

9   Scott?

10          MR. FERNANDEZ:  Object --

11          MS. WYDLER:  Objection, form.

12          THE WITNESS:  Yes.

13   BY MR. PIERRE:

14      Q.   So you didn't tell Officer Hernandez stop,

15   correct, of the search?

16          MS. WYDLER:  Form.

17          THE WITNESS:  I did -- what did you just ask

18      me?  If I told him to search him?

19   BY MR. PIERRE:

20      Q.   No, no, no, no.  I know you told -- and

21   correct me if I'm wrong -- based off of your prior

22   testimony, you told him to stop the search because you

23   didn't want anyone else to dictate the situation.

24      A.   I didn't tell him that.

25          MR. FERNANDEZ:  Wait for him to finish the

1      question.

2   BY MR. PIERRE:

3      Q.   Okay.  So, now, I'm all confused, so please

4   clarify for me.

5           Did Officer Hernandez search without your

6   authority or your direction?

7           MS. WYDLER:  Objection, form.

8           MR. FERNANDEZ:  Form.

9           THE WITNESS:  I didn't tell him to search or

10          pat anybody down.  He started patting him down.

11          That's when I told him to stop, that he was

12          detained for the time being.

13  BY MR. PIERRE:

14     Q.   Okay.  So thank you for that clarification

15  because that's what I heard.  I don't think I actually

16  said it as eloquently as you did.

17          So you tell Officer Hernandez stop.  What

18  happens next?

19     A.   Again, I contacted my sergeant to verify

20  everything I had, then I placed Defendant in custody.  I

21  went to read Miranda.  He, again, we had the

22  conversation and he was trying to tell me where he was

23  before.  He couldn't dispel that for me.  He couldn't

24  tell me a specific address, specific person, and then he

25  was transported to the north station, City of Miami

1    Police Officer Station.

2         Q.   Okay.  And you -- at this point, you were an

3    officer for three years, correct?

4         A.   Three or four, yeah.  Around there.

5         Q.   Okay.  And in your experience as an officer

6    for three years, what was suspicious about Mr. Scott

7    that led you to believe he was involved in criminal

8    activity?

9              MR. FERNANDEZ:  Object to form.

10             MS. WYDLER:  Form.

11             THE WITNESS:  I mean, I ID'd him as I visually

12        saw him committing a crime.

13   BY MR. PIERRE:

14        Q.   So you visually saw Mr. Scott committing a

15   crime.  That's your testimony?

16        A.   Correct.  I mean, he was speeding.  He was

17   fleeing from me.  He crashed and left the scene of a

18   crash, and then he attempted to report a stolen vehicle,

19   falsifying that document.

20        Q.   Okay.  So that led you to believe that -- I

21   mean, correct me if I'm wrong, that seems to be probable

22   cause, right?  That's not reasonable suspicion.

23   Reasonable suspicion is there's a possibility that

24   there's objective facts that indicate that he might be

25   involved in a crime.

```
 1       A.   I saw --
 2            MR. FERNANDEZ:  Object to form.  Go ahead.
 3            MS. WYDLER:  Join.
 4            THE WITNESS:  I saw him after the first crime,
 5       which was speeding, and then he continued to do the
 6       different crimes after me knowing who he was or
 7       having an ID of who he was.
 8  BY MR. PIERRE:
 9       Q.   Okay.  There's a difference -- and I'm glad
10  you said that.  Have you ever -- before June 1, 2018,
11  have you ever seen Mr. Scott?
12       A.   No.
13       Q.   Before June 1, 2018, did you ever have any
14  interactions with Mr. Scott?
15       A.   No.
16       Q.   Before June 1, 2018, has there been any
17  investigations that you were involved in that had to
18  indicate that Mr. Scott was involved in criminal
19  activity?
20       A.   Not by me.
21       Q.   Okay.  So you said you physically saw him
22  committing a crime, correct?
23       A.   Yeah, traffic is a crime.  Speeding is.
24       Q.   And I don't disagree with you, Officer.  What
25  I'm getting at is that you -- oh, I know we've been
```

1    going for an hour and a half, so if you need to take a

2    bathroom break, you can go right ahead.

3        A.   Sure.  Thank you.

4            MR. FERNANDEZ:  Yeah, if we could take a break

5        soon, Faudlin.

6            MR. PIERRE:  You know me.  You know me.

7            MR. FERNANDEZ:  I know.

8            MR. PIERRE:  Okay.  I'll ask you this one

9        question before we take this break.

10   BY MR. PIERRE:

11       Q.   So you haven't had any prior interactions with

12   Mr. Scott, but you saw him physically committing a crime

13   on June 1, 2018, as he was driving past you at 50 miles

14   per hour, closest distance he was to you was ten feet,

15   correct?

16           MR. FERNANDEZ:  Object to form.

17           MS. WYDLER:  Form.

18           THE WITNESS:  Correct.

19           MR. PIERRE:  All right.  We can take the

20       break.

21           (Off the record.)

22           MR. PIERRE:  We're back on the record.

23   BY MR. PIERRE:

24       Q.   So let's see.  You placed -- did you consult

25   with anyone prior to placing him under arrest?

1      A.   Consult what?

2      Q.   Like besides -- did you consult with any --

3  did you consult with Carriel, Officer Hernandez, and

4  Officer Bloom regarding making this arrest?

5      A.   No.

6      Q.   Okay.  Did you have an opportunity to view the

7  body cam footage?

8      A.   I have.

9      Q.   Okay.  And there's a section or point where

10 Officer Carriel is raising his taser.  Do you see that?

11 Do you recall that?

12     A.   Yeah.

13     Q.   Did you instruct Officer Carriel to raise his

14 taser?

15     A.   I did not.

16     Q.   Do you know why Officer Carriel decided to

17 raise his taser?

18          MR. FERNANDEZ:  Object to form.

19          THE WITNESS:  You would have to ask him that.

20 BY MR. PIERRE:

21     Q.   Okay.  Did he ever inform you as to why he

22 raised his taser?

23     A.   No.

24     Q.   Did you say that he was -- did you say Mr.

25 Scott was under arrest and that's why Officer Carriel

1    did -- strike that.

2           Did you say Mr. Scott was under arrest and

3    then Officer Carriel raised his taser?

4        A.   You would have to ask him.  I don't know why

5    he had his taser out, but that's not -- I can't tell you

6    why.

7        Q.   Oh, I understand that, and that's why I'm not

8    asking that question.  The question that I'm asking is

9    specifically did you observe Officer Carriel raise his

10   taser after you stated that Mr. Scott was under arrest,

11   or was it before?

12       A.   I don't even recall the taser being out until

13   I saw the video of the body-worn camera.

14       Q.   Okay.  So were you -- when you were

15   effectuating this arrest, were you working with your

16   other officers, or was this just you were effectuating

17   the arrest and they got in the way?

18           MR. FERNANDEZ:  Object to form.

19           THE WITNESS:  What do you mean they got in the

20       way?  I don't understand the question.

21   BY MR. PIERRE:

22       Q.   Yeah.  What I'm saying is -- first of all, let

23   me break the question down.

24           Were the other officers, Officers Carriel,

25   Bloom, and Hernandez, involved in effectuating your

1    arrest of Scott?

2              MR. FERNANDEZ:  Object to form.

3              THE WITNESS:  No, not at all.  They were just

4        assisting me.

5    BY MR. PIERRE:

6        Q.   Okay.  So they were involved to some degree

7    because they were assisting you in effectuating --

8        A.   Correct.

9        Q.   -- the arrest.  Okay.

10       A.   Correct.

11       Q.   So you arrest Mr. Scott.  What do you do -- I

12   mean, you physically placed the handcuffs on him?

13       A.   Yes, I believe so.  Yes.

14       Q.   Okay.  And whose vehicle did you place him in?

15       A.   Officer Hernandez's vehicle.

16       Q.   Okay.  And why did you place him in Officer

17   Hernandez's vehicle?

18       A.   Because it was a bigger vehicle to transport

19   him into the north station.

20       Q.   Okay.  And prior to leaving the station, did

21   you speak to Carriel -- I mean, prior to -- strike that.

22              Prior to leaving the scene where you found my

23   client, did you speak to Carriel, Bloom, and Hernandez

24   regarding the arrest afterwards?

25       A.   You mean the station?

1        Q.    Not the station.  The scene, meaning --

2        A.    I mean, at the scene?

3        Q.    -- prior to you leaving the scene.  Yeah.

4        A.    At the scene, it was just me and Carriel and

5   the sergeant.

6        Q.    Okay.

7        A.    I spoke to Carriel.  He saw what I saw at the

8   scene because he got there when I set the perimeter.

9        Q.    Okay.  Not the crash scene but the scene where

10  you found my client.

11       A.    Oh, okay.  So what was the question about the

12  scene where I find your client?

13       Q.    Okay.  So prior -- okay.  So you placed my

14  client in handcuffs.

15       A.    Correct.

16       Q.    Then you place him in Hernandez's vehicle,

17  correct?

18       A.    Correct.

19       Q.    After you place him in Hernandez's vehicle, do

20  you communicate with the other officers?

21       A.    Communicate what?

22       Q.    I don't know.  Did you communicate with the

23  officers?

24       A.    I talked to them but nothing about the case.

25  It was my case.  It was my arrest.  I didn't have

1    nothing to tell them about it.

2        Q.   Okay.  I understand it was your case and your

3    arrest, but why did you place him in Hernandez's

4    vehicle?

5        A.   Because it was a bigger vehicle.  I had a

6    Taurus.  He had an Explorer, and he was a heavyset male.

7        Q.   Okay.  And you directed Hernandez to transport

8    him to the north station?

9        A.   Correct.

10       Q.   Okay.  And then when's the next time you come

11   in contact with my client?

12       A.   At the north station.

13       Q.   The north station.  And then when you come in

14   contact with my client, what happens next?

15       A.   Nothing.  I completed the paperwork, then I

16   transported him to TGK.  Actually, no, to central

17   station for the wagon.

18       Q.   So you transported him -- from north station

19   to central station.

20       A.   Correct.

21       Q.   And then --

22       A.   No, actually, no.  To TGK.  Sorry.

23       Q.   Okay.  I was going to say because I think your

24   paperwork --

25       A.   Yeah, yeah.

1        Q.   -- actually says --

2        A.   Yeah, yeah, yeah, yeah.

3        Q.   -- TGK.  Okay.  So you transfer her from TGK

4   -- I mean from the north station to TGK.

5        A.   Correct.

6        Q.   Correct?  Correct?

7        A.   Correct.  Yeah, I said correct.

8        Q.   Okay.  While you were at the scene, did you

9   take any witness statements?

10       A.   No, I didn't have any witnesses.

11       Q.   Okay.  Did you ask for any exculpatory

12   evidence from Mr. -- my client?

13       A.   What kind of evidence?

14       Q.   Anything to show that he wasn't the black

15   heavyset male.

16       A.   I asked him --

17            MR. FERNANDEZ:  Let him finish his question.

18       Go ahead.

19   BY MR. PIERRE:

20       Q.   Yeah.  So anything to indicate he wasn't the

21   black heavyset male wearing the white tank top that you

22   saw fleeing the scene?

23       A.   I did.  He couldn't give me a straight answer.

24       Q.   Okay.  And then -- let's see.  Okay.  And the

25   last time you saw my client was once you dropped him off

1   at TGK?

2        A.   Correct.

3        Q.   So you haven't seen him since then.

4        A.   I saw him in court during the case.  That's

5   about it.

6        Q.   Okay.  Let's talk about some of the charges

7   that were brought against him.  What were those charges?

8        A.   They're on the A-form.  I mean, I know

9   speeding, the accident, plus the final report, the

10  cannabis and the firearm.

11       Q.   Okay.  Okay.  So you stated -- and he was

12  prosecuted for those charges, correct?

13       A.   He was what?

14       Q.   I mean, did this -- let me rephrase that.  Did

15  his case go to trial?

16       A.   I know I was in court like four times for that

17  case, and it was getting suspended, and it was all kinds

18  of stuff dealing with it, but I don't know the results

19  of the case.

20       Q.   Okay.  Okay.  So did you ever speak with the

21  prosecution as to -- I mean, the City Attorney's Office

22  as to this case?

23       A.   I can't recall.  I don't believe so, no.

24  Besides there in the courtroom when I showed up every

25  time there was -- I was asked to go to the courthouse, I

1   didn't.

2       Q.   And did you -- so did you ever give any

3   deposition testimony as a part of the --

4       A.   I don't believe so, no.

5       Q.   -- criminal proceeding?

6       A.   I don't believe so, no.

7       Q.   Okay.  At any point during the course of the

8   arrest, was my client disrespectful to you?

9       A.   No, no, not at all.

10      Q.   Did he curse at you?

11      A.   No, he did not.

12      Q.   Was he physically violent with you?

13      A.   Not at all.

14      Q.   I know officers often do this.  Once they've

15   ID'd an individual, they go back to their vehicle to

16   check if there's any outstanding warrants or anything

17   that might lead to an arrestable offense.  Did you do

18   that as a part of your investigation?

19      A.   I did.

20      Q.   And what turned up once you did that?

21      A.   I believe he had a previous arrest, traffic

22   arrest, prior to my incident.

23      Q.   Okay.  Okay.  And was that cleared up at the

24   time, or was that still outstanding?

25      A.   I didn't -- I mean, it wasn't a warrant, so I

1   didn't look into it further.  I just knew he had a

2   previous arrest.

3        Q.   Okay.  So you go to court about four or five

4   -- four times approximately.  Do you know if the case --

5   you stated you didn't know the disposition of the case,

6   correct?

7        A.   I did not.  I would not know.

8        Q.   Okay.  As we sit here today, do you know what

9   happened to the case?

10        A.   I do not know.

11        Q.   Okay.  Let's talk about your police report.

12   In the academy, are you trained how to do police

13   reports?

14        A.   Generally, yeah.

15        Q.   What about during your -- with your job?  Do

16   they have any policies or procedures on how to do police

17   reports?

18        A.   We have to do now how to do police reports,

19   yeah.

20        Q.   Okay.  And would you agree with me that as a

21   part of your job that all police reports should be

22   complete?

23        A.   Correct.

24        Q.   Then would you agree as part of your practice,

25   training, and education in the field of law enforcement

1    that all material information, material facts, should be

2    included in your police report, correct?

3         A.   What has to do with the case, yes.

4         Q.   Yeah, material to the probable cause

5    determination.

6         A.   Correct.

7         Q.   And I apologize for cutting you off.

8         A.   No problem.

9         Q.   And what's the reason for having a complete

10   and accurate police report?

11             MR. FERNANDEZ:  Object to form.

12             THE WITNESS:  What's the reason?  I mean, for

13        the state attorney and defense attorney, we do the

14        report to know what happened.

15             Are you talking about police report or arrest

16        report?  Those are different things.

17   BY MR. PIERRE:

18        Q.   Arrest report.

19        A.   Okay.  Yes, so same answer.  So when it goes

20   to trial, so the state can read and know what happened.

21        Q.   Okay.  Thank you for the clarification,

22   Officer.  I'll re-ask that so the record's clear.

23             What is the importance of having a complete

24   and accurate arrest report?

25             MR. FERNANDEZ:  Object to form.

```
1              THE WITNESS:  So you can have the facts for

2         the state attorney and defense attorney and

3         everybody that reads it will know what happened.

4    BY MR. PIERRE:

5         Q.   Okay.  I'm going to introduce Plaintiff's

6    Exhibit 1.

7              (Thereupon, Plaintiff's Exhibit 1 was marked

8         for identification.)

9              MR. FERNANDEZ:  Police report?

10             MR. PIERRE:  Yeah, it's the arrest affidavit,

11        the A-form.

12             MR. FERNANDEZ:  Okay.  I'll need copies.

13             MR. PIERRE:  That's fine.

14             MR. FERNANDEZ:  I have Bates stamp 1326.

15             MR. PIERRE:  It might be it, or it might be

16        something I got from you guys from the public

17        records request.

18             MR. FERNANDEZ:  Okay.  I just handed it to

19        him.

20             MR. PIERRE:  Yeah, this one isn't Bates.  This

21        is from the --

22             MR. FERNANDEZ:  It's the same one.

23             MR. PIERRE:  Let the record reflect that I'm

24        showing Officer Guzman a copy of the complainant

25        arrest, the affidavit, dated June 1, 2018,
```

1          consisting of two pages.

2     BY MR. PIERRE:

3          Q.   I believe your counsel provided you a copy.

4          A.   Yes.

5          Q.   Okay.  So for the purposes of the jury, I'm

6     just going to reflect -- ask you questions as it relates

7     to your arrest affidavit from -- the one that's marked

8     as Exhibit 1.  Okay.

9               MR. PIERRE:  Correction for the record.  This

10              actually says June 2, 2018.  Oh, that's where it

11              was done by your Sergeant Sampson.

12    BY MR. PIERRE:

13         Q.   Officer Guzman, do you recognize what's been

14    labeled to you as Plaintiff's Exhibit 1?

15         A.   Yes.

16         Q.   What is it?

17         A.   A complete arrest A-form.

18         Q.   Okay.  Is it an accurate copy of the arrest

19    affidavit that you did on June 1, 2018?

20         A.   Yes, sir.

21         Q.   Okay.  I'm going to ask you some questions.

22    Is this your electronic signature?

23         A.   Yes, sir.

24         Q.   And is it right below where it says I swear

25    the above statement is true and correct?

1     A.   Yes, sir.

2     Q.   And on Page 2, is that also your electronic

3  signature beneath the statement that says I swear the

4  above statement is true and correct?

5     A.   Yes.

6     Q.   Okay.  Who is the subject of this police or

7  this arrest affidavit?

8     A.   The defendant.

9     Q.   When you say the defendant, you have to be

10  clear because now, we've switched sides, right?  You're

11  the Defendant in this case whereas he was --

12     A.   Oh.

13     Q.   -- the defendant --

14     A.   You said on this page, and it says defendant

15  name, last name, and middle.  Is that what you're

16  referring to?

17     Q.   Yeah.  I'm referring -- but for the record for

18  us to be clear, right?  So regarding who is the person

19  that is the subject of this arrest affidavit?

20     A.   Defendant Scott Samuel, Jr.

21     Q.   Okay.  And what is the arrest date of Samuel

22  Scott, Jr.?

23     A.   6/1/2018.

24     Q.   And what is the arrest time?

25     A.   18:05.

1      Q.   And that's in military time.  What is that in

2   layman's time?  What's the translation?

3      A.   6:05 p.m.

4      Q.   Okay.  And what is the arrest location?

5      A.   563 Northwest 48th Street, Miami, Florida

6   33127.

7      Q.   Okay.  There's some identifying information as

8   to his date of birth, his age, race, sex, and what have

9   you.  Do you see that line?

10     A.   Yes, I do.

11     Q.   Okay.  Where did you get his date of birth?

12     A.   I don't recall.  Probably his ID.  I'm not

13  sure.

14     Q.   Okay.  I'm assuming the race, how did you --

15  did you identify him as black?

16     A.   I mean, yeah.

17     Q.   Okay.  And I'm assuming you also identified

18  him as male.

19     A.   Correct.

20     Q.   And there's this thing called Hispanic

21  ethnicity.  It says no AFR.  What does that mean?

22     A.   It says Hispanic.  It gives you the option of

23  Hispanic, yes or no, and then it gives you ethnicity,

24  and it gives you one of those options, African American.

25     Q.   Okay.  So AFR means African American.

1        A.    Yes, sir.

2        Q.    And where did you get the height and his

3   weight?

4        A.    From where?  Oh, the height, from his ID

5   probably, and the weight, I probably asked him.

6        Q.    Regarding his -- I'm assuming you got the hair

7   color and the hair length based off of your observation,

8   correct?

9        A.    Correct.

10       Q.    Hairstyle, AFR, what does that mean?

11       A.    I think it's African American or something

12   like that.  It gives you a whole bunch of hair types,

13   curly, straight, African, afro or something like that.

14       Q.    Oh, okay.  But he's bald, so I don't know why

15   would have a hairstyle.  Maybe that it a hairstyle.

16       A.    You have to pick an option.  If you leave it

17   blank, it would deny the report, so that's why.

18       Q.    Oh, okay.

19       A.    That's why I put bald, obviously and then I

20   guess --

21       Q.    And teeth, it says NOR.  What does that mean?

22       A.    It's normal.

23       Q.    Okay.  And the charges that he was levied with

24   were what?  What did you charge him with?

25       A.    Leaving the scene of an accident with property

1    damage, false report of commission of a crime, firearms,

2    weapon concealment, failed to carry his license,

3    cannabis possession, 20 grams or less, marijuana, and

4    then reckless driving, damage to property or person.

5          Q.   Okay.  Bear with me.  This report is complete,

6    correct?

7          A.   Correct.

8          Q.   And this report is accurate, correct?

9               MR. FERNANDEZ:  Object to form.

10              THE WITNESS:  Correct.

11   BY MR. PIERRE:

12         Q.   Correct?

13         A.   Correct.

14         Q.   And when you were drafting this report, you

15   didn't leave anything out, did you?

16              MR. FERNANDEZ:  Object to form.

17              THE WITNESS:  I try not to.  It gets rejected.

18   BY MR. PIERRE:

19         Q.   Okay.  And you were truthful when you actually

20   wrote this report, correct?

21         A.   Yes, sir.

22         Q.   And when you made this report, it was closer

23   in time of the events that are subject of this lawsuit

24   than we are today, correct?

25              MR. FERNANDEZ:  Object to form.

1            THE WITNESS:  Correct.

2    BY MR. PIERRE:

3        Q.   Okay.  Can you -- in your first sentence, it

4    says at the above date and time, on the routine patrol,

5    I was conducting a radar detail on Northwest 12th Avenue

6    and Northwest 57th Street.  That's true; isn't it?

7        A.   That's true.

8        Q.   And you observed a black Jeep Compass bearing

9    FL tag CASL84 traveling southbound on Northwest 12th

10   Avenue at 50 miles per hour in a 30 mile per hour zone,

11   correct?

12       A.   Uh-huh.

13            MR. FERNANDEZ:  That's a yes?

14            THE WITNESS:  Yes.  Sorry.

15   BY MR. PIERRE:

16       Q.   Correct?

17       A.   Yes, sir.

18       Q.   Okay.  So that statement is also true?

19       A.   Yes.

20       Q.   Okay.  Then you say I then made a U-turn

21   heading southbound to attempt to stop the vehicle.  That

22   statement is true, correct?

23       A.   Yes.

24       Q.   Without turning my lights and sirens, I

25   observed the vehicle make a hard right turn on Northwest

1    12th Avenue and Northwest 64th Street.  Is that

2    statement true?

3              MR. FERNANDEZ:  Object to form.

4              THE WITNESS:  Correct.

5    BY MR. PIERRE:

6         Q.   All right.  Because earlier, you stated you

7    didn't turn on your sirens and your lights.  I mean, you

8    turned on your sirens and lights.

9         A.   Further into it, yes.  Further into the chase,

10   I did but not before I read the tag and before I told

11   him I was behind him.

12        Q.   Okay.  So you notified him via the -- via your

13   vehicle that you told him to stop?

14        A.   No.  I got behind him.  I got the tag, and

15   then I turned my sirens.

16        Q.   You turned your sirens on.  Were you able to

17   voice that you need to stop like in some megaphone or

18   some sort of manner?

19             MR. FERNANDEZ:  Object to form.

20             THE WITNESS:  No, you can't do that while

21        you're driving, no.

22   BY MR. PIERRE:

23        Q.   Okay.  I then continued to follow the vehicle

24   on Northwest 10th Avenue and Northwest 67th Street where

25   he failed to stop at a stop sign, correct?

1        A.   Correct.

2        Q.   So that statement is true?

3             MR. FERNANDEZ:  Object to form.

4             THE WITNESS:  Correct.

5   BY MR. PIERRE:

6        Q.   The vehicle then turned eastbound on Northwest

7   10th Avenue and Northwest 71st Street onto 7th Avenue

8   and Northwest 71st Street.  He failed to stop at a red

9   steady device.  That statement is also true?

10       A.   Correct.

11       Q.   The vehicle then made a left turn on Northwest

12  5th Court northbound where he collided with another

13  vehicle.  The driver exited the vehicle and fled the

14  scene of the accident on foot.  Is that statement true?

15       A.   That is true.

16       Q.   As he fled, I observed a black male, bald --

17  I'm assuming that means bald -- about six foot two,

18  heavyset with a white tank top running away from the

19  scene.  Is that statement true?

20       A.   It's true.

21       Q.   I then begin my investigation and conducted a

22  record check of the vehicle that revealed that the owner

23  was Samuel Scott, Jr., correct?  Is that statement true?

24       A.   Correct.

25       Q.   I then conducted a --

1        A.    Right.

2        Q.    Oh, okay.  Thank you.  I conducted a search of

3    the vehicle where in plain view, I found a picture ID of

4    the defendant, Samuel Scott, Jr. hanging from the

5    rearview mirror, correct?

6        A.    Correct.

7        Q.    In the vehicle in plain view, I found a black

8    and silver Smith & Wesson 0.40 caliber -- and that was

9    40 caliber, but just reading your thing -- on the front

10   passenger floor not properly encased in glove box or

11   center console; is that true?

12       A.    Yes.

13       Q.    Is the statement true in your report where you

14   say also in plain view in the center console, I found a

15   plastic baggies with green spots with suspected

16   marijuana?

17       A.    Yes.

18       Q.    And about at 5:40, a call was received through

19   the City of Miami dispatchers of a stolen Jeep Compass,

20   FL tag CASL84 on 563 Northwest 48th Street, and the

21   complainant stated that the vehicle was taken from

22   Northwest 6th Avenue and Northwest 48th Street at

23   approximately 40 minutes delay.  Is that statement true?

24       A.    Yes.

25       Q.    I then was advised that the person reporting

1   the stolen vehicle matched the description of the

2   offender that fled the scene of the hit and run.  Is

3   that statement true?

4        A.   True.

5        Q.   Upon arrival, the complainant was wearing the

6   same clothing description as above, and I was able to ID

7   the suspect that fled the hit and run.  Is that

8   statement true?

9        A.   Yes.

10        Q.   At this point, the defendant, Samuel Scott,

11   Jr., was given a stolen vehicle affidavit by Officer

12   Bloom and advised that it is a legal document and if he

13   made a false report, he could be arrested.  The

14   defendant acknowledged and understood what Officer Blood

15   had advised him and signed the affidavit.  Is that

16   statement true?

17             MR. FERNANDEZ:  Object to form.

18             THE WITNESS:  Yes.

19   BY MR. PIERRE:

20        Q.   Defendant was transported to the Miami central

21   station where he was read his Miranda by card to be

22   interviewed by Detective Martinez.  Is that statement

23   true?

24        A.   True.

25        Q.   And is the statement defendant was arrested

1    and transported to TGK, is that statement true?

2         A.   True.

3         Q.   Okay.  And it says B. Williams.  Who's B.

4    Williams?

5         A.   Brandon Williams.

6         Q.   And what was his role in this?

7         A.   He conducted the traffic report, the crash

8    report.

9         Q.   Okay.  Did you instruct him to conduct the

10   crash report?

11        A.   I didn't.  The sergeant did.

12        Q.   Okay.  I know that was a long and laborious

13   statement, but I just wanted to make sure that we

14   confirm your narrative.  So, here, you make no mention

15   about -- that when you first saw my client.

16             MR. FERNANDEZ:  Object to form.

17             MR. PIERRE:  Yeah, let me rephrase the

18        question.

19   BY MR. PIERRE:

20        Q.   When I'm reading your truthful and accurate

21   testimony, the first mention of my client is on Page 2

22   where it reveals the owner as Samuel Scott, Jr., but you

23   never mention in your narrative that at Northwest 12th

24   Avenue at 50 miles per hour in a 30 miles per hour zone

25   that you observe the driver of the vehicle.

1                MR. FERNANDEZ:  Object to form.

2                MS. WYDLER:  Objection, form.

3                MR. FERNANDEZ:  Go ahead.

4                THE WITNESS:  That was a question?

5      BY MR. PIERRE:

6           Q.   Yes.

7           A.   Oh.  Well, I had saw him then, obviously,

8      because he was driving towards me, and I was able to ID

9      him.

10          Q.   Yeah.  I understand, and the English language

11     can be very tricky, but as you stated, your arrest

12     affidavit has to be accurate, right?  And when I'm

13     reading your arrest affidavit, the first and only

14     mention of a description of the person who was in the

15     vehicle is when you state as he fled, I observed a black

16     male, bald, about six, two, heavyset with a white tank

17     top running away from the scene.

18               Do you see that?

19          A.   Yeah, I see it.

20          Q.   And that's the only observation you made prior

21     to today as to what -- when you first saw the individual

22     who was driving the vehicle, correct?

23               MR. FERNANDEZ:  Object to form.

24               THE WITNESS:  In the report, yes.

25     BY MR. PIERRE:

```
 1        Q.    Your -- I'm sorry.  I apologize.

 2        A.    No.

 3        Q.    Go ahead.  Go ahead.  I apologize because it

 4   works the same way.

 5        A.    So I have to put the facts of the charges and

 6   also, where it started from, I started visually seeing

 7   the vehicle, and then when I was able to ID him, that's

 8   when I put it down in the narrative.

 9        Q.    But you were able to ID the individual when he

10   fled the vehicle.  Is that a true statement?

11             MR. FERNANDEZ:  Object to form.

12             THE WITNESS:  No, I said I ID'd him when he

13        passed me ten feet away.

14   BY MR. PIERRE:

15        Q.    I get it.  Before we had this lawsuit, before

16   we had the criminal proceeding, when you were drafting

17   this report, did you say -- did you make those

18   statements in your report?

19             MR. FERNANDEZ:  Object.

20             MS. WYDLER:  Form.

21             THE WITNESS:  That I visually saw him ten feet

22        away, no.

23   BY MR. PIERRE:

24        Q.    Okay.  Did you -- in your opening paragraph on

25   the first page, where did you say I observed a black
```

1    male in a black Jeep Compass?

2        A.    A what?

3        Q.    Yeah.

4        A.    Sorry.

5        Q.    Okay.   In your second sentence, this is the

6    first time that we see that you observed the vehicle.

7        A.    Correct.

8        Q.    Where in that sentence, Page 1, where you're

9    identifying the vehicle, do you identify the description

10   of the individual who is driving the vehicle?

11           MS. WYDLER:   Objection, form.

12           MR. FERNANDEZ:   Object to form.

13           THE WITNESS:   Sorry, I don't.

14   BY MR. PIERRE:

15       Q.    So, again, the English language can be very

16   tricky, but the first time and the only time in your

17   police -- your arrest affidavit in which you identify or

18   provide a general description is when that individual

19   flees on foot, correct?

20           MR. FERNANDEZ:   Object to form.

21           MS. WYDLER:   Join.

22           THE WITNESS:   On the A-form, yes.

23   BY MR. PIERRE:

24       Q.    Okay.   And as you described within the A-

25   form, you state as he fled, I observed a black male,

1   bald, about six, two, heavyset with a white tank top

2   running away from the scene, correct?

3        A.   Correct.

4        Q.   Okay.  Let's take a step back.  A black male,

5   bald, six, two, heavyset, white tank top.  How many

6   people could that be in the model city area?

7             MR. FERNANDEZ:  Object to form.

8             THE WITNESS:  A thousand.

9   BY MR. PIERRE:

10       Q.   Okay.  So it's not limited to just Mr. Samuel

11  Scott, correct?

12            MS. WYDLER:  Objection.

13            MR. FERNANDEZ:  Object to form.

14            THE WITNESS:  No, it's not limited just to the

15       defendant.

16  BY MR. PIERRE:

17       Q.   And the population in that area, would you

18  agree with me, is predominantly African American?

19            MS. WYDLER:  Objection, form, predicate.

20            THE WITNESS:  There's a lot of Hispanics, too.

21  BY MR. PIERRE:

22       Q.   Okay.  Okay.  Let me clarify that.

23  Predominantly, in that area, are there a lot of

24  individuals who are of African descent, whether they're

25  Hispanic or otherwise?

1       A.   Yes.

2       Q.   So you first get a glimpse of Mr. Samuel

3  Scott's picture is from his ID in his vehicle, correct?

4            MR. FERNANDEZ:  Object to form.

5            MS. WYDLER:  Join.

6            THE WITNESS:  A physical ID, yes.

7  BY MR. PIERRE:

8       Q.   I couldn't hear you because there was a couple

9  of objections.

10      A.   A physical ID, yes, his work ID.

11      Q.   Yeah.  Let me rephrase that.  So your first

12 observation of Mr. Samuel Scott was from his work ID

13 that you found in his vehicle, correct?

14           MR. FERNANDEZ:  Object to form.

15           MS. WYDLER:  Join.

16           THE WITNESS:  Yes.

17 BY MR. PIERRE:

18      Q.   So I'm trying to figure out you stated that

19 this male individual who was running away was

20 approximately 20 yards ahead of you and he was running

21 with his back against you, correct?

22           MR. FERNANDEZ:  Object to form.

23           MS. WYDLER:  Join.

24           THE WITNESS:  Yes.

25 BY MR. PIERRE:

1      Q.   And then he turns -- you lose sight of this

2   individual while he's going northbound, correct?

3      A.   Correct.

4      Q.   You stated that you were advised that the

5   person reporting the stolen vehicle matched the

6   description of the offender that fled the scene of the

7   hit and run.  We went through great pains to figure out

8   and paint your story.

9           MS. WYDLER:  Objection, form.

10           MR. PIERRE:  Okay.  Let me take the

11       editorializing out and just ask you the question.

12   BY MR. PIERRE:

13      Q.   In this statement where you stated you were

14   advised that the person reporting the stolen vehicle

15   matched the description of the offender that fled the

16   scene of the hit and run, who advised you?

17      A.   Officer Bloom.

18      Q.   So was that prior to the scene, you got to the

19   scene, or was that once you got to the scene?

20           MR. FERNANDEZ:  Form.  Which scene?  Sorry,

21       Faudlin.

22           MR. PIERRE:  Okay.

23   BY MR. PIERRE:

24      Q.   Prior to you got to the scene where my client

25   was -- strike that.  Let me just rephrase the entire

1    question.

2              So did Officer Bloom advise you prior to you

3    arriving to the scene where my client was?

4         A.   Over the radio, yes.  Once he put out the BOLO

5    on the radio, I had him go to a channel where you speak

6    one to one.  I asked him to give me a description of the

7    driver.

8         Q.   And is that --

9         A.   Of the --

10        Q.   I'm sorry.  Go for it.  I'm sorry.

11        A.   No, go ahead.

12        Q.   Is that channel recorded or not recorded?

13        A.   I believe all the channels are recorded.

14        Q.   Okay.  So you and Officer Bloom spoke one to

15   one regarding the description of the person that was

16   reporting the vehicle stolen as well as the description

17   of the individual that fled the scene, correct?

18             MR. FERNANDEZ:  Object to form.

19             MS. WYDLER:  Join.

20             THE WITNESS:  No.  I just asked him to give me

21        a description of the person reporting their vehicle

22        stolen.

23   BY MR. PIERRE:

24        Q.   Okay.  And what did he say?

25        A.   Black male, heavyset, white tank top.

 1        Q.   Okay.  So he tells you black male, heavyset,

 2   white tank top.  Is that the only description that

 3   Officer Bloom gives to you as it relates to the advice

 4   that you mentioned in your police report?

 5             MR. FERNANDEZ:  Object --

 6             THE WITNESS:  I can't recall what I said.

 7   BY MR. PIERRE:

 8        Q.   But all you can recall is that he said it was

 9   a black male, heavyset with a white tank top, correct?

10        A.   Correct.

11        Q.   And what did you tell Officer Bloom once he

12   said it was a black male, heavyset with a white tank

13   top?

14        A.   That I was on my way.

15        Q.   Here, you also stated at this point, the

16   defendant, Samuel Scott, Jr., was given a stolen vehicle

17   affidavit by Officer Bloom and advised that it is a

18   legal document and if he made a false report, he could

19   be arrested.  Were you present when this advice was

20   made?

21        A.   No.  Officer Bloom stated to me what he

22   advised him, and it says that on the paper before you

23   sign it.

24        Q.   Okay.  Just so we're clear on the timing, so

25   from what I gather, he was arrested at 6:05, correct?

 1             MR. FERNANDEZ:  Object to form.

 2             THE WITNESS:  No, that was when the report was

 3        done.  Well, in general, yeah.

 4   BY MR. PIERRE:

 5        Q.   Okay.  So the report was done at 6:05.

 6             MR. PIERRE:  Is that us or you, Brandon?

 7             MR. FERNANDEZ:  No, that's me.  Hold on.

 8             MR. PIERRE:  Okay.  It sounds like you need to

 9        take care of that, man.

10             (Off the record.)

11   BY MR. PIERRE:

12        Q.   So let's go back to the timeline, all right?

13   So at 6:05 approximately, you arrest Mr. Samuel Scott,

14   Jr., correct?

15        A.   Yeah.

16             MR. FERNANDEZ:  Object to form.

17   BY MR. PIERRE:

18        Q.   And at about 5:40, a call was received through

19   the City of Miami dispatchers of a stolen Jeep Compass,

20   and you stated there was approximately a 40-minute

21   delay.  Do you see that?

22        A.   That I stated there was a 40-minute delay?

23        Q.   It's in your report.  It says at approximately

24   40-minutes' delay.

25        A.   Okay.

1      Q.   Yeah.  So I want to clarify that, right?  So

2   the call is received at 5:40.  Where do you get that

3   information?

4           MR. FERNANDEZ:  Object to form.

5           THE WITNESS:  That's all right here.

6   BY MR. PIERRE:

7      Q.   Okay.  So the radio says at approximately 5:40

8   p.m., a person is reporting --

9      A.   No --

10     Q.   -- that their car was stolen.

11          MR. FERNANDEZ:  Let him finish.

12          THE WITNESS:  I got the BOLO on the radio at

13          5:40.  The person giving out the BOLO, Officer

14          Bloom, said there was a 40-minute delay on it.

15   BY MR. PIERRE:

16     Q.   Okay.  So what does a 40-minute delay mean?

17     A.   That the person reporting their vehicle said

18   they got -- it had been 40 minutes since they got their

19   vehicle stolen.

20     Q.   Okay.  So at approximately five o'clock, that

21   person would have reported their vehicle stolen?

22     A.   No, they got their vehicle stolen.

23     Q.   Okay.  So it's been gone for 40 minutes.

24          MR. FERNANDEZ:  Give me five minutes.  I'm

25          going to call fire.  I'm sorry.

```
 1           MR. PIERRE:  Okay.  No, no worries.  No

 2       worries.

 3           (Off the record.)

 4           MR. PIERRE:  Let's go back to the report.

 5       Thank you, all.

 6   BY MR. PIERRE:

 7       Q.   Also, you charged him with reckless driving

 8   and damage to property or person, correct?

 9       A.   Correct.

10       Q.   And you charged him with all of this because

11   he was a black male, bald, heavyset wearing a white tank

12   top, correct?

13           MR. FERNANDEZ:  Object to form.

14           MS. WYDLER:  Join.

15           THE WITNESS:  No, I identified the defendant,

16       and I arrested him, identifying him as the driver

17       of the vehicle -- of the Jeep Compass.

18   BY MR. PIERRE:

19       Q.   When he was running away from you, did he turn

20   his head and say anything towards you, or was he running

21   for dear life?  Did he know you were running after him?

22           MR. FERNANDEZ:  Object to form.

23           THE WITNESS:  It was barely -- he didn't even

24       know -- I mean, by the time he made a right turn to

25       go north, that's when I started running.  So he
```

1          probably didn't see me running to him.

2     BY MR. PIERRE:

3          Q.   Okay.  So he was basically gone by the time

4     you decided to run.

5          A.   He was --

6               MR. FERNANDEZ:  Object to form.  Go ahead.

7               MS. WYDLER:  Join.

8               THE WITNESS:  He was out of his car by -- yes.

9     BY MR. PIERRE:

10         Q.   What I'm getting at is there's a heavyset

11    black male that is running away from you, but he doesn't

12    know that you're actually running behind him, correct?

13              MR. FERNANDEZ:  Object to form.

14              THE WITNESS:  I mean, you stated that if I was

15         behind and he turned around to say something to me,

16         no.  I mean, I was in the car chasing him.  When he

17         got into the crash, that's when I make a left turn.

18         As he's getting out of the car, he's about to make

19         a right turn to go under I-95.  That's when I'm

20         already running towards him telling him to stop.

21    BY MR. PIERRE:

22         Q.   So you tell him to stop, right?

23         A.   Uh-huh.

24         Q.   And does he turn his head back and respond no,

25    Officer, yes, Officer?

```
 1              MR. FERNANDEZ:  Object to form.  Go ahead and
 2         answer.
 3              THE WITNESS:  What was that?
 4    BY MR. PIERRE:
 5         Q.   Yeah.  He's 20 yards ahead of you when you
 6    decide to run.  You tell him to stop.  In response to
 7    you telling him to stop, what does he say?
 8              MS. WYDLER:  Objection, form.
 9              THE WITNESS:  He didn't say nothing.  He kept
10         running.
11              MR. FERNANDEZ:  Wait until he completes the
12         question.
13              THE WITNESS:  I did.
14              MR. FERNANDEZ:  I know.  I know.
15              THE REPORTER:  Could you repeat your answer
16         again for me, please?
17              MR. PIERRE:  Do you want me to repeat the
18         question?
19              THE REPORTER:  No, the answer because there
20         was an Objection.
21              MR. PIERRE:  Okay.  That's you.
22              MR. FERNANDEZ:  What was your answer?
23              THE WITNESS:  I don't know what the question
24         was anymore.
25              MR. PIERRE:  I'll repeat the question.
```

```
 1              THE REPORTER:  Okay.

 2   BY MR. PIERRE:

 3      Q.   When you exit your vehicle, he's 20 yards

 4   ahead of you.  You start to run.  You tell him to stop.

 5   What does this black male, heavyset with a white tank

 6   top say in response?

 7              MR. FERNANDEZ:  Object to form, asked and

 8         answered.  Go ahead.

 9              THE WITNESS:  Nothing.

10   BY MR. PIERRE:

11      Q.   Does he turn his head towards you as you tell

12   him to stop?

13      A.   No.

14      Q.   Okay.  So you know he's going northbound,

15   correct?

16      A.   Correct.

17      Q.   And so you set up a perimeter northbound,

18   correct?

19              MR. FERNANDEZ:  Object to form, asked and

20         answered.  Go ahead.

21              THE WITNESS:  Yes, not only northbound but

22         eight blocks.  6th Avenue -- 5 Avenue to 71 to 75.

23   BY MR. PIERRE:

24      Q.   Okay.  But you didn't go to 48th Street, did

25   you?
```

1             MR. FERNANDEZ:  Object to form.

2             MR. PIERRE:  Let me rephrase that question.

3   BY MR. PIERRE:

4        Q.   Did your perimeter contain 48th Street and

5   Northwest 6th Avenue?

6        A.   That had nothing to do at that point with the

7   incident.

8        Q.   Okay.  Okay.  In here, you say they had the

9   same clothing description, meaning the individual that

10  you saw fleeing from the vehicle and my client, correct?

11       A.   Yes.

12       Q.   Isn't it true when you walked or when you

13  first observed my client on the scene, he was wearing a

14  black shirt?

15       A.   On top of the tank top, yes.  The white tank

16  top, yes.

17       Q.   Okay.  Was the white tank top noticeable?

18       A.   Yes.

19       Q.   Okay.  So, Officer, are you wearing a white

20  tank top?

21             MR. FERNANDEZ:  Object to form.

22             THE WITNESS:  I do not use tank tops.

23  BY MR. PIERRE:

24       Q.   Okay.  How often do you see white tank tops in

25  the City of Miami?

```
 1              MS. WYDLER:  Objection, form, predicate.
 2              MR. FERNANDEZ:  Join.
 3              THE WITNESS:  I don't know.  I mean, I don't
 4         be looking at guys' tank tops.  I don't understand
 5         the question.
 6    BY MR. PIERRE:
 7         Q.   Yeah.  I'm saying is this first time that
 8    you've ever seen a white tank top beneath someone's
 9    shirt?
10              MS. WYDLER:  Objection, form.
11              THE WITNESS:  No, sir.
12    BY MR. PIERRE:
13         Q.   What was the answer?  I couldn't hear it.
14         A.   No, sir, no.
15         Q.   Is it common for you to see a male wearing a
16    white tank top beneath their shirt?
17              MR. FERNANDEZ:  Object to form.
18              MS. WYDLER:  Form.
19              THE WITNESS:  A lot of people wear them, yes.
20    BY MR. PIERRE:
21         Q.   So, now, we're getting -- so you were -- from
22    the time that the vehicle was stolen, meaning the time
23    that Mr. Scott had noticeably been without his vehicle
24    for 40 minutes, correct?
25         A.   Was that a question?  I'm not sure.
```

1    Q.   Yes, that was a question.  Because you stated

2    in your report there was a 40-minute delay, meaning his

3    vehicle had been stolen 40 minutes prior to the report

4    of the vehicle.

5    A.   That's what he stated to the officer, yes.

6    Q.   Okay.  When did you start chasing after the

7    vehicle?

8         MR. FERNANDEZ:  Object to form, asked and

9         answered.

10         MR. PIERRE:  No, it's not.

11   BY MR. PIERRE:

12   Q.   When did you start chasing after the vehicle?

13   A.   When he passed me at 12 and 67.

14   Q.   And I used to do traffic, and usually, when

15   you do the -- when you're clocking the individual, I

16   believe the officers have a timestamp.  Do you or some

17   sort of recordkeeping that documents when they clocked

18   the speed?  Do you have that in your possession?

19   A.   I don't have that in my possession, no, and we

20   don't clock when you do a radar -- I mean, when you

21   direct a ticket, you put a time --

22   Q.   Okay.

23   A.   -- of the incident, which I believe there's a

24   ticket --

25   Q.   Yeah.

1        A.    -- for that.

2        Q.    Don't you guys have a log?

3        A.    The log is for the certification and the

4   testing of the radar before we conduct radar.

5        Q.    Okay.  Yeah, so prior to the use of it, you

6   establish -- I mean, I'm assuming you establish a time

7   when it was tested and checked; is that inaccurate?

8        A.    No, that's accurate.  At the beginning of my

9   shift, I test it and then I use it if I'm going to use

10  it.

11       Q.    Okay.  Then when you write the ticket, you

12  place another timestamp as to when the infraction

13  occurred; is that correct?

14       A.    That's correct.

15       Q.    Okay.  So you don't know, based off of your

16  testimony, when this chase began?

17            MR. FERNANDEZ:  Object to form.

18            THE WITNESS:  Yeah, I don't.

19  BY MR. PIERRE:

20       Q.    Okay.  So --

21       A.    I don't have --

22       Q.    So based off of your testimony, you stated

23  that you were on the scene.  The perimeter was for about

24  20 to 30 minutes, right?

25       A.    Right.

1      Q.   Okay.  Then it takes about five minutes to get

2   to my client, so that's 25, 35 minutes, correct?

3           MR. FERNANDEZ:  Object to form.

4           MS. WYDLER:  Join.

5   BY MR. PIERRE:

6      Q.   Let me rephrase that so we can make the record

7   clear.

8           After the individual fled the scene, you were

9   on the perimeter for 20 to 30 minutes, correct?

10          MR. FERNANDEZ:  Objection, asked and answered.

11          THE WITNESS:  Correct.

12   BY MR. PIERRE:

13      Q.   Was that a yes or no?

14      A.   That was a correct.

15      Q.   Okay.  And then it takes you about -- you get

16   a BOLO from Officer Bloom, and upon receiving that, it

17   takes you about five minutes to get to the scene where

18   my client is at, correct?

19          MR. FERNANDEZ:  Object to form.

20          THE WITNESS:  Correct.

21   BY MR. PIERRE:

22      Q.   So we have about 25 to 35 minutes, and then

23   sometime around 6:05, my client is placed under arrest,

24   correct?

25          MR. FERNANDEZ:  Object to form, asked and

1    answered.

2        MS. WYDLER:  Form, join.

3        THE WITNESS:  Correct.

4    BY MR. PIERRE:

5        Q.   Okay.  So let's just say -- you mentioned

6    something about citations, and you issued citations in

7    this case, correct?

8        A.   Correct.

9        Q.   I'm going to label.  I think these are the

10   citations.

11       MR. PIERRE:  Madam Court Reporter, this is

12       going to be Plaintiff's Exhibit 2.

13       (Thereupon, Plaintiff's Exhibit 2 was marked

14       for identification.)

15       MR. PIERRE:  Brandon, do you have a copy of

16       citations for the Officer, or do I need to remote?

17       MR. FERNANDEZ:  You need to remote.  I didn't

18       print those out.

19       MR. PIERRE:  Okay.

20   BY MR. PIERRE:

21       Q.   Okay.  Officer Guzman, I'm providing you

22   what's been marked as Plaintiff's Exhibit 2.  You can

23   remote -- I'm giving you the authorization to control my

24   screen so you can review.  Upon your review, I'll ask

25   you some questions.

1           MR. FERNANDEZ:  Scroll down a little bit.

2           MR. PIERRE:  I haven't even moved it.  He can

3      move it.

4           MR. FERNANDEZ:  No, he can't move it.  You

5      have to scroll down because it's screen share.

6           MR. PIERRE:  Oh, okay.  I see.

7           MR. FERNANDEZ:  Tell him to stop when you need

8      him to.

9           THE WITNESS:  I don't know what I'm looking

10     at.

11          MR. FERNANDEZ:  This is --

12          THE WITNESS:  Yeah, I know it's a citation,

13     but what does he want me to do with that?

14          MR. PIERRE:  Yeah, no, you have to review it,

15     then I can ask you the questions.

16          THE WITNESS:  I don't have access.  I can't

17     move it.  If you don't move it, I move it.

18          MR. PIERRE:  Yeah, that's what we're doing

19     right now, Officer.

20          MR. FERNANDEZ:  I can print these out if you

21     need me to.

22          MR. PIERRE:  It's up to you.  Whatever is

23     easier.

24          MR. FERNANDEZ:  Want me to print these out?

25          THE WITNESS:  No, it's fine.  If he shows me

1        what he's going to ask me, that's fine.

2              MR. FERNANDEZ:  Yeah, you should walk him

3        through, Faudlin.  It's good.

4              THE WITNESS:  Yeah.

5              MR. PIERRE:  Okay.

6              THE WITNESS:  No big deal.

7    BY MR. PIERRE:

8        Q.  So I just showed you four citations that were

9    issued to Mr. Samuel Scott.

10       A.  Correct.

11       Q.  Were these citations issued by you?

12       A.  Yes, sir.

13       Q.  Okay.  In the first citation, it shows 9:23

14   p.m.  What is that in reference to?

15       A.  When I created the ticket.

16       Q.  Okay.  So this has nothing to do with the time

17   of the actual incident.

18       A.  No, sir.  That's the system that gives you a

19   time when you create a ticket.

20       Q.  Here, it says this is the reckless driving

21   property damage ticket.

22       A.  Uh-huh.

23       Q.  It has I believe this is east, the direction

24   that it's going, traveling east.  Is that where you're

25   saying that the offense occurred?

```
 1      A.   That's the reckless driving property, east.  I
 2  don't know.  Is that east?  I can't tell.  I mean, it's
 3  check marked, but I can't see -- it says south, east,
 4  west.  Yeah, I believe so.
 5      Q.   Okay.  And, here, it says traveling E, so I'm
 6  assuming.
 7      A.   Correct.
 8      Q.   Okay.  So you're saying that the Northwest 7th
 9  Avenue and Northwest 71st Street, that's where the
10  reckless driving took place.
11      A.   That's where he took the red light.  He took
12  all the stop signs that I mentioned and then that red
13  light on 71 going eastbound, yes.
14      Q.   This is the ticket for leaving a scene without
15  giving the information, more than $50 damage.
16      A.   Correct.
17      Q.   And you issued this ticket towards Mr. Samuel
18  Scott, correct?
19      A.   Correct.
20      Q.   What was the basis because it just says
21  Northwest 7th Avenue, Northwest 71st Street east,
22  traveling E.
23      A.   Yeah.
24      Q.   What was the basis of issuing this ticket?
25      A.   Well, he crashed and fled the incident, so
```

1   with that charge, you have to give a ticket.

2       Q.   This is Ticket Number 3, failure to stop at

3   steady signal, red signal, and it's the same direction,

4   all traveling east.

5       A.   If you move up, I believe the exact

6   intersection is given.  No, that's fine.

7       Q.   Okay.  So what was the factual basis for this

8   ticket?

9       A.   The stop sign on 10 and 71.

10      Q.   And, finally, this is a different address.

11      A.   Correct.

12      Q.   And this is the failure to stop at a steady

13  red signal, one-way street before making left turn.

14  What was the factual basis for your fourth ticket, which

15  is A9Y0XCE?

16      A.   That was the red light on 77.

17      Q.   Okay.  So the distance from 71st Street, the

18  crash scene, and the distance from where you found my

19  client on 48th Street, how many miles is that

20  approximately?

21          MR. FERNANDEZ:  Object to form.

22          THE WITNESS:  I wouldn't tell you exactly.  I

23      mean, it's not far, but I wouldn't know the exact

24      mileage.

25  BY MR. PIERRE:

 1        Q.   Is it half a mile away?

 2        A.   I can't distance, so I don't know exactly how

 3   many miles.  It's not a far drive if that's what you're

 4   getting at.

 5        Q.   No, I mean, to run.  Let's say have you ever

 6   ran from 71st Street to 48th Street?

 7        A.   I haven't, no.

 8        Q.   No, I didn't know if you had a fleeing felon

 9   situation where you had to run like you're a marathon

10   runner.

11        A.   I mean, I wouldn't be in this job if I was

12   running that.

13        Q.   So as we sit here today, you don't know.  How

14   many streets away is it from 71st to 48th Street?

15        A.   I'll do the math, but again, it's not far

16   because you're on 5 Avenue and 71 to 6th Avenue and

17   48th.  It's not a far distance.

18        Q.   Okay.  And isn't it south from where the crash

19   scene is at?

20             MR. FERNANDEZ:  Object to form.

21             THE WITNESS:  South?

22   BY MR. PIERRE:

23        Q.   South, south.

24        A.   South?

25        Q.   Yeah.

 1      A.   It's, yeah, southeast of it.

 2      Q.   Okay.  So it's southeast of where the crash

 3  scene is at.

 4      A.   Correct.

 5      Q.   So the person who fled the vehicle was running

 6  north, correct?

 7      A.   Correct.

 8      Q.   Sir, I'm trying to get the next exhibit.

 9           MR. PIERRE:  Madam Court Reporter, I'm showing

10           you Plaintiff's Exhibit 3.

11           (Thereupon, Plaintiff's Exhibit 3 was marked

12           for identification.)

13           MR. PIERRE:  I'm showing the Plaintiff's

14           Exhibit 3.

15  BY MR. PIERRE:

16      Q.   Officer Guzman, have you ever seen this

17  document before?

18      A.   What is that?

19      Q.   Incident detail.

20      A.   No.

21      Q.   Okay.  Well, let's just say I'll represent to

22  you this document was produced by your counsel or

23  actually, by the City.  What's a Signal 14?

24      A.   Direct arrest.  It says right next to it.

25      Q.   Yeah.  And the address, it says Northwest 12th

1    Avenue, Northwest 67th Street.  That presumes to be TGK,

2    correct?

3        A.   No, that's the beginning of the incident, 12th

4    Avenue and 67th Street.

5        Q.   Oh, okay.  And then it says dispatch 6/1/2018

6    at 8:22:50 p.m.  Do you see that?

7        A.   I see that, yeah.

8        Q.   What is the 8:22:50 p.m.?

9        A.   That's dispatch for patrol, but we don't get

10   dispatched.  When I took the signal, 14 took on that to

11   do the paperwork.

12       Q.   That's when you took the signal to do the

13   paperwork.

14       A.   Correct.

15       Q.   Okay.  So this doesn't actually mean when you

16   -- the course of the incident or what was happening

17   during the incident.

18       A.   No, it has nothing to do with the incident.

19       Q.   I mean, it has something to do with the

20   incident.  You're doing the paperwork for the incident,

21   correct?

22       A.   It's irrelevant to the incident.

23       Q.   So this has nothing to do with Mr. Scott's

24   arrest?

25            MR. FERNANDEZ:  Object to form.

 1          THE WITNESS:  It just gives you the broad

 2      information, but the dispatch time has nothing to

 3      do with it.

 4  BY MR. PIERRE:

 5      Q.   Okay.  So when it says arrival here at 8:22:50

 6  p.m., this is just as it relates to the paperwork for

 7  Mr. Scott's arrest, correct?

 8      A.   Yes, sir.  Yes, sir.

 9      Q.   And then it says in service,11:38:46 p.m.; is

10  that when the paperwork was completed?

11      A.   That's when I went back into service.

12      Q.   Okay.  That's the wrong officer.  Did you ever

13  speak to Officer Williams about this case?

14      A.   No.

15      Q.   Okay.  And I know you don't know this

16  situation, but I'm going to label this as Plaintiff's

17  Exhibit 4.

18          (Thereupon, Plaintiff's Exhibit 4 was marked

19      for identification.)

20  BY MR. PIERRE:

21      Q.   Okay.  This is Plaintiff's Exhibit 4.  This

22  says -- and I'll give you some opportunity to review the

23  question before I ask you -- review the document so you

24  don't feel like I'm giving you a got you situation.

25      A.   All right.

1     Q.   Okay.  Okay.  This is an incident detail.  The

2   crime area officer is Officer Bloom.  It says his

3   arrival was 6/1/2018 at 6:30:23 p.m.  He says he was --

4   the next time he went back into service was 8:22:27 p.m.

5   The comments here state OCC to CMP 07 black or BLK Jeep

6   Compass by unknown offender.  BOLO for BLK 2007 Jeep

7   Compass TCASL84 LS at Northwest 6th Avenue 48th Street.

8         Do you know what the comments mean?

9     A.   Complainant, 07 means cancel, black Jeep

10   Compass by unknown officer.  BOLO obviously, the BOLO,

11   the Jeep Compass, the tag and the address, which is 6

12   and 48.

13     Q.   Okay.  Do you know what the OCC means?

14     A.   No, I do not.

15     Q.   Okay.  What is the 22 stolen vehicle?  Is that

16   the same signal meaning it's a stolen vehicle?

17     A.   Yeah, 22 -- I mean, vehicle is stolen vehicle.

18     Q.   Okay.  Here, it says that officer arrived at

19   6:22 or 6:30 p.m.  In your arrest affidavit, you stated

20   that you arrest him at -- him being Samuel Scott -- at

21   6:05, correct?

22     A.   Correct.

23     Q.   Okay.  What I'm trying to get at, wasn't

24   Officer Bloom with Samuel Scott prior to you arriving at

25   48th Street and Northwest 6th Avenue?

1        A.   Correct.

2        Q.   So how could he have been arrested prior to

3    Officer Bloom's arrival?

4             MR. FERNANDEZ:  Object to form.

5             MS. WYDLER:  Objection, form.

6             THE WITNESS:  I mean, somebody has the time

7        off wrong, whether it was my A-form, or you can

8        always show arrival way after you arrive to the

9        scene.  I mean, it could be inaccurate timing.

10   BY MR. PIERRE:

11       Q.   Okay.  Let's see because I'm trying to get at

12   the timeline here what actually occurred.  Okay.  I'm

13   going to show you Officer Bloom's worksheet.  We'll

14   label this as Plaintiff's Exhibit 5.

15            (Thereupon, Plaintiff's Exhibit 5 was marked

16       for identification.)

17   BY MR. PIERRE:

18       Q.   Okay.  In your line of work, you've seen

19   officer worksheets before, correct?

20       A.   We don't use them anymore, but yes.

21       Q.   Okay.  So what do you guys use now?

22       A.   We don't.

23       Q.   So okay.  In this -- in Officer Bloom's

24   worksheet, what is the signal that's associated with Mr.

25   Scott's stolen vehicle?

1      A.   The same way you saw on the previous page,

2  exhibition 22, 563 Northwest 48th Street.

3      Q.   Okay.  So the officer worksheet says he

4  arrived there around 6:30 as well as the incident search

5  detail shows he arrived there at 6:30, correct?

6      A.   Correct.

7      Q.   I'm going to go to report that was -- and have

8  you had an opportunity to ever review Brandon Williams

9  report?

10     A.   Earlier today, yeah.

11     Q.   Okay.  And I'm not going to ask you to check

12  for accuracy because I know you didn't write the report,

13  and did you ever consult with him providing any

14  information as it relates to the crash?

15     A.   No, because everything was there for the

16  crash.

17          MR. PIERRE:  Madam Court Reporter, I'm going

18      to label this as Plaintiff's Exhibit 6.

19          (Thereupon, Plaintiff's Exhibit 6 was marked

20      for identification.)

21  BY MR. PIERRE:

22     Q.   Okay.  Time on the scene and do you want to

23  review this before I --

24     A.   No, no, go ahead.

25     Q.   -- start talking?

1          A.    That's fine.

2          Q.    Good.  Okay.  Here is Officer Brandon Williams

3     report.  He states that the time dispatched was 6:47.

4     The time on the scene was 6:47.  The time that he

5     cleared the scene was 7:31.  He says the time of the

6     crash was 6:22.  Do you see that?

7          A.    I see that.  Yes, sir.

8          Q.    So based off of -- do you have any reason to

9     believe that the accuracy -- I mean, that Mr. Williams

10    or Officer Williams -- I apologize -- was mistaken when

11    he said the time of the crash was 6:22?

12              MR. FERNANDEZ:  Object to form.

13              MS. WYDLER:  Join.

14              THE WITNESS:  You will have to ask him.

15    BY MR. PIERRE:

16         Q.    Okay.  No, I just want to know because you

17    list Officer Williams in your arrest affidavit as a

18    person who had a body-worn camera, and presumably, I

19    think you connected your report -- your arrest affidavit

20    with his report; is that true?

21              MR. FERNANDEZ:  Object to form.

22              THE WITNESS:  Correct.

23    BY MR. PIERRE:

24         Q.    Okay.  So you said you were the only person on

25    the scene at the time of the crash, correct?

1        A.    Correct.

2        Q.    The only officer.

3        A.    At the time of the crash, yes.

4        Q.    Okay.  So if Officer Williams was not present

5   at the time of the crash, where would he have gotten the

6   information of the time of the crash?

7        A.    From me.

8        Q.    So did you inform Officer Williams that the

9   time of the crash was 6:22 p.m.?

10       A.    I can't recall, but it's me or the dispatch

11   when I advised them.

12       Q.    Okay.

13       A.    So either one.

14       Q.    Okay.  So if I'm going by this, and based off

15   of the timeline that we have right now, you state that

16   Mr. Scott was already arrested and in handcuffs,

17   correct?

18            MR. FERNANDEZ:  Object to form.

19            MS. WYDLER:  Join.

20            THE WITNESS:  Correct.

21   BY MR. PIERRE:

22       Q.    I didn't hear that because of the objections,

23   so I'm going to re-ask the question, and just wait for

24   your counsels to object because I know they're going to

25   object, and then you can answer.

 1                You stated in your arrest affidavit that Mr.

 2    Samuel Scott was arrested at 6:05, correct?

 3                MR. FERNANDEZ:  Object to form, asked and

 4          answered.

 5                THE WITNESS:  Correct.

 6    BY MR. PIERRE:

 7          Q.   You or the dispatcher provided Officer

 8    Williams at the time of crash at 6:22 p.m., correct?

 9                MR. FERNANDEZ:  Object to form.

10                THE WITNESS:  Correct.

11    BY MR. PIERRE:

12          Q.   The time reported on the traffic report for

13    the crash was 6:47 p.m. as it's identified on the

14    Florida Traffic Crash Report, correct?

15          A.   Correct.

16          Q.   Based off of your review of Officer Michael

17    Bloom's incident search with incident details and his

18    officer worksheet, he arrived at -- I mean, he didn't

19    arrive at the location, but he was dispatched at 6:22:58

20    p.m. for the stolen vehicle.

21                MR. FERNANDEZ:  Object to form, asked and

22          answered.

23                THE WITNESS:  Yeah, yes, correct.

24    BY MR. PIERRE:

25          Q.   Okay.  What I'm -- and then he actually

```
 1   arrives at 6:30.

 2            MR. FERNANDEZ:  Object to form.

 3            THE WITNESS:  Apparently, yes.

 4   BY MR. PIERRE:

 5       Q.   Okay.  What I'm trying to get at is how were

 6   you able to arrest an individual who hadn't reported his

 7   vehicle stolen yet?

 8            MR. FERNANDEZ:  Object to form.

 9            MS. WYDLER:  Join.

10            THE WITNESS:  The paperwork is done after.  I

11          mean, there was a mistake made in the A-form, but

12          the time part, I mean, that's -- everything is done

13          way after.  So it's not like I made the A-form

14          before I went and arrested the guy.

15   BY MR. PIERRE:

16       Q.   You would agree with me, Officer, that what

17   you write on your A-form has to be true, correct?

18            MR. FERNANDEZ:  Object to form.

19            THE WITNESS:  It's true, but it doesn't mean

20          I'm not allowed to make mistakes, especially on the

21          time.

22   BY MR. PIERRE:

23       Q.   I agree with that, but because the time you're

24   asking us to believe your side of the story, and the

25   time places a significant importance in this case.  We
```

1    have to address the time, right?

2            MR. FERNANDEZ:  Object to form.

3            MS. WYDLER:  Join.

4            THE WITNESS:  I believe -- sorry, ma'am.  Go

5        ahead.

6    BY MR. PIERRE:

7        Q.   You can respond.  They objected.

8        A.   I believe that me ID'ing the person is more

9    important than the time, but that's me.

10       Q.   Yeah.

11       A.   And the fact that I state on my narrative.

12       Q.   And you raise two important points.  First,

13   can a person be in two places at once?

14           MR. FERNANDEZ:  Object to form.

15           MS. WYDLER:  Join.

16           THE WITNESS:  It's not the same time.

17   BY MR. PIERRE:

18       Q.   What I'm telling you is -- just indulge me.

19   Can a person be in two different locations at the same

20   time?

21           MR. FERNANDEZ:  Object to form.

22           THE WITNESS:  No.

23   BY MR. PIERRE:

24       Q.   So in your narrative, you stated there was a

25   40-minute delay.  That would have been 40 minutes from

```
 1   -- it would have been the 5:40 time?

 2           MR. FERNANDEZ:  Object to form, asked and

 3       answered.

 4           THE WITNESS:  I can't tell you that because

 5       that's what the caller said.  That's not what I

 6       estimated.  Not what I did.  Not what I heard.

 7       That's what the caller said that he called that the

 8       vehicle was stolen 40 minutes ago from the time

 9       that he called.  You will have to go back and look

10       at his call time and take 40 minutes from there.

11   BY MR. PIERRE:

12       Q.   Okay.  Let's see if we can -- okay.  Officer,

13   do you see my --

14       A.   I do.

15       Q.   -- screen?  So you're conceding that you made

16   a mistake at the 6:05 p.m. time.

17           MR. FERNANDEZ:  Object to form.

18           THE WITNESS:  I mean, I guess I am.  That's

19       for all the same scenario.

20   BY MR. PIERRE:

21       Q.   Okay.  What else have you made a mistake on in

22   your report?

23           MR. FERNANDEZ:  Object to form.

24           THE WITNESS:  I don't know, sir.

25   BY MR. PIERRE:
```

1        Q.   Did you make a mistake on at 5:40 p.m., a call

2   was received through the City of Miami's dispatch?

3             MR. FERNANDEZ:  Object to form.

4             THE WITNESS:  I don't know.

5   BY MR. PIERRE:

6        Q.   Did you make a mistake as he fled, I observed

7   a black male, bald, about six, two, heavyset with a

8   white tank top running away from the scene?

9             MR. FERNANDEZ:  Object to form.

10            THE WITNESS:  Just I made a mistake on that.

11  BY MR. PIERRE:

12       Q.   Okay.  I have one more exhibit.

13            MR. PIERRE:  Madam Court Reporter, what

14       exhibit are we on?

15            THE REPORTER:  Just a moment.  The next one

16       will be Exhibit 7.

17            (Thereupon, Plaintiff's Exhibit 7 was marked

18       for identification.)

19            MR. PIERRE:  Okay.  Thank you.

20  BY MR. PIERRE:

21       Q.   Officer Guzman, can you see my screen?

22       A.   I can.

23       Q.   Okay.  I'm going to scroll down for you, and

24  you let me know if I'm going too fast.  Have you seen

25  this already?

1      A.   I have.

2      Q.   Okay.  I'm going to ask you some questions as

3   it relates to this.  Okay.

4           Question Number 1, it says provide a detail

5   narrative to what led to Scott's arrest by you on June

6   1, 2018.

7      A.   Yes.

8      Q.   Can you please read that into the record?

9      A.   The whole thing?

10     Q.   Yeah.

11     A.   On June 1, 2018, at around 4:30 p.m., Officer

12   Guzman conducted radar detail in the area of Northwest

13   12th Avenue and Northwest 67th Avenue in Miami, Florida.

14   While conducting a radar detail around 5:00 p.m.,

15   Officer Guzman identified a black Jeep Compass traveling

16   approximately 50 miles an hour in a 30 mile per hour

17   zone and began pursuit of the vehicle and initial

18   traffic stop.

19          As Officer Guzman pursued the vehicle, he

20   observed the plaintiff and the vehicle with what

21   appeared to be a white tank top.  As Officer Guzman

22   pursued the vehicle, the vehicle failed to stop at a

23   stop sign and a red steady device, and the vehicle

24   ultimately crashed into a second vehicle parked in the

25   area of 515 Northwest 72 Avenue.

1          Officer Guzman then observed an African

2     American male heavyset with what appeared a white tank

3     top exit the vehicle and fled the scene.  Officer Guzman

4     investigated the vehicle where he observed in plain view

5     a black and silver firearm on front passenger floor,

6     four plastic baggies suspected of containing marijuana

7     and a photo ID of the plaintiff.

8          At or about 5:40 p.m., City dispatch advised

9     of a report of a stolen Jeep Compass and subsequently,

10    Officer Bloom met up with the plaintiff in the area of

11    563 Northwest 48th Street, who claimed he reported a

12    stolen vehicle.  Officer Guzman was provided a

13    description of the plaintiff and subsequently met up in

14    the area where Officer Bloom and the plaintiff were

15    located.

16         Officer Guzman identified plaintiff as the

17    individual who he believes fled the scene of the former

18    accident, as the plaintiff was an African American male,

19    heavyset wearing a white tank top and sweating from

20    fleeing the scene.  Based on the facts and information

21    with Officer Guzman's knowledge as an officer of the

22    scene, Officer Guzman ultimately arrested the pf.

23         MR. FERNANDEZ:  And I'm going to object to the

24        extent there wasn't a question asked.

25         MR. PIERRE:  I said please read it into the

 1       record, but I could have said what does your

 2       Question Number 1 say?  So you want him to read it

 3       again?

 4              THE WITNESS:  No, it's fine.

 5    BY MR. PIERRE:

 6       Q.   Okay.  Well, Officer Guzman, here is what

 7    usually happens in my line of field.  You have the

 8    arrest affidavit and then I propound these

 9    interrogatories for you to answer in the civil case.  I

10    generally try to figure out how close is the officer's

11    story to the arrest affidavit.

12              So my question is this.  What is the

13    difference between your arrest affidavit and these

14    answers to interrogatories that you were required to

15    submit under oath?

16              MR. FERNANDEZ:  Object to form.  Answer if you

17       can.

18              THE WITNESS:  The difference, I would have to

19       compare both of them.  I mean, I don't know how

20       specific what difference.

21    BY MR. PIERRE:

22       Q.   Okay.  Did you write this answer, and if it

23    requires you to divulge any information about your

24    attorney, I don't want to know.  Outside of that, did

25    you write this response to Question Number 1?

```
 1            MR. FERNANDEZ:  Object to form, and Faudlin,

 2       it's kind of delving into work product.

 3            MR. PIERRE:  Okay.  Like I said, I'm not --

 4            MR. FERNANDEZ:  I don't want to trample on

 5       your question but --

 6            MR. PIERRE:  Yeah.

 7            MR. FERNANDEZ:  -- I'll instruct him not to

 8       answer to the extent it doesn't involve answering

 9       his interrogatory.  I would just ask you rephrase

10       the question and try to elicit non-privileged work

11       product information.

12            MR. PIERRE:  Okay.

13  BY MR. PIERRE:

14       Q.  As your attorney instructed, I don't want to

15  know what he's done or what you and him have done

16  together.  That has no -- I don't want that question.

17            What I'm trying to get at is independent from

18  your attorney, what portion, if any, did you contribute

19  to the narrative response to Question Number 1?

20            MR. FERNANDEZ:  And I have to instruct him not

21       to answer because it deals with our collaboration.

22            MR. PIERRE:  Okay.  And I will respectfully

23       accept that answer.

24            MR. FERNANDEZ:  Thank you.

25            MR. PIERRE:  Or that instruction.
```

1   BY MR. PIERRE:

2       Q.   Okay.  So here's what I've noticed between

3   your affidavit and your answers to interrogatories.  It

4   says as Officer Guzman pursued the vehicle, he observed

5   the plaintiff in the vehicle with what appeared to be a

6   white tank top.  I'm just going to highlight that for

7   the record.  So let's go back to your arrest affidavit.

8   Where in your arrest affidavit does it actually say what

9   you said in your response to Interrogatory Number 1?

10          MS. WYDLER:  Objection, form.

11          THE WITNESS:  At the bottom when I describe

12      the plaintiff?

13  BY MR. PIERRE:

14      Q.   Please direct me to it so I can highlight it

15  for the jury.

16      A.   With a white tank top running away from the

17  scene.

18      Q.   Okay.  Let's go back to your response to

19  interrogatories.  It says as Officer Guzman pursued the

20  vehicle, he observed the plaintiff in the vehicle with

21  what appeared to be a white tank top.  Do you see that?

22      A.   I see that.

23      Q.   Okay.  In your arrest affidavit, where does it

24  say you observed my client in the vehicle?

25      A.   It doesn't.

1          Q.   And when you wrote this arrest affidavit, did

2     you have any help in writing this arrest affidavit?

3               MR. FERNANDEZ:  Object to form.

4               THE WITNESS:  No.

5     BY MR. PIERRE:

6          Q.   Were you being sued by my client for any of

7     the claims in this lawsuit at the time?

8          A.   No.

9          Q.   And, again, like I said, the English language

10    is very tricky, but you were able to clearly communicate

11    that you observed my client in his vehicle with what

12    appeared to be a white tank top in your response to

13    interrogatories, correct?

14         A.   Correct.

15         Q.   And in your arrest affidavit, when you use the

16    terminology observe, you clearly stated as he fled, I

17    observed a black male, bald about six, two, heavyset

18    with a white tank top running away from the scene,

19    correct?

20         A.   Correct.

21         Q.   Here, it says officer -- at or about 5:40

22    p.m., City dispatch advised a report of a stolen black

23    Jeep Compass, and subsequently, Officer Bloom met up

24    with the plaintiff in the area of 563 who claimed he

25    reported the stolen vehicle.  Was that information known

1    to you at the time, or was it known to you -- when did

2    this information become known to you?

3         A.   What information?  That there was a stolen

4    vehicle being dispatched?

5         Q.   Not that portion because I see that in the

6    police report, but subsequently, Officer Bloom met up

7    with plaintiff in the area of 563 Northwest 48th Street.

8         A.   Yeah, that's the scene.

9         Q.   Okay.  I asked for Number 6, have you ever

10   been a party, either plaintiff or defendant, in a legal

11   proceeding other than the present matter.  Do you see

12   that question?

13        A.   Yes, sir.

14        Q.   Okay.  Let me ask you that question again so

15   we have it on record.  Have you ever been a party,

16   plaintiff or defendant, in a legal proceeding other than

17   the present matter?

18        A.   Like me personally?

19        Q.   Yes, you personally.

20             MR. FERNANDEZ:  Object to form.

21             THE WITNESS:  No.

22   BY MR. PIERRE:

23        Q.   So you've never been sued?

24        A.   No.

25        Q.   You have never filed for a -- and I'm not

1   talking about traffic proceedings, right?  You've never

2   had criminal charges filed against you?

3        A.   No.

4        Q.   You've never had any -- have you had any

5   quasi-legal administrative proceedings?

6        A.   No.

7        Q.   Okay.  Number 7 asks within the last ten

8   years, identify all instances where a complaint has been

9   filed or charges filed against you for false arrest,

10  unlawful search.  Do you see that question?

11       A.   Yeah, I see it.

12       Q.   Has any complaints ever been filed against

13  you, Officer Guzman?

14            MR. FERNANDEZ:  Object to form.  What type of

15       complaints?

16  BY MR. PIERRE:

17       Q.   Any complaints regarding to the false arrest,

18  unlawful search, unlawful entry to the home, retaliation

19  for free speech, prosecution.  Any complaints, whether

20  it's civil, informal, internal affairs, what have you?

21       A.   Not in reference to things it specifies here,

22  no.

23       Q.   Okay.  Question Number 8, is it your

24  contention that the City of Miami is liable for your

25  actions leading to Scott's arrest because you did not

1    act in bad faith, litigious purpose, or in a manner

2    examining wanton or willful disregard for human rights

3    or safety?

4            MR. FERNANDEZ:  Object to form.  You can

5        answer if you know.

6            THE WITNESS:  I mean, you're asking me if the

7        City of Miami is liable?

8    BY MR. PIERRE:

9        Q.  What I'm saying -- let me first ask this.  In

10   arresting Scott, did you act with bad faith, malicious

11   purpose, or in a manner exhibiting wanton or willful

12   disregard for human rights, safety, or property with

13   regard to the incident at issue?

14           MR. FERNANDEZ:  Object to form.

15           THE WITNESS:  No, not at all.

16   BY MR. PIERRE:

17       Q.  Okay.  And why do you say no, not at all?

18       A.  Not at all because I come to do my job as best

19   as I can.

20       Q.  Early on, I asked about your training and your

21   ability to -- and your experience and education

22   regarding searches and seizures.  Do you remember that?

23       A.  Yeah.  Yes, sir.

24       Q.  What's reasonable suspicion?

25       A.  Reasonable suspicion?  Where you have -- sorry

1   -- any reason for a crime being acted or was about to be

2   committed.

3        Q.   Okay.  And what's probable cause?

4        A.   The proof of the crime that was committed or

5   being committed or would be committed.

6        Q.   Okay.  And probable cause, what's the

7   difference between probable cause and reasonable

8   suspicion?

9             MR. FERNANDEZ:  Object to form.

10            MS. WYDLER:  Join.

11            THE WITNESS:  Reasonable suspicion is like,

12        you know, dispel or confirm the crime, and then

13        probable cause is the evidence or the facts that

14        you have about the crime.

15   BY MR. PIERRE:

16        Q.   Okay.

17        A.   Or the incident.

18        Q.   So you can correct me if I'm wrong.  There's

19   three sort of police and citizen encounters, right?

20   There's the consensual encounter which I can go up to

21   you as an officer and we can discuss -- and you can come

22   up to me as a citizen and discuss anything.  I'm free as

23   a citizen to stop the encounter, correct?

24        A.   Correct.

25        Q.   And then there's this thing called the Terry

1    stop.  Did you learn about that in the academy?

2         A.   Yes.

3         Q.   Okay.  And correct me if I'm wrong, the Terry

4    stop says there has to be articulable facts to suggest

5    that a crime has been committed, is in the process of

6    being committed, or will be committed.  Is that an

7    accurate assessment or definition?

8              MR. FERNANDEZ:  Object to form.

9              THE WITNESS:  That is correct.

10   BY MR. PIERRE:

11        Q.   And under the Terry stop, an officer can stop

12   an individual, and I think what you said, to confirm or

13   dispel the suspicion, right?

14        A.   Correct.

15        Q.   But that -- and that's where the reasonable

16   suspicion comes in that it has to be -- it can't be a

17   hunch or a guess.  Would you agree with that?

18             MR. FERNANDEZ:  Form.

19             THE WITNESS:  Correct.

20   BY MR. PIERRE:

21        Q.   And it has to be brief, so brief is

22   reasonable, meaning long enough to confirm or dispel

23   your suspicion that a crime has been committed.  Is that

24   what you know the Terry stop to be?

25             MR. FERNANDEZ:  Object to form.

1              THE WITNESS:  Correct.

2   BY MR. PIERRE:

3      Q.   And then there's that third line where we

4   cross, and that's where we come to probable cause.

5   That's when, based off of the totality of the

6   circumstances, you're able to effectuate an arrest

7   because you have believed that the facts indicate that a

8   crime has been committed.  Is that a correct definition

9   or summary of what probable cause may be under your

10  training and education?

11             MR. FERNANDEZ:  Object to form.

12             MS. WYDLER:  Join.

13             THE WITNESS:  Yes.

14  BY MR. PIERRE:

15     Q.   So in this situation, you believe that there

16  was probable cause to arrest Samuel Scott based off of

17  -- let's just go by your arrest affidavit because that's

18  all we have at the time -- because you observed a six

19  foot two, black male, heavyset, running northbound on

20  95, right?

21             MR. FERNANDEZ:  Object.

22             MS. WYDLER:  Join.

23             THE WITNESS:  Correct.

24  BY MR. PIERRE:

25     Q.   So let me ask you some other questions.

```
 1              MR. PIERRE:  And, Lourdes, I saw your message

 2         in the chat.  We may be able to get done with this

 3         before your 2:30.

 4              MS. WYDLER:  Okay.  Thank you.

 5              MR. PIERRE:  No problem.

 6    BY MR. PIERRE:

 7         Q.   Okay.  Officer Guzman, do you own a home?

 8         A.   Yes.

 9         Q.   How many homes do you own?

10         A.   One.

11         Q.   How much is that home worth?

12         A.   I'm not sure right now.

13         Q.   How much did you buy it for?

14         A.   345.

15         Q.   When did you buy that home?

16         A.   Five years ago.

17         Q.   So it's worth a lot of money now.  What is

18    your annual salary?

19         A.   80,000.

20         Q.   Do you have any bank accounts?

21         A.   Yes.

22         Q.   And how many bank accounts do you have?

23         A.   Two.

24         Q.   What is the value of the total bank accounts?

25              MR. FERNANDEZ:  Object to form.
```

```
1              THE WITNESS:  Like 500 bucks.

2   BY MR. PIERRE:

3        Q.   Do you have any stocks?

4        A.   No.

5        Q.   Do you have any pension, or do you have a

6   pension fund of some sort?

7        A.   Yes.

8        Q.   And do you know what's the present value of

9   that fund?

10       A.   No.

11       Q.   Do you have any other securities such as --

12       A.   No, no.

13       Q.   Do you own any businesses?

14       A.   No.

15       Q.   Do you have any ownership interest in anything

16  that is valued over the amount of 10,000?

17       A.   No.

18       Q.   And that excludes your house?

19       A.   Yes.

20       Q.   Okay.  Do you own a vehicle?

21       A.   Yes.

22       Q.   How much is your vehicle worth?

23            MR. FERNANDEZ:  Object to form.

24            THE WITNESS:  I'm not sure.

25  BY MR. PIERRE:
```

1      Q.    What's the value of your vehicle?

2      A.    I'm not sure the value right now.

3      Q.    Okay.  What year, make, and model is your

4  vehicle?

5      A.    It's a Ford Escape, 2016.

6      Q.    Okay.  And I know you mentioned that you no

7  longer work for Target and the U.S. Open.  Are you

8  receiving any retirement benefits from either of those

9  companies?

10      A.    No.

11      Q.    Do you receive any rent from any of the

12  individuals -- I mean, do you receive rent?

13      A.    No.

14      Q.    Okay.  I talked about your arrest affidavit,

15  but I have to ask you these questions just as a sort of

16  closing remark.  The arrest affidavit that was

17  introduced as Plaintiff's Exhibit, I believe --

18          MS. WYDLER:  You cut out, Faudlin.

19          MR. PIERRE:  Can you hear me?

20          MS. WYDLER:  Now we can.  I think so.

21          MR. PIERRE:  Okay.  Sorry about that.  I

22      didn't hear the response, so I'll repeat it for the

23      record.

24  BY MR. PIERRE:

25      Q.    As it relates to the arrest affidavit that was

1   submitted into the record in this deposition, you signed

2   this arrest affidavit, correct?

3        A.   Correct.

4        Q.   And you reviewed before you signed the arrest

5   form, correct?

6        A.   Correct.

7        Q.   Did you review it for accuracy prior to

8   signing it?

9             MR. FERNANDEZ:  Object to form.

10            THE WITNESS:  Correct.

11   BY MR. PIERRE:

12        Q.   And were statements in the police report -- I

13   mean, the arrest affidavit true?

14            MR. FERNANDEZ:  Object to form, asked and

15        answered.

16            THE WITNESS:  Correct.

17   BY MR. PIERRE:

18        Q.   Was the narrative that you supplied in the

19   arrest affidavit true?

20            MR. FERNANDEZ:  Object to form, asked and

21        answered.

22            THE WITNESS:  Correct.

23   BY MR. PIERRE:

24        Q.   Was the narrative an account of the events

25   that you perceived closer in time when you wrote the

1    arrest affidavit?

2            MR. FERNANDEZ:  Object to form, asked and

3        answered.  He's answered these questions about

4        three or four times now, Faudlin.  I'm allowing him

5        to answer it one more time.  Go ahead.

6            THE WITNESS:  Correct.

7    BY MR. PIERRE:

8        Q.  Did you make any false statements in the

9    narrative that you supplied in your arrest affidavit?

10           MR. FERNANDEZ:  Same objection.  Last time you

11       will answer this question.

12           THE WITNESS:  Correct.

13           MR. FERNANDEZ:  No, hold on.  Answer the

14       questions that he asked.  Don't just say correct.

15           Go ahead, Faudlin, ask the question one more

16       time.

17   BY MR. PIERRE:

18       Q.  I'm going to try to get you out of here

19   shortly.  These are my last remarks, Officer.  I know --

20       A.  You're killing me.  I know it's for the record

21   but --

22       Q.  I'm almost there.  Just hang in there.

23           Did you make any false statements in this

24   narrative?

25           MR. FERNANDEZ:  Object to form.

```
 1              THE WITNESS:  No.
 2   BY MR. PIERRE:
 3        Q.   And did the narrative constitute a complete
 4   account of the events that you perceived on June 1,
 5   2018?
 6              MR. FERNANDEZ:  Object to form, asked and
 7         answered.
 8              MS. WYDLER:  Form.
 9              THE WITNESS:  Yes.
10   BY MR. PIERRE:
11        Q.   Okay.  Is there anything you would like to add
12   that's important or relevant?
13        A.   No.
14        Q.   Have you understood all the questions asked?
15        A.   Yes.
16        Q.   Have you answered each question truthfully?
17        A.   Yes.
18        Q.   I didn't hear that.  Have you answered each
19   question truthfully?
20        A.   Yes.
21        Q.   Have you answered each question completely?
22        A.   Yes.
23        Q.   At this time, do you want to change or amend
24   any of your answers?
25              MR. FERNANDEZ:  Object to form.
```

```
 1              THE WITNESS:  No.
 2    BY MR. PIERRE:
 3        Q.   If this case proceeds to trial or hearing,
 4    will your testimony remain the same?
 5              MR. FERNANDEZ:  Object to form.
 6              THE WITNESS:  Yes.
 7    BY MR. PIERRE:
 8        Q.   If you do recall something, will you alert
 9    your counsel so we can amend the record?
10        A.   Yes.
11        Q.   Officer, I don't have any further questions
12    for you.  The other counsels -- your counsel and Ms.
13    Wydler may have.
14              MR. FERNANDEZ:  So I do, and Lourdes does, but
15         she's got a call at 2:30.  Can we come back at
16         three o'clock?
17              MR. PIERRE:  Yeah, that's fine.
18              MR. FERNANDEZ:  Okay.  All right.  Thank you.
19         Let's go off the record.
20              (Off the record.)
21                         CROSS EXAMINATION
22    BY MR. FERNANDEZ:
23        Q.   Officer, Guzman, my name is Brandon Fernandez.
24    I represent the City of Miami and yourself along with
25    the other officers.  How are you doing today?
```

```
 1        A.   Good, good, good.

 2        Q.   I know you've been here for a long time, so I

 3   appreciate you being here and, you know, getting through

 4   this and testifying to the incident we're here about

 5   today.

 6             The incident was June 1, 2018, right?

 7        A.   Correct.

 8        Q.   Okay.  Was that in the middle of summer?

 9        A.   Yes, sir.

10        Q.   Okay.  Was it -- can you describe the

11   conditions that day?  Was it sunny?  Was it dark?  Was

12   it raining?  Was it clear?  How was it?

13        A.   It was sunny and daytime.

14        Q.   Okay.  Did it rain that day?

15        A.   No.

16        Q.   Okay.  And, obviously, you know, we talked

17   about when you radared the suspect in the case, it kind

18   of went to the trajectory of the route.  So I'm going to

19   go ahead and mark -- you know, derive some context with

20   some photos.  I'm going to mark these Google images

21   Bates stamped City of Miami 003525 through 35 as

22   Composite Exhibit A.

23             (Thereupon, Defendant's Exhibit 1 was marked

24        for identification.)

25   BY MR. FERNANDEZ:
```

1      Q.   Do you have those?  I'll go ahead and share my

2   screen.

3           MR. FERNANDEZ:  Oh, I can't share my screen.

4           MR. PIERRE:  Oh.

5           MR. FERNANDEZ:  Whoever the host is needs to

6       allow me to share my screen.

7           MR. PIERRE:  You're good.

8           MR. FERNANDEZ:  Okay.  Everybody see this?

9           MR. PIERRE:  Yes.

10          MR. FERNANDEZ:  Okay.

11   BY MR. FERNANDEZ:

12      Q.   Officer Guzman, this has been marked as

13   Composite Exhibit A.  We'll call this Composite Exhibit

14   A1.  Are you familiar with what's being shown in this

15   exhibit?

16      A.   Yes.

17      Q.   Okay.  And what is being shown in this

18   exhibit?

19      A.   12th Avenue and 68 Street.

20      Q.   Okay.  And 68 or 67th Street?

21      A.   Correction, yes, 67.  It's facing 68.

22      Q.   Okay.  And is this the intersection where you

23   were conducting radar detail on June 1, 2018?

24      A.   Correct.

25      Q.   All right.  Let me ask you this.  On the date

1    of the incident here, how many times have you conducted

2    radar in this particular area right here?

3         A.   Multiple times when I was patrolling the

4    motorists in that area.

5         Q.   On that date, how long would you say timewise

6    -- would you give us an estimation as to how long you

7    had been patrolling that area?

8         A.   That date?

9         Q.   Uh-huh.  Well, not that date.  Just in general

10   up until that day.

11        A.   In general, up until that date?  Like what do

12   you mean?  Timewise or like --

13        Q.   Strike that.  Let me ask it this way.  On the

14   date in question, where were you conducting radar

15   detail?

16        A.   Right behind the tree on the right side of the

17   tree in the median.

18        Q.   Okay.  So for purposes of the record, were you

19   in the -- do you see the light pole right there?

20        A.   Correct.

21        Q.   Were you located in front of that?

22        A.   Yes.

23        Q.   Okay.  Closest to the curb?

24        A.   Correct.

25        Q.   Okay.  And how many times in your tenure as a

1  Miami Police Officer would you say you conducted radar

2  in that exact spot?

3       A.   Multiple times.  I mean, again, I was there

4  for three years, and that was my regular spot.

5       Q.   More than ten times?

6       A.   Ten, fifteen, twenty times.

7       Q.   More than 50 times?

8       A.   No, about 20 times.

9       Q.   Okay.  So let's talk about your Ford Taurus.

10  When you're conducting radar detail in the vehicle you

11  were driving on that day, where was your radar located

12  in your vehicle?

13       A.   Inside the vehicle on the right front column.

14       Q.   Okay.  When you mean right front column, the

15  pillar on the passenger side, right?

16       A.   Correct.

17       Q.   And is it at the roof, or is it at the bottom?

18       A.   At the roof hanging off the body.

19       Q.   Okay.  And so when you're conducting radar

20  detail in this particular spot, for your radar to, you

21  know, make a read on oncoming traffic, you have to park

22  -- would you agree with me your vehicle needs to be as

23  close to the curb as possible?

24       A.   Correct.  So I'm able to read the traffic

25  coming my way.

```
 1         Q.    Okay.  So on the date of the incident, you

 2    testified that you were in this green area right in

 3    front of this police, correct?

 4         A.    Correct.

 5         Q.    And you had clocked, for lack of a better

 6    term, clocked a black Jeep Compass traveling towards

 7    you?

 8         A.    Southbound, yes.

 9         Q.    Southbound towards you, right?

10         A.    Correct.

11         Q.    And you're faced northbound?

12         A.    Correct.

13         Q.    In the median?

14         A.    Correct.

15         Q.    Okay.  And the front of your windshield, is it

16    tinted?

17         A.    No, sir.

18         Q.    Okay.  So as a car is coming towards you, at

19    some point, it comes right next to you, right?

20         A.    Correct.

21         Q.    As it's passing you.

22         A.    Correct.

23         Q.    And at that point, you were able to look into

24    the vehicle, right?

25         A.    Correct.
```

1      Q.   Okay.  And you said, I believe earlier, he had

2  clear tints.

3      A.   The Compass had clear tints, clear tines.

4      Q.   Okay.  And when you looked into the vehicle,

5  right, you saw who you believed later on to be Samuel

6  Scott, right?

7      A.   Correct.

8           MR. PIERRE:  Objection.

9  BY MR. FERNANDEZ:

10     Q.   So let's go to -- and just for purposes of the

11  record and illustrative purposes on this exhibit, the

12  black Jeep Compass would have been traveling in the same

13  lane that this silver car right here would be traveling?

14     A.   Correct, yes.

15     Q.   Okay.  Do you recognize what's being shown in

16  this exhibit?

17     A.   Correct.

18     Q.   Okay.  And would you agree with me that this

19  exhibit shows the southbound view of the right lane

20  heading south on, what was it, 12th Avenue?

21     A.   Correct.

22     Q.   Okay.  And your vehicle would have been

23  located behind the speed limit sign, right?

24     A.   Correct.

25     Q.   In front of that light police, right?

1       A.    Correct.

2       Q.    In that U-shaped grassy area?

3       A.    Yes.

4       Q.    And you were in that U-shaped grassy area when

5  the black Jeep Compass was traveling in this direction,

6  right?

7       A.    Correct.

8       Q.    Okay.  So you were asked a series of questions

9  about your police report and was it correct and the

10 directions.  I guess my first question for you is, and I

11 know you had testified to this earlier, you completed

12 your police report after you had chased the vehicle,

13 right?

14      A.    Correct.

15      Q.    After you had arrived on the scene where the

16 vehicle crashed, right?

17      A.    Correct.

18      Q.    And you didn't do it then.  You did it after

19 you went to the scene where the plaintiff was

20 eventually, right?

21      A.    Correct.

22      Q.    And after all that time passed, you did it

23 after all that happened, right?

24      A.    Correct.

25      Q.    Okay.  So first time you testified -- so once

```
 1   you determined the vehicle traveling towards you was

 2   speeding, you made a U-turn?

 3        A.   Yes, I conducted a U-turn coming off the

 4   median to head south of 12th Avenue.

 5        Q.   Okay.  In the direction that was Exhibit A, I

 6   guess, 2 is going, right, southbound?

 7        A.   Correct.

 8        Q.   Okay.  So you're starting to chase this

 9   vehicle.  Lights and sirens weren't on yet, right?

10        A.   Not yet.

11        Q.   Okay.  So let's go to the next exhibit.  Are

12   you -- let's call this Composite Exhibit A3.  Are you

13   familiar with what's being shown in this exhibit?

14        A.   Yes.

15        Q.   What is being shown in this exhibit?

16        A.   The intersection of 12th Avenue and 64th

17   Street.

18        Q.   Okay.  And I believe in your arrest form --

19   well, let me ask you this.  When you were following the

20   black Jeep Compass, where did it go in this particular

21   exhibit?

22        A.   He made a left turn going eastbound on 64th

23   Street.

24        Q.   Okay.  And we looked at your A-form earlier.

25   Do you have that with you?
```

1      A.   I do, sir.

2      Q.   Okay.  So if you go to the fourth line down,

3   and this is one of the Plaintiff's exhibits that was

4   previously introduced earlier, you state I observed the

5   vehicle make a hard right turn on Northwest 12th and

6   64th, correct?

7      A.   Correct.

8      Q.   You meant to say left turn, right?

9      A.   Correct.

10      Q.   Okay.

11      A.   Yeah, there's no right turn there.

12      Q.   There's only a left turn, right?

13      A.   Yes, sir.

14      Q.   Okay.  So he makes a left turn.  You follow

15   him in pursuit, right?

16      A.   Correct.

17      Q.   Are your lights and sirens on now?

18      A.   No.  When he gets to 10th Avenue, I turn my --

19      Q.   Okay.  But before we go to 10th Avenue, you

20   were still following him on this particular street,

21   right?

22      A.   Correct.

23      Q.   Okay.  So let's go to Composite Exhibit A4

24   now, I believe.  Are you familiar with what's being

25   shown in this exhibit?

```
1       A.    That would be, I believe, 11 and 64.

2       Q.    Okay.  And do you see a stop sign here?

3       A.    Correct.

4       Q.    And this wasn't 10th Avenue, right?

5       A.    No.

6       Q.    This is the block before 10th Avenue?

7       A.    Correct.

8       Q.    And when you were following the black Compass,

9  did it stop at this stop sign?

10      A.    No, not at all.

11      Q.    Does Florida law require an individual to stop

12 at a stop sign?

13      A.    Yes, sir.

14      Q.    Okay.  All right.  And then so you continued

15 to follow the police officer through the stop sign,

16 correct?

17      A.    Correct.

18      Q.    And for the record -- well, we'll get to that

19 later.  Let's go to the next one.  This is Bates stamp

20 3529, Exhibit A4.  What's being shown in this exhibit?

21      A.    The intersection of 10 and 65 -- 64.

22      Q.    Okay.  So there's a stop sign here, too,

23 right?

24      A.    Correct.

25      Q.    And when you were following the Jeep Compass
```

1    up to this intersection, what did it do?

2         A.   It made a left turn on 10th and 64.

3         Q.   To the left?

4         A.   Yes.

5         Q.   Did he stop --

6         A.   There's a stop sign.

7         Q.   He didn't stop at the stop sign?

8         A.   He didn't stop, no.

9         Q.   Did he do a California roll, slow down, and go

10   through it?

11        A.   Sure did.  No, he went right through it making

12   a left turn.

13        Q.   Okay.  And then were your lights and sirens on

14   at this time?

15        A.   Yes.  I then turned my lights because he

16   obviously had taken two stop signs, so he was refusing

17   -- he knew I was behind him.

18        Q.   Right.

19        A.   So I just made it official and turned my

20   lights and my siren on.

21        Q.   Okay.  When this whole thing started, he was

22   going, give or take, 50 miles an hour?

23        A.   Correct.

24        Q.   Did he slow down at all?

25        A.   No, not at all.  He actually picked it up.

1        Q.    Okay.  Were you -- was your foot on the gas

2   trying to catch up to him?

3        A.    Yes.

4        Q.    You said lights and siren.  How do the lights

5   and sirens operate in your car?  What I mean by that is

6   if you wanted to turn them on, how would it work?

7        A.    You have three different levels.  One, which

8   is the rear.  Level two, which is the front and back, no

9   sirens, and level three, which is sirens and all lights

10  on.

11       Q.    Okay.  Number three is sirens and lights?

12       A.    Correct.

13       Q.    You ever heard of the butterfly effect?

14       A.    Right.

15       Q.    What's the butterfly effect?

16       A.    You turn it back off and on and off.

17       Q.    Okay.  But you know what the wig wag is,

18  right?

19       A.    Correct.

20       Q.    The wig wag is you've got the lights going,

21  right?  You've got the sirens going, and the siren's

22  wailing.

23       A.    Correct.

24       Q.    Give me an example on how the siren wails.

25       A.    I don't know how to make a siren sound with my

1   voice.

2        Q.   But it's pretty loud, right?

3        A.   It's pretty loud, yes.

4        Q.   Okay.  And before you --

5        A.   You can hear it from a distance.

6        Q.   Before you were a police officer, were you

7   ever pulled over?

8        A.   Yes.

9        Q.   You heard lights and sirens?

10       A.   I'm sure I did.

11       Q.   Everyone knows what they sound like, right?

12       A.   They sure do.

13       Q.   Okay.  And when you see those and you hear

14   those, are you supposed to stop?

15       A.   Supposed to stop or move out the way.

16       Q.   Right.  Okay.  So the individual driving the

17   black Compass makes a left onto 10th Ave., right?

18       A.   10th Avenue.

19       Q.   Okay.  And then he proceeds -- let's go down

20   to the next exhibit and what is being shown in Composite

21   Exhibit A, what are we on now, 6?

22            MR. PIERRE:  7.  Oh, that one was 6.  This is

23       7.

24            MR. FERNANDEZ:  This is Bates stamped for the

25       -- sorry, I apologize.  This is Bates stamped 3530,

1          and this is A6, right?

2     BY MR. FERNANDEZ:

3          Q.   What's being shown here?

4          A.   This is the intersection of 10 and 71.

5          Q.   And what you mean by 10 and 71, this is 10th

6     Ave. and 71st Street?

7          A.   Correct.

8          Q.   Okay.  And is 71st Street kind of a major road

9     there?

10         A.   Yes, it is.

11         Q.   All right.  How far were you behind the

12    Compass, give or take, when you were coming up to this

13    particular intersection?

14         A.   At this time, pretty close.

15         Q.   Okay.  And before we got up to this

16    intersection, are you familiar with the high school

17    named Miami Northwestern?

18         A.   Yeah, it would be on the left side of it.

19         Q.   Okay.  And how many blocks would you say, give

20    or take, don't need to be specific, would this

21    intersection be from the intersection of 64th and 10th

22    Ave.?

23         A.   64th and 10th Ave.?

24         Q.   Yeah.

25         A.   I mean, that's about a good say a block.

```
 1        Q.   Okay.  So he's -- whoever is driving the black

 2   Jeep Compass is just going, right?

 3        A.   Yeah.

 4        Q.   Okay.  Not slowing down?

 5        A.   Not slowing down.

 6        Q.   All right.  There's a stop sign in this

 7   picture, too, right?

 8        A.   Correct.

 9        Q.   Did he stop there?

10        A.   No, he did not.

11        Q.   Okay.  Just cranked it right?

12        A.   He made a right turn without stopping.

13        Q.   Okay.  So lights and sirens are still on,

14   right?

15        A.   At this point, yes.

16        Q.   All right.  Let's go to --

17             MR. PIERRE:  7.

18             MR. FERNANDEZ:  7.

19   BY MR. FERNANDEZ:

20        Q.   This is 3531.  What's being shown in Exhibit

21   A7?

22        A.   The intersection of 7 and 71.

23        Q.   Okay.  And this looking in what direction?

24        A.   This is looking westbound.

25        Q.   Okay.  Earlier, you had testified that you
```

1   were trailing this individual, right?

2        A.   Correct.

3        Q.   And he went through a red light?

4        A.   Correct.

5        Q.   Okay.  Did you go through the red light?

6        A.   I had to stop before I went through it.

7        Q.   Okay.  Why did you stop before you went

8   through it?

9        A.   It's our policy and procedure that at red

10  lights, we stop and make sure we're clear before we

11  cross.

12       Q.   Okay.  Perfect.  So when you go or approach

13  the intersection, obviously, your sirens and lights are

14  going, right?

15       A.   Yeah.

16       Q.   Do you press any buttons when you approach an

17  intersection like a horn to let everybody know, hey, I'm

18  coming through?

19       A.   Correct.

20       Q.   Okay.  Which button did you press?

21       A.   The horn.

22       Q.   Okay.  How many times did you press it?

23       A.   Multiple times.

24       Q.   Okay.  And then the area was clear.  You went

25  through, right?

 1       A.   Correct.  Once traffic stopped, I went

 2   through.

 3       Q.   But whoever is driving the Jeep Compass is

 4   moving.

 5       A.   He went right through it.  He didn't press his

 6   brakes.

 7       Q.   He gained a little bit of distance on your,

 8   right?

 9       A.   Correct.

10       Q.   Okay.  So he ran a red light though, right?

11       A.   Correct.

12       Q.   You're supposed to stop at a red light?

13       A.   Correct.

14       Q.   Before you were a police officer, did you stop

15   at red lights?

16       A.   Yes.

17       Q.   Okay.  Went straight through this, right?

18   Straight through this intersection?

19       A.   Yes, sir.

20       Q.   Okay.  So, now, you're coming up to 71st and

21   Northwest 54th.  Does that accurately reflect what's

22   kind of in this exhibit?

23       A.   Correct.

24       Q.   Okay.  And what happened here?

25       A.   He made a left turn on 71st Avenue.

```
 1        Q.    Okay.  And just for purposes of kind of

 2   figuring out where you were at this particular time, do

 3   you recall if you were beyond -- first, let me ask you

 4   this.  The bridge right there, is that 95?

 5        A.    That is 95.

 6        Q.    Okay.  Were you on the other side of 95, or

 7   were you under it?

 8        A.    I was a little bit after it, yes.

 9        Q.    So you were --

10        A.    Like getting close to I-95.

11        Q.    Like close to leaving 95?

12        A.    No, on 95, so where the bridge is at, where

13   the underpass is, right there.

14        Q.    So you were like right underneath it.

15        A.    Correct.

16        Q.    Okay.  And then was that -- were you under the

17   95 bridge when you made the left, or did he make the

18   left before?

19        A.    No, he made the left before I cleared the

20   underpass.

21        Q.    Before you cleared it, right?

22        A.    Correct.

23        Q.    All right.  So he makes a left there.  Let me

24   ask you this.  Turn signal?

25        A.    No.
```

1     Q.   Okay.  So lights and sirens still on, right?

2     A.   Yes, sir.

3     Q.   All right.  So you make the left here, too?

4     A.   Correct.  I make a left following the vehicle.

5     Q.   All right.  So that was 8.  Let's go to Bates

6     stamp 3533.  We'll mark this as 8 -- mark this as 9.

7     I'm sorry.

8          What's being shown here in Exhibit A9?

9     A.   The intersection of 54 and 72nd Street.

10    Q.   Okay.  And before we get -- there's a stop

11    sign here, too, right?

12    A.   Correct.

13    Q.   Did you see him go through this stop sign?

14    A.   I didn't see him go through that stop sign.

15    Q.   Okay.  But you did see -- you eventually

16    approach this area, right?

17    A.   Correct.

18    Q.   Okay.  And where did you see his vehicle?

19    A.   His vehicle is where that F-150 is at.

20    Q.   Okay.  And what color is that F-150?

21    A.   It's a burgundy F-150.

22    Q.   Actually, when you look at this exhibit, do

23    you see where it says Google Maps on the top left?

24    A.   Yes, sir.

25    Q.   Do you see underneath it where it says Miami,

1    Florida?

2         A.   Yes, sir.

3         Q.   Do you see where it says street view?

4         A.   Yes, sir.

5         Q.   What date does that say?

6         A.   April 2018.

7         Q.   Okay.  And when did this accident happen?

8         A.   June 2018.

9         Q.   All right.  I'm going to go ahead and go to --

10   all right.  So this is Exhibit A10, Bates stamp 3534.

11   What's being shown here?

12        A.   The same F-150 burgundy.

13        Q.   Okay.  Street view still says April 2018?

14        A.   Yes, sir.

15        Q.   Okay.  And where did you -- can you explain in

16   this exhibit -- I know you talked about it last time --

17   where did the black Compass end up in this vicinity?

18        A.   It would be the right side of the F-150

19   crashed into the Compass.

20        Q.   And by right side, you mean the front of it?

21        A.   Correct.  Front right side of that burgundy

22   collided with the left side front of the black Compass.

23        Q.   So left front or right front of the Compass

24   hit the right front of the Ford?

25        A.   Correct.

1        Q.   Okay.  And when that happened, you were

2    already on 5th is it Court?

3        A.   5th Court.

4        Q.   Okay.  And at that time -- well, let me ask

5    you this.  Where did you park your car and get out of

6    your vehicle in this area?

7        A.   Right behind the little driveway going up.

8        Q.   Okay.  So you see that gold vehicle right

9    there?

10       A.   Correct.  Right diagonally from it in the

11   middle of the street.

12       Q.   So you were right next to it?

13       A.   Correct.

14       Q.   Okay.  And then you get out of your vehicle?

15       A.   Yes.

16       Q.   And you went through the stop sign, parked

17   your car.  Was the suspect already out of the vehicle?

18       A.   Yes.

19       Q.   Okay.  Did you see him exit the vehicle?

20       A.   Exit the vehicle, no.  He was already out of

21   the vehicle running.

22       Q.   Because you saw him on foot.

23       A.   Correct.

24       Q.   Wearing a white tank top?

25       A.   Yes.

```
1        Q.    Heavyset male?

2        A.    Yes.

3        Q.    African American?

4        A.    Yes, sir.

5        Q.    Okay.  Bald?

6        A.    Yes, sir.

7        Q.    Okay.  Blue jeans?

8        A.    Dark -- I couldn't see if they were blue or

9   black, but they were dark in color.

10       Q.    They weren't light, right?

11       A.    No.

12       Q.    Okay.

13       A.    They were dark in color.

14       Q.    He wasn't wearing cowboy boots, right?

15       A.    No, no cowboy boots.

16       Q.    Okay.  Explain to me -- all right.  So,

17  eventually, he ran toward -- okay.  You see the blue

18  vehicle right there, behind that pole?

19       A.    Correct.

20       Q.    You testified earlier, would you agree with

21  me, that he went around that corner?

22       A.    Yes.

23       Q.    Okay.  You saw him go around that corner?

24       A.    I saw him making a right turn right before

25  that blue car, and that's when I lost vision.
```

1      Q.   Okay.  But you saw the back of him?

2      A.   Correct.

3      Q.   Did you see his shoulder at all?

4      A.   I saw his right back blade as he turns right.

5      Q.   Okay.  You saw him go around that corner?

6      A.   I saw him making a right turn right before

7  that blue car, and that's when I lost visual.

8      Q.   Okay.  But you saw the back of him.

9      A.   Correct.

10      Q.   Did you see his shoulder at all?

11      A.   I saw his right back blade as he turned right.

12      Q.   Okay.  Same guy you saw in the car when you

13  were radaring though, right?

14      A.   Yes, sir.

15      Q.   Guy didn't stop, pick somebody else up in the

16  car, and keep going?

17      A.   No, I had visual of the vehicle since I did

18  the radar.

19      Q.   Okay.  Let's go to 11, and this is Bates stamp

20  3535.  Does this area look familiar?

21      A.   Yes, sir.

22      Q.   Okay.  And April 2018, right?  Street view

23  says April 2018?

24      A.   Yes, sir.

25      Q.   You just testified that he was making a right

1    around this car.  He disappeared over into this area

2    behind the building, correct?

3         A.   Correct.

4         Q.   Okay.  Whether he ran over to the bridges and

5    hid behind a pole or just went straight, he just

6    disappeared going northbound, right?

7         A.   Correct.

8         Q.   And because he had already gotten -- blanked

9    on you from the light --

10        A.   Correct.

11        Q.   -- right, it was hard for you to catch up with

12   him.

13        A.   Correct.

14        Q.   Okay.  So the perimeter?

15        A.   Yes.

16        Q.   Okay.  Now, let's see here.  Actually, I want

17   to go back to this exhibit.  You see this exhibit?

18        A.   Yes.

19             MR. FERNANDEZ:  And, Counsel, because we're

20        kind of doing it virtually, I can't show two

21        exhibits at once, but if you have the crash report

22        that Brandon Williams completed, if you can go to

23        Page 6 for me.  I'll give you some time to find

24        that if you can bring it up.  Let me know when

25        you're ready.

1          And I'll introduce this as Defendant's Exhibit

2     2.

3          (Thereupon, Defendant's Exhibit 2 was marked

4     for identification.)

5          MR. FERNANDEZ:  Are you ready?

6          MR. PIERRE:  Yeah, I'm ready.

7          MR. FERNANDEZ:  Lourdes?

8          MS. WYDLER:  Go ahead.

9          MR. FERNANDEZ:  Is that a yes?

10         MS. WYDLER:  Yes.  Sorry, go ahead.

11         MR. FERNANDEZ:  Okay.  Sorry.  No, no problem.

12    BY MR. FERNANDEZ:

13    Q.   So turning to Page 6 of the crash report

14    completed by Brandon Williams, the bottom is marked

15    Bates stamp COM1365.  Do you see that?

16    A.   Yes.

17    Q.   Okay.  The top, you see Vehicle Number 2?

18    A.   Yes, sir.

19    Q.   What's the Vehicle Number 2 description?  Can

20    you read that out for me, please?

21    A.   It's a 2003 Ford F-150 pickup, maroon/burgundy

22    in color.

23    Q.   And this incident happened on June 1, 2018?

24    A.   Yes.

25    Q.   And this thing -- this Exhibit 9, 10, or 11,

1   whatever the quasi-Exhibit A, this was street view April

2   2018, right?

3          A.   Correct.

4          Q.   Two, three months before the incident took

5   place.

6          A.   Correct.

7          Q.   Is that the burgundy truck you saw on the date

8   of the incident?

9          A.   That is the same burgundy pickup truck that

10  the Compass collided with.

11         Q.   Okay.  So you call the perimeter, right?  Now,

12  before you call the perimeter, do you check the vehicle?

13         A.   Yeah, really quick before I cross it.

14         Q.   Okay.  Before you cross to go see where he was

15  going, right?

16         A.   Correct.

17         Q.   And was the door open?  Do you remember?

18         A.   The driver door.

19         Q.   Driver door was open.  Do you remember if the

20  car was on or not?

21         A.   I can't recall.  I can't remember.

22         Q.   Okay.  And why did you look in the car first

23  before you continued --

24         A.   To see if there was somebody else in there.

25         Q.   All right.  And when you went back to the

1    vehicle, you said you found a firearm, right?

2         A.    Correct.

3         Q.    You remember what type of firearm it was?

4         A.    Smith & Wesson.

5         Q.    What type of Smith & Wesson?  Was it chrome?

6    Was it black?

7         A.    It was a silver chrome 40 caliber.

8         Q.    Full size?

9         A.    Full size.

10        Q.    Seventeen rounds?

11        A.    I think so.

12        Q.    Okay.  This was on the floor, right?

13        A.    Yeah, the passenger floor.

14        Q.    Not in a holster?

15        A.    Not in a holster.

16        Q.    Not in a glove?

17        A.    Not in the glove compartment.

18        Q.    Not in the console?

19        A.    Not in the console.

20        Q.    Okay.  Did you find magazines in there as

21   well?

22        A.    I believe there was one in the gun, and then

23   everything else was in the trunk.

24        Q.    Okay.  And it's not a crime to have a firearm,

25   right?  It's America, right?

1       A.    Correct.

2       Q.    But you can't have it just hanging out.

3       A.    Correct.

4       Q.    Okay.  And did you ever find ammo in that

5  vehicle?

6       A.    Yes, the trunk.

7       Q.    In the trunk?

8       A.    Yes.

9       Q.    And do you remember what type of ammo you

10  found?

11      A.    I don't remember the size and caliber, but it

12  was in a bag, a regular bag.

13      Q.    How much ammo did you find?

14      A.    I can't say.  It's on the property receipt.  I

15  didn't count that.  Brandon Williams actually counted

16  how much we had.

17      Q.    Okay.  But you saw it?

18      A.    Yeah, I was able to see.  I just didn't count

19  it on scene.

20      Q.    Let me ask you this.  When you looked in the

21  back of the trunk, did you see any laptops?

22      A.    No, no laptops.

23      Q.    No?  Did you see any electronic devices?

24      A.    Huh-uh.

25      Q.    No?

1      A.   Nothing.

2      Q.   What about inside the car itself?

3      A.   A laptop, no.

4      Q.   And you testified earlier that when you looked

5   in the car, you found what you suspected to be marijuana

6   in the console.

7      A.   Correct.

8      Q.   In baggies?

9      A.   Correct.

10      Q.   Was it filled with weed?  Not weed.  Let's

11   call it marijuana.  Was it filled with marijuana?

12      A.   Yes.

13      Q.   It was?  Okay.  Did you find -- let me do

14   this.  Let me just back out of this and stop sharing.

15   The next one is going to be -- I'll mark this as

16   Defendant's Exhibit 2 or 3.  This is the property

17   receipt.

18           (Thereupon, Defendant's Exhibit 3 was marked

19      for identification.)

20   BY MR. FERNANDEZ:

21      Q.   Okay.  You ever seen this before?

22      A.   Yes, sir.

23      Q.   Okay.  What is this?

24      A.   Property receipt from the City of Miami Police

25   Department.

```
 1      Q.   And it's a standard property receipt?

 2      A.   Yes, sir.

 3      Q.   Okay.  And this is from June 1, 2018, right?

 4      A.   Correct.

 5      Q.   And you see under Number 3, it says narcotics?

 6      A.   Yes, sir.

 7      Q.   And can you read what the description says for

 8 me?

 9      A.   It says short, clear plastic baggies with

10 suspected marijuana and one brown rolled cigarette with

11 suspected marijuana.

12      Q.   Okay.  Brown rolled cigarette like a blunt?

13      A.   Yes.

14      Q.   Okay.  Which is, for layman's terms, it's like

15 a tobacco leaf, right?

16      A.   Correct.

17      Q.   Okay.  Do you recall was it full?  Was it

18 smoked?  Do you recall?

19      A.   No, it was not smoked.  It was full of

20 marijuana.

21      Q.   Okay.  And then you also found a MasTec

22 identification card.

23      A.   Correct.

24      Q.   And when you found this MasTec identification

25 card, where was it exactly in the vehicle?
```

1      A.   Hanging from the rearview mirror.

2      Q.   Okay.  Was it hanging like off a rubber band?

3      A.   No, a lanyard.

4      Q.   Okay.  Anything else you find in the vehicle

5  that stood out to you?

6      A.   That stood out, no.

7      Q.   Okay.  So there was a lot made about some of

8  the timing of everything like why does this document

9  state this time.  Why does it say that time?  Do you

10  remember that line of questioning?

11      A.   Yes, sir.

12      Q.   Okay.  So in reality, right, these events

13  occurred within, let's call it a timeframe of 30 minutes

14  to an hour, right?

15      A.   Correct.

16      Q.   Okay.

17           MR. PIERRE:  Objection.

18  BY MR. FERNANDEZ:

19      Q.   And was it dark outside?

20      A.   No, sir.

21      Q.   Okay.  So you're going to the -- after you

22  went through the vehicle, how long did it take you to go

23  -- strike that.

24           After the suspect fled and you returned to the

25  vehicle to go through it, how long would you say, give

1    or take, you were there?

2          A.    Fifteen, twenty minutes tops.

3          Q.    Okay.  And then during that time, Officer

4    Carriel arrived on scene.

5          A.    Correct.

6          Q.    Anybody else?

7          A.    No.  Oh, Sergeant Sampson.

8          Q.    Sergeant Sampson arrived on scene.

9          A.    Correct.

10         Q.    And then at some point, right, you get a

11   dispatch -- something over the radio along the lines of,

12   hey, this car has been reported stolen.

13         A.    Correct.

14         Q.    And then you also testified that Sampson had

15   -- strike that.

16               When you heard the car was stolen, what did

17   you do next?

18         A.    I told my sergeant are you listening to the

19   radio, and he's like yeah.  Contact the officer and see

20   what he got.

21         Q.    And who did you contact?

22         A.    Officer Bloom over the radio.

23         Q.    And when you contacted Bloom, what did you ask

24   him?

25         A.    I asked him what vehicle like just to double

1   verify the vehicle.  He stated the Compass, black

2   Compass, and then he gave me a description of the black

3   male, heavyset, bald head.  White tank top.

4        Q.   Okay.  Did he say he was wearing a black shirt

5   at the time?

6        A.   Correct.  But he said I can see a tank top

7   under it.

8        Q.   Okay.  Did he say he was sweating?

9        A.   Profusely.

10       Q.   Okay.  And we'll get to this later, but you

11  saw him sweating on scene when you arrived there later,

12  right?

13       A.   Very sweaty.

14       Q.   And after you got that description from Bloom,

15  in your mind, did it match what you saw when, one, you

16  first clocked the Jeep Compass?

17       A.   Correct.

18       Q.   And, two, when you saw him leave the scene?

19       A.   Correct.

20            MR. PIERRE:  Objection.

21  BY MR. FERNANDEZ:

22       Q.   By leave scene, leave the scene of the crash

23  after the --

24            MR. PIERRE:  Objection.

25            THE WITNESS:  Correct.

```
 1   BY MR. FERNANDEZ:

 2        Q.   Okay.  That was your independent

 3   identification, right?

 4        A.   Correct.

 5        Q.   And Bloom said, hey, the individual that

 6   reported his car stolen, here's his description.  Match

 7   what you previously saw, right?

 8        A.   Correct.

 9             MR. PIERRE:  Objection.

10   BY MR. FERNANDEZ:

11        Q.   Okay.  And the Jeep didn't have tints?

12        A.   The Jeep?

13        Q.   Yeah, the Jeep.

14        A.   The Jeep Compass?  No, no tints.

15        Q.   No tints.  Okay.

16        A.   The front windshield didn't have any tints.

17        Q.   When you got the MasTec ID, did it look like

18   the same guy who was in the vehicle when he passed you?

19        A.   Yeah.

20             MR. PIERRE:  Objection.

21             THE WITNESS:  I was only able to see the upper

22        torso part, but it was the same heavyset- looking

23        bald guy.

24   BY MR. FERNANDEZ:

25        Q.   And did the MasTec ID have a name on it?  Do
```

1    you recall?

2         A.    I believe so.  I'm not sure.

3         Q.    And when Carriel arrived on scene, did you

4    discuss with him like what you saw and what happened?

5         A.    Yeah, of course.

6         Q.    Okay.  And you had talked about -- you guys

7    were discussing I think it was not side channel, but it

8    was on a personal channel, right?

9         A.    Correct.

10         Q.    And by personal channel, I mean, it's not the

11    main dispatch channel, but it's the channel where you

12    and whatever officers in the area, you guys can directly

13    talk to each other.

14         A.    Correct.

15         Q.    Because if not, you would be chattering up the

16    dispatch line the entire time, right?

17         A.    Correct.

18         Q.    They call it like clear the air.  You don't

19    want to fog up the air, right?

20         A.    Correct.

21              MR. PIERRE:  Objection.

22    BY MR. FERNANDEZ:

23         Q.    Okay.  When Bloom described to you what he

24    observed in the area where the plaintiff ultimately was,

25    what did you do next?

1      A.   I told Bloom to stand by, that I was headed to

2   the scene.

3      Q.   Okay.  And do you recall how long it took for

4   you to get there?

5      A.   Five minutes.  Five to ten minutes because I

6   kept talking to my sergeant and finishing up there

7   before I went over there.

8      Q.   Okay.  And during that time -- strike that.

9   So let's talk about -- let's go back to your A-

10          Form real quick.  All right.  So we talked

11   about the language that said, you know, I observed the

12   vehicle make a hard right turn on 12th and 64th, right?

13      A.   Correct.

14      Q.   Okay.  The next line goes I continued to

15   follow the vehicle on Northwest 10th Ave. and 67th

16   Street.  You meant 64th Street, right?

17      A.   Correct.  I mean, he was passing 64th, 5, 6,

18   7th.

19      Q.   Right.  Because literally, the sentence

20   before, you say 64th.

21      A.   Correct.

22      Q.   Okay.  Minor discrepancy, but either way --

23          MR. PIERRE:  Objection.

24   BY MR. FERNANDEZ:

25      Q.   Okay.  So at some point, you arrive on scene?

```
 1    A.    At six and five minutes, yeah.

 2    Q.    Where Officer Bloom was?

 3    A.    Correct.

 4    Q.    And let's get out of this, and let's play.

 5          MR. FERNANDEZ:  I'm going to introduce

 6    body-worn camera footage from Officer Guzman.  This

 7    is the footage that ends in 1845.

 8          (Thereupon, Defendant's Exhibit 4 was marked

 9    for identification.)

10          MR. FERNANDEZ:  Can all counsel see the video?

11          MS. WYDLER:  Yes, we can see it.

12          MR. FERNANDEZ:  Okay.  All right.  For

13    purposes of the record, I'm just going to reference

14    the time period at the top right.

15  BY MR. FERNANDEZ:

16    Q.    So, Officer, have you reviewed body cam

17  before?

18    A.    Yes, sir.

19    Q.    Okay.  You see the dates, the 6/1/2018?

20    A.    Correct.

21    Q.    You see the T22 next to it?

22    A.    Yes, sir.

23    Q.    Do you understand that to be Zulu time?

24    A.    Correct.

25    Q.    Okay.
```

```
 1              MR. FERNANDEZ:  And just for purposes of the

 2          record, I'm just going to reference the Zulu time

 3          so people can follow along.

 4              MR. PIERRE:  You might have to clarify that

 5          for the record, the Zulu time.

 6              MR. FERNANDEZ:  Okay.

 7    BY MR. FERNANDEZ:

 8       Q.   Do you know what Zulu time is?

 9       A.   I do.

10       Q.   Okay.  What does Zulu time mean to you?

11       A.   It's military time but different with the

12    daytime.

13       Q.   It's not military time, right?

14       A.   It's not.

15       Q.   It's not regular time.

16       A.   No.

17       Q.   This is a different time that's specifically

18    on these body-worn cameras.

19       A.   Correct.

20       Q.   But I know that and you know that because of

21    your profession that you're in, right?

22       A.   Correct.

23       Q.   Okay.

24              MR. FERNANDEZ:  And, Counsel, just for the

25          record, this is just to pinpoint the time in the
```

1        actual video for the record.  So if there's any

2        clarification needed, please let me know.

3    BY MR. FERNANDEZ:

4        Q.   So this is you arriving on scene, right?

5    Officer Carriel, we're starting at 22:45:30.  This is

6    you, right?

7        A.   Yes, sir.

8        Q.   Okay.

9        A.   Or my body cam.

10       Q.   And do you recall what you said to Carriel

11   there?

12       A.   That's the guy.

13       Q.   And because you pulled up in your car?

14       A.   Yes, sir.

15       Q.   Okay.  So you're walking over here.  I'm going

16   to stop it right there, and this is at 22:45:36.  Do you

17   see the individual in dark jeans right there?

18       A.   Yes, sir.

19       Q.   Next to the police car?

20       A.   Yes, sir.

21       Q.   Whose police car is he standing next to?

22       A.   Bloom, Officer Bloom.

23       Q.   All right.  And you see the Miami Police

24   vehicle with the yellow tag right to your left?

25       A.   Yes, sir.

1        Q.   Do you recall whose vehicle that is?

2        A.   Officer Hernandez.

3        Q.   And Officer Hernandez was another officer that

4   arrived on scene?

5        A.   Correct.

6        Q.   Okay.  And correct me if I'm wrong.  At this

7   point when you observe this individual, did you believe

8   in your mind that this was the individual who was

9   driving the Jeep Compass away from you?

10       A.   I did.

11            MR. PIERRE:  Objection.

12   BY MR. FERNANDEZ:

13       Q.   Okay.  This was based on you -- this was based

14   on information that you as an officer on the scene had

15   in your mind at the time, true?

16       A.   Correct.

17            MR. PIERRE:  Objection.

18   BY MR. FERNANDEZ:

19       Q.   Okay.

20            (Video played.)

21   BY MR. FERNANDEZ:

22       Q.   Okay.  Carriel said it's him, right?

23       A.   Uh-huh.  Correct.

24       Q.   And that was based on the conversation you had

25   with him.

1          A.   Correct.

2               MR. PIERRE:   Objection.

3     BY MR. FERNANDEZ:

4          Q.   Okay.  In the police car is Officer Bloom,

5     correct?

6          A.   Correct.

7          Q.   And is that the stolen vehicle affidavit that

8     was talked about earlier?

9          A.   The one he's holding in his hand, yes.

10         Q.   Okay.  And that, at that time, was already

11    completed, right?

12         A.   Correct.

13         Q.   Okay.  You didn't force anybody to sign the

14    affidavit?

15         A.   No.

16         Q.   Okay.

17              (Video played.)

18    BY MR. FERNANDEZ:

19         Q.   After you spoke with Bloom, what did you do

20    next?

21         A.   I think call my sergeant and tell him what I

22    got.

23         Q.   Why did you call your sergeant?

24         A.   Just to doublecheck everything he had at my

25    scene and, again, he's my supervisor, so I have to get

1    everything approved by him.

2         Q.   Okay.  So at this point, you saw an individual

3    driving towards you in a Jeep Compass, right?

4         A.   Correct.

5         Q.   You saw an individual drive the Jeep Compass,

6    get out of the Jeep Compass, right?

7         A.   Correct.

8         Q.   You saw an individual on the MasTec ID that

9    was inside the vehicle that the suspect fled out of,

10   right?

11        A.   Correct.

12        Q.   You had spoken to Bloom over the radio who

13   gave a description that matched the ID that you saw with

14   your own eyes, true?

15        A.   Correct.

16        Q.   And then, once you got on scene and you laid

17   your eyes on this individual who we now know as the

18   plaintiff, you in your mind immediately said, hey,

19   that's the guy.

20        A.   Correct.

21        Q.   Any doubt about it?

22        A.   No doubt.

23             MR. PIERRE:  Objection.

24   BY MR. FERNANDEZ:

25        Q.   You sure?

```
 1        A.    100 percent.

 2        Q.    Okay.  So you call your sergeant next, right?

 3        A.    Yes, sir.

 4              (Video played.)

 5   BY MR. FERNANDEZ:

 6        Q.    That's the MasTec ID?

 7        A.    Correct.

 8              (Video played.)

 9   BY MR. FERNANDEZ:

10        Q.    I just want to stop it real quick.  We're at

11   Zulu time 22:46 on the video, 22:46:43.  You're calling

12   your sergeant?

13        A.    Correct.

14        Q.    Okay.  And let's just see what you state to

15   him.

16              (Video played.)

17   BY MR. FERNANDEZ:

18        Q.    Okay.  So at this point, you know that this is

19   the guy, right?

20        A.    Correct.

21        Q.    Now, you're going through your procedure, make

22   sure everything lines up?

23        A.    Correct.

24        Q.    Okay.  So I'm going to skip through -- let's

25   go to 22:50.
```

```
 1                (Video played.)

 2    BY MR. FERNANDEZ:

 3         Q.   Okay.  I want to talk to you about this part

 4    of the incident here.  So you testified earlier that you

 5    saw an individual who was driving a Jeep Compass wearing

 6    a white tank top, right?

 7         A.   Correct.

 8         Q.   Okay.  Well, let me ask you this.  June 2018,

 9    middle of the summer?

10         A.   Yes, sir.

11         Q.   What was the temperature like?  Was it hot?

12    Was it cold?  Can you explain?

13         A.   It was really hot.

14         Q.   It was really hot?

15         A.   Yeah.

16         Q.   And when you got out of your vehicle, you ran,

17    too, right?

18         A.   Correct.

19         Q.   Okay.  Were you sweating a lot?

20         A.   Not a lot.

21              MR. PIERRE:  Objection.  This is --

22              MR. FERNANDEZ:  Okay.

23              (Video played.)

24    BY MR. FERNANDEZ:

25         Q.   I'm going to pause it here, and this is Zulu
```

1    time 22:50:19.  Do you see what's depicted in this

2    exhibit right here?

3          A.   Yes, sir.

4          Q.   Okay.  What do you see?

5          A.   The offender, black male, white tank top, bald

6    headed.

7          Q.   Okay.  And white tank top, right?

8          A.   Yes, sir.

9          Q.   Similar to the one you saw --

10         A.   Yes, sir.

11         Q.   -- up until this point?

12         A.   Yes, sir.

13         Q.   Okay.  Did you ever feel that white shirt?

14         A.   I did.

15         Q.   Was it after this point?

16         A.   Yes, sir.

17         Q.   Okay.  And how did it feel?

18         A.   It was soaked in sweat.

19         Q.   Soaked in sweat?  What about the black shirt?

20   Was it soaked in sweat, too?

21         A.   Yes, yes.

22         Q.   Okay.  Now, I'm going to go to -- almost done

23   with this video.  I promise.  I'm going to try get done

24   as quickly as possible.

25              And at this point, you were like talking to

1   your sergeant still, right?

2        A.   Yeah.

3        Q.   Okay.

4        A.   Yeah, I only call my sergeant.

5        Q.   Okay.

6             (Video played.)

7             MR. FERNANDEZ:  And just for the record, we're

8        at 22:51:15.

9   BY MR. FERNANDEZ:

10       Q.   You received a call from your sergeant?

11       A.   Correct.

12       Q.   Giving you a call back?

13       A.   Yes, sir.

14       Q.   And you're about to explain to him what you've

15  seen, right?

16       A.   Yeah.

17            (Video played.)

18  BY MR. FERNANDEZ:

19       Q.   I'm going to pause it right there.  You said,

20  Serg, yes, that's him.  He was wearing the white tank

21  top under a black shirt like the one he was driving

22  with, right?

23       A.   Correct.

24       Q.   Wasn't driving with a black shift, but the guy

25  you saw in the car fleeing the scene had a white tank

1    top on, right?

2         A.   Correct.

3         Q.   And sweating, correct?

4         A.   Correct.

5         Q.   Okay.

6              (Video played.)

7    BY MR. FERNANDEZ:

8         Q.   Before we continue, you're going through

9    protocol?

10        A.   Yes.

11        Q.   Checking all your boxes?

12        A.   Yeah.

13        Q.   Because it's your arrest, right?

14        A.   Correct.

15        Q.   You're the guy who clocked him?

16        A.   Yes, sir.

17        Q.   You saw him -- you know, saw him but you saw a

18   suspect who you believed to be the plaintiff later on,

19   correct?

20        A.   Correct.

21        Q.   Okay.  We're at Zulu 22:53:12.  Do you recall

22   some of Samuel Scott's items being on the trunk of this

23   Crown Vic?

24        A.   Correct.

25        Q.   Do you recall what was there?

```
 1        A.   I believe his ID, a pair of keys, a phone, and

 2   a lighter.

 3        Q.   Okay.  And a lighter?

 4        A.   Correct.

 5        Q.   And when you're transporting someone to the

 6   north station or eventually to TGK, is a lighter

 7   something you can bring to the jail?

 8        A.   No, no, you cannot bring it.

 9        Q.   Okay.  And just so we're clear, you never met

10   Scott -- you never knew who Scott was until this day,

11   right?

12        A.   No, sir.

13        Q.   Okay.  No reason just to take him to jail just

14   because?

15        A.   No, sir.

16        Q.   Are you racist?

17             MR. PIERRE:  Objection.

18             THE WITNESS:  Definitely not.

19   BY MR. FERNANDEZ:

20        Q.   You don't only arrest African American's,

21   right?

22        A.   In my seven years in the department, I've

23   arrested multiple types of ethnicities.

24        Q.   If you break a law, it doesn't matter who you

25   are.  There are consequences, right?
```

 1                MR. PIERRE:  Objection.

 2                THE WITNESS:  Correct.

 3                MR. FERNANDEZ:  Counsel had some questions

 4         before I get there.  Let's do this.  I'm going to

 5         go ahead and stop this video, and I'm going to play

 6         the next one.  I forget what exhibit I'm on now.  I

 7         think I'm on 4 or 5.  This is going to be the

 8         body-worn camera from Officer Guzman that ends in

 9         1859 that was produced in discovery.

10                THE REPORTER:  It's going to be Exhibit 5.

11                (Thereupon, Defendant's Exhibit 5 was marked

12         for identification.)

13    BY MR. FERNANDEZ:

14         Q.   Okay.  So this is -- we're at Zulu time.  This

15    is when -- at this point, Scott's already in the car,

16    right?

17         A.   I believe so.

18         Q.   Okay.  And I believe here, you're going to

19    speak with him briefly, right?

20         A.   Correct.

21                (Video played.)

22    BY MR. FERNANDEZ:

23         Q.   Oh, is he sweating here?

24         A.   Yes.

25                MR. PIERRE:  Objection.

```
 1   BY MR. FERNANDEZ:

 2        Q.   22:59:36, right?

 3        A.   Correct.

 4             (Video played.)

 5   BY MR. FERNANDEZ:

 6        Q.   He's kind of sweating a lot here, would you

 7   say?

 8        A.   Yeah, yeah.

 9        Q.   Profusely?

10        A.   A lot.

11             (Video played.)

12   BY MR. FERNANDEZ:

13        Q.   That's a lot of sweat, right?

14        A.   Yes, sir.

15        Q.   Okay.

16             MR. FERNANDEZ:  I'm going to screenshot this

17        and mark it as Exhibit 6.

18             (Thereupon, Defendant's Exhibit 6 was marked

19        for identification.)

20   BY MR. FERNANDEZ:

21        Q.   I'm done sharing videos.  Let me get out of

22   this.  Okay.

23             So let's talk about the individual who you

24   believed was Samuel Scott at the end of the day, right?

25   The individual driving the black Compass was speeding,
```

```
 1   right?

 2        A.   Correct.

 3        Q.   And once you hit lights and sirens, he

 4   continued to travel away from you, right?

 5        A.   Correct.

 6        Q.   He went through one stop sign, right?

 7        A.   Correct.

 8        Q.   A second stop sign?

 9        A.   Correct.

10        Q.   And a third stop sign?

11        A.   Correct.

12        Q.   Then he went through a red light, true?

13        A.   Correct.

14        Q.   Okay.  And then once the vehicle crashed, the

15   individual got out of the vehicle and fled away, right?

16        A.   Correct.

17        Q.   And you said stop.

18        A.   Correct.

19        Q.   Did you say police?

20        A.   No, just stop.

21        Q.   And the individual didn't stop, right?

22        A.   No.

23        Q.   Okay.  And then when you searched the vehicle,

24   you found a firearm on the floor, right?

25        A.   Correct.
```

1       Q.   Not encased?

2       A.   Correct.

3       Q.   Okay.  And, eventually, there was a point

4    where after, you know, this individual was arrested,

5    they went through the criminal justice process?

6       A.   Correct.

7       Q.   And, you know, the State Attorney's Office

8    gets involved, right?

9       A.   Correct.

10      Q.   How many times did you talk to the State

11   Attorney's Office about this case?

12      A.   Talked to them?

13      Q.   Yeah.

14      A.   I mean, in the courtroom one of the four, five

15   times that we went to the courtroom, but that's about

16   it.

17      Q.   Let me ask you this.  When we got to the

18   criminal process part of this, you know, incident, did

19   they call you and tell you to show up?

20      A.   No, I just got notified at the department.

21      Q.   You got notified by somebody?

22      A.   Yeah.

23      Q.   You weren't calling them like, hey, what's

24   going on with this case, right?

25      A.   No.

1          Q.   When you were on scene, and by scene, I mean

2     with Bloom and with Carriel and everybody --

3          A.   Okay.

4          Q.   -- did any family members of Mr. Scott come

5     out of any of those houses to talk to you guys?

6          A.   No, sir.

7          Q.   Okay.  Let me see.  And counsel had a question

8     earlier about I believe it was reasonable suspicion or

9     probable cause.  He said it can't be just a hunch,

10    right?

11         A.   Yes.

12         Q.   This wasn't a hunch when you saw Mr. Scott on

13    the scene of the second --

14              MR. PIERRE:  Objection.

15    BY MR. FERNANDEZ:

16         Q.   It was when -- let me put it this way.  When

17    you arrived on the scene where Officer Bloom was, this

18    wasn't a hunch that the individual you saw, Mr. Scott,

19    was the individual you believed was in the black

20    Compass, correct?

21         A.   Correct.

22              MR. PIERRE:  Objection.

23              THE WITNESS:  I already had seen him twice

24         before.

25    BY MR. FERNANDEZ:

```
 1        Q.   Okay.  Have you testified in criminal trials

 2   before?

 3        A.   Yes, sir.

 4        Q.   How many criminal trials have you testified

 5   in?

 6        A.   I can't --

 7        Q.   Can't remember?

 8        A.   No.

 9        Q.   Ten?

10        A.   About ten, fifteen.

11        Q.   And whenever you testify in criminal trials,

12   are you solely limited to what's in your report?

13        A.   No.

14             MR. PIERRE:  Objection.

15   BY MR. FERNANDEZ:

16        Q.   Okay.  And the report in this case was made

17   sometime after all moving parts in this case occurred,

18   right?

19        A.   A hundred percent correct.

20             MR. PIERRE:  Objection.

21   BY MR. FERNANDEZ:

22        Q.   No one's perfect?

23        A.   No one's perfect.

24        Q.   Are you perfect?

25        A.   I wish.
```

1        Q.   Let's go to your interrogatories answers real

2   quick.  This is one of Plaintiff's exhibits, so I'll

3   just represent that way.

4            So scrolling down, I think we talked about,

5   you know, this line, as Officer Guzman pursued the

6   vehicle, he observed the plaintiff in the vehicle in

7   what appeared to be a white tank top.  Do you remember

8   that?

9        A.   Correct.

10       Q.   I guess we could probably change that to say

11   right before Officer Guzman pursued the vehicle, he

12   observed the plaintiff in the vehicle with what appeared

13   to be a white tank top on, right?

14       A.   Correct.

15            MR. PIERRE:  Objection.

16   BY MR. FERNANDEZ:

17       Q.   (Indiscernible)?

18       A.   Correct.

19       Q.   Okay.  I kind of just want to wrap this all up

20   nice and in a bow.  So totality of circumstance is

21   probable cause.  One individual, black male, white tank,

22   heavyset, in a black Compass speeding, traveling toward

23   you, right?

24       A.   Correct.

25       Q.   He passed you directly to your right side when

1    you're doing radar, right?

2         A.   Correct.

3         Q.   Same individual that exited the vehicle once

4    he crashed, right?

5              MR. PIERRE:  Objection.

6              THE WITNESS:  Correct.

7    BY MR. FERNANDEZ:

8         Q.   And he went through three stop signs, right?

9         A.   Correct.

10             MR. PIERRE:  Objection.

11   BY MR. FERNANDEZ:

12        Q.   And a red light?

13             MR. PIERRE:  Objection.

14             THE WITNESS:  Correct.

15   BY MR. FERNANDEZ:

16        Q.   Bloom gave you a description that matched the

17   guy that you saw, true?

18        A.   Correct.

19             MR. PIERRE:  Objection.

20   BY MR. FERNANDEZ:

21        Q.   And then when you got on scene and you saw the

22   plaintiff in this case, you in your mind believed that

23   was the individual you had identified leading up to the

24   crash, right?

25        A.   Correct.

1          MR. PIERRE:  Objection.

2   BY MR. FERNANDEZ:

3      Q.   And he asked about Brandon Williams.  Did

4   Brandon Williams ever go on scene, and what I mean by

5   scene, where Carriel and Hernandez were?

6      A.   The arrest location, no.

7      Q.   No.  He was just did the report, arrest

8   report.

9      A.   Correct.

10          MR. FERNANDEZ:  I don't have anything else.

11          MS. WYDLER:  Officer, I have a few questions.

12          I'm going to limit it to the arrest location based

13          on your testimony, okay?

14          THE WITNESS:  Yes, ma'am.

15          MS. WYDLER:  I appreciate your time so far.

16          THE WITNESS:  Thank you very much.

17                    CROSS EXAMINATION

18   BY MS. WYDLER:

19      Q.   All right.  So when you were driving after you

20   received the BOLO on dispatch and you had your

21   conversation with Officer Bloom, do you know what was

22   dispatched to the other officers to arrive to the arrest

23   location?

24      A.   I'm not sure, no.

25      Q.   Okay.  So you're unaware of whatever signal it

 1   was that brought Hernandez to the arrest scene?

 2        A.   Yes.  I was only with Officer Carriel, which

 3   is my crew, and then Officer Bloom, obviously responded

 4   to a stolen vehicle call.

 5        Q.   Okay.  So you have no recollection or personal

 6   knowledge as to what was dispatched for Officer

 7   Hernandez to arrive on the scene, correct?

 8        A.   No, ma'am.

 9        Q.   Now, we saw a portion of the video where we

10   saw both Officer Bloom and Officer Hernandez at least

11   making some physical contact with the plaintiff.  Do you

12   recall that scene?

13        A.   Yes, ma'am.

14        Q.   Okay.  You testified earlier that you saw

15   Officer Hernandez conducting a pat down, and you told

16   him to stop; is that correct?

17        A.   Correct.

18        Q.   All right.  What is a pat down done for?

19   What's the reason officers do those?

20             MR. PIERRE:  Objection.

21             THE WITNESS:  Any weapons, any firearms,

22        anything that can hurt us or bring harm to the

23        scene.

24   BY MS. WYDLER:

25        Q.   All right.  And you mentioned earlier in your

1   deposition testimony when Mr. Pierre was questioning you

2   that at that point, the plaintiff in this case, Mr.

3   Scott, had already been detained; is that correct?

4           MR. PIERRE:  Objection.

5           THE WITNESS:  Correct.

6   BY MS. WYDLER:

7       Q.   Is it proper for an officer to conduct a pat

8   down if someone is being detained?

9           MR. PIERRE:  Objection.

10          THE WITNESS:  Yes.

11  BY MS. WYDLER:

12      Q.   All right.  And isn't it true, sir, that based

13  upon your arrival and as the investigating officer for

14  the arrest, you had established probable cause once you

15  arrived and observed the individual who was claiming

16  that the vehicle had been stolen?

17          MR. PIERRE:  Objection.

18  BY MS. WYDLER:

19      Q.   Is that correct?

20          MR. PIERRE:  Objection.

21          THE WITNESS:  Correct, ma'am.

22  BY MS. WYDLER:

23      Q.   Okay.  So was the pat down that Officer

24  Hernandez was conducting, was that permissible?

25          MR. PIERRE:  Objection.

1              THE WITNESS:  Yes, it was.

2    BY MS. WYDLER:

3         Q.   Okay.  Why did you tell him to stop?

4         A.   I just told him to stop because when it's my

5    scene, I want to do everything for these same issues,

6    and then, again, I was talking to the sergeant making

7    sure that everything that we were going to charge the

8    defendant was accordingly and everything was squared

9    away.  So I just told him to slow down because he wanted

10   to, you know, hurry up and get it done, but I told him

11   to slow it down.

12        Q.   Earlier, you testified that you didn't speak

13   directly to Officer Hernandez when you arrived on the

14   arrest scene, correct?

15             MR. PIERRE:  Objection.

16             THE WITNESS:  Correct.

17   BY MS. WYDLER:

18        Q.   Okay.  Now, we saw portions of the video from

19   your body cam where you did speak with Officer Carriel,

20   right?

21        A.   Yes, he was the only one I was talking to.

22        Q.   And we did see a portion of the video where

23   Officer Carriel communicated to Officer Bloom in the

24   view of the camera that this was the person that you had

25   identified, right?

1          MR. PIERRE:  Objection.

2          THE WITNESS:  Correct.

3    BY MS. WYDLER:

4          Q.   Is it possible that there were other

5    communications between Officer Carriel and Officer

6    Hernandez that you were unaware of?

7          A.   No, definitely not because Carriel was with me

8    at the scene, and we traveled together at that scene.

9          Q.   Right.  And when you were on the phone with

10   the sergeant, were you speaking with Carriel the entire

11   time, or was Carriel near where the subject and the

12   other officers were?

13         A.   I can't recall that.  I'm not sure.  I mean, I

14   know we were all there.

15         Q.   So it's possible that the other officers were

16   speaking with one another while you were speaking with

17   your sergeant.  Is that fair to say?

18         MR. PIERRE:  Objection.

19         THE WITNESS:  Yeah.  I mean, we were all --

20         once I got to the scene, everybody knew what was

21         going on.

22   BY MS. WYDLER:

23         Q.   Okay.  When you got to the scene and you say

24   everybody knew what was going on, I'm going to ask you

25   does that mean that everyone was aware that you believed

1    you had probable cause to identify the person who had

2    committed crimes in front of you was the same person

3    that you were seeing at that scene, correct?

4              MR. PIERRE:  Objection.

5              THE WITNESS:  Correct.

6    BY MS. WYDLER:

7         Q.   I'm sorry, I couldn't hear over counsel

8    objecting and laughing at the same time.

9              MR. PIERRE:  You're giving him the testimony.

10             I know this is like a question, but you're giving

11             him the testimony.  That's why the objection.

12   BY MS. WYDLER:

13        Q.   I didn't hear your answer, sir.

14        A.   Correct.

15        Q.   Okay.  So what is it that you meant when you

16   just testified everybody knew what was going on?

17        A.   I mean, Officer Bloom knew I was going to go

18   identify the defendant because that's what I told him

19   over the radio.  I told him to, hey, hold on what you've

20   got.  I didn't want him to leave the defendant.  I

21   didn't want him to drive away.

22             Officer Carriel obviously knew everything

23   because he was at the scene of the accident with me, and

24   we were investigating that together, and then we drove

25   together to the other scene.  That's why he identified

1    the defendant also upon arrival of the scene.

2              And then Officer Hernandez, I don't know what

3    signal he took.  I don't know what he was there for, but

4    I'm assuming Officer Bloom -- he spoke to Officer Bloom

5    and he kind of knew or I can't tell you what Officer

6    Hernandez knew or did not know, but if he was there with

7    Bloom, I don't know.  You would have to ask Officer

8    Hernandez or Officer Bloom what that conversation was.

9         Q.   Understood.  So back to one of my initial

10   questions, which was even though you didn't speak

11   directly to Officer Hernandez about the identification

12   you had made of the subject, it's possible that he was

13   informed by other officers on scene, including Officer

14   Bloom that that individual indeed matched that subject,

15   correct?

16             MR. PIERRE:  Objection.

17             THE WITNESS:  For the actions that Hernandez

18        took that day of trying to pat him down and trying

19        to, you know, rush the arrest, yeah, I'm assuming

20        he knew that I had already identified the guy.

21   BY MS. WYDLER:

22        Q.   Okay.  What do you mean by rush the arrest?

23        A.   He was trying to get him in custody and

24   handcuffed inside the vehicle, and that's when you heard

25   me tell him to stop and slow down.

1      Q.   And if you were the arresting -- were you the

2   arresting officer for this incident?

3      A.   Yes, ma'am.

4      Q.   And he was -- and according to your testimony,

5   he was attempting to rush the arrest, but he didn't make

6   the arrest, right?

7           MR. PIERRE:  Objection.

8           THE WITNESS:  No, ma'am.

9   BY MS. WYDLER:

10     Q.   Okay.  Just making sure that the court

11  reporter got your answer, he didn't make the arrest?

12          MR. PIERRE:  Objection for the record.

13          THE WITNESS:  No, ma'am.

14  BY MS. WYDLER:

15     Q.   Now, do you know why he was the person trying

16  to place him under arrest?  Are you aware of whatever

17  transport call may have been made?

18          MR. PIERRE:  Objection.

19          THE WITNESS:  You would have to ask him that.

20     I don't know -- I don't even know why he was there.

21  BY MS. WYDLER:

22     Q.   Okay.  Were you planning to transport the

23  plaintiff in this case after the arrest?

24     A.   Yeah, we have to transport him to the station,

25  yes.

1      Q.   Were you personally in your vehicle -- after

2  you would have made the identification of the same

3  subject that you had seen commit previous crimes, was

4  your intent to transport him in -- what did you have --

5  Taurus?

6      A.   Correct.

7      Q.   Okay.  So what it your intent to transport, or

8  was there another vehicle called for transport?

9      A.   It was an intent to transport, and then

10  Officer Hernandez was there, so I asked him if he could

11  please transport to the station so the defendant could

12  be -- you know, because it's hard for him to fit in my

13  car.

14      Q.   Going back to the pat down, when you observed

15  him conducting the pat down, if I'm understanding your

16  testimony correctly, it's not because he was doing

17  anything wrong.  It was because you wanted to control

18  the scene; is that correct?

19           MR. PIERRE:  Objection.

20           THE WITNESS:  Correct.

21  BY MS. WYDLER:

22      Q.   Officer Hernandez did not place the handcuffs

23  on him, correct?

24           MR. PIERRE:  Objection.

25           THE WITNESS:  No, ma'am.

1   BY MS. WYDLER:

2       Q.   And we previously saw a portion of the clip

3   where the plaintiff's shirt had been lifted.  Was that

4   Officer Hernandez who had lifted the plaintiff's shirt?

5       A.   I'm not sure if it was him or Bloom.  Either

6   one.

7       Q.   Do you defer to the video?

8            MR. PIERRE:  Objection.

9            THE WITNESS:  Correct.

10           MS. WYDLER:  I have no other questions.  Thank

11      you.

12           THE WITNESS:  No problem.

13           MR. PIERRE:  Okay.  I have follow up,

14      obviously.

15                   REDIRECT EXAMINATION

16  BY MR. PIERRE:

17      Q.   Officer Guzman, I love that portion of the

18  deposition because basically, you say correct to

19  whatever they say.  I'm going to be a little bit harder.

20           MR. FERNANDEZ:  Strike.

21           MS. WYDLER:  Join.

22  BY MR. PIERRE:

23      Q.   So we went through the composite video, the

24  composite image.

25           MR. PIERRE:  Brandon, if you can put that up

1      for me.

2            MR. FERNANDEZ:  Yeah, hold on one second.

3            MR. PIERRE:  Thanks, man.

4            MR. FERNANDEZ:  Which one?

5            MR. PIERRE:  Let's start at A1.  Okay.  If you

6      can zoom in as much as possible.

7            MR. FERNANDEZ:  Right here?

8            MR. PIERRE:  Yeah.

9  BY MR. PIERRE:

10     Q.   Officer Guzman, do you see that white vehicle?

11     A.   The grey, yes.

12     Q.   Or the grey vehicle.  Do you see the person

13  that's driving the vehicle?  Can you make it out?

14          MR. FERNANDEZ:  Object to form.

15          THE WITNESS:  The picture, definitely not.

16  BY MR. PIERRE:

17     Q.   Okay.  Well, I'm saying that this is a camera

18  and it might have better vision than a human being, but

19  let's just say based off of your view, let's go back to

20  the image in its original setting.

21          Any of these vehicles, can you see the

22  individual that's actually in the car?

23          MS. WYDLER:  Objection, form.

24          THE WITNESS:  No.

25  BY MR. PIERRE:

```
 1        Q.   And you stated that you were placed right

 2   there between the tree and the light pole, correct?

 3        A.   Yes.

 4        Q.   And your vehicle was facing -- I'm assuming

 5   since you're facing southwards, correct?

 6        A.   I'm not.  I'm facing northbound.

 7        Q.   You're facing northbound.  So this is going

 8   south.  This is southbound.

 9        A.   Correct.

10        Q.   Okay.  You're seated from the farthest from

11   the road.

12        A.   Yeah, the driver's seat.

13        Q.   Yeah.

14        A.   Of my vehicle.

15        Q.   So you're in the driver's seat.

16        A.   Uh-huh.

17        Q.   So when this individual sees you -- when you

18   see this individual in the Jeep Compass, you're at an

19   angle.

20             MR. FERNANDEZ:  Form.

21             THE WITNESS:  Yeah.

22   BY MR. PIERRE:

23        Q.   Okay.  So when he passes you, do you rotate

24   your head, or are you fixated on the driver's seat?

25        A.   I'm looking at the vehicle at the driver
```

1    speeding down past me, so when he passes me, I can get

2    off the curb and make a U-turn.

3         Q.   Okay.  So you testified earlier that there was

4    a -- you said your view was unobstructed, correct?

5         A.   Yeah.  It was not obstructed.

6         Q.   Okay.  And there was -- and you also testified

7    there was a lanyard that was hanging in the vehicle,

8    correct?

9         A.   What?

10        Q.   His MasTec ID.

11        A.   Correct.

12        Q.   And where was that hanging?

13        A.   Obviously, I saw that at the crash scene.

14        Q.   I get it.  I get it.  So what I'm asking, it

15   was hanging in the rearview mirror?

16        A.   Yes.

17        Q.   Okay.  When you viewed -- when this vehicle

18   was passing by you, did you see the lanyard?

19        A.   No, no.  I wasn't looking at that.

20        Q.   I'm just wondering if your view was

21   unobstructed.

22        A.   It was unobstructed 100 percent because there

23   was no --

24        Q.   There was no lanyard.  I'm sorry.  You can

25   continue.

```
 1        A.   No, I'm good.

 2        Q.   No, no, no.  Go ahead.  I want you to finish.

 3   I want to be respectful to you.

 4        A.   No, nothing was obstructed.

 5        Q.   So you saw this guy at an angle with no

 6   lanyard in place, and do you remember when he was

 7   passing you, was his windows up, or was it down?

 8        A.   The windows were up.

 9        Q.   Windows were up.  Were the side vehicles

10   tinted -- windows tinted?

11        A.   I don't recall the side windows.

12        Q.   So you don't know if the side windows were

13   tinted.

14        A.   No.

15        Q.   Okay.  So your only view -- did you see

16   through the passenger window?

17        A.   No, at that time, I was already getting off

18   the curb to make a U-turn.

19        Q.   Oh, okay.  So you didn't wait for him to pass

20   you.

21             MR. FERNANDEZ:  Object to form.

22             THE WITNESS:  Yes.

23   BY MR. PIERRE:

24        Q.   Okay.  I'm saying you weren't stationary when

25   he passed you.
```

1        A.   Yes.

2        Q.   So how did it happen?  Were you stationary, he

3   passed you, and then you get off the median?

4        A.   Right.  Correct.

5        Q.   Okay.  So there is -- you don't know if it was

6   tinted, but the windows were up.  You see through an

7   angle at ten feet away.  Possibly there might have been

8   a lanyard there, correct?

9        A.   Correct.  If you say so.

10       Q.   No, it's not if I say.  It's what you saw

11  because you're making this arrest.  We can go to the

12  next page.  Let's just say for the purposes of this,

13  this is the direction.  Now, it's going northbound.

14       A.   That's going southbound.

15       Q.   That's going southbound.  Now, you have turned

16  around and following this vehicle.

17       A.   No, I'm still -- this picture shows where I'm

18  located on the right side between the tree and the pole,

19  the light pole.

20       Q.   Okay.  So you're actually between those trees.

21       A.   I'm between the tree and the light pole.

22       Q.   Okay.  So at this point, when do you -- how

23  many seconds after he passes you do you get off?

24       A.   Instantly after he passes.

25            MR. PIERRE:  You can take this off, Brandon.

1    BY MR. PIERRE:

2        Q.   In your testimony with your counsel, you

3    fessed up to another mistake on your police report, your

4    arrest affidavit, correct?

5            MR. FERNANDEZ:  Object to form.

6            THE WITNESS:  Correct.

7    BY MR. PIERRE:

8        Q.   And you said it should have been a right turn.

9    Not a left turn, correct?

10       A.   Yes, there was no left turn on that street.

11       Q.   So far, we have the timing, that it's 6:05

12   p.m.  When you made the arrest.  That's a mistake,

13   correct?

14           MR. FERNANDEZ:  Object to form.

15           THE WITNESS:  Correct.

16   BY MR. PIERRE:

17       Q.   We have it should have been a left turn.  Not

18   a right turn, correct?

19       A.   Correct.

20       Q.   So are there any other mistakes that you made

21   in this police report besides those two?

22           MR. FERNANDEZ:  Object to form.

23           THE WITNESS:  No, not that I know of.

24   BY MR. PIERRE:

25       Q.   Okay.  Because your counsel referred to them

1    as minor discrepancies.

2              MS. WYDLER:  Objection, form.

3    BY MR. PIERRE:

4         Q.   Do you recall when he said that -- made that

5    statement?

6         A.   Yeah, yeah, 100 percent.

7         Q.   So these minor discrepancies didn't affect

8    your ability to perceive the situation at the time?

9              MR. FERNANDEZ:  Object to form.

10             THE WITNESS:  Correct.

11   BY MR. PIERRE:

12        Q.   Your counsel went through at lengths this car

13   chase.  How long was this car chase?

14        A.   I can't recall that.  I mean, it was too long

15   ago.

16        Q.   I mean, you were pretty precise on which

17   direction you went at what time, I mean, when you went

18   there.  You actually even said you stopped at a red

19   light.  You were pretty accurate.  So based off of your

20   familiarity with that area, how long was the car chase?

21             MR. FERNANDEZ:  Object to form.

22             MS. WYDLER:  Objection, form.

23             THE WITNESS:  I can't give you an exact time.

24        I mean, that's hard to tell you, especially such a

25        long time has passed.

1  BY MR. PIERRE:

2      Q.   You stated you checked the vehicle, right?

3      A.   Right.

4      Q.   Like when it crashed, you checked the vehicle.

5      A.   I did.

6           MS. WYDLER:  Form.

7  BY MR. PIERRE:

8      Q.   You checked to see if there was anybody in

9  there.

10     A.   Before I approached it, yes.

11     Q.   Yeah.  So there was a point in time you

12 weren't paying attention to the actual suspect that was

13 fleeing the vehicle.

14          MS. WYDLER:  Objection, form.

15          MR. FERNANDEZ:  Form, mischaracterizes

16     evidence.

17 BY MR. PIERRE:

18     Q.   I mean, I'm asking you did you check the

19 vehicle?  Yes or no?

20     A.   I did, yes.  I mean, as I was walking by, I

21 pointed my gun through the vehicle and I keep going.

22     Q.   And while you were pointing your gun towards

23 the vehicle, was your eye on the vehicle, or was it on

24 the suspect that was fleeing?

25     A.   On the vehicle.

1        Q.   Okay.  So my question again is there was a

2   point in time that you weren't paying attention to the

3   suspect.

4        A.   I wouldn't put it not paying attention.  I

5   can't pay attention to two different points at the same

6   time.

7        Q.   I agree with you.

8        A.   I have to look at the vehicle for my own

9   safety, and that's when I saw the offender make a right

10   turn, and I lost him.  That's why I lost him.  Like I

11   went to check the vehicle.

12        Q.   Okay.  So back to your testimony as to the

13   fact that you couldn't pay attention to the suspect

14   because you had to check for your safety, correct?

15        A.   Correct.

16        Q.   So there was a point in time that you lost

17   site of the suspect.

18        A.   Yeah, that's why I set a perimeter.

19        Q.   In Zulu time, right, we went through that, but

20   for the purposes of the jury, Zulu time is just like

21   Greenwich/British time, right?  Let me -- is that your

22   understanding?

23             MR. FERNANDEZ:  Object to form.

24             THE WITNESS:  Yeah, that's the time that XR

25        uses for their body-worn camera.

1   BY MR. PIERRE:

2        Q.   Yeah, Greenwich Mean Time, which is like what

3   the UK and the British use.

4             MR. FERNANDEZ:  Object to form.

5             THE WITNESS:  Okay.

6   BY MR. PIERRE:

7        Q.   Basically, it's only a two-hour difference in

8   military time from our military time.  Do you disagree

9   with that?

10       A.   No, no, you're -- that's fine.

11            MR. FERNANDEZ:  Object to form.

12  BY MR. PIERRE:

13       Q.   Okay.  So in the body-worn camera, it says you

14  arrive there at 22:45.

15       A.   I can't recall.  I don't have the image with

16  me.

17            MR. PIERRE:  Brandon, can you place the

18       body-worn camera for me?

19            MR. FERNANDEZ:  Hold on.

20            THE WITNESS:  Yeah.

21            MR. PIERRE:  Okay.  Can you go where he

22       actually arrives?

23            MR. FERNANDEZ:  This is when he arrives on

24       scene, Faudlin.

25            MR. PIERRE:  Okay.

```
 1             THE WITNESS:  45.

 2             MR. PIERRE:  Okay.

 3   BY MR. PIERRE:

 4        Q.   Greenwich Mean Time is actually like five

 5   hours.  I said two hours.  Big difference.  So at that

 6   time, it would have been 17:45, correct, if it was our

 7   military time?

 8        A.   Sure.  If you're making the math.  I'm not.

 9        Q.   No.  What I'm trying to say was it 5:45?

10        A.   Yeah.

11        Q.   So you arrive there at 5:45, correct?

12             MR. FERNANDEZ:  Object to form.

13             THE WITNESS:  I guess so.

14             MS. WYDLER:  Form.

15   BY MR. PIERRE:

16        Q.   Okay.  So we were talking about the timelines

17   here.  Your arrest affidavit says it was dispatched at

18   5:40.  Your body-worn camera says 5:45 was when you

19   arrived.  The transcript or I mean the worksheet from

20   Officer Bloom says 6 -- actually, I'm incorrect.  This

21   would have been -- this actually would have been 6:45

22   because we forward time at that time because it's

23   summertime.

24             MR. FERNANDEZ:  Object to form.

25             MS. WYDLER:  Yeah, objection.
```

```
 1              MR. PIERRE:  That's fine.  We can do the

 2         calculations later.

 3    BY MR. PIERRE:

 4         Q.   But in any case, your body-worn camera says

 5    that this is 6:45 in our time.

 6              MR. FERNANDEZ:  Object to form.

 7              MS. WYDLER:  Join.

 8    BY MR. PIERRE:

 9         Q.   Do you agree?

10              THE WITNESS:  Do I?

11              MR. FERNANDEZ:  To the best of your ability.

12              THE WITNESS:  Yes.

13    BY MR. PIERRE:

14         Q.   Okay.  So you arrived at the scene at 6:45.

15              MS. WYDLER:  Objection, form.

16              MR. FERNANDEZ:  Form.

17              THE WITNESS:  Yes.

18    BY MR. PIERRE:

19         Q.   And does -- and since you reviewed your

20    body-worn camera, does your body-worn camera actually

21    pick up what you say to Carriel at the time?

22         A.   What do you mean what I say to Carriel?

23         Q.   Your counsel basically said that you and

24    Carriel spoke right before you got to Officer Bloom's

25    vehicle, correct?
```

1          A.   Correct.  We spoke at the scene because he

2     arrived at the crash.

3          Q.   Okay.  Not the crash scene.  I'm talking about

4     this scene right here.

5          A.   Correct.  Carriel arrived at the crash scene.

6     We met there because that's when I requested the

7     perimeter, and then we drove together in separate cars,

8     one following the other, drove to the scene of the

9     arrest.

10          Q.   What I'm getting at is when you get out of

11     your car, does your body-worn camera show or pick up

12     when you tell him that's the guy?

13          A.   I didn't tell Carriel that.

14          Q.   Okay.  So how did Carriel -- how was Carriel

15     able to tell Bloom that's the guy?

16          A.   Because he already had been involved in the

17     whole scene and he knows the guy we're looking for, the

18     description of the guy we're looking for.

19          Q.   Oh, okay.  So Carriel is just saying based off

20     of a black guy or let's strike that.

21          So Carriel goes independently, not from you,

22     to Officer Bloom and says that's the guy based off of

23     your description of six foot two, heavyset, black male,

24     bald with a white tank top, correct?

25          MR. FERNANDEZ:  Object to form.

1              THE WITNESS:  I'm not sure.  I mean, you have

2         to ask Carriel where he got that from.

3    BY MR. PIERRE:

4         Q.   Yeah.  I'm trying to ask you because what's

5    going to happen is I will ask him, and if he says you

6    told him, I want to make sure that the record's clear

7    that you didn't tell him.

8         A.   Okay.

9              MR. FERNANDEZ:  Let him ask his question.

10             Object to form.  This wasn't a question.  It

11        was a statement.

12   BY MR. PIERRE:

13        Q.   So the question is did you tell Carriel that

14   Mr. Scott, that's the guy?

15             MR. FERNANDEZ:  Object to form, asked and

16        answered.  Last time going to answer it.  Go ahead.

17             THE WITNESS:  As you hear on the body- worn

18        camera, I say that's the guy.  Whether Carriel

19        heard it or that he's there, I don't know.  You

20        have to ask Carriel because I also -- I informed

21        them of the defendant I'm looking for, and I

22        described it to him when I was at the scene of the

23        crash.

24             So as you hear me verbally say it in my body-

25        worn camera, right, when I get off the car and I

1          say that's the guy, whether Carriel is next to me,

2          I can't tell you that.  I mean, I don't recall

3          that.  I don't know if he heard me.  You have to

4          ask Carriel that.

5     BY MR. PIERRE:

6          Q.   Okay.  And there was some property that your

7     counsel spoke about that was -- that my client still

8     hasn't been able to find.  Do you know what happens to

9     that?

10         A.   I don't know what happened to that, no.

11         Q.   I know in the videos, it shows that you had

12    the possession of his wallet.  Do you know what happened

13    to his wallet?

14         A.   No, I gave it to Officer Hernandez.

15         Q.   Why did you give it to Officer Hernandez?

16         A.   Because he transported him to the station, and

17    he kept it.

18         Q.   So Officer Hernandez ended up keeping the

19    wallet?

20         A.   I'm not sure.  I'm just saying I gave him the

21    property when he transported him to north station, and

22    that's what I know.  I never had possession besides that

23    scene of the property, except the -- not even.  The

24    MasTec ID, I gave it to Brandon Williams so he can turn

25    it in.

1      Q.   So you gave it to Brandon Williams?  When did

2   you give it to Brandon Williams, the MasTech ID?

3      A.   I don't recall.  I think at the station

4   because Brandon Williams is the one that turned in the

5   property.

6      Q.   Okay.  In your earlier testimony, you stated

7   that there was a 40-minute delay, correct?

8           MR. FERNANDEZ:  Object to form, asked and

9        answered.

10          THE WITNESS:  Yeah, that's on my narrative

11       from the A-form.

12   BY MR. PIERRE:

13      Q.   Okay.  In 40 minutes, are you able to take a

14   vehicle, crash it, and run back to the scene where it

15   was taken from?

16          MR. FERNANDEZ:  Object to form.

17          MS. WYDLER:  Join.

18          MR. FERNANDEZ:  Answer if you can.

19          THE WITNESS:  I don't know.  I don't know what

20       the question is because I didn't call and say my

21       car was stolen 40 minutes ago.  Remember, the 40

22       minutes is the defendant calling and saying I got

23       my vehicle stolen 40 minutes ago.  That's where the

24       40 minutes came from.

25   BY MR. PIERRE:

1      Q.   In your earlier testimony, you said 15 minutes

2   to 20 minutes.  What were you referring to when you made

3   that -- I mean, when you were being cross examined by

4   your counsel?

5           MR. FERNANDEZ:  Object to form.

6           THE WITNESS:  I don't remember the question.

7      It's been so many time questions, I don't know.

8   BY MR. PIERRE:

9      Q.   You testified that it was summer at the time

10  on June 1, 2018, correct?

11     A.   Correct.

12     Q.   You stated it was a hot summer day, correct?

13     A.   Correct.

14     Q.   You stated that my client was sweating.

15     A.   Profusely sweating, yes.

16     Q.   Profusely sweating.  And I think your counsel

17  even asked you that you ran, right?

18     A.   Yes, ran some distance between my car.

19     Q.   You ran some distance and you were sweating

20  profusely.

21     A.   Profusely, no.

22     Q.   Okay.  Does your vehicle have air

23  conditioning?

24     A.   It does.

25     Q.   Okay.  So did you run a mile before you

1   stopped sweating?

2         MR. FERNANDEZ:  Object to form.

3         MS. WYDLER:  Join.

4         THE WITNESS:  I did not run a mile.

5   BY MR. PIERRE:

6      Q.   So you didn't run a mile?

7      A.   No.

8         MR. FERNANDEZ:  Object to form.

9   BY MR. PIERRE:

10     Q.   How far did you actually run?

11     A.   Fifteen yards between my car and the corner of

12  the I-95 there where you showed the picture earlier.

13     Q.   Okay.  So you ran 15 yards, and you weren't

14  sweating profusely.

15     A.   Correct.

16     Q.   And then you went back into your air-

17  conditioned vehicle, correct?

18     A.   No, I did not.

19     Q.   Okay.

20     A.   I went --

21     Q.   I'm sorry.  I apologize for that.

22     A.   I said I went to search the car after that.

23     Q.   Okay.  You went to search the vehicle.

24     A.   We did the perimeter first and then searched

25  the car.

```
1        Q.   Okay.  And you were at the perimeter for 15,

2   minutes?

3        A.   Uh-huh.

4        Q.   Okay.  And you weren't sweating profusely

5   then?

6        A.   I was not.  No, sir.

7        Q.   Okay.  And then you went back into your air-

8   conditioning car.

9        A.   As I was driving to the other scene, yes.

10        Q.   And you weren't sweating profusely in the air

11   conditioning.

12        A.   I was not.  No, sir.

13        Q.   Okay.  Do you know how long Samuel Scott was

14   outside waiting for the police?

15            MS. WYDLER:  Objection, form.

16            THE WITNESS:  I do not.

17   BY MR. PIERRE:

18        Q.   Did you ask Samuel Scott how long you were

19   here waiting for the police?

20            MR. FERNANDEZ:  Object to form.

21            THE WITNESS:  No.

22   BY MR. PIERRE:

23        Q.   Did you ask Officer Bloom how long he was

24   present with you while waiting for the police?

25        A.   No.
```

```
 1        Q.   Did you ask to gain a timeline of how my

 2   client was driving his vehicle that he reported stolen

 3   probably at the same time you were chasing this vehicle?

 4             MR. FERNANDEZ:  Object to form.  Answer if you

 5        can.

 6             THE WITNESS:  I mean, I don't really

 7        understand what the question was.

 8   BY MR. PIERRE:

 9        Q.   Yeah.  Let me rephrase it for you.  Can you at

10   least agree with me that the timestamps in your arrest

11   affidavit are not accurate?

12             MR. FERNANDEZ:  Object to form, asked and

13        answered.

14             MS. WYDLER:  Join.

15             THE WITNESS:  They're off, yes.

16   BY MR. PIERRE:

17        Q.   Okay.  So we can't rely on your timestamps,

18   meaning he was arrested at 6:05.  Forty minutes before

19   that, he reported a stolen vehicle, correct?

20             MR. FERNANDEZ:  Object to form.

21             MS. WYDLER:  Join.

22             THE WITNESS:  I guess.  I mean, I don't know

23        what to say because I have said it so many times

24        already.

25   BY MR. PIERRE:
```

 1      Q.   So you arrive on the scene, do you explore any

 2   possibilities that Mr. Scott was actually with Officer

 3   Bloom at the time that you engage in the car chase with

 4   this other suspect?

 5           MS. WYDLER:  Objection, form.

 6           THE WITNESS:  Timewise, I can't tell you, but

 7       he should have told me when I gave him the

 8       opportunity to dispel my alarm and to tell me what

 9       witnesses did he have to say, listen, this is where

10       I was.  Here's what time it was, but he didn't.

11   BY MR. PIERRE:

12      Q.   Yeah, but you didn't need him to dispel your

13   alarm because based off of your testimony today, you

14   already identified on the scene when you arrived that,

15   that was the guy, correct?

16           MR. FERNANDEZ:  Object to form.

17           THE WITNESS:  Correct but I still gave him the

18       opportunity to dispel that alarm.

19   BY MR. PIERRE:

20      Q.   I'm sorry because it works both ways.  I'm not

21   trying to cut you off.

22      A.   No, it's fine.  Go ahead.  It's fine.

23      Q.   Okay.  So you said you gave him the

24   opportunity.  In the video, he literally is saying you

25   guys have the wrong guy.  Did you ask any questions as

```
 1    to where he was, where his alibi was?

 2         A.   Yes, I did.  He said his aunt, but he wouldn't

 3    give me an address, a telephone number.  Nobody came

 4    out.  Nobody said anything.

 5         Q.   Okay.  And we already discussed it.  The

 6    police didn't make any attempts to go to the aunt that

 7    was right in front of them to you.

 8         A.   I didn't know --

 9              MR. FERNANDEZ:  Object to form.

10              THE WITNESS:  I didn't know.  I mean, if he

11         would have gave me an address.  If he would have

12         gave me, hey, here's the address.  Go check.  Guess

13         what I would have done, but he didn't.

14    BY MR. PIERRE:

15         Q.   Okay.  And did Officer Bloom, when you were

16    speaking to him, tell you how long he was with this

17    individual?

18              MR. FERNANDEZ:  Object to form.

19    BY MR. PIERRE:

20         Q.   Like prior to you getting to the scene?

21              MR. FERNANDEZ:  Object to form, asked and

22         answered.

23              MR. PIERRE:  I'm asking prior to him getting

24         on the scene.

25              MR. FERNANDEZ:  Go ahead.
```

```
 1                 THE WITNESS:  No, no.

 2     BY MR. PIERRE:

 3          Q.   In the video, you said he was sweating

 4     profusely, right?

 5                 MR. FERNANDEZ:  Object to form, asked and

 6          answered.

 7                 MR. PIERRE:  I'm not finished.

 8                 MR. FERNANDEZ:  Okay.

 9     BY MR. PIERRE:

10          Q.   So in the video, you said he was sweating

11     profusely, correct?

12          A.   Correct.

13          Q.   Your attorney did a still shot of him sweating

14     profusely, correct?

15          A.   Correct.

16          Q.   But there's a comment that comes afterwards by

17     yourself where you're saying that the car is hot.  Do

18     you remember that?

19          A.   No, I never said that.

20          Q.   You never stated that the vehicle that my

21     client was in was hot?

22                 MR. FERNANDEZ:  Object to form.

23                 THE WITNESS:  Definitely not.

24     BY MR. PIERRE:

25          Q.   Okay.  And you never stated that -- you never
```

```
 1    had the vehicle/car turned down because it was hot --

 2    the window?

 3         A.   No, not at all.

 4         Q.   Okay.  Your counsel asked if you were racist.

 5    Do you recall that?

 6         A.   I recall that.

 7         Q.   Are you racist?

 8         A.   I am not, sir.

 9         Q.   Okay.  And you don't have a racist bone in

10    your body?

11         A.   No, sir.

12              MS. WYDLER:  Form.

13    BY MR. PIERRE:

14         Q.   Have you ever said the N word?

15              MR. FERNANDEZ:  Object to form.

16              MS. WYDLER:  Join.

17              MR. PIERRE:  You opened the door.

18              THE WITNESS:  No.

19    BY MR. PIERRE:

20         Q.   So you never said the N word or used a

21    derogatory slur towards African Americans.

22              MR. FERNANDEZ:  Object to form, asked and

23         answered.

24              MS. WYDLER:  Join.

25              THE WITNESS:  No, sir.
```

1   BY MR. PIERRE:

2       Q.   Towards African Americans?

3       A.   No.

4       Q.   Do you have any views of Black Lives Matter?

5            MR. FERNANDEZ:  Object to form, relevance.

6            MR. PIERRE:  This is an issue about race.  You

7       opened the door, man.  You can't complain about it

8       once you say is he racist.

9            MR. FERNANDEZ:  Go ahead.  Object to the form.

10      You can answer.

11           THE WITNESS:  No, I don't care about it.  Not

12      like the actual cause or whatever you're asking

13      about Black Lives Matter.

14  BY MR. PIERRE:

15      Q.   Okay.  And then you mentioned and testified

16  that you arrest all kinds of people, correct?

17      A.   I sure do.

18      Q.   And if you would have to classify the people

19  that you hang out with, what would you say consists of

20  American Americans on a personal level?

21           MR. FERNANDEZ:  Object to form.

22           MS. WYDLER:  Objection, form.

23           MR. FERNANDEZ:  This is the only time he's

24      going to answer this question if you can.

25           THE WITNESS:  I mean, I don't recall a number,

1          but I have plenty of African American, especially

2          that I was raised in New York City, Brooklyn.  Most

3          of my high school and elementary friends are black.

4     BY MR. PIERRE:

5          Q.   Okay.  So would you say that all black people

6     look alike?

7               MR. FERNANDEZ:  Object to form.

8               THE WITNESS:  Look alike?

9               MS. WYDLER:  Form.

10    BY MR. PIERRE:

11         Q.   Yeah.

12         A.   Definitely not.

13         Q.   Okay.  In your interrogatories, and I'll pull

14    that up.  Okay.  You stated on June 1st at around 4:30

15    p.m., Officer Guzman conducted a radar detail in the

16    area of Northwest 12th Avenue and Northwest 67th Avenue

17    in Miami, Florida.  Do you see that?

18         A.   I see that.

19         Q.   This is the first time that you mention 4:30

20    p.m.  Where did that come from?

21              MR. FERNANDEZ:  Object to form.

22              THE WITNESS:  I believe that's the time I

23         started doing radar.

24    BY MR. PIERRE:

25         Q.   Okay.  So this was not the time you actually

1    first observed the vehicle in --

2         A.    No.

3         Q.    -- question.

4         A.    Sorry I cut you off.  Not at all.

5         Q.    Okay.  Thank you for that clarification.  So

6    you don't know when, in fact, you actually observed that

7    vehicle?

8              MR. FERNANDEZ:  Object to form.

9              MS. WYDLER:  Join.

10             THE WITNESS:  Timeframe?

11   BY MR. PIERRE:

12        Q.    Yeah.

13        A.    No.  I mean, I can't tell you the exact time.

14        Q.    And you would agree with me that your

15   characterization in your arrest affidavit of a heavyset

16   black male approximately six foot wearing a tank top

17   would fit a large category of people, correct?

18             MR. FERNANDEZ:  Object to form.

19             MS. WYDLER:  Objection, form.

20             MR. FERNANDEZ:  You're starting to harass the

21        witness at this point.

22             Go ahead and answer one more time, please.

23             THE WITNESS:  Yeah, that -- I mean, it fits

24        the general population.

25   BY MR. PIERRE:

 1      Q.   Your counsel asked you about I think there was

 2   some modification of the interrogatories.  Do you

 3   remember that line of questioning?  He essentially asked

 4   you to modify the interrogatories that you stated in the

 5   previous question.

 6           What exactly were you attempting to change in

 7   your interrogatories?

 8      A.   I don't recall.  I didn't write it down.

 9           MR. FERNANDEZ:  Can we just refer to the

10           record?

11           MR. PIERRE:  I kind of want to know.  I mean,

12           if you want to stipulate to what you were

13           attempting to change, that's fine, too.

14           MR. FERNANDEZ:  Yeah, that's fine.  We can

15           stipulate to that.

16           MR. PIERRE:  Well, what was it?

17           MR. FERNANDEZ:  It was -- so where it says as

18           Officer Guzman pursued, it would be right before

19           Officer Guzman pursued the vehicle, he observed the

20           plaintiff in the vehicle with what appeared to be a

21           white tank top.

22   BY MR. PIERRE:

23      Q.   So based off of your counsel's stipulation, it

24   seems to me that again, you're attempting to change the

25   narrative of -- I mean, your narrative.

1           MS. WYDLER:  Form.

2           MR. FERNANDEZ:  Object to form,

3       mischaracterizes the evidence and testimony.

4           MR. PIERRE:  Let me rephrase that.

5   BY MR. PIERRE:

6       Q.   Based off of the stipulation on record, it

7   seems again that you're attempting to change the

8   narrative in your arrest affidavit, correct?

9           MR. FERNANDEZ:  Object to form.  We'll amend

10          the answers to the interrogatories after the

11          deposition.

12  BY MR. PIERRE:

13      Q.   You still have to answer.

14      A.   I guess so.

15      Q.   Okay.  Then this comes to the line of

16  questioning by Ms. Wydler.  Why did you tell Officer

17  Hernandez to stop?

18          MR. FERNANDEZ:  Object to form, asked and

19          answered again.

20          MS. WYDLER:  Join.

21          MR. PIERRE:  He provided two different

22          answers.  I need to get his answer.

23  BY MR. PIERRE:

24      Q.   But anyway, why did you tell Officer Hernandez

25  to stop?

1      A.   Because I was -- I like to do my own thing at

2  my own scene, and again, I was verifying with my

3  sergeant everything we had in totality, and I didn't

4  want to -- I wanted to put him in custody.  I like to do

5  everything in my scenes.

6      Q.   Okay.

7      A.   And Officer Hernandez was in a rush for

8  whatever reason to put him in handcuffs and into the

9  vehicle, and that's why I told him to stop.

10     Q.   You also testified in Ms. Wydler's line of

11 questioning everybody knew what was going on.  What did

12 you mean by that?

13     A.   At that point, they all knew that I was there

14 the defendant matching the crash scene and, obviously,

15 the chase.

16     Q.   Okay.  I want to make sure that -- by the way,

17 did you ever -- the crash that occurred on 71st Street,

18 did you ever check to see if there was cameras?

19     A.   I did from the dealership.

20     Q.   And did they have any?

21     A.   No, they didn't.  They didn't even want to be

22 a part of the report.

23     Q.   Okay.  And did they make a claim as it relates

24 to that burgundy Ford?

25          MR. FERNANDEZ:  Object to form.

```
 1              THE WITNESS:  I have no idea.  I mean, we put
 2         the car in the report, but at least the dealer
 3         didn't want nothing to do with it.
 4    BY MR. PIERRE:
 5         Q.   Did Officer Bloom ever tell you how he knew
 6    that there was a white tank top beneath my client's
 7    shirt?
 8         A.   When we spoke on the radio, I told him that's
 9    the defendant I was looking for.
10         Q.   So you told him you were looking for it, but
11    I'm asking what did he tell you as it related to my
12    client wearing the tank top?
13              MR. FERNANDEZ:  Object to form, asked and
14         answered.  Go ahead.
15              THE WITNESS:  All he told me was about the
16         stolen vehicle affidavit and the stolen vehicle and
17         the BOLO, obviously, or he put it over the radio.
18    BY MR. PIERRE:
19         Q.   Correct me if I'm wrong, in my review of the
20    video, when you first step on the scene, I don't see a
21    white tank top that's readily visible.
22         A.   I saw it from the back of your defendant -- of
23    the defendant's body.
24         Q.   So this is specifically in camera view or
25    camera shot?
```

1            MR. FERNANDEZ:  Object to form.

2            THE WITNESS:  I don't know if the camera

3        caught it or not, but that's what it was.

4    BY MR. PIERRE:

5        Q.   Okay.  Because the only time I saw within all

6    of the camera views is when Officer Hernandez and

7    Officer Bloom were searching my client and it reveals

8    the white tank top.  So you're saying there was an

9    earlier time that wasn't seen on camera where you

10    observed the white tank top beneath my client's shirt.

11            MS. WYDLER:  Objection, form.

12            MR. FERNANDEZ:  Object to form, asked and

13        answered.

14            THE WITNESS:  You can see the white tank top

15        from the rear under the black shirt.

16    BY MR. PIERRE:

17        Q.   Okay.  Your testimony as it relates to that

18    you're not limited by the arrest affidavit.  Do you

19    remember that line of questioning that your counsel

20    asked you?

21        A.   Uh-huh.  Yes.

22        Q.   And he said that you can essentially -- you're

23    not limited to what you wrote on your arrest affidavit.

24    You can actually testify to more at trial.  Do you

25    remember that?

```
 1        A.   Correct.

 2        Q.   So are you telling me now that the arrest

 3   affidavit isn't a complete and accurate view of the

 4   facts as they existed at that time?

 5             MR. FERNANDEZ:  Object to form.

 6             MS. WYDLER:  Join.

 7             THE WITNESS:  Correct.

 8   BY MR. PIERRE:

 9        Q.   So if it wasn't an accurate view of the events

10   at that time, why should we believe what you're saying

11   about the events as they occur now?

12             MR. FERNANDEZ:  Object to form, argumentative.

13             MS. WYDLER:  Objection, form.

14             THE WITNESS:  Because I have my statement.

15             That's why I'm here.  If everything was on the

16             A-form, I wouldn't be sitting.

17   BY MR. PIERRE:

18        Q.   That's probably why it's a good practice to

19   include everything in the A-form, correct?

20             MR. FERNANDEZ:  Object to form.

21             MS. WYDLER:  Join.

22             THE WITNESS:  I guess so.  I'm not going to

23             answer that question because it won't come out

24             right.

25   BY MR. PIERRE:
```

```
 1        Q.   Why did you say you weren't going to answer

 2   the question?

 3        A.   Go ahead.

 4        Q.   Oh, you said you weren't going to answer that

 5   question.  Why?

 6        A.   No, no.  I mean, I just had a lot of things in

 7   my head, but I'm not going to -- it's not going to be

 8   very respectful, but yes, I agree.

 9             MR. FERNANDEZ:  Do you know how many more

10        questions you have, or can we take a break?

11             MR. PIERRE:  I'm going to get them out before

12        5:00.

13             MR. FERNANDEZ:  Okay.

14   BY MR. PIERRE:

15        Q.   Okay.  Here's my swan song.  Can you admit

16   that you screwed this one up?

17             MR. FERNANDEZ:  Object to form.

18             MS. WYDLER:  Objection, form.

19             THE WITNESS:  You want me to answer that?

20   BY MR. PIERRE:

21        Q.   Yeah, answer.

22        A.   Definitely not.

23        Q.   Okay.  Because I understand what your counsel

24   and the co-counsel is trying to paint, all right, but

25   based off of what I see in your affidavit, it says the
```

1    first time you actually observed the suspect is when he

2    gets out of the vehicle, correct?

3              MS. WYDLER:  Objection, form.

4              MR. FERNANDEZ:  Objection, asked and answered.

5              MS. WYDLER:  Form, mischaracterization

6         testimony.

7    BY MR. PIERRE:

8         Q.   Let's just go by the affidavit, Officer

9    Guzman, and I'm going to get you out of here before

10   5:00, all right?  So that's the first time that you

11   placed a physical description of what the suspect looks

12   like, correct?

13             MR. FERNANDEZ:  Object to form.

14             THE WITNESS:  If you're going to go by the

15        A-form, yes.

16   BY MR. PIERRE:

17        Q.   Okay.  And if we go by the A-form, all we have

18   is a black guy wearing a white tank top, heavyset.  It

19   doesn't even say color of jeans, correct?

20             MR. FERNANDEZ:  Object to form.

21             MS. WYDLER:  Objection, form.

22             THE WITNESS:  Correct.

23   BY MR. PIERRE:

24        Q.   So your testimony also shows that you actually

25   when the suspect was fleeing away, you took your

1    attention off of the heavyset black male with a white

2    tank top that was exiting the vehicle, correct?

3              MR. FERNANDEZ:  Object to form, asked and

4         answered.

5              MS. WYDLER:  Objection, form.

6              MR. FERNANDEZ:  This is the fourth time,

7         Faudlin.

8              MS. WYDLER:  And, Counsel, you keep on missing

9         an identification mark also.

10             MR. PIERRE:  What's the identification mark?

11             THE WITNESS:  Bald head.

12             MS. WYDLER:  The witness just said it.

13   BY MR. PIERRE:

14        Q.   So the BOLO.

15        A.   The bald, bald head.

16        Q.   Oh, the bald head.  I'm sorry.  Okay.

17        A.   You're making mistakes.  It's okay.

18        Q.   Hey, believe me, I feel your pain.

19             So the first time you've actually identified

20   in your arrest affidavit was this black male, bald head,

21   wearing a white tank top, heavyset is once he exits the

22   vehicle, correct?

23             MR. FERNANDEZ:  Object to form, asked and

24        answered.

25             MS. WYDLER:  Join.

1          THE WITNESS:  Correct.

2   BY MR. PIERRE:

3      Q.   Okay.  And then in your testimony today, you

4   admit that your attention was taken off of the

5   individual who was exiting the vehicle for I don't know

6   how long, but just for your safety, you checked the

7   vehicle to see if there was someone in there, correct?

8      A.   Yes, after I had a full -- identify that

9   person as I described it.

10     Q.   Okay.  And then you arrived on the scene.  You

11  see a black male.  I'm getting there.  Just hang on with

12  me.  You see a black male, heavyset, wearing a black

13  shirt and bald head, and you say that's the guy,

14  correct?

15     A.   Correct.

16     Q.   And you're saying based off of all of that,

17  that was your probable cause to arrest Mr. Scott, Samuel

18  Scott, Jr.

19          MR. FERNANDEZ:  Object to form,

20      mischaracterizes testimony and evidence.

21          MS. WYDLER:  Join.

22          THE WITNESS:  Correct.

23          MR. PIERRE:  I have no further questions for

24      this witness.

25          MR. FERNANDEZ:  I don't have any either.

```
1              MS. WYDLER:  No further questions.

2              MR. FERNANDEZ:  Okay.  We're going to rush

3         order, and we're going to read.

4              (The deposition was concluded at 4:56 p.m.)

5              (Reading and signing of the deposition was

6         reserved.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF MIAMI-DADE

5

6              I, Tyesha Scott, Reporter, Notary Public,

7         State of Florida, certify that JONATHAN GUZMAN

8         appeared before me on the 28th day of December

9         2022, and was duly sworn.

10

11             Signed this 4th day of January 2023.

12

13

14

15         _____
                     Tyesha Scott, Reporter
16                   Notary Public, State of Florida
                     Commission No.:  HH99623
17                   Commission Expires:  06/30/2025

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF MIAMI-DADE

 5

 6           I, Tyesha Scott, Reporter, certify that I was

 7       authorized to and did report the deposition of

 8       JONATHAN GUZMAN, that a review of the transcript

 9       was reserved, and that the transcript is a true and

10       correct record of my electronic notes.

11           I further certify that I am not a relative,

12       employee, attorney, or counsel of any of the

13       parties, nor am I a relative or employee of any of

14       the parties' attorneys or counsel connected with

15       the action, nor am I financially interested in the

16       action.

17

18           Dated this 4th day of January 2023.

19

20

21

22       _____ *Tyesha Scott*

23                    Tyesha Scott, Reporter

24

25
```

```
1                    WITNESS NOTIFICATION LETTER

2

3    January 4, 2023

4    JONATHAN GUZMAN
     c/o Brandon L. Fernandez, Esquire
5    Office of the City Attorney
     444 Southwest 2nd Aveue
6    Miami, Florida 33130

7    In re:  Samuel Scott, Jr. vs. City of Miami, et al.

8    Deposition taken on December 28, 2022

9

10            The transcript of the above proceeding is now

11       available for your review.

12            Please call to schedule an appointment with

13       our office.

14            Please complete your review within 30 days.

15

16            Sincerely,

17

18

19            Tyesha Scott, Reporter
              Scott Reporting
20            954) 383-4955

21

22

23

24

25
```

```
 1                          ERRATA SHEET

 2                  DO NOT WRITE ON THE TRANSCRIPT

 3                  ENTER CHANGES ON THIS PAGE

 4

 5   IN RE:  SAMUEL SCOTT, JR. vs. CITY OF MIAMI, et al.

 6                        JONATHAN GUZMAN
                          December 28, 2022
 7

 8   Page No.   Line No.          Change           Reason

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21          Under penalties of perjury, I declare that I

22       have read the foregoing document and that the facts

23       stated in it are true.

24       _____
         Date                      JONATHAN GUZMAN
25
```