1          UNITED STATES DISTRICT COURT SOUTHERN
                 DISTRICT OF FLORIDA
2
               CASE NO:  21-CV-23995
3

4

5   SAMUEL SCOTT, JR.,

6          Plaintiff,

7   vs.

8   CITY OF MIAMI, a political subdivision of the State of
    Florida, JONATHAN GUZMAN, MICHAEL BLOOM, BRANDON
9   WILLIAMS, MIGUEL HERNANDEZ, RANDY CARRIEL, sued in their
    individual capacity,
10
           Defendants.
11   _____/

12

13              TAKEN REMOTELY

14

15            Friday, January 13, 2023

16            9:00 a.m. - 3:58 p.m.

17

18        VIDEOCONFERENCE DEPOSITION OF

19              MICHAEL BLOOM

20

21        Taken before Tyesha Scott, Reporter and Notary

22   Public for the State of Florida at Large, pursuant

23   to Notice of Taking Deposition filed in the

24   above-styled cause.

25

*PLAINTIFF'S EXHIBIT*

**8**

```
 1                    APPEARANCES OF COUNSEL

 2   On Behalf of the Plaintiff:

 3        PIERRE SIMON
          600 Southwest 4th Avenue
 4        Fort Lauderdale, Florida 33315
          305-336-9193
 5        fplaw08@yahoo.com
          BY:  FAUDLIN PIERRE, ESQUIRE
 6        (Appearing via Zoom)

 7   On Behalf of Miguel Hernandez:

 8        MARRERO & WYDLER
          2600 South Douglas Road, Floor 4
 9        Coral Gables, Florida 33134
          305-446-5528
10        lew@marrerolegal.com
          BY:  LOURDES WYDLER, ESQUIRE
11        (Appearing via Zoom)

12   On Behalf of Officer Bloom, Carriel, Williams, and
     Guzman and the City of Miami:
13
          CITY OF MIAMI, OFFICE OF CITY ATTORNEY
14        444 Southwest 2nd Avenue
          Miami, Florida 33130
15        305-416-1800
          bfernandez@miamigov.com
16        BY:  BRANDON FERNANDEZ, ESQUIRE
          (Appearing via Zoom)
17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF PROCEEDINGS

 2   Deposition of Michael Bloom                    Page

 3   Direct Examination by Mr. Pierre                  4
     Cross Examination by Ms. Wydler                 209
 4   Cross Examination by Mr. Fernandez             235
     Redirect Examination by Mr. Pierre             236
 5   Recross Examination by Mr. Fernandez           254
     Further Direct Examination by Mr. Pierre       258
 6
     Certificate of Oath                            261
 7   Certificate of Reporter                        262
     Errata Pages                                   263
 8

 9                    INDEX OF EXHIBITS

10   PLAINTIFF'S          DESCRIPTION              PAGE

11   Exhibit 1            Arrest Report             118

12   Exhibit 2            Officer Worksheet         132

13   Exhibit 3            CAD Report Detail         135

14   Exhibit 4            Video                     142

15   Exhibit 5            Video                     187

16   Exhibit 6            Unredacted CAD Report     198

17

18   DEFENDANT'S          DESCRIPTION              PAGE

19   Exhibit 1            Google Image              213

20

21

22

23

24

25
```

```
 1              (The deposition commenced at 9:03 a.m.)
 2              THE REPORTER:  Good morning.  My name is
 3         Tyesha Scott.  Today's date is Friday, January 13,
 4         2023.  The time is now 9:03 a.m., and the
 5         deposition of Michael Bloom will be recorded and
 6         the oath will be administered remotely under the
 7         Florida Supreme Court Administrative Order Number
 8         2023.
 9              Will counsel please indicate their agreement
10         by stating your name and your agreement on the
11         record?
12              MR. PIERRE:  Faudlin Pierre on behalf of the
13         Plaintiff, we agree.
14              MS. WYDLER:  Lourdes Wydler on behalf of
15         Miguel Hernandez, agreed.
16              MR. FERNANDEZ:  Brandon Fernandez on behalf of
17         Officer Bloom, Carriel, Williams, and Guzman and
18         the City of Miami, we agree.
19    THEREUPON:
20                        MICHAEL BLOOM
21         Having been first duly sworn, testified as follows:
22                      DIRECT EXAMINATION
23    BY MR. PIERRE:
24         Q.   Good morning, Officer Bloom.  How are you?
25         A.   Good morning.  I'm fine.  Thank you.
```

 1        Q.   Good, good, good.  I'm sure you've done

 2   depositions before, but I'm going to walk you through

 3   the rules of the road.  At least, my rules of the road.

 4             I'm going to ask you a series of questions.

 5   You are to answer them truthfully.  Can you do that?

 6        A.   Yes.

 7        Q.   I'm going to ask you a series of questions,

 8   and you are to answer them completely.  Can you do that?

 9        A.   Yes, I can.

10        Q.   You have just taken an oath to tell the truth.

11   Is there any reason why you cannot tell the truth today?

12        A.   No, there isn't.

13        Q.   Within the past 24 hours, have you taken any

14   medications that would affect your ability to provide

15   truthful testimony today?

16        A.   No.

17        Q.   If you don't hear a question, please let me

18   know, and I will repeat it.

19        A.   Okay.

20        Q.   If you don't understand a question, please

21   tell me, and I will try to rephrase it.

22        A.   Okay.

23        Q.   The court reporter is going to take down

24   everything you and I say, but she cannot take non-

25   verbal communication such as uh-huh and head nods.  Do

1   you understand?

2        A.   I do.

3        Q.   Only one of us can speak at a time.  I'm

4   pretty slow with my drawl and my speech, so please give

5   me time and then respond to the question.

6        A.   Okay.

7        Q.   Your attorney will object.  Unless your

8   attorney says not to answer, you must respond to the

9   question anyway.  Do you understand?

10       A.   I understand.

11       Q.   If you need a break at any time, just let me

12   know and I will try to find a convenient stopping point.

13   Just not while my question is pending.  Do you

14   understand?

15       A.   I understand.

16       Q.   Do you understand that the testimony you

17   provide today may be used at trial or a Motion for

18   Summary Judgment?

19       A.   I do.

20       Q.   Did you speak to anyone about this lawsuit?

21       A.   I did not.

22       Q.   Okay.  Are you married?

23       A.   No, not anymore.

24       Q.   Okay.  During this incident -- I mean, during

25   the course of this deposition, there will be, as I refer

1    to it, a scene and a crash scene.  The scene, as defined

2    by the various reports, is 563 Northwest 48th Street.

3    Do you understand?

4         A.   Yes.

5         Q.   The crash scene, as defined by the various

6    reports in the City of Miami's possession, is -- I

7    believe it's 71st Street and Northwest 5th Street -- I

8    mean, 71st Street and Northwest 5th/6th Avenue.  Around

9    there.  Do you understand?

10        A.   I do.

11        Q.   And when I refer to incident, I am simply

12   referring to the events leading up to my client, Samuel

13   Scott, Jr.'s, arrest on June 1, 2018.  Do you

14   understand?

15        A.   I do.

16        Q.   Okay.  These are the rules of the road.  Do

17   you have any questions?

18        A.   No, I don't.

19        Q.   Okay.  Please state your full name for the

20   record.

21        A.   Michael Anthony Bloom.

22        Q.   And how old are you, Officer Bloom?

23        A.   I'm 63.

24        MR. PIERRE:  Madam Court Reporter, do you need

25        Officer Bloom to spell his name out?

```
 1              THE REPORTER:  No, I'm good.  Michael Anthony
 2         is what he said, right?  It's all good.
 3              MR. PIERRE:  Okay.
 4    BY MR. PIERRE:
 5         Q.   And how old did you say you were?
 6         A.   How old am I?
 7         Q.   Yes.
 8         A.   I'll turn 64 in December.  I'm sorry, 64.  I'm
 9    in old age.
10         Q.   Okay.  And you're still working.  God bless
11    you.
12         A.   My second career.
13         Q.   Oh, okay.  Let's get into that.  Well, before
14    we get into that, what is your highest education level?
15         A.   I have a bachelor's degree in criminal
16    justice.
17         Q.   Where did you attend college?
18         A.   Union Institute and University.
19         Q.   Is that in Pennsylvania or New Jersey?
20         A.   Well, they have different campuses.  They have
21    one in Florida.  They have the main campus in
22    Cincinnati, Ohio.  They have a few campuses in Los
23    Angeles.
24         Q.   Okay.  And what degree did you -- you received
25    a criminology, a criminal justice degree?
```

```
 1        A.    Criminal justice, yes.

 2        Q.    And what is your current occupation?

 3        A.    I'm a police officer.

 4        Q.    And how long have you been a police officer?

 5        A.    Next month will be six years with the City of

 6   Miami.

 7        Q.    It will be six years?

 8        A.    With the City of Miami, yes.

 9        Q.    Okay.  And prior to being with the City of

10   Miami as a police officer, what was your occupation?

11        A.    I was a Miami-Dade County Corrections

12   sergeant.

13        Q.    Okay.  And how long were you a correct officer

14   with Miami-Dade?

15        A.    Twenty-six years.

16        Q.    Okay.  So 26 years with Corrections for

17   Miami-Dade.  So in total, you have 32 years of law

18   enforcement experience?

19        A.    Yes.

20        Q.    Okay.  For Miami-Dade, what did you do for

21   work?

22        A.    I was in the military.

23        Q.    Okay.  And how long were you in the military?

24        A.    Well, I stayed on the active component side

25   for six years, and I did the rest on the reserve side.
```

```
 1        Q.   Okay.  Actively, how long were you --

 2        A.   Six years.

 3        Q.   Six years?

 4        A.   Yes.

 5        Q.   Okay.  And how long were you as a reserve?

 6        A.   I guess a total of probably 20 years.  I mean,

 7   I stayed there my entire career throughout corrections.

 8        Q.   Okay.  And when you -- what was your role and

 9   duties in the military?

10        A.   Well, I had several throughout the years.

11   When I retired, I retired at the 841st -- correct, 724

12   brigade.

13        Q.   Okay.  In which branch?  I forgot to ask you.

14        A.   Army.

15        Q.   Okay.  So you were in the Army.  And you had

16   various positions with the military, correct?

17        A.   That's correct.

18        Q.   And what were those positions, if you can

19   remember?

20        A.   I was -- I'll start from the bottom.  I was

21   just a service member.  I was a military police

22   throughout my -- well, actually two careers.  I mean,

23   not two careers.  Throughout my career, I was a military

24   police, and I was also a combat engineer.  I was a squad

25   leader.  I was a section leader, and I got out of the
```

1    regular component and went to the reserves side of the

2    house, and I was a platoon sergeant for several years.

3    I went from platoon sergeant.  I went up the ranks to

4    the master sergeant.  From master sergeant, I was first

5    sergeant.

6        Q.   Okay.  So you've had more than 32 years of law

7    enforcement experience.

8        A.   I mean, if you want to include military with

9    that, yes.

10        Q.   Yeah.  Okay.  Okay.  Besides your military

11    service, have you had any other employment?

12        A.   Besides from military service, no.

13        Q.   Okay.

14        A.   I mean, corrections.  Miami-Dade Corrections.

15        Q.   Yeah.  No, what I'm talking besides what we've

16    previously discussed.

17        A.   Oh, no.

18        Q.   Okay.  Let's talk about your current job with

19    the City of Miami.  You stated that you've been there

20    for six years.

21        A.   Well, February will be six years.

22        Q.   February will be six years.  And what have --

23    what positions have you held with the City of Miami?

24        A.   Well, I was part of the problem-solving team,

25    and I'm a field training officer.  Now, I'm currently a

1    CIT officer currently, which is crisis intervention

2    team.

3        Q.   Yeah, you read my mind.  What's a CIT officer?

4        A.   Crisis intervention team.  Any time they have

5    calls out for people acting erratic or maybe, you know,

6    not quite there, I would have to come out and assess it

7    and make a determination whether they need to go to

8    Jackson Memorial Hospital.

9        Q.   Okay.  So, essentially, if it's not

10   necessarily criminal in nature, such as a mental health

11   crisis, is that when you come out, or am I wrong about

12   that?

13       A.   Well, it can be criminal in nature; however,

14   if it's a felony, a felony will supersede the crisis

15   portion of it, but we would still give them help and put

16   it in the A-form that they were going through a crisis,

17   but if it's a misdemeanor, then we can kind of, you

18   know, determine whether they're going to go to jail or

19   whether they're going to go to crisis.

20           Usually, if it's a misdemeanor, we usually

21   just send them to crisis because they need the help.

22       Q.   Okay.  And explain to the jury what's a

23   problem solving?

24       A.   Problem solving is pretty much -- you know,

25   you work for your commander.  The commander has

 1   different areas where you go into the city, wherever

 2   it's going to be.  I was on the north end, so we only

 3   dealt with the north end, and they have, you know, a lot

 4   of drug sales in certain areas.  The problem-solving

 5   team would go there and try to resolve that issue.

 6   Drinking in public, the problem-solving team will go in

 7   and try to alleviate those issues.

 8           Anything that the commander feels that's

 9   necessary that the patrol officers won't be able to help

10   with, that's what the problem-solving team takes care

11   of.

12       Q.   Okay.  And you are currently assigned to which

13   unit?

14       A.   I'm with the north station.  I'm at the north

15   station.

16       Q.   Okay.  I mean because I know you've mentioned

17   you're a patrol officer.

18       A.   Yes.

19       Q.   Okay.  So you're currently a patrol officer.

20       A.   That's correct.

21       Q.   Okay.  On June 1, 2018, what unit were you

22   assigned to?

23       A.   I was assigned to bravo shift, Little Haiti.

24       Q.   Okay.  And were you a patrol officer at that

25   time?

1        A.    I was, yes.

2        Q.    Okay.  And what was your unit number?

3        A.    I don't remember.  It was 12-something.  I

4    can't remember what unit number it was.

5        Q.    Okay.  And what was your badge number on that

6    day?

7        A.    The badge number remains the same, 43732.

8        Q.    And what was your job responsibilities on June

9    1, 2018?

10       A.    I was a patrol officer.  That's what it's --

11       Q.    Yeah, I know, but explain that to the jury.

12   What does a patrol officer do?

13       A.    A patrol officer answers calls of service from

14   dispatch.  Whatever calls come up, we respond to that

15   area and resolve the issue, whatever it may be.  It can

16   be anything from just simple battery to aggravated

17   batter with robbery to -- anything that has to do with

18   calls for service.  There's a slew of things you can do.

19   It depends on what call you get.

20       Q.    Okay.  During your long and lustrous career in

21   law enforcement, have you ever made any false statements

22   which you were disciplined for?

23       A.    No.

24       Q.    And do you suffer from any medical conditions

25   that would affect your ability to tell the truth in this

1    deposition?

2         A.   No, I don't.

3         Q.   Do you suffer from any medical conditions that

4    affect your ability to recall events?

5         A.   No.

6         Q.   Do you suffer from any medical conditions that

7    affect your ability to perceive the events as they are

8    happening?

9         A.   No.

10        Q.   Do you use social media at all?

11        A.   No.  Well, I watch TikTok, but I don't post

12   anything.

13        Q.   Okay.  What's your TikTok handle?

14        A.   I have no idea.  I mean, I could find it for

15   you, but I have no idea.  I just go on there and just

16   look.  I don't even respond to half the things.  I just

17   like to watch.  It's kind of entertaining.

18        Q.   Okay.  You said this was your second career,

19   but this seems to be like your third career in some

20   respect.

21        A.   Well, yes, but it is my third career, but I

22   mean, it's not really going to be a career because I'm

23   looking to leave the end of this year.

24        Q.   Oh.

25        A.   So I won't complete the career.

```
 1        Q.   Okay.  Let's see.  All right.  Prior to
 2   becoming a police officer with the City of Miami, did
 3   you go to the academy, the police academy?
 4        A.   Did I go to the police academy?
 5        Q.   Yeah.
 6        A.   No, I've got -- I went to the police academy
 7   when I was hired by the City of Miami.
 8        Q.   Yeah, that's what -- oh, okay.
 9        A.   Oh, okay.
10        Q.   Yeah, that's what I'm talking about.  When did
11   you attend the police academy?
12        A.   I attended the police academy in April 2017.
13        Q.   Okay.  So you were allowed to -- because you
14   had prior law enforcement experience, were you allowed
15   to get hired first and then go to the police academy?
16        A.   Well, I'm not sure if I was hired first.
17   There was already some new officers or new trainees that
18   was there prior to me getting there.  So I don't know if
19   I was first.
20        Q.   Okay.  Let's talk about your experience in the
21   police academy.  Did you learn about searches and
22   seizures?
23        A.   I did.
24        Q.   Did you learn about probable cause?
25        A.   I did.
```

1      Q.   Did you learn about reasonable suspicion?

2      A.   I have, yes.

3      Q.   Did you learn about the difference between

4   investigatory detention and arrest?

5      A.   Yes, we have.

6      Q.   What police academy did you attend?

7      A.   The City of Miami.

8      Q.   Oh, City of Miami has its own police academy?

9      A.   They have their own police academy, yes.

10      Q.   Oh, okay.  I didn't know that.  Usually, they

11   say Miami-Dade or Broward County.

12      A.   No, City of Miami has its own for the past 15

13   years.

14      Q.   Okay.  During the course of your employment,

15   do you learn about how to effectuate an arrest?

16      A.   I don't understand the question.

17      Q.   Yeah.  While you're a police officer, are you

18   taking courses about what's a proper arrest?

19      A.   Yes.

20      Q.   And while you're a police officer, do you take

21   courses about what constitutes probable cause?

22      A.   Yes.

23      Q.   While you're a police officer, do you take

24   course that tell you what constitutes a reasonable

25   suspicion?

1      A.   Yes.

2      Q.   Okay.  Let's get down to business.  On June 1,

3   2018, where were you?

4           MR. FERNANDEZ:  Object to form.

5           THE WITNESS:  Where was I?

6   BY MR. PIERRE:

7      Q.   Yeah.

8      A.   I was here in Florida.

9      Q.   Okay.  Were you in -- I'm assuming were you on

10   duty with the City of Miami?

11      A.   Yes.  June 1st, I guess I was.  I mean, I

12   would have to look at my schedule because I can't recall

13   what day I was on duty.  I mean if it was a duty day,

14   then yes, I was there.

15      Q.   Okay.  Do you recall being in contact with a

16   person by the name of Samuel Scott, Jr.?

17      A.   I do, yes.

18      Q.   Okay.  Before we get to what happened, I would

19   like to talk about several individuals you may or may

20   not know.  Do you know a person by the name of Samuel

21   Scott, Jr.?

22      A.   I don't personally know him, but I know of

23   him.

24      Q.   On June 1, 2018, was that the first time that

25   you met Samuel Scott, Jr.?

```
 1        A.   Yes, it was.

 2        Q.   On June 1, 2018 -- and since June 1, 2018, has

 3   that been the last time you've made any contact with

 4   Samuel Scott, Jr.?

 5        A.   Yes.

 6        Q.   So before then and after June 1, 2018, you've

 7   had no interactions, to your knowledge, with Samuel

 8   Scott, Jr.?

 9        A.   That's correct.

10        Q.   So prior to June 1, 2018, you had no

11   information what criminal activity, if any, Samuel

12   Scott, Jr. was involved in, correct?

13        A.   Yes.

14        Q.   Okay.  Let's talk about some of your Co-

15   Defendants.  Do you know a person by the name of

16   Jonathan Guzman?

17        A.   Yes, I know him.

18        Q.   And how do you know him?

19        A.   Just coworkers.

20        Q.   Okay.  Is he a City of Miami police officer?

21        A.   He is.

22        Q.   Okay.  And would you describe your

23   relationship social or professional or both?

24        A.   It's just professional.

25        Q.   Okay.  Do you know a person by the name of
```

1    Miguel Hernandez?

2        A.    I do.

3        Q.    And who is Miguel Hernandez?

4        A.    He's a police -- well, he was.  I believe he

5    retired with the City of Miami.  He trained me when I

6    came to the FTO program.

7        Q.    Okay.  And is your relationship with Miguel

8    Hernandez professional or social or both?

9        A.    No, it's just professional.

10       Q.    Okay.  Do you know a person by the name of

11   Randy Carriel?

12       A.    I know of him.  I don't quite know him, but I

13   know of him.

14       Q.    Okay.  And how do you know Mr. Carriel?

15       A.    I know he's in the training section with the

16   City of Miami Police Department, and when we trained, I

17   would see him on the gun range or giving classes of some

18   sort.

19       Q.    Okay.  So Randy Carriel is also a City of

20   Miami police officer, correct?

21       A.    He is.

22       Q.    Finally, do you know a person by the name of

23   -- actually, not finally, but do you know a person by

24   the name of Brandon Williams?

25       A.    No, I don't know who that is.

```
 1        Q.   Okay.  So you've never met a person by the
 2   name of Brandon Williams?
 3        A.   I mean, I could have met him, but I don't know
 4   who that is.  I have no idea who he is.  I don't
 5   remember any interaction with him.
 6        Q.   Okay.  Do you know a person by the name of
 7   Patricia Carriel?
 8        A.   Yes, yes, I know her.
 9        Q.   And how do you know her?
10        A.   She came to the training academy, I think, a
11   class or two behind me.
12        Q.   Okay.  And is she also a City of Miami police
13   officer?
14        A.   She is, yes.
15        Q.   And on June 1st, what was she?
16        A.   On June 1st, say it again?
17        Q.   On June 1, 2018, was she a City of Miami
18   police officer?
19        A.   She wasn't a City of Miami police officer.
20   She was a City of Miami -- yeah, she was -- yeah, she
21   was training.  Yeah, she was a police officer at that
22   time, yes.  Yes, she was.
23        Q.   Okay.  And do you know a person by the name of
24   Gary Sampson?
25        A.   Yes, I do.
```

1        Q.   And who is Gary Sampson?

2        A.   That's Sergeant Sampson.  He was my sergeant

3    when I was in PST, and he's my current sergeant now on

4    patrol.

5        Q.   Okay.  And have you spoken to your sergeant

6    about this case?

7        A.   Yes.  Well, not actually spoke with him.  He

8    called me the other day, but I had my pre-depo and asked

9    to give him a call once I'm done with my pre- depo.

10       Q.   Okay.  What's a pre-depo?

11       A.   Prior to coming here to this depo, just

12   general questions that they ask in reference to the

13   actual depo.

14       Q.   All right.  Tell me how a pre-depo goes

15   because I've never heard that before.

16       A.   Okay.  The pre-depo is pretty much your

17   attorney will call you and let you know -- or whoever it

18   is, the state attorneys, however it may be -- let you

19   know, okay we have this case coming up.  Do you recall

20   certain things?

21            Do you need A-forms to look over to see if you

22   can remember, you know, anything about whatever the case

23   is.  They say this may happen during the depo, or this

24   may not happen, or these are some of the questions that

25   may be asked.  Just kind of prepping you for the

1    original depo.

2         Q.   Okay.  So Sergeant Sampson called you to prep

3    you for this deposition, correct?

4         A.   No, he didn't prep me for anything.  He just

5    asked me what was going on, do I remember the case, and

6    I told him vaguely, I do remember, but he wasn't

7    prepping me for anything.

8         Q.   Okay.  So how is it a pre-depo if he wasn't

9    prepping you?

10             MR. FERNANDEZ:  Object to form.

11             THE WITNESS:  I'm sorry, can you repeat the

12        question?  I didn't hear what you said.

13   BY MR. PIERRE:

14        Q.   Yes.  How was it a pre-depo if he wasn't

15   prepping you to advise you what's going to happen?

16        A.   No, he didn't pre --

17             MR. FERNANDEZ:  Hold on.  Wait, wait, wait.

18        Object to form.

19             Wait for him to finish the question, then you

20        can answer him.  Go ahead.

21             THE WITNESS:  Okay.  He didn't prep me for the

22        pre-depo.  My attorney did.

23   BY MR. PIERRE:

24        Q.   Oh, okay.  Okay.  Okay.  So sorry.  I was

25   confused.  Then why did Sergeant Sampson call you?

```
 1        A.   He called me because he just wanted to know

 2   what was going on.

 3        Q.   Okay.  Do you know if Sergeant Sampson did a

 4   deposition in this case or is going to take a deposition

 5   in this case?

 6        A.   Oh, I didn't know he was involved in it.  I

 7   have no idea.

 8        Q.   Okay.  I was just wondering.  I'm just trying

 9   to figure out Sampson's role.

10             Okay.  Because I had previously asked you what

11   you do -- oh, let me ask you this.

12             What did you do in preparation of this

13   deposition?

14        A.   I didn't do anything.

15        Q.   Okay.  Have you spoken to any of your Co-

16   Defendants about this case?

17        A.    No, I have not; however, Officer Hernandez did

18   call me a couple of times asking did I have the depo

19   yet, and I told him no, I didn't have it and that was

20   pretty much the extent of the conversation.

21        Q.   Okay.  And now let's get down to business.

22   June 1, 2018, where were you -- were you on duty?

23        A.   Yes, I was.

24        Q.   Okay.  And when did you start?

25        A.   1400 hours.
```

1      Q.   Okay.  So you started about two o'clock.

2  What's the first thing you did while you were on duty?

3      A.   The first thing I do is get my computer

4  together to make sure that it's working properly before

5  I go out on the road.  That's the first thing, roll

6  call.

7      Q.   Okay.  That's what I'm saying.  So you went

8  for roll call.  Is that the first thing that happened?

9      A.   Yes.

10     Q.   And what happens after roll call?

11     A.   After roll call, everybody goes to wherever

12  they're assigned to.

13     Q.   And where were you assigned to on June 1,

14  2018?

15     A.   Little Haiti patrol.

16     Q.   Okay.  And did you pick a particular spot?

17  Were you under a tree?  Were you talking at the Little

18  Bodega?

19          MR. FERNANDEZ:  Object to form.  Go ahead.

20          THE WITNESS:  I don't know what I was doing,

21      but I -- what I normally do, basically, what I

22      normally do is a go on patrol and whatever calls

23      they have holding or if they need someone to be

24      relieved from a hospital or detail, their shift --

25      they're getting ready to go off shift -- getting

```
 1          ready to come off shift, you know, we do things --
 2          I don't really know exactly what I was doing.  I
 3          know wasn't up under a tree.  I would never be up
 4          under a tree.
 5     BY MR. PIERRE:
 6          Q.   Okay.  Sometimes I see officers under a tree.
 7     I don't know why.  It just seems like it's the best
 8     place for an officer.
 9          A.   They're probably doing reports.
10          Q.   Okay.
11          A.   Take care of the reports.
12          Q.   Okay.  And were you in uniform?
13          A.   I was.
14          Q.   Were you in a marked patrol vehicle?
15          A.   I was.
16          Q.   Okay.  When did you first -- okay.  As it
17     relates to my client, Samuel Scott, Jr., when did you
18     make contact with him?
19          A.   I don't know when I made contact with him, but
20     I know I got a call in reference to a stolen vehicle,
21     and I responded to the location of the stolen vehicle
22     and I didn't find anyone there where they said it was
23     at.
24          So I normally would go one block up or one
25     block backwards just to see.  Maybe they gave the wrong
```

 1   location.  That happens quite a bit, and then as I was

 2   coming back around, I believe it was 5th Avenue, that's

 3   when I saw someone walking up the sidewalk waving their

 4   hand towards.  I just pulled over, and that's when I met

 5   him, and he said that his vehicle was stolen.  He was

 6   reporting a stolen vehicle.

 7        Q.   Okay.  Let's walk that.  So you first received

 8   a dispatch, correct?

 9        A.   That's correct.

10        Q.   Okay.  And what does the dispatch say?

11        A.   The dispatch says to -- they gave me a

12   location.  I don't remember exactly the location.  I

13   know like 5th Avenue, maybe 48th Street, 46th Street.

14   Somewhere in that general area in reference to a stolen

15   vehicle.

16        Q.   Okay.  So did they tell you who was calling

17   you as it relates to --

18        A.   They don't tell you who's calling, but you can

19   look on the CAD if you just look under the information.

20   It will tell you who the caller is.

21        Q.   Okay.  So you get the call, and do you know

22   approximately what location you were at when you

23   received the dispatch?

24        A.   I don't know the location, but I know it was

25   like Northwest 5th Avenue and I want to say 48th Street.

1      Q.   So you were generally in that area anyway,

2   correct?

3      A.   Not too far from it.  I was less than five

4   minutes away.

5      Q.   Okay.  So you're about five minutes away from

6   this area?

7      A.   Yes.

8      Q.   You received a dispatch.  What happens next?

9      A.   Then I go to the location, and I didn't see

10   anybody when I got there.

11      Q.   And what location exactly did you go to?

12      A.   Again, I know it's 5th Avenue, but I don't

13   know the exact street.  I know it was in the 40s.  I

14   can't tell you the exact -- what street it was, but I

15   want to say 48th Street and 5th.  I know it was 5th

16   Avenue for sure.

17      Q.   Okay.

18      A.   It was a little small park right there.

19      Q.   So you went to a park.

20      A.   Well, I didn't go to the park because you

21   can't drive through the park, but the roadway goes

22   around the park, so I just figured I didn't see anyone

23   here.  Let me go a block over and a block, you know, up

24   and maybe I can find that person because often times,

25   when we get those calls, those locations aren't the

1    correct location.  They give the wrong location quite a

2    bit.

3         Q.   Oh, okay.  Okay.  So you go to the first

4    location.  That's somewhere around 48th Street and

5    Northwest 5th Street, and it's near a park, correct?

6         A.   No, it's 5th Avenue.

7         Q.   5th Avenue.

8         A.   Yes.

9         Q.   So you go -- once you receive the dispatch,

10   you go to a location that's near 48th Street and 5th

11   Avenue near a park, correct?

12        A.   That's correct.

13        Q.   And then you don't find the person near this

14   park.  Do you know who you're looking for?

15             MR. FERNANDEZ:  Object to form.

16             THE WITNESS:  We don't know exactly who we're

17        looking before because oftentimes, when someone

18        calls, that doesn't necessarily mean they're the

19        complainant.  Sometimes they can be calling for

20        someone.  So we don't necessarily -- that doesn't

21        necessarily mean it's that person who actually, you

22        know, had the incident.

23   BY MR. PIERRE:

24        Q.   Okay.  Okay.  So you have no idea who you're

25   looking for.

1            MR. FERNANDEZ:  Object to form.

2            THE WITNESS:  Well, once I look at the CAD,

3        then I knew who I was looking for then.  I looked

4        at the CAD.

5    BY MR. PIERRE:

6        Q.   And what, Officer?

7            MR. FERNANDEZ:  Object to form.

8    BY MR. PIERRE:

9        Q.   Okay.  Let me rephrase that for you.  Once you

10   looked at the CAD, you thought what?

11       A.   Well, I knew who the person was and they have

12   a phone number next to it and you can just call the

13   phone number and say, hey, you know, you're officer

14   whoever it may be.  Where are you located?  I'm here.  I

15   don't see you.

16       Q.   Okay.

17       A.   And that's what we do.

18       Q.   Okay.  So let's get back to our incident in

19   question.  So you didn't see him at the first location

20   near the park.  Did you know the name of the person that

21   called for the reported stolen vehicle?

22       A.   Yeah, it's -- again, it's on the CAD.  You

23   just look and see what name is on the CAD of the caller.

24       Q.   And who was that?

25       A.   Well, again, I don't remember exactly who it

```
 1   was because I don't have the CAD -- you know, I don't

 2   have that information in front of me, so I don't know

 3   exactly who it was at that time.

 4        Q.   Okay.

 5        A.   That was five years ago.  I can't remember

 6   whose name was on there.

 7        Q.   Okay.  So what happens after the first

 8   location?

 9        A.   Okay.  Then I went a block over, then I turned

10   around and came back to that same location, then I saw

11   someone walking up the sidewalk waving their hand.

12        Q.   Okay.  Did you call this person before you

13   spoke -- I mean before you met him?

14        A.   No, I did not.

15        Q.   So you had no conversations with this

16   individual?

17        A.   No.

18        Q.   Okay.  Prior to meeting him?

19        A.   That's correct.

20        Q.   Okay.  Officer, what is your -- on June 1,

21   2018, what was your cell phone number?

22        A.   305-793-2896.

23        Q.   And who's your cell phone provider?

24        A.   AT&T.

25        Q.   Okay.  So you didn't make any calls to Samuel
```

1    Scott, Jr.?

2        A.    No, I didn't have to because at the time I

3    came and turned around, that person was walking up the

4    sidewalk.  And normally what I would do is just call

5    dispatch and say, hey, I can't find the person.  Could

6    you give a callback, and dispatch will just give a

7    callback, but I didn't have to do that because he was

8    walking up the sidewalk.

9        Q.    Okay.  And you said when you saw this person,

10   he was waving his hands.

11       A.    Yes.

12       Q.    And when you saw this individual, how did he

13   look?

14       A.    How did he look?

15       Q.    Yeah, how did he look?

16       A.    It looked like he was disoriented to me.

17       Q.    Okay.  Physically, how did he look?

18       A.    Physically, I mean, he's a big guy.  Had a

19   little sweat coming off his forehead, but that's pretty

20   much it.

21       Q.    Okay.  Was he smoking a cigar when you saw him

22   or cigarette?

23       A.    I don't recall him smoking a cigarette.

24       Q.    Okay.  Was he white or black?

25       A.    Oh, a black guy.

```
 1        Q.   Did he have a full set of -- was he bald, or

 2   did he have a full set of hair?

 3        A.   I don't remember that.

 4        Q.   Was he -- what was he wearing when you met

 5   him?

 6        A.   I don't recall.

 7        Q.   Officer, did you review any of the dash cam

 8   videos?

 9        A.   I did.

10        Q.   Or the body-worn cameras?

11        A.   I did.

12        Q.   And after reviewing the body-worn cameras, did

13   that refresh your recollection on who you met on June 1,

14   2018?

15        A.   Yes, sir.  Sorry, yes.

16        Q.   Okay.  So let me ask you the questions again.

17   What was he wearing when you met him?

18             MR. FERNANDEZ:  Object to form.

19             THE WITNESS:  A white tank top and blue jeans.

20   BY MR. PIERRE:

21        Q.   So he was wearing a white tank top and some

22   blue jeans when you met him?

23             MR. FERNANDEZ:  Object to form.

24   BY MR. PIERRE:

25        Q.   Correct?
```

 1        A.    After looking at the video, yes.

 2        Q.    Okay.  So while he was in your presence, did

 3   he put on any clothes?

 4        A.    No, he didn't put on any clothes.

 5        Q.    Okay.  So he was wearing -- so right now, when

 6   you go to the scene, you see an individual, black male,

 7   bald head, white tank top, and blue jeans, correct?

 8             MS. WYDLER:  Objection, form.

 9             THE WITNESS:  I didn't say anything about a

10        bald head.  I just said I didn't recall, but you

11        know, after looking at the video, I do recall his

12        hair was -- he had a low-cut haircut and white tank

13        top on, if I'm not mistaken, with blue jeans.

14   BY MR. PIERRE:

15        Q.    Okay.  Okay.  I apologize.  I described the

16   bald head.  You don't recall the bald head, but you did

17   see an individual who was a black male in a white tank

18   top and blue jeans, correct?

19             MR. FERNANDEZ:  Object to form, asked and

20        answered.

21   BY MR. PIERRE:

22        Q.    Was there a response?

23        A.    The video that I watched, the gentleman had a

24   low haircut, white tank top, and a pair of blue jeans.

25        Q.    And this individual did not take off his pants

1  while he was in your presence?

2       A.   He did not.

3       Q.   He did not take off his shirt while he was in

4  your presence?

5       A.   He did not.

6       Q.   Okay.  You meet up with this individual.  Does

7  he tell you his name?

8       A.   I don't recall if he told me his name or not,

9  but I'm sure he did.  He gave me his ID card.

10      Q.   Okay.  And what does his ID card look like?

11      A.   It was a Florida ID card.

12      Q.   Okay.  And did that Florida ID card identify

13  who this individual was?

14      A.   I did.

15      Q.   And what did the Florida ID card reveal this

16  individual to be?

17      A.   Samuel Scott, Jr.

18      Q.   Okay.  Does that ID card give his address?

19      A.   Yes, there was an address on there.

20      Q.   It gives his age?

21      A.   Yes, his date of birth is on there.

22      Q.   Okay.  Once you get the ID card, what do you

23  do next?

24      A.   I asked him to explain to me what happened.

25      Q.   And what do you recall him saying, if any?

1      A.   He said that he left his vehicle at the park

2   where we were at right on 5th Avenue, and I want to say

3   48th Street.  He said he left the keys in his car, and

4   he walked from the car and went to a relative's house on

5   that same street.  And I said to him, well, why would

6   you leave your keys in the car running.  He said I don't

7   know why I did that.  I didn't why I did that.

8           I said, okay, fine, and then I told him I'm

9   going to give him a stolen vehicle affidavit and you

10   have to be truthful on this stolen vehicle affidavit

11   because if you tell a lie, it can come back to, you

12   know, haunt you in the long run.  He said no problem.

13   I'll write everything that happened, and that was pretty

14   much it.

15      Q.   Okay.  Because you said a lot, I'm just trying

16   to figure out what happened.  Okay.  So he tells you

17   that he left his keys in the car, correct?

18      A.   Yeah, he left the truck -- I don't know if

19   it's a truck, but the car running with the keys in

20   there.  That's what he told me at the park.

21      Q.   At the park?

22      A.   That's exactly what he said.

23      Q.   Okay.  And he said he left his keys at the

24   park and was it a truck?

25      A.   I don't recall if it was a truck or was it a

1   car, but I remember he said he left the keys in the

2   vehicle running.  That's exactly what he said, and he

3   walked down to his relative's house, which was on the

4   same block of 5th Avenue and whatever street that was,

5   48th or 47th.  I really recall the street it was.

6           And I said why would you leave your car

7   running at the park and walk to your aunt's house.  He

8   said I know that was dumb.  I know that was stupid.  I

9   shouldn't have done that.

10      Q.   Okay.  And at the time, you weren't wearing

11  any body-worn camera, correct?

12      A.   I don't think I was issued one at that time.

13  I'm not really sure.

14      Q.   Okay.  So this is based off of your

15  recollection.

16      A.   Yes.

17      Q.   And you have already said you don't recall

18  exactly all the details of that day, correct?

19          MR. FERNANDEZ:  Object to form.

20          THE WITNESS:  I don't recall all the details

21      of that day, but I do recall what he's told me

22      about his vehicle.

23  BY MR. PIERRE:

24      Q.   Okay.  Okay.  You said -- and I just want it

25  clear for the record -- he told you exactly that he left

1   his vehicle at the park running, correct?

2       A.   That's exactly what he told me.  He said he

3   left the keys in the vehicle, and he was just walking

4   down to one of his relative's houses.  I can't remember

5   if it was his aunt, niece, whoever it was.  To go down

6   to their house to do whatever he was going to do.

7   That's exactly what he told me.

8       Q.   So he didn't tell you that his vehicle was in

9   front of the place where you found him.

10      A.   Negative.

11           MR. FERNANDEZ:  Object to form.

12           THE WITNESS:  He said that his vehicle was at

13       the park and the reason why I can remember this so

14       vividly is because that didn't make any sense to me

15       to leave the vehicle at the park, the keys,

16       running, and you walking down to a relative's

17       house.  That just didn't make any sense to me.

18  BY MR. PIERRE:

19      Q.   Maybe it didn't make any sense to you because

20  it didn't happen?

21           MR. FERNANDEZ:  Object to form, argumentative.

22           MS. WYDLER:  Join.

23           MR. FERNANDEZ:  You can answer.

24           THE WITNESS:  Well, that's what he said.

25  BY MR. PIERRE:

1      Q.   Okay.  Well, that's what you recall him saying

2   to you, correct?

3           MR. FERNANDEZ:  Object to form, asked and

4        answered.

5           Go ahead.

6           THE WITNESS:  Yes, I know exactly what he said

7        when it came to the vehicle.  I know exactly what

8        he told me.

9   BY MR. PIERRE:

10     Q.   Okay.  We'll get there.  Do you know where you

11  found him where he was actually at?

12          MR. FERNANDEZ:  Object to form, asked and

13       answered.

14          Go ahead.

15          THE WITNESS:  Do I -- can you repeat that

16       question?

17  BY MR. PIERRE:

18     Q.   Yeah.  The location where you found my client,

19  do you know why he was present at that location?

20          MR. FERNANDEZ:  Object to form.

21          THE WITNESS:  He said that he was going to a

22       relative's house that lives there.  That's what he

23       said to me.

24  BY MR. PIERRE:

25     Q.   So from -- based off of your testimony, my

1  client leaves his vehicle at a park running then walks

2  to a relative's house, the location where you find him,

3  correct?

4          MR. FERNANDEZ:  Object to form.

5          THE WITNESS:  Yes.

6  BY MR. PIERRE:

7      Q.   Okay.  And then did he tell you which

8  relative?

9      A.   No.  He did, but I can't really recall.

10     Q.   Okay.  Because that wasn't important, was it?

11         MR. FERNANDEZ:  Object to form.

12         THE WITNESS:  Yes, it was important.

13  BY MR. PIERRE:

14     Q.   Okay.  So that fact was important, but you

15  just don't remember that important fact.

16         MR. FERNANDEZ:  Object to form.

17         MS. WYDLER:  Form.

18         THE WITNESS:  Well, I remember it.  It's just

19         I just thought that was pretty unusual for someone

20         to leave their car at the park running just to walk

21         to a relative's house.  That didn't make any sense

22         to me.

23  BY MR. PIERRE:

24     Q.   I fully agree with you, Officer.  I fully

25  agree with you.  It doesn't make sense to me.

1          But what I'm trying to get at is when he walks

2     up to you, does he notify you of the location that he is

3     at?

4          MR. FERNANDEZ:  Object to form.

5          THE WITNESS:  He said the relative lived at

6          this house.  All he said was this house.  That's

7          all he was -- he just pointed at this house.  I'm

8          like okay, and tell me the story, what happened.

9          Then he told me he left his vehicle at the

10         park running, and he walked to a relative's house.

11         I can't remember if he said his aunt, his uncle.  I

12         can't remember exactly what that was, but I just

13         found it to be very unusual for someone to leave

14         the keys running at the park just to walk to a

15         relative's house.  That didn't make any sense to

16         me.

17    BY MR. PIERRE:

18         Q.   Okay.  And where you found him, he was at the

19    relative's house?

20         MR. FERNANDEZ:  Object to form.

21         THE WITNESS:  Negative.  He was on the

22         sidewalk.

23    BY MR. PIERRE:

24         Q.   Okay.  He was on the sidewalk.  Where was his

25    position on the sidewalk as it relates to the relative's

1    house?

2         A.   He was on the -- he was like standing right in

3    the middle of the sidewalk.  I mean, there was numerous

4    homes in that general area.  It's like five or six

5    homes.

6         Q.   Okay.  And was he -- you say he was standing.

7         A.   He was standing, yes.

8         Q.   Okay.  Tell me about that day.  Was it raining

9    on that day?

10        A.   No, it was a sunny day.

11        Q.   So it was a sunny, clear day.  Was it

12   summertime or springtime?

13        A.   It was July.  It's probably -- it's

14   summertime.

15        Q.   Okay.  I'm from Miami, Officer.  Where are you

16   from?

17        A.   I was born and raised right here in Miami.

18        Q.   Oh, so we're both Miami natives.

19        A.   Yes.

20        Q.   My experience -- and you're a little bit older

21   than I am -- with Miami summers is that they're pretty

22   hot.  Would you agree with me from one Miamian to

23   another Miamian?

24             MS. WYDLER:  Form.

25             THE WITNESS:  Yes.

1   BY MR. PIERRE:

2        Q.   I mean, sweltering hot in my opinion.  Do you

3   agree?

4             MR. FERNANDEZ:  Object to form.

5             MS. WYDLER:  Form.  Not at night.

6   BY MR. PIERRE:

7        Q.   Well, talking about the day.  In the middle of

8   the day, would you agree that we Miamians need our AC?

9             MR. FERNANDEZ:  Object to form.

10            THE WITNESS:  Yes, we do.

11  BY MR. PIERRE:

12       Q.   Okay.  So at that time, it was the -- when you

13  made contact with my client, it was still light outside,

14  correct?

15       A.   It was, yes.

16       Q.   And it was pretty hot outside, correct?

17       A.   It was.

18       Q.   And when you met my client, you were in your

19  vehicle, correct?

20       A.   I was, yes.

21       Q.   And my client comes up to you waving for you

22  outside, correct?

23       A.   Well, he didn't actually come up to me.  I was

24  pulling up in my vehicle, and I just pulled over.

25       Q.   Okay.  So you pulled over.

1     A.    Yes.

2     Q.    But you don't exit your vehicle, do you?

3     A.    Initially, yes, I did.  Initially exit the

4  vehicle to get the information of what was going on.  I

5  wasn't sitting in the vehicle.

6     Q.    Okay.  So you exited the vehicle when you met

7  my client.

8     A.    Yes.

9     Q.    Okay.  When you saw him standing on the

10  sidewalk, it's a hot Miami summer day, correct?

11          MR. FERNANDEZ:  Object to form.

12          THE WITNESS:  Yes.

13  BY MR. PIERRE:

14     Q.    And then what do you do?

15     A.    I approach him and ask him is he the caller

16  and what's going on, and then he told me, yes, he's the

17  one who called, and he told us about his vehicle being

18  left at the park with the keys in it, and he was walking

19  down to a relative's house, and someone took off in his

20  vehicle.

21     Q.    Okay.  Okay.  And from the time you received

22  the call until the time that you actually met my client,

23  how long was that about?

24     A.    Well, I got to the location within five

25  minutes.  I'm sure of that.  And then I didn't see

1    anyone, so I went up the block, came back around.  As I

2    came back around, that's when I saw him on the sidewalk

3    waving his hand.

4         Q.   Okay.

5         A.   He was coming towards me.

6         Q.   Okay.  And you have already testified that

7    oftentimes, these dispatchers give wrong addresses,

8    correct?

9              MR. FERNANDEZ:  Object to form.

10             THE WITNESS:  Well, they don't actually give

11        the wrong address.  The caller themselves gives the

12        dispatchers the wrong address.  The dispatcher only

13        can go by what the caller states to them.

14   BY MR. PIERRE:

15        Q.   Okay.  So do you recall who your dispatcher

16   was at that time?

17        A.   No, I couldn't even tell you who the

18   dispatcher was yesterday.  I have no idea who they are.

19        Q.   Okay.  I was just wondering.  So you go to my

20   client.  He tells you what's going on.  He says my

21   vehicle has been stolen, and from your testimony, he

22   says his vehicle has been stolen at the park, correct?

23             MR. FERNANDEZ:  Object to form, asked and

24        answered.

25             THE WITNESS:  Yes.

1   BY MR. PIERRE:

2       Q.   But he's now currently in front or adjacent to

3   a relative's house, correct?

4           MR. FERNANDEZ:  Object to form.

5           THE WITNESS:  According to him, he said a

6       relative lived there.

7   BY MR. PIERRE:

8       Q.   Okay.  Did you check if the relative lived

9   there?

10      A.   No, I did not check.

11      Q.   Okay.  And when you came up to him, was he a

12  suspect for any crimes that was being committed or you

13  perceived to be committed?

14          MR. FERNANDEZ:  Object to form.

15          THE WITNESS:  Negative.  Negative.  He just

16      called a call for service for a stolen vehicle.

17  BY MR. PIERRE:

18      Q.   Okay.  For his stolen vehicle, correct?

19      A.   Correct, yes.

20      Q.   So you had no reason at the time to believe

21  that he was involved in any criminal activity.

22      A.   I had no reason.

23      Q.   Was there any evidence to suggest that my

24  client was involved in criminal activity when he spoke

25  to you?

1          MR. FERNANDEZ:  Object to form.

2          THE WITNESS:  Not that I recall.

3    BY MR. PIERRE:

4      Q.   Was there anyone present besides you and my

5    client when you had these conversations?

6      A.   No, it was just he and I.  There was no one

7    else.

8      Q.   So you didn't have backup?

9          MR. FERNANDEZ:  Object to form.

10         THE WITNESS:  I didn't need backup.  I was

11         just there to do a stolen vehicle report.

12   BY MR. PIERRE:

13     Q.   Okay.

14     A.   That's a one-officer call.

15     Q.   Okay.  So you were dispatched to do a stolen

16   vehicle report.

17     A.   Yeah, report, yes.

18     Q.   Okay.  And once he tells you his vehicle was

19   stolen at the park, what do you do next?

20     A.   Explain to him that he as to fill out a stolen

21   vehicle affidavit stating exactly what happened to his

22   vehicle.  He had to sign off on it, and then I would go

23   ahead and sign off on the report -- the affidavit, and

24   then I'll do a report.  I'll give him a chase car, and

25   we'll move forward from there.

1      Q.   Okay.  Let's talk about this.  So let's talk

2  about this stolen affidavit or stolen affidavit report.

3  Have you seen the stolen affidavit report that my client

4  executed?

5      A.   I did.  It's not actually a report.  It's a

6  form, and the form itself, he has to fill out -- he or

7  she, whoever it may be -- has to fill out stating

8  exactly what happened to their vehicle.

9      Q.   And so I'm clear, where is that stolen

10  affidavit form executed by my client?

11      A.   Where is it?

12      Q.   Yes.

13      A.   I have no idea where it's at.

14      Q.   Okay.  You're the officer that's responsible

15  for the initial custody of the stolen affidavit,

16  correct?

17      A.   That's correct.  I was the primary officer at

18  that time.

19      Q.   Okay.  You asked my client to fill out the

20  stolen affidavit form, correct?

21      A.   That's correct.

22      Q.   My client doesn't hesitate.  He fills out the

23  stolen affidavit form, correct?

24      A.   That's correct.

25      Q.   Do you see what the stolen affidavit form

1  actually says?

2      A.   Yes, I did.  It said exactly what he said on

3  the -- I mean, we have to read it, you know, to make

4  sure everything is correct and then we sign off on that,

5  then we validate it.

6      Q.   And what did it say?

7      A.   Exactly what he said.  He said that he was at

8  the park.  He left his keys in the vehicle.  He walked

9  down to a relative's home.  Again, I don't know what

10  relative it was.  I don't quite remember because I don't

11  have the form in front of me.  And when he left from his

12  relative's house and went back to the car, the vehicle

13  was gone.

14      Q.   Okay.  So before I get into the details, once

15  he executes the stolen affidavit, what do you do with

16  the stolen affidavit form?

17      A.   I go back to my car.  I put it in the system.

18  I have to call CIS to let them know this vehicle was

19  stolen.  Could you put it in the database as a stolen

20  vehicle, and that vehicle gets stopped with that tag on

21  there, they would know it's a stolen vehicle and effect

22  the arrest.

23      Q.   Okay.  And what happens to the form executed

24  by my client?

25      A.   Okay.  I'll have to back up a little bit.  So

1    when -- before I can finish signing off -- well, I did

2    sign off on the form -- I got a call on the radio, and

3    communications told me QSY, which means change channels.

4    So I changed channels.  When I changed channels, it said

5    we heard the transmission.  We believe this vehicle was

6    involved in a perimeter that they had set up, and the

7    person broke the perimeter before they could set up what

8    they call a box to capture the person.

9         And that fit the description of the vehicle

10   that you're dealing with so we're going to send some

11   units by.  Units came by and started doing their initial

12   investigation.

13   Q.   That's great, Officer, but I was asking a more

14   precise question than that.  My question was what

15   happens to the affidavit form that my client executed,

16   the physical copy?

17        MR. FERNANDEZ:  Object to form.  Answer if you

18        can.

19        THE WITNESS:  What happened to the copy of it?

20        Okay.  Again, if I'm primary on a call, I would put

21        it in the system showing that the vehicle was

22        stolen.  The form itself, I normally upload it in

23        the record section, so in case it's lost or stolen

24        -- not stolen -- lost or misplaced, that they can

25        find it in the record section.

```
 1              However, I didn't have time to do that because

 2         the units that came by took primary of that call.

 3         So if they're going to take primary, that's going

 4         to make me the backup officer, and I gave

 5         everything to them so they could initiate their

 6         investigation on what they're doing.

 7    BY MR. PIERRE:

 8         Q.   Okay.  So you turn over the stolen affidavit

 9    form to a different unit, correct?

10         A.   Yes.

11         Q.   And they were supposed to upload the stolen

12    affidavit form into the system, correct?

13         A.   Not necessarily.  Everybody doesn't do that.

14    Some of us do.  There's nothing saying you have to do

15    it.  I do it because I just want to make sure if it ever

16    comes back that we need it, you can still find it.

17              Now, it's not a requirement that every unit

18    has to do it.  It's just something that I do.

19         Q.   Okay.  But you didn't upload the stolen

20    affidavit form into the system on June 1, 2018?

21         A.   No, because the unit that came, took

22    everything from me.  So, now, everything falls on them.

23         Q.   Okay.

24         A.   Now, for me -- you know, I was the primary

25    officer.  Now they've taken over the investigation, now
```

1   they're going to become the primary officer, and I'm

2   just going to be assisting.

3        Q.   Okay.  Now, let's get back to after my client

4   fills out the stolen affidavit form, correct?  Do you

5   remember that?

6             MR. FERNANDEZ:  Object to form.

7             THE WITNESS:  Yes, I remember that.

8   BY MR. PIERRE:

9        Q.   Okay.  So after he fills out the stolen

10  affidavit form, you go back to your car?

11       A.   Yes.

12       Q.   And what do you do once you're in your car?

13       A.   I call CIS, which is located at central

14  station, to put the car in the stolen vehicle database.

15       Q.   And CIS, for the jury, is what?

16       A.   CIS is a unit that pretty much they handle

17  anything that's stolen, any type of stolen vehicle,

18  stolen property, pawn shop, whatever it may be, and you

19  give them all the information of the driver -- not the

20  driver -- the owner of the vehicle, whatever it may be,

21  and then they would put it in the database showing it's

22  stolen.

23             So if an officer were to initiate a traffic

24  stop and call that tag number in, that tag is going to

25  pop up red showing that, okay, it's an alert that it's

1    stolen or whatever the case may be.

2        Q.   Okay.

3        A.   They input all their information in the

4    database, whether, you know, stolen or whatever it may

5    be.  Missing child or whatever it may be.

6        Q.   And what happens after you call CIS?

7        A.   I'm sorry, what happens after you call CIS?

8        Q.   No, after you called CIS for my client's

9    stolen vehicle.

10       A.   Well, I didn't get any chance to call CIS

11   because the other units had already arrived.

12       Q.   Oh, okay.  I thought you went to your vehicle,

13   and you called CIS.

14           MR. FERNANDEZ:  Wait, wait, wait.  Hold on.

15           Let him finish his question so I can put my

16           objection on the record, object to form, and then

17           you can answer.

18           THE WITNESS:  Okay.

19           MR. FERNANDEZ:  Sorry, Faudlin.  Go ahead.

20   BY MR. PIERRE:

21       Q.   Yeah.  Here's how the narrative is going in my

22   mind, and correct me if I'm wrong.  You speak to my

23   client.  He fills out the form.  You go back to your

24   car.  You call CIS.  Where am I wrong?

25           MR. FERNANDEZ:  Object to form.

```
 1              THE WITNESS:  Okay.  You're wrong about -- you
 2         asked me previously what do I do with the form.  I
 3         didn't say I did that with his form.  You asked me
 4         what do you do, and I stated to you what I do with
 5         the form.  I never got the opportunity to do that
 6         with his form because the other units had came and
 7         took over the investigation.
 8              I was explaining to you what you do with the
 9         form.  Not what I did with his form.
10    BY MR. PIERRE:
11         Q.   Okay.  So all of the standard operating
12    procedures that you've typically employed on a Signal
13    22, stolen vehicle, you did not employ it for my
14    client's stolen vehicle, correct?
15              MR. FERNANDEZ:  Object to form.
16              THE WITNESS:  That's correct.  I did not do it
17         because the other unit came and took over the
18         investigation.  If the other units had not came and
19         took over the investigation, yes, I would have did
20         it.
21    BY MR. PIERRE:
22         Q.   Okay.  So I want to know now we're talking
23    about what you did after my client executes the stolen
24    --
25         A.   Is that a question?
```

```
 1            MR. FERNANDEZ:  Could you repeat your
 2       question?
 3   BY MR. PIERRE:
 4       Q.   Yes, I want to know what you did after my
 5   client executes the stolen vehicle affidavit form.
 6       A.   Okay.  Once he filled out the stolen vehicle
 7   affidavit form, I read it, make sure that everything is
 8   correct, make sure he didn't leave anything off, and I
 9   called CIS and put it in the database from there.
10       Q.   Okay.  So we know you never got an opportunity
11   to call CIS, correct?
12            MR. FERNANDEZ:  Object to form.
13            THE WITNESS:  That's correct.
14   BY MR. PIERRE:
15       Q.   What happens before that leads -- that
16   prevents you from calling CIS?
17            MR. FERNANDEZ:  Object to form.
18            THE WITNESS:  Okay.  Again, units arrived and
19       took over the investigation, which stopped me from
20       proceeding forward with that affidavit, and
21       everything was turned over to them.
22   BY MR. PIERRE:
23       Q.   Okay.  What I'm missing is -- and what I need
24   you to help me out with -- is the steps before the units
25   arrive, right?
```

```
 1      A.   I'm sorry, can you repeat that?

 2      Q.   Yeah.

 3      A.   I'm not sure what you said.

 4      Q.   How do the units know to arrive at your

 5  location?

 6      A.   They heard the transmission over the radio.

 7  Everyone watches the radio.  Everybody is on the same

 8  channel, so everybody is hearing all the transmissions

 9  that's going on.

10      Q.   Okay.  Okay.  Now, I think I see where we

11  left, and help me out here, Officer.  My client

12  completes the stolen vehicle affidavit form.  You go to

13  your car.  Do you make any calls as it relates to the

14  stolen vehicle?

15           MR. FERNANDEZ:  Object to form.

16           MS. WYDLER:  Join.

17           THE WITNESS:  I'm not really sure of the

18       question, make any calls.  I'm not really sure what

19       you mean by that.

20  BY MR. PIERRE:

21      Q.   Yeah.  Do you go on the dispatch and say, hey,

22  I'm with this heavyset black male wearing a white

23  T-shirt, tank top, blue jeans who was just reporting a

24  stolen vehicle.  Do you do that after you speak with my

25  client?
```

```
 1            MR. FERNANDEZ:  Object to form.
 2            THE WITNESS:  Negative.  I didn't do that.
 3       When dispatch gave me the call, everyone was
 4       already monitoring the radio.
 5            They already hear what's going on, and from my
 6       understanding, there was something going on prior
 7       to us coming on shift, and they heard the
 8       transmission and they said they were going to send
 9       some units over to do that investigation because it
10       appears like it's the same vehicle that was at
11       their perimeter and the driver ran and got away,
12       got out of the vehicle.
13  BY MR. PIERRE:
14       Q.   So these other units, they came to your
15  location on their own accord, correct?
16            MR. FERNANDEZ:  Object to form.
17            THE WITNESS:  Yes, they did.
18  BY MR. PIERRE:
19       Q.   So you didn't personally reach out or
20  communicate to what we now know is to be Officer Guzman
21  and Officer Randy Carriel, correct?
22            MR. FERNANDEZ:  Object to form.
23            MS. WYDLER:  Objection, form.
24            THE WITNESS:  Yes, that's true.  The units
25       were already still on the perimeter and they heard
```

1           the call go out and that vehicle that was being

2           reported stolen was the same vehicle that they had

3           at the perimeter.

4    BY MR. PIERRE:

5           Q.   Okay.  So did you -- I just want to make sure

6    we're clear.  So prior to any other units coming on the

7    scene, you did not communicate with Officer Jonathan

8    Guzman, correct?

9                MR. FERNANDEZ:  Object to form.

10               THE WITNESS:  Yes, that's correct.  I didn't

11          communicate with anyone because I didn't have to.

12          I was just there for the stolen vehicle.  That was

13          it.

14   BY MR. PIERRE:

15          Q.   Okay.  Prior to anyone coming on the scene,

16   you did not communicate with Officer Randy Carriel about

17   my client's stolen vehicle, correct?

18               MR. FERNANDEZ:  Object to form.

19               THE WITNESS:  No, that's correct.  I didn't

20          report to anyone.  I responded to -- talk to anyone

21          in reference to my call.

22   BY MR. PIERRE:

23          Q.   Okay.  And I'm sorry, this is going to seem

24   repetitive, but I have to make it clear for the record.

25               Prior to any other units coming on the scene

1   where you and my client were at, you did not communicate

2   with Officer Miguel Hernandez, correct?

3            MR. FERNANDEZ:  Object to form.

4            THE WITNESS:  That's correct.  I didn't

5        communicate with anyone.

6   BY MR. PIERRE:

7        Q.   Prior to any officer's arrival on the scene

8   where you and my client were on June 1, 2018, you did

9   not communicate with an officer by the name of Patricia

10  Carriel, correct?

11           MR. FERNANDEZ:  Object to form.

12           THE WITNESS:  Yes, that's correct.  I didn't

13       communicate with anyone.

14  BY MR. PIERRE:

15       Q.   Prior to anyone coming onto the scene where it

16  was just you and my client on June 1, 2018, you did not

17  communicate with Officer Randy Carriel, correct?

18           MR. FERNANDEZ:  Object to form.

19           THE WITNESS:  That's correct.  I didn't

20       communicate with anyone.

21  BY MR. PIERRE:

22       Q.   Prior to any other units arriving on the scene

23  where my client and yourself was at on June 1, 2018, you

24  did not communicate with a person by the name of

25  Sergeant Gary Sampson, correct?

```
 1              MR. FERNANDEZ:  Object to form.
 2              THE WITNESS:  That's correct.  I didn't speak
 3         with the sergeant.
 4    BY MR. PIERRE:
 5         Q.   Okay.  So based off of your testimony, you
 6    didn't provide any communication to any officers prior
 7    to any officers arriving on the scene on June 1, 2018,
 8    where you were initially the primary officer for a
 9    stolen vehicle reported by my client, Samuel Scott, Jr.,
10    correct?
11              MR. FERNANDEZ:  Object to form.
12              THE WITNESS:  That's correct.  During that
13         time, I didn't even know any of those officers or
14         sergeant.
15    BY MR. PIERRE:
16         Q.   Okay.
17         A.   I didn't know who they were.
18         Q.   Oh, so --
19         A.   Other than Hernandez who trained me, that was
20    the only one I knew.
21         Q.   Okay.  So on June 1, 2018, the only officers
22    you actually knew prior to the events -- strike that.
23              The only officer you knew at the time before
24    you met them on June 1, 2018, was Miguel Hernandez,
25    correct?
```

1            MR. FERNANDEZ:  Object to form.

2            THE WITNESS:  Yes, he's the only one I knew

3        because he trained me for a couple of weeks or

4        maybe a couple of days.  I'm not really sure what

5        it was, but yes, he's the only one I knew.  The

6        other ones, I didn't know at all.

7   BY MR. PIERRE:

8        Q.   Okay.  So your first communication with these

9   individuals was on the scene where you met my client,

10  Samuel Scott, Jr., correct?

11           MR. FERNANDEZ:  Object to form.

12           THE WITNESS:  That's correct.

13  BY MR. PIERRE:

14       Q.   And this excludes Miguel Hernandez, correct?

15       A.   Correct.

16       Q.   Okay.  Let's get back to the communications.

17  Okay.  So you're on the scene.  You received the report

18  from my client, stolen vehicle affidavit report.  What

19  are you doing after you receive the stolen vehicle

20  affidavit report?

21           MR. FERNANDEZ:  Object to form.

22           THE WITNESS:  I go back to my car, and I read

23       the form and I sign off on the form to validate it.

24  BY MR. PIERRE:

25       Q.   Okay.  And did you validate it yet?

1      A.   I'm sure I did validate it.  I'm not quite 100

2   percent sure, but I'm sure I did.  I mean, that was the

3   reason why I walked back to my vehicle.

4      Q.   Okay.  And did you do an incident report for

5   the stolen vehicle?

6      A.   I didn't because the other units had already

7   arrived, and they took over the investigation.  So if

8   they're going to take over the investigation, there is

9   no need for me to finish up anything because they're

10  going to take it from there.

11     Q.   Okay.  And did you take any witness statements

12  while you were there besides my client's?

13          MR. FERNANDEZ:  Object to form.

14          THE WITNESS:  No, there was no one --

15          MR. FERNANDEZ:  Object to form.  Go ahead and

16      answer.

17          THE WITNESS:  No, there was no one there but

18      me and Mr. Scott.

19  BY MR. PIERRE:

20     Q.   Okay.  So did you ask to speak to his relative

21  that was nearby?

22     A.   I don't recall if I did --

23          MR. FERNANDEZ:  Object to form.  Go ahead.

24          MS. WYDLER:  Objection, form, predicate.

25          THE WITNESS:  I don't recall if I did or did

1          not.

2     BY MR. PIERRE:

3          Q.   Okay.  But he did inform you that his -- he

4     was at the location near his relative's house, correct?

5               MR. FERNANDEZ:  Object to form.

6               THE WITNESS:  He did.

7     BY MR. PIERRE:

8          Q.   And you did not ask him if you could speak to

9     his relative, correct?

10              MR. FERNANDEZ:  Object to form.

11              THE WITNESS:  I don't really recall if I did

12         or did not, but I just know he was pointing.  I

13         don't recall if I did or did not.

14    BY MR. PIERRE:

15         Q.   Okay.  Okay.  And why didn't you?

16              MR. FERNANDEZ:  Object to form.

17              THE WITNESS:  Again, I'm not really sure if I

18         did or did not because I can't really recall

19         exactly our conversation when it came to the

20         relative, but I do recall asking which house your

21         relative lives in, and he pointed at one house, and

22         he pointed at another house and that was pretty

23         much the extent of the conversation.  And then I

24         just asked him to tell me what happened.

25    BY MR. PIERRE:

1      Q.   Okay.  And did you find anything suspicious

2  about my client's behavior when you interacted with him?

3           MR. FERNANDEZ:  Object to form.

4           THE WITNESS:  I did not.

5  BY MR. PIERRE:

6      Q.   Okay.  Did you assume that he was

7  participating in a crime?

8           MR. FERNANDEZ:  Object to form.

9           THE WITNESS:  No, we're trained not to make

10          assumptions of anything.

11  BY MR. PIERRE:

12      Q.   I mean, that area, what's the predominant race

13  in that area where my client was located?

14          MR. FERNANDEZ:  Object to form.

15          MS. WYDLER:  Objection, form.

16          THE WITNESS:  I don't know what the

17          predominant, but from my understanding, it's more

18          Haitian Americans that live in that general area.

19  BY MR. PIERRE:

20      Q.   Okay.

21      A.   I don't have no paperwork in front of me that

22  states who is dominant in that area.  I have no idea.

23      Q.   Okay.  But based off of your experience, your

24  knowledge, your work history in this area, is it a

25  predominantly white area?

1          MR. FERNANDEZ:  Object to form.

2          THE WITNESS:  I really can't speak on that.  I

3      don't really know.

4   BY MR. PIERRE:

5      Q.   Okay.  You earlier testified that it was

6   predominantly a Haitian American area, correct?

7          MR. FERNANDEZ:  Object to form.

8          THE WITNESS:  That's what I said, and that's

9      the reason why they call it Little Haiti.

10  BY MR. PIERRE:

11     Q.   Okay.

12     A.   Based on that.

13     Q.   Okay.  So based off of your experience, I'm

14  not asking you to guess, Officer, do the residents tend

15  to be black?

16         MR. FERNANDEZ:  Object to form.

17         MS. WYDLER:  Join.

18         THE WITNESS:  That, I don't know.  You know,

19     when I'm working, I don't look at it.  I just

20     answer calls for service.  I don't go by trying to

21     figure out who's who, who lives here.  I don't do

22     all that.  I think that's being biased.

23  BY MR. PIERRE:

24     Q.   I'm not asking you to be race conscious.  I'm

25  asking you just to apply your commonsense, right?  So in

1    that area, the predominant people in the area, do they

2    have --

3              MR. FERNANDEZ:  Is there a question?

4              THE WITNESS:  Yeah.  What was it?

5              MR. PIERRE:  Is my connection unstable?

6              MR. FERNANDEZ:  Yeah.

7              MS. WYDLER:  Unstable.

8              MR. FERNANDEZ:  Yeah.

9              MR. PIERRE:  What was the last thing you heard

10        because I was saying something philosophical?

11             MR. FERNANDEZ:  Something about in the area,

12        and then we lost you.

13             THE WITNESS:  We lost you after that.

14             MR. PIERRE:  Oh.

15             MR. FERNANDEZ:  We lost you again.

16             MR. PIERRE:  Okay.  I don't know if God wants

17        me to speak, but I'm going to try.

18             MS. WYDLER:  Maybe he doesn't want you to be

19        philosophical.

20             MR. PIERRE:  I'm going to try to avoid the

21        philosophical and go with --

22    BY MR. PIERRE:

23        Q.   So in that area, would you agree with me that

24    most people that you come in contact with are people

25    that are of African descent?

```
 1              MR. FERNANDEZ:  Object to form.

 2              MS. WYDLER:  Join.

 3              THE WITNESS:  I don't agree with that.

 4         Everyone has their definition of what African

 5         descent is.  I mean, I was born and raised here.  I

 6         don't consider myself African American.  I just

 7         consider myself American.

 8    BY MR. PIERRE:

 9         Q.   That's fine, but do you consider yourself

10    black?

11         A.   I do not.  I consider myself brown.

12         Q.   Okay.  Do you consider yourself brown?

13         A.   Yes, I consider myself brown.  I do.

14         Q.   Do the people in the area that you were called

15    in, are they varying shades of brown?

16              MR. FERNANDEZ:  Object to form.

17              MS. WYDLER:  Join.

18              THE WITNESS:  I haven't worked that area in

19         quite some time, so I really can't answer that.

20    BY MR. PIERRE:

21         Q.   Okay.  Is it a predominantly Asian American

22    area?

23              MR. FERNANDEZ:  Object to form.

24              MS. WYDLER:  Join.

25              THE WITNESS:  Well, I mean, it depends on
```

1          where you're talking about.  Asian American where?

2          I mean, in California, of course, there are plenty

3          Asian American areas, but I wouldn't know about

4          here in Florida.  I mean, I don't know.  I can't

5          answer that.

6     BY MR. PIERRE:

7          Q.   Okay.  So I'm going to try to wind this down.

8     So most of the people in that area, would you say that

9     they sort of look like Samuel Scott?

10          MR. FERNANDEZ:  Object to form.

11    BY MR. PIERRE:

12          Q.   As in skin color?

13          MR. FERNANDEZ:  Object to form.

14          MS. WYDLER:  Objection, form.

15          THE WITNESS:  I can't really say that.  I

16          think, again, that's being biased, and I really

17          can't answer that.

18    BY MR. PIERRE:

19          Q.   Okay.  I'm glad you're not trying to be

20    biased, but here's -- when you receive a BOLO, how do

21    they -- what descriptors do they use?

22          MR. FERNANDEZ:  Object to form.

23          THE WITNESS:  Again, it depends on the BOLO.

24          I mean, a lot of times, it would say white male,

25          black shirt, black pants or a black male, black

```
 1          shirt, dark color pants.  You know, it depends.  It
 2          depends on what the BOLO is.  It depends on how the
 3          BOLO comes out.  I mean, it can be, you know, it
 4          can be descriptive and depends on who it is.
 5               So, you know, it's kind of -- I just feel like
 6          that's being biased.  I truly do.
 7   BY MR. PIERRE:
 8        Q.   Okay.  And when you receive those BOLOs that
 9   describe individuals as black males, do you -- who do
10   you look for?
11               MR. FERNANDEZ:  Object to form.
12               THE WITNESS:  I look for the description of
13          the BOLO.  Oftentimes, those BOLOs are not correct
14          depending on who the caller is, who's giving the
15          information.  They don't always give the correct
16          information.
17   BY MR. PIERRE:
18        Q.   Are you being biased when you look for a black
19   male?
20               MR. FERNANDEZ:  Object to form.
21               THE WITNESS:  No, I'm just doing my job as a
22          police officer for the City of Miami Police
23          Department.
24   BY MR. PIERRE:
25        Q.   Okay.  So I'm asking you as the City of Miami
```

1    police officer, when you are in this area and given a

2    BOLO of a black male, how many individuals fit that

3    description?

4            MR. FERNANDEZ:  Object to form.

5            MS. WYDLER:  Objection, form.

6            THE WITNESS:  Again, it depends on the BOLO.

7        The BOLO could say, if you want to say a black

8        male.  You know, it could be a black male.  It

9        could be thin build.  It could be a black male,

10       heavyset.  It could be, you know -- it really

11       depends.

12           The BOLO is really -- you know, if it's pretty

13       close to the description that we're trying to find,

14       I'll go with what they're saying and try to see if

15       anybody in that general area that fits the

16       description, but we can do an investigation and go

17       from there.

18   BY MR. PIERRE:

19       Q.   Okay.

20       A.   The BOLOs are not always 100 percent.  It's

21   not perfect.

22       Q.   Okay.  So in the area of 48th Street and

23   Northwest 5th Avenue, if you received a BOLO saying a

24   black male, do a lot of people fit that description?

25           MR. FERNANDEZ:  Object to form.

```
 1              MS. WYDLER:  Join.
 2   BY MR. PIERRE:
 3       Q.   In that area?
 4       A.   Again, I can't say because I didn't have a
 5   BOLO over there, so I really can't say.
 6       Q.   Okay.  So that's a good point.  You didn't
 7   receive a BOLO for a person who stole Mr. Scott's
 8   vehicle, correct?
 9              MR. FERNANDEZ:  Object to form.
10              THE WITNESS:  Yes, that's correct.  I didn't
11              receive a BOLO of anything.  I just received a call
12              for service in reference to a stolen vehicle.
13              There was no BOLO initiated for that.  It was just
14              a stolen vehicle, and the gentleman flagged me
15              down.
16              As I came back around, he was on the sidewalk.
17              So, of course, if someone is going to flag me down,
18              I'm going to stop and see what they need.
19   BY MR. PIERRE:
20       Q.   And the gentleman that flagged you down, was
21   he a black male?
22       A.   He was a black male.  That's correct.
23       Q.   Okay.  And you weren't being biased when you
24   identified him as a black male, correct?
25              MR. FERNANDEZ:  Object to form.
```

```
 1              THE WITNESS:  Correct.  I'm not, I mean, being

 2         biased.  I'm just trying to help whoever the

 3         citizen is out in reference to their stolen

 4         vehicle.

 5   BY MR. PIERRE:

 6         Q.   Okay.  And in that area, how many black males

 7   are there?

 8              MR. FERNANDEZ:  Object to form.  Asked and

 9         answered multiple times.

10              MS. WYDLER:  Join.

11              MR. PIERRE:  No, one.

12              THE WITNESS:  I don't really know how many are

13         there, but all I know, that day, he was just he and

14         I.

15   BY MR. PIERRE:

16         Q.   Okay.  So in that area, to your knowledge, are

17   there a lot of black male residents?

18              MR. FERNANDEZ:  Object to form.

19              THE WITNESS:  To my knowledge, there is mixed.

20         There's other races over there quite a bit.

21   BY MR. PIERRE:

22         Q.   Okay.  And what other races are there?

23              MR. FERNANDEZ:  Object to form.

24              THE WITNESS:  I have no idea what other races

25         are.  All I know, you know, they're fair skinned
```

1       males, females, so on and so forth.  I mean, I

2       don't really know their race.

3            I don't sit here and mingle with them unless

4       they, you know, call a need for something serious

5       or just need directions or whatever the case may

6       be.  I don't sit here and, you know, talk with them

7       unless I have to.  I don't know how to answer that.

8            MR. PIERRE:  Okay.

9            MS. WYDLER:  We've been going for -- I'm

10      sorry, we've been going for an hour and a half.  Do

11      you mind if we take a quick break?

12           MR. PIERRE:  Yeah, that's fine.  That's fine.

13      Okay.  We'll take five minutes.  Is that good for

14      you guys?

15           MS. WYDLER:  Yeah, I just need water.

16           MR. PIERRE:  Okay.

17           (Off the record.)

18           MR. PIERRE:  I hate to do this to you, Madam

19      Court Reporter, but what was the last question that

20      I had?

21           (Reporter read the record as requested.)

22  BY MR. PIERRE:

23      Q.   So let's get back to once you're in your car.

24  You're, at this point, beginning to fill out your -- the

25  various reports that you have to do, correct?

1          MR. FERNANDEZ:  Object to form.

2          THE WITNESS:  No, that's incorrect.  The only

3       report that you would be filling out is the call

4       that you're on.

5   BY MR. PIERRE:

6       Q.   Okay.  Okay.  So you get in your car.  He

7   gives you the stolen vehicle affidavit, and you're about

8   to fill out an incident report?

9          MR. FERNANDEZ:  Object to form.

10          THE WITNESS:  Negative.  It's the stolen

11       vehicle affidavit.  The top part is what he has to

12       fill out, the narrative where he put exactly what

13       happened to his vehicle, and then from there, you

14       would do his ID card, driver's license, whatever it

15       need be, whatever form of ID he has to validate

16       what they're saying and the date and time that they

17       made that statement and then you just sign off on

18       it to validate it.

19   BY MR. PIERRE:

20       Q.   Okay.  And before the other officers arrive on

21   the scene, was there any other thing that Mr. Scott said

22   to you?

23          MR. FERNANDEZ:  Object to form.

24          THE WITNESS:  Can you repeat that question?

25       I'm not sure what you're asking.

1   BY MR. PIERRE:

2       Q.   Yeah.  Prior to the arrival of the other

3   officers, when it was just you and Mr. Scott, did he

4   disclose anything else to you?

5       A.   No, he did not.

6       Q.   Okay.  And prior to the arrival of the other

7   officers, you had not communicated to anyone else

8   regarding Mr. Scott's stolen vehicle, correct?

9       A.   That's correct.  I was in dispatch -- I spoke

10  with dispatch.

11      Q.   Okay.  And when you spoke with dispatch, what

12  did you say to dispatch?

13      A.   I had to check in arrival.  Any time you're

14  wherever you're at, you always have to check in arrival.

15      Q.   Okay.  But that's -- so once you actually

16  arrive on the scene, you dispatch -- you speak with

17  dispatch telling them that you have arrived at the scene

18  where Mr. Scott is, correct?

19           MR. FERNANDEZ:  Object to form.

20           THE WITNESS:  Yes, I told them that I found

21      the complainant because he wasn't there.

22  BY MR. PIERRE:

23      Q.   Okay.  But that's the only other communication

24  that you had.  Besides your communications with Mr.

25  Scott and dispatch, you had no other communications,

1    correct?

2              MR. FERNANDEZ:  Object to form.

3              THE WITNESS:  No, that's incorrect.  The units

4        that heard the transmission asked me to switch

5        channels, which is QSY.  They told me they were

6        sending some units by because the description of

7        the vehicle meets the same description of the

8        vehicle wherever the scene was at.  I don't know

9        because I wasn't there wherever scene one.  I have

10       no idea, and they're sending units to come by.

11   BY MR. PIERRE:

12       Q.   Okay.  Okay.  I just want to make sure because

13   I went ad nauseam, and I'm sure everyone on this Zoom

14   conference heard me.  You didn't actually speak to

15   anyone when you switched channels, did you, correct?

16             MR. FERNANDEZ:  Object to form.

17             THE WITNESS:  That's incorrect.  I mean, when

18       you're switching channels, you have to speak to

19       someone.  That's the reason they want to get you

20       off the main channel onto the other channel so that

21       way, you won't have the main channel.

22   BY MR. PIERRE:

23       Q.   Okay.  So, now, you've spoken to someone,

24   correct?

25       A.   Yes, I did.  Yes.

1      Q.   Okay.  Prior to this break, did you have any

2   communications with anyone?

3      A.   No, I did not.

4      Q.   So you didn't speak to your counsel about your

5   testimony?

6      A.   Prior to the break?

7      Q.   Yes.  I mean, prior to us commencing -- during

8   the break, did you speak to your counsel regarding your

9   testimony?

10     A.   No, he went to the restroom, and I stayed

11   here.

12     Q.   Okay.  When I made it perfectly clear on the

13   record did you speak to Officer Guzman, you weren't

14   telling the truth then when you said no, you didn't

15   speak to Officer Guzman, correct?

16          MR. FERNANDEZ:  Object to form.

17          MS. WYDLER:  Objection, form.

18          MR. FERNANDEZ:  Mischaracterizes testimony.

19          THE WITNESS:  No, I was telling the truth.  I

20      didn't speak with Officer Guzman at that time.  I

21      didn't know who Officer Guzman was.

22   BY MR. PIERRE:

23     Q.   So who did you speak to on this different

24   channel?

25     A.   I have no idea who it was.  It could have been

1    a supervisor.  They just said QSY.  I didn't know --

2    half the people, I didn't know at that time.  They asked

3    me to QSY.  I QSY, and we change channels.  They said

4    we're going to be sending -- it had to be a supervisor

5    because they're not going to say we're sending units

6    over.  Another officer is not going to say that.  It has

7    to be a supervisor, but I don't know who the supervisor

8    was.

9            They just said have them QSY.  I QSY.  They

10   said we'll have units come by to your call.  I said good

11   for them.  Back to the regular channel.

12        Q.    And was it Gary Sampson who stated that?

13        A.    I have no idea because at the time, I didn't

14   know who Gary Sampson was.

15        Q.    Okay.  Okay.  And they said they were sending

16   other units to your scene, correct?

17        A.    Yes, that's correct.

18        Q.    And what did you say in response?

19        A.    I acknowledged what they said, and that was

20   pretty much it.

21        Q.    So you didn't actually say anything as it

22   relates to what you saw on the scene?

23        A.    On the scene, no, not at all.  I mean, the

24   only thing that was on the scene was a caller calling

25   about a stolen vehicle.  That was -- it was nothing to

1    talk about.  It was a stolen vehicle.

2         Q.   Okay.  So you didn't communicate Samuel

3    Scott's -- strike that.

4              When you switched channels, did you describe

5    Samuel Scott?

6         A.   Negative.  I didn't have to describe anybody.

7    They were just saying that they were coming by.  I

8    didn't have to describe anything.  They just asked me --

9    again, they asked me to QSY.  I QSY, and they said we're

10   going to send some units over to your scene, and I said

11   QSL.  That was it.

12        Q.   Okay.  What is QSL?

13        A.   QSL means you're acknowledging the

14   transmission.

15        Q.   And QSY?

16        A.   QSY means to change channels.

17        Q.   Okay.  And what's standby?  Does is standby?

18        A.   Standby is just that, standby.  Standby until

19   we get there or whatever.  It depends on what you're

20   talking about, but if they say, hey, can you standby?

21   If you guys want a break, just say, hey, standby.  We'll

22   be right back.  It's just standing by.  Just stand there

23   until we get back.

24        Q.   Okay.

25        A.   Until we return.  That's pretty much all

1   that's standby.  It's just a standard term that they

2   use.

3        Q.   Okay.  So when you switch channels, the only

4   thing that you -- any communication that took place was

5   someone said that they were sending units to your

6   location and you acknowledged that statement, correct?

7        A.   That's correct.  I mean, you have to

8   acknowledge it.  That's the only way they know that you

9   read the transmission.  If you don't acknowledge, they

10  don't know you read the transmission, so they'll ask you

11  the same thing again until they know you read the

12  transmission.  So you have to acknowledge.

13       Q.   Okay.  Okay.  While you're in the car, do you

14  switch channels immediately once you get on the car, or

15  like is it sometime afterwards?

16       A.   If they ask you to QSY, you have to QSY

17  immediately because if you don't, someone else could be

18  on the channel talking about something else and you have

19  to go back to the main channel and get a call from them

20  again to QSY.  So, yes, you always have to QSY

21  immediately.

22       Q.   Okay.  How long after you were informed that

23  units were going to be sent over to your scene?

24       A.   Could you repeat that?  I'm not really sure

25  what you're asking.

1      Q.   All right.  Strike that.

2           Did you know where these units were coming

3   from?

4      A.   Negative.  I had no idea where the units were

5   coming from.

6      Q.   Okay.  And when you saw Samuel Scott, was he

7   dangerous?  Did you perceive him to be dangerous?

8           MR. FERNANDEZ:  Object to form.

9           THE WITNESS:  Well, I don't look at anyone as

10          being dangerous, but as police, we always keep

11          officer safety in mind because you're going there

12          for a victim.  That could always turn out to be a

13          defendant, and it happens, but you always use

14          officer safety regardless of what.  I don't care

15          what the call is.  You always want to keep officer

16          safety in mind.

17  BY MR. PIERRE:

18      Q.   Did you place handcuffs on Mr. Scott?

19          MR. FERNANDEZ:  Object to form.

20          THE WITNESS:  Negative.  I didn't have to

21          place handcuffs on him because he was just asking

22          about -- talking about the stolen vehicle, so there

23          was no need to put cuffs on him unless he, you

24          know, because outrageous or something of that

25          nature.

1    BY MR. PIERRE:

2        Q.   And did you fear for your safety when you were

3    Mr. Scott's presence?

4            MR. FERNANDEZ:  Object to form.

5            THE WITNESS:  Negative.  I didn't fear for my

6        safety; however, I did keep officer safety in mind

7        always, regardless of the call.

8    BY MR. PIERRE:

9        Q.   So when you went back into your vehicle, did

10   you restrain Mr. Scott prior to getting in your vehicle?

11       A.   No, that wouldn't make no sense to restrain

12   him.  I mean, he's just there filling out the stolen

13   vehicle affidavit sitting on the curb.  You don't have

14   to restrain a person for that.

15       Q.   Okay.  During your interactions with Mr.

16   Scott, was he rude to you at all?

17       A.   Negative.  He wasn't rude at all.

18       Q.   Would you describe his mannerisms or behavior

19   as polite?

20       A.   He was polite, but he did seem a little

21   nervous, but he was polite.

22       Q.   Okay.  At any point in your interaction, Mr.

23   Scott didn't attempt to strike you, did he?

24           MR. FERNANDEZ:  Object to form.

25           THE WITNESS:  No, he didn't attempt to strike

```
1          me.  I mean, he was just asking simple questions.

2          I mean, there was no need to for that.

3    BY MR. PIERRE:

4          Q.   So there was no physical opposition from Mr.

5    Scott at any point during your interactions with him on

6    June 1, 2018?

7              MR. FERNANDEZ:  Object to form.

8              THE WITNESS:  Yes, there was no bad behavior

9          or blood between he and I.  The guy was, you know,

10         he was just asking a simple question, and I gave

11         him the answers that he asked for and that was

12         pretty much it.

13   BY MR. PIERRE:

14         Q.   Okay.  Okay.  All right.  So how long are you

15   and Mr. Scott on the scene before any other units

16   arrive?

17         A.   It would have been about -- I mean, I don't

18   think it was more than 10 minutes, 15 minutes.  I don't

19   think it was that long.

20         Q.   All right.  So you guys are there -- you're

21   with Mr. Scott for about 10 to 15 minutes and then the

22   other units arrived, correct?

23         A.   Yeah.  Yes, that's correct.

24         Q.   Who was the first unit to arrive?

25         A.   I have no idea who the first one to arrive.
```

1    When I saw the units arrive, I saw pretty much all of

2    them at the same time.  I mean, it could have been one

3    came a little bit before.  I don't know.  Normally, when

4    the units arrive, they would arrive together, but I

5    can't really say who was first and who was second.  I

6    have no idea.

7         Q.   Okay.  Okay.  Do you recall who was the first

8    unit that actually spoke or the first officer that

9    actually spoke to you?

10        A.   I have no idea who was the first officer.

11        Q.   Okay.  When the units arrive, what happens

12   next?

13        A.   Once the units arrived, I saw the units with

14   their tasers, and they spoke to me in reference to Mr.

15   Scott, and I told them I was filling out -- I was

16   getting ready to validate the stolen vehicle affidavit.

17   They said okay, no problem, and they started talking to

18   him.

19        Q.   Okay.  At that time, did they inform you that

20   Mr. Scott had -- was the subject of their investigation?

21             MR. FERNANDEZ:  Object to form.

22             MS. WYDLER:  Join.

23             THE WITNESS:  I don't quite remember the

24        conversation, but I know it had something to do

25        with Mr. Scott.  I don't remember all the details.

1    BY MR. PIERRE:

2         Q.   Okay.  And since you were initially the

3    primary, did you turn over the investigation to the

4    other units?

5              MR. FERNANDEZ:  Object to form.

6              THE WITNESS:  I didn't actually turn it over.

7         They said they were going to speak to him in

8         reference to the investigation that was going on,

9         and they'll take it from there.  So I just gave

10        everything to them that I had.

11   BY MR. PIERRE:

12        Q.   Okay.  And do you know who was the primary

13   officer on the scene?

14        A.   I have no idea.  I mean, normally, the A-form

15   would tell you who the primary officer, whoever signs

16   the bottom, that's usually the primary officer.

17        Q.   Okay.  So the other units arrive on the scene.

18   Who approaches you while you're in your vehicle?

19        A.   I don't quite remember who it was, who

20   approached me.  I really don't know.

21        Q.   Do you know whether it was Officer Guzman who

22   approached you?

23        A.   I don't know.  I mean, it could have been, but

24   I'm not like 100 percent sure, but it could have been.

25        Q.   Do you know if it was Officer Carriel that

1    approached you?

2         MR. FERNANDEZ:  Object to form.

3         THE WITNESS:  Again, I really don't know.  It

4         could have been Carriel or it could have been

5         Guzman.  I really don't know.

6    BY MR. PIERRE:

7    Q.   Okay.  What happens after the officer approach

8    you?

9    A.   They asked me is this the gentleman, and I

10   said yeah, he's sitting behind my car -- I believe

11   behind my car still sitting on the curb, and they went

12   and approached him.

13   Q.   Okay.  At that time, did you know when they

14   said this is the gentleman, that he was the subject of

15   their investigation?

16        MR. FERNANDEZ:  Object to form.

17        THE WITNESS:  Again, I believe it was stated

18        to me that he was the subject of their

19        investigation because he was the only one there and

20        me, and so if they come to my location, yeah, he

21        would be the subject of the investigation because

22        there was no one else there.

23   BY MR. PIERRE:

24   Q.   Okay.  But did you inform them that he had

25   reported his vehicle stolen?

1          A.    I did.

2          Q.    Ad did you find it odd that he would have been

3     the subject of their investigation if he reported his

4     vehicle stolen?

5               MR. FERNANDEZ:  Object to form.

6               THE WITNESS:  Negative.  I don't find that

7          odd.  That happens all the time.

8     BY MR. PIERRE:

9          Q.    Okay.  So it happens all the time?

10              MR. FERNANDEZ:  Object to form.  Move to

11         strike the narrative.

12              Go ahead and answer.

13              THE WITNESS:  Quite a bit.  It happens quite a

14         bit.

15    BY MR. PIERRE:

16         Q.    So people are calling their vehicles stolen

17    when, in fact, it's not stolen?

18              MR. FERNANDEZ:  Object to form.

19    BY MR. PIERRE:

20         Q.    All the time?

21              MR. FERNANDEZ:  Hypothetical, go ahead.

22              MS. WYDLER:  Objection, form.

23              THE WITNESS:  It happens from time to time.

24         Oftentimes, they would report a vehicle stolen

25         that's not even their vehicle.  It's going to be

```
 1        their girlfriend's vehicle or mom's vehicle, dad's

 2        vehicle.  It's not even their vehicle.

 3            We tell them we can't do a report on something

 4        -- if it's not your vehicle, we can't do a report

 5        on that.  We have to talk to the actual owner of

 6        the vehicle, so it happens quite a bit.

 7   BY MR. PIERRE:

 8        Q.   Yeah, but in this situation, it was his

 9   vehicle, wasn't it?

10            MR. FERNANDEZ:  Object to form,

11        mischaracterizes testimony.  Go ahead.

12            THE WITNESS:  He stated it was his vehicle.  I

13        mean, the information came back to his vehicle.

14        That's it.  Him being the owner of the vehicle.

15   BY MR. PIERRE:

16        Q.   Okay.  So what I'm trying to get at is it

17   happens all the time that someone reports their vehicle

18   stolen --

19            MR. FERNANDEZ:  Object to form.

20   BY MR. PIERRE:

21        Q.   -- when, in fact, it has not been stolen?

22            MR. FERNANDEZ:  Object to form.

23            THE WITNESS:  Well, I don't quite understand

24        what you're asking, but you know, it happens.  It

25        happens.  I've been to plenty of calls where they
```

1        said a vehicle was stolen.  It wasn't stolen.  It

2        was repossessed, or it wasn't theirs.  So it

3        happens quite a bit.

4   BY MR. PIERRE:

5        Q.   Okay.  And then you file a false -- a charge

6   for filing false information -- I mean, false report,

7   correct?

8             MR. FERNANDEZ:  Object to form.

9             THE WITNESS:  That's negative.  It depends.

10       If they want to go through with a statement, yeah,

11       if that's they're vehicle -- it's not their

12       vehicle, then of course, it would -- you know, it

13       would be filing a false police report, but

14       oftentimes, they're like it's my aunt's vehicle or

15       it's my uncle's vehicle.  Yeah, it was repossessed.

16  BY MR. PIERRE:

17       Q.   Okay.  So you've testified you did not find it

18  odd that Mr. Samuel Scott had reported his vehicle

19  stolen and was the subject of the other unit's

20  investigation, correct?

21            MR. FERNANDEZ:  Object to form.

22            THE WITNESS:  I know this for sure that the

23       vehicle they had on the scene was the same vehicle

24       that was reported stolen by Mr. Scott.

25  BY MR. PIERRE:

1      Q.   Okay.  So do you know what location that

2   vehicle that was at the crash scene was at?

3      A.   That was before my shift came on.  I had no

4   idea where that vehicle was.

5      Q.   Okay.  So what happens -- were you present

6   when the other units were discussing with Mr. Scott in

7   reference to their investigation?

8          MR. FERNANDEZ:  Object to form.

9          THE WITNESS:  I wasn't present during their

10          investigation.  I mean, I was present but not

11          there, you know, in the conversation with them.

12   BY MR. PIERRE:

13      Q.   Did you have an idea that they were going to

14   arrest Mr. Scott?

15          MR. FERNANDEZ:  Object to form.

16          THE WITNESS:  Negative.  I had no idea they

17          were going to make an arrest.  I mean, you don't

18          know what the officer is going to do when they're

19          on the scene.  They have to finish the

20          investigation before they can, you know, come up

21          with a solution.  You can't just arrest somebody

22          just to arrest them.  You have to have PC.  You

23          can't just arrest them just to arrest them.

24   BY MR. PIERRE:

25      Q.   Did they notify you on the scene that Mr.

1    Scott had crashed his vehicle nearly two to two and a

2    half miles away?

3              MR. FERNANDEZ:  Object to form.

4              THE WITNESS:  They didn't notify me in

5         reference to that at all.

6    BY MR. PIERRE:

7         Q.   Okay.  What information did they give you to

8    suggest that they had probable cause to arrest Mr. Scott

9    of any crimes?

10             MR. FERNANDEZ:  Object to form.

11             THE WITNESS:  Well, I know when they left, it

12        was not an arrest.  They was just detaining Mr.

13        Scott until they finished their investigation.  I

14        know there was no arrest.  I never went back to the

15        station with them because that's a separate unit.

16        I just went back on patrol once they took over the

17        investigation.  I didn't know anything about an

18        arrest.

19   BY MR. PIERRE:

20        Q.   Okay.  So what I'm getting at is before we get

21   to the actual effectuating the arrest, I'm talking about

22   when the officers approach you while you're in your

23   vehicle, what did they say to you to lead you to believe

24   there was probable cause to arrest Mr. Scott for any

25   offense?

1           MR. FERNANDEZ:  Object to form.

2           THE WITNESS:  Again, it was on those officers,

3       you know, the decision that they made as it relates

4       to Mr. Scott.  It was that vehicle that was still

5       at the first scene that matched the description of

6       the vehicle that Mr. Scott was reporting stolen.

7           I mean, it's their decision on what -- you

8       know, I can't tell them, hey, you need to arrest

9       him.  No, it's your decision, and once they finish

10      their investigation, it's their decision on what

11      they do from there.  I can't tell them what they

12      can and cannot do.  It's the primary officer's

13      responsibility.

14  BY MR. PIERRE:

15      Q.   Okay.  And Mr. Scott -- okay.  I understand

16  it's their decision.  What I'm trying to focus on is at

17  the time when you were in your car and you're approached

18  by the police officers, what information did they

19  disclose to you about their investigation?

20          MR. FERNANDEZ:  Object to form.

21          THE WITNESS:  They're just stating to me that

22      it's a possibility that this is the guy that got

23      out of the perimeter, but they're going to conduct

24      their investigation to make sure it's the right

25      person.

1   BY MR. PIERRE:

2        Q.   Did they give you any descriptors as to what

3   the guy looked like that got out of their perimeter?

4             MS. WYDLER:  Objection, form.

5             THE WITNESS:  I don't recall that.  I mean,

6        they may have, but I just don't recall it.

7   BY MR. PIERRE:

8        Q.   Okay.  Do you recall them saying it was a

9   black male, heavyset with a white tank top on and blue

10  jeans?

11            MR. FERNANDEZ:  Object to form.

12            MS. WYDLER:  Join.

13            THE WITNESS:  I do recall that, but I don't

14       remember who actually said it, but I do recall

15       that.

16  BY MR. PIERRE:

17       Q.   Okay.  And when do you recall that being said?

18       A.   After I looked at the video.

19       Q.   Oh, okay.  So you don't have an independent

20  recollection of when that was said to you.

21            MR. FERNANDEZ:  Object to form.

22            THE WITNESS:  I do not.

23  BY MR. PIERRE:

24       Q.   So your entire information based off of the

25  descriptor that was given was based off of your review

1    of the body-worn cameras, correct?

2              MR. FERNANDEZ:  Object to form.

3              MS. WYDLER:  Objection, form.

4              THE WITNESS:  That's part of it.  I mean, the

5         vehicle itself that was on the scene was the same

6         vehicle that was reported by Mr. Scott as being

7         stolen.

8    BY MR. PIERRE:

9         Q.  I don't think there's any dispute about the

10   fact that Mr. Scott reported his vehicle stolen, and the

11   vehicle that was at the crash scene was his vehicle that

12   he reported stolen.

13             My question is what information, apart from

14   what you learned after the fact, did the officers

15   disclose to you regarding the identity of the individual

16   that crashed Mr. Scott's vehicle?

17             MR. FERNANDEZ:  Object to form.

18             MS. WYDLER:  Join.

19             THE WITNESS:  I don't really recall.  I mean,

20        it could have been said.  Again, that's five years

21        ago.  I don't quite remember every little detail.

22   BY MR. PIERRE:

23        Q.  Okay.  So you don't recall if they actually

24   told you anything about who crashed Mr. Scott's vehicle,

25   correct?

1          MR. FERNANDEZ:  Object to form.

2          MS. WYDLER:  Join.

3          THE WITNESS:  I don't recall what they said.

4     I know they said something to me.  I don't recall

5     what it was because it's been so long ago.  I don't

6     recall who said it to me, but I'm sure they said

7     something.

8          They're not going to come on the scene and not

9     say anything to the primary officer at the time.

10    They've got to explain to you why they're there, so

11    I'm sure something was said.  I just don't recall

12    what it was.

13  BY MR. PIERRE:

14    Q.  Was the information that you said that led you

15  to believe that Mr. Scott was the individual who crashed

16  his vehicle nearly two to two and a half miles away?

17         MR. FERNANDEZ:  Object to form.

18         THE WITNESS:  It could have been.

19  BY MR. PIERRE:

20    Q.  Okay.  Now, we're getting somewhere, Officer,

21  but what I'm really trying to figure out is because we

22  really need to know what you knew at the time, and all I

23  have right now is it could have been.

24         MR. FERNANDEZ:  Object to form.

25  BY MR. PIERRE:

1      Q.   What did you know on June 1, 2018, from the

2  officers when they arrived on the scene?

3      A.   Again, it's been a long time.  I know they

4  said something to me.  I just don't recall exactly what

5  it was related to Mr. Scott.  Again, they would not come

6  there and not say anything to me if it didn't have any

7  type of relevance to Mr. Scott or whoever may have been

8  on the scene at the time.

9      Q.   Okay.  Your first interaction with Officer

10  Carriel, Guzman, and Patricia Carriel was when they

11  arrived on that scene on June 1, 2018, correct?

12          MR. FERNANDEZ:  Object to form.

13          MS. WYDLER:  Join.

14          THE WITNESS:  Well, the female Carriel was in

15      the academy with me like a couple classes behind me

16      or a couple classes ahead of me.  I'm not really

17      sure, but the other ones, I used to see them in

18      passing.  They work a special unit.  They work

19      upstairs.  They don't come in roll call with us.

20      They don't anything that patrol does.  They have

21      their own little entity, so I see them in passing,

22      and of course, I'm going to speak.  I speak to

23      anyone, any officer in uniform or any officer in

24      the building.  It doesn't matter.  I'll speak and

25      keep walking, keep going, but I never had any

1        interaction with them.

2    BY MR. PIERRE:

3        Q.   Okay.   That's what I'm getting at.   Prior to

4    June 1, 2018, you didn't have any interaction with

5    Officer Guzman and Officer Randy Carriel besides the

6    polite saying of hi and bye, correct?

7            MR. FERNANDEZ:  Object to form.

8            THE WITNESS:  That's correct.  That's it.

9    BY MR. PIERRE:

10       Q.   Okay.   So this is the first time you actually

11   have meaningful conversation with Randy Carriel and

12   Officer Guzman.  What did they tell you regarding that

13   conversation?

14           MR. FERNANDEZ:  Object to form.

15           THE WITNESS:  Again, I don't remember the

16       conversation, but I know it had something to do

17       with Mr. Scott.

18   BY MR. PIERRE:

19       Q.   Okay.   And they told you we're about to arrest

20   him, correct?

21           MR. FERNANDEZ:  Object to form.

22           THE WITNESS:  Negative.  They never said

23       anything about arresting anyone.  They never said

24       that.

25   BY MR. PIERRE:

1      Q.   Okay.  They said we have our guy, Mr. Scott,

2   because he's a black male, bald headed, wearing a white

3   tank top and blue jeans, correct?

4           MR. FERNANDEZ:  Object to form.

5           THE WITNESS:  They never said that.

6   BY MR. PIERRE:

7      Q.   Okay.  They said, hey, we have enough to

8   arrest Mr. Scott because he stole his vehicle nearly two

9   and a half miles away, correct?

10          MR. FERNANDEZ:  Object to form.

11          MS. WYDLER:  Join.

12          THE WITNESS:  Negative.  They never said that.

13          They never said anything about arresting --

14          detaining him and taking him to the station to

15          finish the investigation.  They never said anything

16          about arresting.  They never said that.

17   BY MR. PIERRE:

18     Q.   Okay.  So at this point, when they actually

19   speak to you, you don't believe that Mr. Scott is the

20   subject of any investigation, correct?

21          MS. WYDLER:  Objection, form.

22          THE WITNESS:  That's incorrect.  I mean, they

23          are, you know -- if that vehicle met the same

24          description of the vehicle that was being reported,

25          of course, I'm going to have some type of -- I'm

```
1        going to think maybe there's something here.  I

2        can't just dismiss it as, okay, it's nothing.  I

3        just can't do that.

4   BY MR. PIERRE:

5        Q.  Why didn't you effectuate an arrest on Mr.

6   Scott once you switched over to the channel?

7             MR. FERNANDEZ:  Object to form.

8             THE WITNESS:  Because it was not my call.  My

9        call was to -- it was a 22, a stolen vehicle, and

10       that was why I called.  I had absolutely no reason

11       to arrest him.

12  BY MR. PIERRE:

13       Q.  And why didn't you have any reason to arrest

14  Mr. Scott?

15            MR. FERNANDEZ:  Object to form.

16            MS. WYDLER:  Join.

17            THE WITNESS:  Because I was just there to do

18       the recovery -- not recovery, the initial report

19       for the stolen vehicle.  That's all the information

20       that I had.  I can't arrest someone just because

21       they're reporting their vehicle stolen.  I can't do

22       that.

23  BY MR. PIERRE:

24       Q.  Yeah, that would be silly, wouldn't it?

25            MR. FERNANDEZ:  Object to form.
```

1            THE WITNESS:  That's for sure.

2    BY MR. PIERRE:

3        Q.   What did you say?  I didn't hear you.

4        A.   I said that wouldn't make any sense to me to

5    arrest someone for reporting their vehicle being stolen.

6    I mean, where is the PC?  You've got to have PC.  You

7    can't just arrest someone just to arrest them.

8        Q.   Okay.  So eventually, Mr. Scott is no longer

9    the victim but becomes he defendant in this report of a

10   stolen vehicle.  When did that happen?

11           MR. FERNANDEZ:  Object to form.

12           MS. WYDLER:  Join.

13           THE WITNESS:  Again, I don't know when that

14           happened because I wasn't at the station.  Once

15           they left, I went back on calls for service.  I

16           have no idea when that happened.

17   BY MR. PIERRE:

18       Q.   Okay.  Did they notify you as to why he became

19   the subject of the investigation as opposed to being the

20   victim of the investigation?

21           MR. FERNANDEZ:  Object to form.

22           THE WITNESS:  Negative.  That was never

23           relayed to me why.

24   BY MR. PIERRE:

25       Q.   Okay.  So you did review the video, correct?

1              MR. FERNANDEZ:  Object to form.

2              THE WITNESS:  Yes, I did.

3    BY MR. PIERRE:

4         Q.   And you were -- oh, before I get to that,

5    there is this issue about a perimeter.  How did you know

6    a perimeter was set up?

7         A.   When you're in roll call, they always explain

8    to you what's going on from the previous shift.  That's

9    always, so whatever happened that night, that's what

10   roll call is all about, information so that you know

11   what's out there.

12        Q.   So you received notification of the perimeter

13   at roll call, correct?

14             MS. WYDLER:  Objection, form.

15             THE WITNESS:  It wasn't notification.  I mean,

16        it's just information that they put out.  Any time

17        something is going on, they will put out if a

18        perimeter exists, perimeter at whatever the

19        location may be.  You need to go and relieve their

20        shift, and they'll tell you what location to go to.

21        That's pretty much it.  I mean, anything that

22        happens, they have to put it out in roll call.  You

23        don't want to go out there blindly and don't know

24        what's going on.

25   BY MR. PIERRE:

1      Q.   And my question is a bit more specific than

2    that.  In roll call, were you told that there was a

3    perimeter as it relates to the stolen vehicle of Mr.

4    Scott?

5      A.   Well, in roll call, they don't get that in

6    depth in the details.  They just say we have a perimeter

7    set up at wherever the location may be, and that's

8    pretty much it.  If they need somebody to relieve units,

9    they'll tell the units to relieve whomever it may be

10   because they're getting ready to go home or whatever the

11   case may be, and that's pretty much it.

12         You don't need everybody in the roll call to

13   go to the perimeters.  You may need maybe three or four

14   people, and that's pretty much it.  They'll get one for

15   each area, and have them relieve those units and you

16   just go there and take over their responsibility until

17   the supervisor calls it off.

18     Q.   Okay.  What I'm getting at is did you learn

19   that a perimeter, as it relates to Mr. Scott's stolen

20   vehicle, was set up at roll call?

21         MR. FERNANDEZ:  Object to form.

22         THE WITNESS:  Yes.  They didn't say anything

23         about a stolen vehicle.  The only thing they talked

24         about is the perimeter.  Once you get to the

25         perimeter or wherever you're going, they'll explain

1        to you what you have.  They don't get into all the

2        details.

3   BY MR. PIERRE:

4        Q.   Okay.  And how did you know a perimeter was

5   set up --

6             MR. FERNANDEZ:  Object to form.

7   BY MR. PIERRE:

8        Q.   -- for the suspect that fled Mr. Scott's

9   stolen vehicle?

10       A.   Again, in roll call, they're not going to say

11  Mr. Scott or Ms. Sam or whoever it may be.  They're just

12  going to say around -- once you get there, whoever is

13  going to be there, then you would find out the details

14  on what you have by the supervisor that's on the scene.

15            So roll call is just pretty much they're going

16  to tell you what we have.  They're not going to get into

17  the details, and once you get there, the supervisor

18  that's on scene will explain to you -- he or she will

19  explain to you what you have.

20       Q.   Okay.  And did you ever get to the perimeter?

21       A.   Negative.  I never made it to the perimeter.

22       Q.   Okay.  So how did you know that there was a

23  perimeter that was even set up?

24            MR. FERNANDEZ:  Object to form.  You can

25       answer.

```
 1          THE WITNESS:  Again, they explain in the roll

 2      call.  Everyone that's in the roll call is going to

 3      get the same information.

 4  BY MR. PIERRE:

 5      Q.  Okay.

 6      A.  If you have to go to the perimeter, then

 7  whoever the supervisor is there, they're going to

 8  explain to you in detail what you have.  They don't have

 9  all the details.  They just know it's a perimeter and

10  they need three officers, four officers, five, whatever

11  it may be.

12      Q.  And when was your shift?  What time did it

13  start?

14      A.  1400, two o'clock.

15      Q.  All right.  Two o'clock.  Okay.  So once the

16  officers exist or leave you in the vehicle and they

17  approach Mr. Scott, what do you do next?

18      A.  Well, I'm going to standby to assist them in

19  whatever it is they need.

20      Q.  And specifically, what did you assist?  How

21  did you assist?

22      A.  Any time an officer is on the scene, whatever

23  the case may be, situational awareness, you're going to

24  be there assisting them on whatever they need.

25      Q.  What I'm getting at is how did you assist
```

1   these officers?

2       A.   Again, I was just there at the scene standing

3   by until I get further instructions on what the primary

4   -- now, they become the primary officer, so whatever

5   they need, I'm going to assist them.

6       Q.   Okay.  And did you pat Mr. Scott down?

7       A.   Yes, I'm sure I did pat him down.  I'm always

8   patting you down.  If I know that you're going to get in

9   my car, as far as officer safety, even though the

10  officer may have pat him down, I'm going to pat you down

11  again.  I don't put anyone in my car without patting

12  them down.

13      Q.   Did Mr. Scott go in your car?

14      A.   No, he did not.  They said -- I thought he

15  was, but they said no, they was going to go usher the

16  car he went to, but they said no, we're not going to put

17  him in your car because we're going to go to the

18  station.  I'm not sure who's car he went in, but it

19  wasn't my car.

20      Q.   Was Mr. Scott's hand on your car?

21          MR. FERNANDEZ:  Object to form.

22          THE WITNESS:  Yes, his hands was on my car

23      because, you know, they had to take everything out

24      of his pockets, so of course, they're going to tell

25      you put your hands on the car.

1   BY MR. PIERRE:

2       Q.   Okay.  So once you searched Mr. Scott, what

3   happens next?

4       A.   I just standby and wait and see what the

5   primary -- now, they're primary, so I can't go -- I'm

6   not primary anymore so I have to wait until they give me

7   instructions on what they need from me.

8       Q.   Okay.  I get that they're primary, right, but

9   at any point, did it cross your mind that an

10  unconstitutional arrest is happening?

11          MR. FERNANDEZ:  Object to form.

12          MS. WYDLER:  Objection, form.

13          THE WITNESS:  Negative.  I mean, you can

14      detain someone until you finish your investigation.

15      If you're going to make an arrest, if you want to

16      say arrest, of course, you know, you've got

17      probable cause for the arrest.  You're not going to

18      arrest unless you're 100 percent sure that it's

19      arrestable.

20          You can detain them.  You can detain them to

21      further your investigation -- to complete your

22      investigation.

23  BY MR. PIERRE:

24      Q.   Okay.  So once -- so they -- so Mr. Scott was

25  just being detained at this point.

```
 1              MR. FERNANDEZ:  Object to form.

 2              THE WITNESS:  Yes.

 3    BY MR. PIERRE:

 4       Q.   For what reason did you know that he was being

 5    detained?

 6              MR. FERNANDEZ:  Object to form.

 7              THE WITNESS:  He was being detained just for

 8         the investigation because of the vehicle that was

 9         at the scene at the perimeter matches the vehicle

10         description that he was given as the stolen

11         vehicle.  So that is probable cause to find out

12         what's going on.

13    BY MR. PIERRE:

14       Q.   Okay.  Do you remember I was telling you about

15    the whole issue about probable cause, reasonable

16    suspicion, and what you learned in the police academy?

17       A.   Yes.

18       Q.   Okay.  If you can educate me as well as the

19    jury, there is about three categories of police/citizen

20    encounters, correct?

21              MR. FERNANDEZ:  Object to form.

22              THE WITNESS:  They're probably -- I mean,

23         offhand, I can't really say how many it is, but

24         yeah, it's -- normally, I just go to my statute

25         book and read up on something if I'm not really
```

```
 1          sure about it, and then I'll make a decision from

 2          there because you can't remember everything that

 3          you learned.  You just can't.

 4     BY MR. PIERRE:

 5          Q.   Okay.  Follow me.  Follow me.  So the first

 6     category is a consensual encounter, correct?

 7               MR. FERNANDEZ:  Object to form.

 8               THE WITNESS:  Again, you know, there are many

 9          categories.  I just don't recall them.  I just

10          can't say, yes, that's the first one or no, that's

11          not the first one.  I just don't, you know,

12          remember that like that.  I just can't recall it.

13          I can't.

14     BY MR. PIERRE:

15          Q.   Okay.  You're a police officer, correct?

16               MR. FERNANDEZ:  Object to form.

17               THE WITNESS:  I am.

18     BY MR. PIERRE:

19          Q.   You are also a training officer, correct?

20          A.   I am.

21          Q.   Okay.  When you encounter citizens, you are

22     able to seize a citizen on the basis of what?

23               MR. FERNANDEZ:  Object to form.

24               THE WITNESS:  Well, again, it depends.  I

25          mean, if you have PC, probable cause, when you see
```

1          something, you know, something stuck in their

2          waistband, their shirt is sticking out, of course,

3          you can, you know, approach them and detain them to

4          find out exactly what's going on.

5     BY MR. PIERRE:

6          Q.   Okay.  So you can arrest someone if there's

7     probable cause to believe that a crime has been

8     committed or was committed or was in the process of or

9     has been committed actually, correct?

10         A.   Yes, you can.

11         Q.   Okay.  So you can put the handcuffs on them.

12    You can put them in the patrol car.  You can take them

13    down to the station.  You can book them and put them in

14    jail and let the judge deal with them.  Is that an

15    accurate assessment of the seizure that takes place in

16    that case?

17              MR. FERNANDEZ:  Object to form.

18              THE WITNESS:  Somewhat but you still want to

19         do the investigation.  You don't just -- I mean,

20         just because you see something doesn't necessarily

21         mean it's what you think it may be.  So you still

22         have to do the investigation.  You ask questions

23         related to what you see, and once the person that

24         you have detained explains -- you know, a lot of

25         times, they can explain why things are what it is,

1        and then you find out later, hey, you don't have

2        anything.

3             So you can detain them until you're 100

4        percent sure that, hey, this is arrestable.  If

5        it's not, you just let them go.

6    BY MR. PIERRE:

7        Q.   Okay.  That's the category beneath the

8    probable cause to arrest.  It's that reasonable

9    suspicion where you basically detain someone based off

10   of specific applicable facts to suggest that a crime

11   had, is in the process, or will be committed, correct?

12       A.   Yeah, that's correct, yes.

13       Q.   So you don't really necessarily have to know

14   that a crime's been committed.  You're just trying to

15   confirm or dispel your suspicions as it relates to your

16   investigation, correct?

17            MR. FERNANDEZ:  Object to form.

18            THE WITNESS:  That's correct.

19   BY MR. PIERRE:

20       Q.   So in this case, if someone is being detained

21   as Mr. Scott is being detained, there's no real belief

22   that a crime has or hasn't been committed.  You're just

23   trying to make sure that the person being detained isn't

24   involved in this criminal activity, correct?

25            MS. WYDLER:  Objection, form.

```
 1              THE WITNESS:  I agree, yes.

 2   BY MR. PIERRE:

 3      Q.   Okay.  And then there's that third category

 4   that I was talking about earlier but we had to work our

 5   way backwards.  It's that consensual encounter.

 6   Basically, I'm a citizen.  You're a police officer.  I

 7   come up to you.  I'm like, hey, how's it going.  What's

 8   your day?  And then I can leave and you can't tell me

 9   anything, right?  Is that --

10              MR. FERNANDEZ:  Object to form.

11              THE WITNESS:  That's correct.

12   BY MR. PIERRE:

13      Q.   So at some point, Mr. Scott was in all three

14   categories, was he not, based off of your understanding

15   of the facts?

16              MR. FERNANDEZ:  Object to form.

17              MS. WYDLER:  Join.

18              THE WITNESS:  I disagree he was in all three

19        categories.  I disagree with that.

20   BY MR. PIERRE:

21      Q.   Okay.  Let's go through it, Officer.  The

22   first category, the consensual encounter, he calls the

23   police and asks for help for a stolen vehicle.  You

24   testified he wasn't detained prior to any arrival of the

25   other units, correct?
```

```
 1              MR. FERNANDEZ:  Object to form.

 2              THE WITNESS:  That's correct.  There was no

 3          reason to detain him.  I mean, he's the one who was

 4          making a report.

 5  BY MR. PIERRE:

 6     Q.    The other police officers get on the scene.

 7  He now becomes subject of the investigation, and they

 8  detain him to confirm whether he, in fact, is the

 9  individual that stole his own vehicle, correct?

10              MR. FERNANDEZ:  Object to form.

11              MS. WYDLER:  Join.

12              THE WITNESS:  Yes, that's correct.  It's their

13          decision on the information that they have.  The

14          information they have -- I don't have all the

15          information they have, so that's totally up to them

16          on what they do.

17  BY MR. PIERRE:

18     Q.    Okay.  So then there's that last category

19  where there was PC for arrest.  Mr. Scott gets

20  handcuffed, gets taken to the station, and then gets

21  prosecuted for the charges that were filed against him

22  based off of the investigation.  Do you agree with me?

23              MR. FERNANDEZ:  Object to form.

24              THE WITNESS:  Yes, I do.

25  BY MR. PIERRE:
```

1      Q.   Okay.  So we now come back to the scene.  At

2  any point, did you believe while Mr. Scott was in your

3  presence after you frisked him, after you searched him,

4  that he was the subject of a criminal investigation?

5      A.   So you're asking me did I feel that he was the

6  subject of the investigation once he was frisked.  Is

7  that what you're asking me?

8      Q.   Yes.

9      A.   I did.

10      Q.   Okay.  And what was your basis for frisking

11  him?

12      A.   Well, now, that was -- frisking and pat downs

13  is the same thing, so I want to make sure we're clear on

14  that.  Officer safety, any time someone is going to be

15  detained, we're going to always pat him down or frisk,

16  which is the same thing.  We're going to always do that.

17  That's just for officer safety.

18           You know, he wasn't under arrest.  He was just

19  being detained.  So any time someone is going to be

20  detained, we're going to pat them down.

21      Q.   Okay.

22      A.   We're not going to put them in a vehicle

23  without patting them down because we don't know what you

24  have on you, so that's just standard.  That's just SOB.

25      Q.   Okay.  And then at any point, did you think he

1    was going to be arrested based off of the information

2    known to you at that time?

3              MR. FERNANDEZ:  Object to form.

4              THE WITNESS:  I can't really answer.  I can't

5         really answer that because, again, it's the primary

6         officer's -- I mean, it's what they see.  It's not

7         what I think.  I mean, if that's the case, you

8         know, I mean, if you have to go by what you think

9         -- you just can't do that.  You have to go by the

10        physical evidence if any of it's present and the

11        probable cause.

12   BY MR. PIERRE:

13        Q.   Okay.

14        A.   That's what you have to go by before you can

15   make that arrest, so I don't know what their -- you

16   know, they probably had more knowledge than I did.  I

17   wasn't at the first scene.  They were.  So I don't have

18   all the information they had, so whatever they did, you

19   know, that's something that, you know, that they felt

20   was necessary.

21        Q.   Did the officers tell you that Mr. Scott was

22   at the first scene?

23              MR. FERNANDEZ:  Object to form.

24              THE WITNESS:  They told me that he meets the

25         description of the person that got out of the

1        perimeter.

2    BY MR. PIERRE:

3        Q.   Okay.  So meeting the description he is a

4    black male with a white tank top and bald?

5            MR. FERNANDEZ:  Object to form, asked and

6        answered.

7            THE WITNESS:  Okay.  So, again, they were

8        there.  I was not there.  They may have had more

9        information -- well, I didn't have any information

10       other than the car was being stolen.  It was

11       stolen.

12           But they were there.  They had better

13       information than I did, so I mean, whatever the

14       decision was, it's their decision.  I wasn't there,

15       so I can't -- you know, I can't really speak for

16       them.

17   BY MR. PIERRE:

18       Q.   Okay.  So Officer Bloom, if another officer

19   tells you, hey, this guy fits the profile of a person

20   who may or may not have committed a crime such as a

21   black male with a white tank top and wearing blue jeans

22   and bald head.  Would you arrest him solely based off of

23   that description?

24           MR. FERNANDEZ:  Object to form.

25           MS. WYDLER:  Join.

```
 1                THE WITNESS:  Again, that's up to that
 2         primary.  I wasn't -- you know, you're saying
 3         someone is telling me this, so if they're telling
 4         me that, that means they're the primary officer.
 5         So it's their decision on what they do.  They have
 6         the information, so whatever decision they make is
 7         their decision.  I can't just say, okay, I'm going
 8         to take primary.  I'm going to arrest.
 9                No, I don't even have the information.  If you
10         have the information -- if you're asking me -- you
11         know, the officer is asking me what do I think, I'm
12         going to say what I think you need to dig in a
13         little deeper, go a little bit deeper with your
14         investigation and find out, and then you go from
15         there.
16                I'm not going to just take over your
17         investigation if you feel this person, you know,
18         robbed whoever.  No, I'm not going to do that.
19         That's your responsibility.  I'm going to be there,
20         situation awareness, to make sure I back this
21         officer up, but I'm not going to take over the
22         investigation because I don't know anything about
23         it.
24    BY MR. PIERRE:
25         Q.   Okay.  So what I'm saying is this.  When you
```

1   receive calls and they give you a BOLO of a black male,

2   bald head, heavyset with a white tank top, is that

3   enough to arrest a person?

4           MR. FERNANDEZ:  Object to form.  Go ahead.

5           THE WITNESS:  No, it's not enough to arrest a

6       person, I mean, because you can have someone that

7       fits that description.

8           Oftentimes, when you have complainants

9       describing someone, it's not 100 percent.  They

10      would probably say a black male with a white shirt

11      and you see a black male with a black shirt.  I

12      mean, how do you know if they changed clothes or

13      not?  You don't know that, so no, that's not enough

14      information to arrest a person, but it's enough

15      information to detain them until you further your

16      investigation.

17  BY MR. PIERRE:

18      Q.   Okay.  I completely agree with you, but would

19  you effectuate an arrest on an individual based off of

20  that BOLO simply because the individual says or the

21  police officer says there's a black male wearing a white

22  tank top, bald head, heavyset?

23          MR. FERNANDEZ:  Object to form.

24          THE WITNESS:  Well, I mean, I would not;

25      however, I would detain them and just, you know, we

1          can just have the victim, you know, come by in the

2          police vehicle and just have them sit in front of

3          my vehicle.  If he or she, whoever the victim is,

4          they said that's him, then of course, now we have

5          enough, but we're not going to arrest just to

6          arrest.  We just don't do that.  That's just not

7          what we do.

8    BY MR. PIERRE:

9          Q.   And if the only eyewitness is a police officer

10   who says I see that it's a black male exiting --

11   actually, strike that.  Let me introduce an exhibit.

12          MR. PIERRE:  Madam Court Reporter, we're going

13          to identify this as Plaintiff's Exhibit 1.

14          (Thereupon, Plaintiff's Exhibit 1 was marked

15          for identification.)

16   BY MR. PIERRE:

17         Q.   Officer Bloom?

18         A.   Yes?

19         Q.   Have you reviewed the arrest affidavit?

20         A.   No, I never looked at the A-form.

21         Q.   Okay.

22         MR. FERNANDEZ:  I gave him a copy of it.

23         MR. PIERRE:  That's good.  I'm going to see if

24         I can -- okay.

25   BY MR. PIERRE:

1       Q.   On Plaintiff's Exhibit 1, I'll turn your

2   attention to Page 2.  Down where he collided with

3   another vehicle, the driver exits the vehicle and fled

4   the scene of the accident on foot.  As he fled, I

5   observed a black male, bald, about six-two, heavyset

6   with a white tank top running away from the scene.

7            Is that enough to arrest Samuel Scott for the

8   crimes that are alleged to be committed?

9            MR. FERNANDEZ:  Object to form.

10           MS. WYDLER:  Objection, form.

11  BY MR. PIERRE:

12      Q.   In this arrest affidavit?

13           MS. WYDLER:  Form.

14           THE WITNESS:  Just that statement that you're

15       showing me here, that's not enough, but that is

16       probable cause, but it's not enough.

17  BY MR. PIERRE:

18      Q.   I mean, arrest versus detain.  I get it you

19  can detain someone.  I think I would disagree, but let's

20  just say to actually arrest someone, is that enough to

21  take them to jail?

22           MR. FERNANDEZ:  Object to form.

23           THE WITNESS:  No, that's not enough to take

24       them to jail.

25  BY MR. PIERRE:

1      Q.   And why wouldn't this description be enough to

2   take the individual to jail?

3           MR. FERNANDEZ:  Object to form.

4           THE WITNESS:  Because that can be -- I mean,

5        you could have several people that's six-two with a

6        white tank top on, and it's summertime in South

7        Florida.  I mean, that could be anyone.

8   BY MR. PIERRE:

9      Q.   Okay.  How tall are you, Officer?

10     A.   I'm six-two.

11     Q.   This is perfect.  Are you -- I know you say

12   you're a brown male.  Are you a male?

13          MR. FERNANDEZ:  Object to form.

14          THE WITNESS:  Yes, I'm a male.

15   BY MR. PIERRE:

16     Q.   Are you, as the BOLO descriptions would

17   describe it, not what you would describe yourself, would

18   you be a black male?

19          MR. FERNANDEZ:  Object to form.

20          MS. WYDLER:  Join.

21          THE WITNESS:  Well, I consider myself brown,

22       so of course, they would say yes, I'm a black male.

23   BY MR. PIERRE:

24     Q.   Okay.  And I understand that.  Would you

25   consider yourself a heavyset black male about six-two?

1              MR. FERNANDEZ:  Object to form.

2              THE WITNESS:  I wouldn't consider myself that.

3        I don't think any male would consider themselves

4        heavy because everybody considers themselves

5        physically fit, but no.

6   BY MR. PIERRE:

7        Q.   You look physically fit from the top up.

8        A.   I am physically fit.  It's just something I've

9   always cared.

10       Q.   Okay.  And do you often wear white tank tops

11  beneath your clothes?

12             MR. FERNANDEZ:  Object to form.

13             MS. WYDLER:  Join.

14             THE WITNESS:  I do.  I do wear white tank

15       tops.

16  BY MR. PIERRE:

17       Q.   I mean, this kind of fits you, Officer,

18  besides being bald.  Oh, it says bold.  I think you're

19  bold.

20             MS. WYDLER:  Objection, form.

21             THE WITNESS:  I'm not bald, but when I do wear

22       tank tops, you would never see it.  I don't wear a

23       tank top by itself.

24  BY MR. PIERRE:

25       Q.   Okay.  So after you frisk and search Mr.

1    Scott, what happens next?

2         A.    The officer -- I'm not sure which officer it

3    was -- they take him and put him in their vehicle.

4         Q.    Okay.  You don't recall which officer it was?

5         A.    I'm not 100 percent sure, but I think it was

6    Officer Hernandez because he has an SUV -- well, at that

7    time, he had an SUV.

8         Q.    Okay.  And then what happens next?

9         A.    I have no idea what happened after that.

10        Q.    And then you go about your day?

11        A.    Negative.  I was standing by until they

12   finished everything they had to do, and I know I was the

13   last unit to leave after they left.

14        Q.    Okay.  And did you -- do you know what charges

15   Samuel Scott was charged with?

16        A.    Well, I'm looking at the A-form now.  I didn't

17   know at the time.  I'm looking at the A-form now.  Yes,

18   I know what the charges are, but at the time, I didn't

19   know.

20        Q.    And one of those charges was filing a false

21   report.  Do you see that?

22        A.    Oh, yes, I do.  Number 2, yes.  Okay.

23        Q.    Okay.  And you had something to do with that,

24   correct?

25             MR. FERNANDEZ:  Object to form.

1          THE WITNESS:  That's negative.  I didn't have

2       anything to do with that.

3   BY MR. PIERRE:

4       Q.   Did you provide Mr. Scott a report, a stolen

5   vehicle affidavit report?

6       A.   Yes, but the stolen vehicle affidavit is not a

7   report.  It's just a form I gave to him, the stolen

8   vehicle affidavit, to fill out, and then I sign off on

9   it, and then it goes with the 22 report, but I never did

10  a 22 report.

11      Q.   Did anyone do a 22 report?

12      A.   I don't think a 22 report was done.

13      Q.   So a 22 report wasn't done.  We have no idea

14  where the stolen affidavit form is at.  Is there any

15  other documents that should have been?

16          MS. WYDLER:  Objection, form.

17          THE WITNESS:  No, that's just the stolen

18       vehicle affidavit, but I turned everything over to

19       the other units.

20  BY MR. PIERRE:

21      Q.   Okay.  Once Mr. Scott is placed in the

22  vehicle, you provide all the documents to whom?

23      A.   That I don't know.  It was only one document.

24  There was only one document to do, and that was the

25  stolen vehicle affidavit.  That was the only document

1   that I had.  There was no other document.

2        Q.   Who did you give that to?

3        A.   I don't have any idea who I gave it to.

4        Q.   Regarding the arrest affidavit, it says that

5   the crash occurred on 71st and about Northwest 5th

6   Avenue -- Northwest 5th Court, correct?  Do you see

7   that?  If you begin with on the 7th -- Northwest Avenue

8   down to Page 2.

9        A.   Yeah.  I see the --

10        Q.   It says --

11        A.   5th Avenue.  I don't see where -- that's on

12   Page 2?  I don't see that.

13        Q.   No, Page 1, if you begin with on Northwest 7th

14   Avenue and Northwest 70 -- the street.  It's been a long

15   night.  He failed to stop at a red city device.  The

16   vehicle then made a left turn on Northwest 5th Court

17   northbound where he collided with another vehicle.  The

18   driver exits.  Based off of that description, the crash

19   occurred on 71st Street?

20        A.   And 10tn Avenue.

21        Q.   And 5th Court.  Would you agree with me on

22   that?

23             MR. FERNANDEZ:  Object to form.

24             THE WITNESS:  I agree, yes.  On 5th Court,

25        yes.

1   BY MR. PIERRE:

2       Q.   Okay.  How far is that from 563 Northwest 48th

3   Street?

4            MR. FERNANDEZ:  Object to form.

5            THE WITNESS:  I'm not really sure, but it's

6       about seven miles.

7   BY MR. PIERRE:

8       Q.   Seven miles?

9       A.   71st -- from 71st to 48, that's about seven

10  miles.  It's not really that far away.

11      Q.   How long does it take to run seven miles?

12           MR. FERNANDEZ:  Object to form.

13           MS. WYDLER:  Join.

14           THE WITNESS:  I don't know.  I mean, I only

15      run three miles, so I couldn't tell you how far

16      seven miles.  I mean, it depends.

17  BY MR. PIERRE:

18      Q.   How long does it take to run three miles?

19           MR. FERNANDEZ:  Object to form.

20           THE WITNESS:  Well, I can run -- now, I mean,

21      back in the day, I could run it a lot faster, but

22      now, I can run three miles, you know, I can do it

23      in about 21 minutes.

24  BY MR. PIERRE:

25      Q.   Twenty-one?

```
 1        A.   Yeah.

 2        Q.   Okay.  Back in the day, when you were at your

 3   fittest, correct?

 4        A.   Yes.

 5        Q.   And about two miles, I'm assuming would be

 6   minutes, correct?

 7             MR. FERNANDEZ:  Object to form.  Object to

 8        form.  Go ahead.

 9             THE WITNESS:  When I was in the military, I

10        ran two miles in less than six minutes.

11   BY MR. PIERRE:

12        Q.   Wow, so you were running three-minute miles?

13        A.   Yeah, back then I could, yeah.  I was 18, 19.

14   Of course, I could do it.

15        Q.   Okay.  When you met Mr. Scott, was he in

16   better physical shape than you were?

17             MR. FERNANDEZ:  Object to form.

18             MS. WYDLER:  Join.

19             THE WITNESS:  I mean, a man would never say

20        another man is in better shape.  He would never do

21        that, but I mean, if you want -- you know,

22        hypothetically speaking, you know, I would say

23        absolutely not.  Even if he was, I would say

24        absolutely not or she or whoever it may be.

25   BY MR. PIERRE:
```

```
 1         Q.   I will come to the alter of humbleness and

 2    tell you that you are in better physical shape than I

 3    am.

 4              So here's -- when you saw Mr. Scott, was he

 5    heavyset?

 6         A.   Yes, he was.

 7         Q.   And was he a black male?

 8         A.   He was.

 9         Q.   Was he bald or bold?

10         A.   His hair was low.  I'm not going to say bald

11    because bald means no hair to me, my definition, but he

12    had a little hair.  It was low.  I'll say a low cut.

13         Q.   And was he wearing a white tank top when you

14    saw him?

15              MR. FERNANDEZ:  Object to form.

16              THE WITNESS:  Yes, he was.

17    BY MR. PIERRE:

18         Q.   Okay.  And at no time, did he actually change

19    his clothes in front of you?

20              MR. FERNANDEZ:  Object to form, asked and

21         answered.

22              THE WITNESS:  No, he did not.

23    BY MR. PIERRE:

24         Q.   And you never filed -- you never filed charges

25    against Mr. Scott for indecent exposure?
```

1          MR. FERNANDEZ:  Object to form.

2          THE WITNESS:  I did not.  That wasn't the

3       reason why I was there.  I mean, even if I would

4       have saw him being indecent, I would take him to

5       crisis.

6   BY MR. PIERRE:

7       Q.   Okay.  Let's see if I can -- oh, upon Mr.

8   Scott being placed in the vehicle, did you inform the

9   other officers that, hey, I think you guys might be

10  jumping the gun here?

11         MR. FERNANDEZ:  Object to form.

12         MS. WYDLER:  Objection, form.

13  BY MR. PIERRE:

14      Q.   Meaning, I think you guys have the wrong

15  person?  Did you say that to the other officers?

16         MR. FERNANDEZ:  Object to form.

17         MS. WYDLER:  Objection.

18         THE WITNESS:  No, I never question another

19      officer's ability to do whatever they need to do.

20      I would never do that because that's their

21      responsibility.  If an officer were to question me,

22      you know, I would feel a little like, hey, you

23      know, you're not working with me.  Let me finish

24      this investigation before you make that decision.

25         So, no, I wouldn't ever do a thing like that.

1    BY MR. PIERRE:

2        Q.   So if you saw an unconstitutional arrest in

3    your presence, you would not stop that arrest?

4            MR. FERNANDEZ:  Object to form, hypothetical.

5            THE WITNESS:  Not negative.  I mean, if it's

6        unconstitutional, it's unconstitutional.  I don't

7        want them to get in trouble or get fired or go to

8        jail.  I'll say let me help.  You just go sit in

9        your car.  No, I wouldn't do that.  Absolutely

10       wouldn't do that.

11   BY MR. PIERRE:

12       Q.   Were you ever called to court for Mr. Scott's

13   case?

14       A.   I was once.

15       Q.   And do you know why you were called?

16       A.   Because my name was on the A-form.  Any time

17   your name is on the A-form, they're going to -- I was

18   surprised -- I didn't even know what the situation was,

19   but yeah, you're going to get called to court if your

20   name is on the A-form.  That's for sure.

21       Q.   So you didn't know Mr. Scott had been

22   arrested?

23           MR. FERNANDEZ:  Object to form.

24           THE WITNESS:  I did not, no.  I did not know

25       he was arrested.

1   BY MR. PIERRE:

2        Q.   Okay.  So you simply assumed that Mr. Scott

3   was being taken to the station to be questioned further,

4   correct?

5             MR. FERNANDEZ:  Object to form.

6             THE WITNESS:  Well, I didn't assume anything.

7        I knew that's where they were going because they

8        said.

9   BY MR. PIERRE:

10       Q.   Okay.

11       A.   But I didn't follow up after it was over.  I

12  didn't follow up on it.

13       Q.   Okay.  So you knew that the reason they were

14  taking him to the station was to question him further,

15  correct?

16            MR. FERNANDEZ:  Object to form.

17            THE WITNESS:  Yes, I knew that.  I mean,

18       they're not going to stand out there in the hot sun

19       and, you know, question him.  They're going to, you

20       know, get into a more secure scene where they can

21       question him.

22  BY MR. PIERRE:

23       Q.   Okay.  And you previously -- so when you went

24  to that court date, did you speak with the prosecutor?

25       A.   No, I didn't speak with them.  If I'm not

1   mistaken, I believe it was reset.  I think that's what

2   it was.  I didn't speak to anyone.  It was just reset.

3        Q.   Okay.  Let's see.  Just trying to get another

4   exhibit for you, but before I get there, during the

5   police academy through the courses you take while you're

6   on the job, when you fill out a police report, what are

7   the basic requirements that are necessary in filling

8   that?

9             MR. FERNANDEZ:  Object to form.

10            THE WITNESS:  The basic requirements, who,

11        what, when, where, how, when.  You have to make

12        sure that grammar is correct.  You've got to make

13        sure the spelling of the name is correct.

14   BY MR. PIERRE:

15        Q.   Would you agree with me that the police report

16   should be complete in of itself?

17            MR. FERNANDEZ:  Object to form.

18            THE WITNESS:  Yes, all police reports should

19        be complete.

20   BY MR. PIERRE:

21        Q.   Would you agree with me that --

22        A.   You don't just -- when you do an A-form, you

23   don't just submit it.  You have -- a supervisor has to

24   go over the A-form to make sure everything is correct.

25   You know, sometimes things get -- you would miss this.

1    You would miss that, but other than that, that's pretty

2    much it.

3         Q.   Let me see if I can share my screen.  Officer,

4    do you see Plaintiff's Exhibit 2?

5              (Thereupon, Plaintiff's Exhibit 2 was marked

6         for identification.)

7              THE WITNESS:  My eyes are killing me right

8         now.  Yes, I see.

9    BY MR. PIERRE:

10        Q.   I feel you.  I feel you.  Is that bigger?

11        A.   Yeah, that's bigger.

12        Q.   Okay.  Okay.  Officer, do you recognize what's

13   been presented to you as Plaintiff's Exhibit 2?

14        A.   Yes, a worksheet.

15        Q.   And what is a worksheet for --

16        A.   An officer worksheet is pretty much all the

17   calls that he or she had for that day during their

18   shift.

19        Q.   And who completes this worksheet?

20        A.   The officer completes it.

21        Q.   Do you guys still do officer worksheets?

22        A.   No, we stopped that a few years ago.

23        Q.   And why did you guys stop that?

24        A.   I have no idea.  I don't know why they stopped

25   it.

```
 1        Q.   So how do we know where you guys have been at
 2   if we don't have officer worksheets?
 3             MR. FERNANDEZ:  Object to form.
 4             THE WITNESS:  The CAD.  You can get it from
 5        the CAD.  You can still get the information through
 6        the communications log where everything is.  It's
 7        just that we no longer input it.  They have to know
 8        where you've been, where you're at.  So you can
 9        just get that from dispatch.
10   BY MR. PIERRE:
11        Q.   Okay.  So, Officer Bloom, so at the time, you
12   guys were doing officer worksheets, correct?
13        A.   Yes.
14        Q.   Okay.  And whose officer worksheet is this?
15        A.   That's my officer worksheet.  That's mine.
16        Q.   And your unit number at the time was what?
17        A.   1225.
18        Q.   Okay.  As it relates to this incident, what
19   was the incident number that we've been discussing
20   throughout this morning?
21        A.   This incident number?
22        Q.   Yes.
23        A.   That's probably not the entire number.
24        Q.   You can tell me the last four.
25        A.   The last four is 5697.
```

1        Q.   Okay.  So that would be the second to the last

2   row, correct?

3        A.   Yes.

4        Q.   And the signal number for that incident is

5   what?

6        A.   Twenty-two.

7        Q.   And then the location is what?

8        A.   63 Northwest 40.

9        Q.   And what does the P stand for?

10       A.   Primary.

11       Q.   Okay.  Did you plug in the time you were

12  dispatched?

13       A.   No, they -- I still carry a book.  I keep all

14  my notes, but no, dispatch does that.

15       Q.   Okay.  So you were dispatched at approximately

16  6:22, correct?

17       A.   Yes.

18       Q.   And you were arrived sometime at 6:30,

19  correct?

20       A.   Correct, yes.

21       Q.   And this all was completed at 7:20; is that

22  correct?

23            MR. FERNANDEZ:  Object to form.

24            THE WITNESS:  I don't know.  Can you pull it

25       up because my face right here, I couldn't see that.

1          Yeah, seven -- I can't see it.  Could you go up a

2          little bit?

3               Yeah, 7:20, 1920, yes.  No, it's big enough.

4          It's just that my photo was right next to it.  I

5          couldn't see it.

6     BY MR. PIERRE:

7          Q.   Oh, okay.  So what is a 22 for laymen?

8          A.   It's a stolen vehicle.

9          Q.   Do you know what time the call was actually

10    placed?

11               MR. FERNANDEZ:  Object to form.

12               THE WITNESS:  The call was actually placed --

13          well, this is the CAD.  It's my worksheet, so it

14          has to be placed at that time, 6:22.

15    BY MR. PIERRE:

16          Q.   Okay.  What's 13 in the line before?  What did

17    that have to do with?

18          A.   Oh, a 13 is conduct investigation.

19          Q.   And do you recall what that investigation was

20    in relation to?

21          A.   I have no idea.

22          Q.   It says four, but it's actually Exhibit 3.  I

23    will change that for you.

24               (Thereupon, Plaintiff's Exhibit 3 was marked

25          for identification.)

1   BY MR. PIERRE:

2       Q.   Officer Bloom, have you seen Plaintiff's

3   Exhibit 3 before?

4       A.   I don't know if I saw it before, but I mean,

5   that's part of the detail that's in the CAD.  I mean,

6   I'm sure I saw it before, but I just don't recall it.

7            MR. PIERRE:  And this is actually for your

8       counsel.

9            Brandon, can you get me the unredacted version

10      of the incident details?

11           MR. FERNANDEZ:  Yeah, I'll request it.

12           MR. PIERRE:  Thanks.

13  BY MR. PIERRE:

14      Q.   All right.  Back to you, Officer Bloom.  In

15  the comment section, it says OCC to CMP, 07 black or BLK

16  Jeep Compass by UNK OFFNDR BOLO for a BLK 2007 Jeep

17  Compass TCASL84LS at Northwest 6th Ave/48th Street.

18           Do you see that?

19      A.   I do.

20      Q.   What does that mean?

21      A.   Well, they're just putting out a BOLO for the

22  2007 Jeep Compass, and it was -- and the LS stands for

23  last seen.  Last seen at Northwest 6th Avenue and 48th

24  Street.

25      Q.   Is that where the park is at?

 1          A.    The park is on 5th Avenue.

 2          Q.    Okay.  So would you agree with me that he

 3     didn't report his vehicle stolen at the park?

 4               MR. FERNANDEZ:  Object to form.

 5               THE WITNESS:  No, I wouldn't agree with that.

 6          He did report his vehicle stolen at the park.

 7     BY MR. PIERRE:

 8          Q.    Okay.  Who is the individual that called the

 9     dispatch?

10          A.    That, I don't know.  I mean, we have to look

11     at the dispatch notes and look on the call.  I have no

12     idea who the caller is.  I have no idea.

13          Q.    Okay.  And what does OCC to CMP mean?

14          A.    Okay.  OCC, I'm not really sure what that is,

15     but the CMP is complainant.

16          Q.    Okay.  And it says 07 Black Jeep Compass by

17     UNK OFFNDR.  Do you see that?

18          A.    Unknown offender.

19          Q.    Okay.  What does that language mean?

20          A.    Unknown offender means whoever -- let me see,

21     let me read this here.  Pretty much, whoever was making

22     a complaint saying they don't know who stole the

23     vehicle.  They just know it was stolen.  That's pretty

24     much what they're saying.

25          Q.    So let's assume once your counsel gives me

1   this unredacted version, that the caller is revealed to

2   be Samuel Scott.  Would that -- would I interpret this

3   to mean that Samuel Scott reported his 2007 black Jeep

4   Compass stolen by an unknown offender?

5           MR. FERNANDEZ:  Object to form.

6           THE WITNESS:  Yes, that's exactly what that

7       would mean.  We already know who the -- I mean, if

8       you have the call log, it would show who the

9       complainant is.  I don't know who the complainant

10      is.  I have no idea.

11  BY MR. PIERRE:

12      Q.   The City hasn't been too generous with giving

13  me things even after I sue them multiple times.

14          MR. FERNANDEZ:  Object to form.  Move to

15      strike.

16  BY MR. PIERRE:

17      Q.   So regarding the section for the BOLO, does

18  the dispatch ever give you an identity of the person who

19  stole Mr. Scott's vehicle?

20      A.   No, they're not going to give you an identity.

21  I mean, if we knew the identity, we would just go pick

22  them up ourselves.  We don't know the identity.  That's

23  why I stand unknown -- and that's pretty much general.

24  I mean, that's just common language that they use by

25  unknown offender.

1       Q.   Okay.  I understand that it's common language.

2    What I'm trying to get at is did the dispatch you

3    received give you a gender, a race, a description of the

4    individual who stole Mr. Scott's vehicle?

5             MR. FERNANDEZ:  Object to form.

6             THE WITNESS:  Dispatch only gave me

7         information about a stolen vehicle.  From there, I

8         conduct the investigation once I get there.

9    BY MR. PIERRE:

10      Q.   And what was the BOLO that was actually given

11   to you?

12            MR. FERNANDEZ:  Object to form.

13            THE WITNESS:  I don't recall.  Even though I

14        see it here, I don't recall a BOLO being given to

15        me.  The only thing I was given was it's a 22 at

16        5th Avenue and whatever, 40-something Street or

17        whatever it was.  That's all I was given.  It

18        wasn't a BOLO.

19            Those comments can be placed in the system by

20        the officer or by the dispatch, but the officer put

21        in a comment.  He or she doesn't have to because it

22        says over the radio in reference to what they have.

23   BY MR. PIERRE:

24      Q.   Okay.  So let's -- help me visualize this.

25   June 1, 2018, you're given a dispatch, right?

```
 1              MR. FERNANDEZ:  Object to form.

 2              THE WITNESS:  Yes, I was given a dispatch.

 3    BY MR. PIERRE:

 4        Q.   And the dispatch doesn't give you a BOLO,

 5    meaning, something to be on the lookout for, right?

 6              MR. FERNANDEZ:  Object to form.

 7              THE WITNESS:  Okay.  Looking at this detail

 8         here, what's the comment under my CAD showing that

 9         information that dispatch put out.  I know I didn't

10         put that in there, so that means dispatch put it in

11         there.

12    BY MR. PIERRE:

13        Q.   Okay.  And in your car, are you able to read

14    the computer-aided dispatch reports?

15        A.   The computer-aided dispatch -- I'm not really

16    sure what you mean by that.

17        Q.   Yeah, that's the CAD.

18        A.   Do I -- can I read it?  Yes, I can read it.

19    It's on the screen, yeah.

20        Q.   No, no.  I'm talking about when you're in your

21    vehicle.

22        A.   Yes, you can read it.

23        Q.   Okay.  So when you're in your vehicle, you can

24    actually see the comments that are being placed,

25    correct?
```

```
 1        A.   Yes, it depends on when the comments are going

 2   to be placed, but comments are not always in there.  I

 3   mean, you have comments but not detailed comments, and

 4   then you can put your own comments once you finish with

 5   that.

 6        Q.   Okay.  And you didn't place these comments

 7   into the system, correct?

 8        A.   No, that's not mine because if that was mine,

 9   I would know what OCC stood for.

10        Q.   Okay.

11        A.   It could be -- I don't know, occupant.  I

12   mean, those are comments that whoever the call is said

13   that to dispatch.  The caller gave to dispatch, and

14   dispatch gave it to police.

15        Q.   Okay.  So let's get this.  And is your

16   testimony today that you do not recall receiving a BOLO

17   for the individual who stole Mr. Scott's vehicle,

18   correct?

19             MR. FERNANDEZ:  Object to form.

20             MS. WYDLER:  Form.

21             THE WITNESS:  Well, that's true.  We don't

22        have a BOLO for the offender.  Oftentimes, the call

23        taker can tell -- not the call taker, but the

24        complainant can tell the call taker anything that's

25        going to be in their favor.  They can always do
```

1          that.  I mean, we don't know until we get there and

2          conduct the investigation.

3    BY MR. PIERRE:

4          Q.   I understand that they can say anything.  I

5    just want to know what you actually knew at the time,

6    and that is what did the dispatch tell you regarding the

7    stolen vehicle?

8               MR. FERNANDEZ:  Object to form.

9               MS. WYDLER:  Join.

10              THE WITNESS:  Again, the dispatch only stated

11         that the vehicle was stolen, and I went there to do

12         a stolen vehicle report.  Yes, you're going to have

13         comments on the CAD related to whatever the call

14         is, but as far as the offender, we don't know who

15         the offender was.  That's why we go there to speak

16         to the complainant to get his or her part of the

17         information so we can, you know, conduct the

18         investigation from there.

19   BY MR. PIERRE:

20         Q.   Okay.  Let's see if I can take you -- bear

21   with me.  We'll introduce this as Plaintiff's Exhibit 4.

22              (Thereupon, Plaintiff's Exhibit 4 was marked

23         for identification.)

24   BY MR. PIERRE:

25         Q.   Can you see what's on my screen, Officer?

1      A.   Yes.

2      Q.   Do you speak Spanish?

3      A.   No, I don't.

4      Q.   Okay.  I wish I did, but I don't as well.  So

5   this may go a little bit quicker.  And just for your

6   reference, I typically play the video, then I ask

7   questions as it relates to the video.

8           Who is that individual on the screen?

9      A.   That's Guzman.

10     Q.   Okay.

11          (Video played.)

12   BY MR. PIERRE:

13     Q.   Who is that individual that is sitting on the

14   sidewalk?

15     A.   That's Scott.

16     Q.   Okay.  What color shirt is he wearing?

17     A.   It looks black.  It looks black.  Yeah, black.

18     Q.   Okay.  So it wasn't a white tank top, correct?

19          MR. FERNANDEZ:  Object to form.

20          THE WITNESS:  I mean, I -- again, I thought it

21     was a white tank top, but I guess it's not.

22   BY MR. PIERRE:

23     Q.   Okay.  Who is that fit brown male individual

24   in the --

25     A.   My twin brother, Mike.

1          (Video played.)

2     BY MR. PIERRE:

3          Q.   Who's the individual that's talking to Mike?

4          A.   I think that's Guzman, I think.  I'm not

5     really sure.  It's either Guzman or the other gentleman.

6     I can't remember.  Carriel, Carriel.

7          Q.   Okay.  And he said you're filling out the

8     police report.  Did they tell you to fill out the police

9     report before or the report?

10         A.   No, that wasn't a police report.  What

11    happened is Mr. Scott had already finished the stolen

12    vehicle affidavit, and again, I have to go over it and

13    sign off on it.  That's what that was.  That's not a

14    report.  The report is done on a computer.

15         Q.   Oh, okay.  Okay.  So that's the mysterious

16    arrest -- stolen affidavit form that I have yet to see,

17    correct?

18              MR. FERNANDEZ:  Object to form.

19              THE WITNESS:  I'm not sure if you saw it or

20         not, but I mean, if you say so, sir.  I mean, I

21         don't really know if I saw it.

22    BY MR. PIERRE:

23         Q.   Okay.  That's the stolen vehicle affidavit

24    form, correct?

25         A.   That's correct, yes.

1      Q.   And they did not instruct you to have Mr.

2    Scott execute, correct?

3           MR. FERNANDEZ:  Object to form.

4           MS. WYDLER:  Join.

5           THE WITNESS:  No, he was already finished

6           signing the form.  The only thing I was doing was

7           reading over it and making sure everything was

8           matching up to what he said, matching his ID card

9           with what he put on there because you have to --

10          there's an area there showing the form of ID that

11          the person used when they're making the report or

12          claim, whatever it be, and so I was just matching

13          all that up and I was going to sign off on it,

14          validate it, and then I was going to call CIS and

15          put it in the system.

16   BY MR. PIERRE:

17     Q.   Okay.  So what I'm getting at is they didn't

18   have you execute or validate this stolen affidavit

19   report just to drum up probable cause.

20          MR. FERNANDEZ:  Object to form.

21          THE WITNESS:  That's correct.  I mean, it was

22          my responsibility to do that form.  That was a call

23          that I was on, the 22, and that's what you have to

24          do.  You have to complete everything.

25   BY MR. PIERRE:

1        Q.   Okay.  Let me see.

2             (Video played.)

3    BY MR. PIERRE:

4        Q.   I believe Officer Carriel says that's the

5    bailout to you.  Was he speaking to you, or was he

6    speaking to Officer Guzman?

7             MR. FERNANDEZ:  Object to form.

8             THE WITNESS:  He is speaking to me.  I mean,

9        they already knew what they had.  I didn't know.

10       So he had to be speaking to me.  He couldn't have

11       been speaking to anyone else.  They're on the same

12       crew, so they already know what's going on.  I did

13       not.  So he had to be speaking to me.

14   BY MR. PIERRE:

15       Q.   So did you understand what he meant by that's

16   the bailout?

17       A.   I did.

18       Q.   And what does that mean to you?

19       A.   It means that the perimeter they were talking

20   about in roll call, the bailout means the guy who got

21   away.

22       Q.   The roll call that you received at two

23   o'clock, correct?

24       A.   Yes.

25            (Video played.)

1  BY MR. PIERRE:

2      Q.   What was that communication between yourself

3  and Officer Guzman?

4      A.   Yeah, that's Guzman.  Yeah, that's Guzman.

5      Q.   No, what I'm saying what was he talking about?

6      A.   The bailout, the gentleman, Mr. Scott is the

7  one who bailed out the vehicle and got away.

8      Q.   And at that point, did you believe that you

9  had probable cause to arrest Mr. Scott?

10          MR. FERNANDEZ:  Object to form.

11          THE WITNESS:  Negative.  I mean, they --

12          again, they came there to take over the

13          investigation, so that was their call.  Not my

14          call.  I had nothing to do with no arrest at all.

15  BY MR. PIERRE:

16     Q.   You had less hair back then, Officer.  Did you

17  just get a fresh cut?

18     A.   Actually, I just let it grow.  I mean, you

19  know, I'm getting ready to leave the department pretty

20  soon, so I'm just kind of letting my hair grow out a

21  little bit.

22     Q.   So you kind of had a low cut, bald at that

23  time then.

24     A.   I did.  I'm still in the military at that

25  time.  I was still in the reserves.

1       Q.   Okay.  So thank God, they didn't arrest you.

2            MR. FERNANDEZ:  Object to form.

3            THE WITNESS:  Yeah, I'm glad they didn't,

4       especially with that uniform on.

5  BY MR. PIERRE:

6       Q.   I wish my client had a uniform on.

7            So who is the individual that you're

8  embracing?

9       A.   Embracing?  Can I see it?  I don't see it.

10       Q.   You don't see it?

11       A.   I mean, I can see it, but you can barely look

12  over -- I mean, from my view, it -- oh, that's

13  Hernandez.  That's Hernandez.

14       Q.   Okay.

15       A.   That's Hernandez.

16       Q.   And who is the other individual that you

17  embraced?

18       A.   That's got to be Carriel.

19       Q.   The female Carriel, correct?

20       A.   Yes, it had to be her because the other guys

21  at that time, I didn't really know them.

22       Q.   Okay.  Okay.  And why is Scott just -- I mean,

23  this is a minute and 21 seconds in.  Why is he just like

24  sitting around looking at his phone?

25            MR. FERNANDEZ:  Object to form.

```
 1              THE WITNESS:  Well, I can't speak for -- I
 2        mean, I know why he's there, but I had him there
 3        because the stolen vehicle affidavit and I was in
 4        my car going over all the information making sure
 5        everything was lining up correctly and signing off
 6        on it.  That's the reason why he was there.
 7   BY MR. PIERRE:
 8        Q.   Okay.  Was Mr. Scott free to leave prior to
 9   these police officers coming?
10              MR. FERNANDEZ:  Object to form.
11              MS. WYDLER:  Join.
12              THE WITNESS:  Yes, he was free to leave if he
13        chose to.
14   BY MR. PIERRE:
15        Q.   Okay.  So you didn't have him under detention
16   before these officers came, correct?
17        A.   That's correct.  I never detained him.  I
18   mean, if I detained him, he wouldn't be sitting there
19   and I'm sitting in my car.  That's for sure.
20              (Video played.)
21   BY MR. PIERRE:
22        Q.   Was Officer Hernandez your backup, or was he
23   someone else's backup?
24        A.   No, I didn't have backup.  I didn't need
25   backup.  I mean, that's something that maybe they heard
```

1    on the radio and they just came to the scene.  I mean,

2    you know, I didn't call for them to come to the scene.

3    He wasn't my backup.  I didn't need any backup.  Backup

4    for what?  He was doing everything I asked him to do.  I

5    mean, he wasn't under arrest, or he wasn't detained.  He

6    wasn't any of that.

7              (Video played.)

8    BY MR. PIERRE:

9         Q.   Were you shocked that Hernandez had Mr. Scott

10   place his hands on top of your vehicle?

11             MS. WYDLER:  Objection, form, predicate.

12             THE WITNESS:  I wasn't shocked.  I mean,

13        that's just standard procedure.

14   BY MR. PIERRE:

15        Q.   Why would -- I mean, before these officers

16   came, Mr. Scott was not being detained as you say or

17   arrested or any of that, correct?

18        A.   That's correct.

19        Q.   And all of a sudden, these officers came and

20   he is now being put in a posture where it looks like

21   he's being detained.  Would you agree with me on that?

22             MR. FERNANDEZ:  Object to form.

23             THE WITNESS:  I mean, I don't know what he was

24        being -- again, that's their decision on what they

25        do.

1   BY MR. PIERRE:

2       Q.   Okay.  Okay.  But you didn't interject and

3   say, hey, hey, hey, he's the victim here.  Did you say

4   that?

5            MR. FERNANDEZ:  Object to form.

6            THE WITNESS:  Negative.  I didn't say that.

7            (Video played.)

8   BY MR. PIERRE:

9       Q.   Okay.  I see you present.  I don't watch a lot

10  of cop movies, but I do a lot of cop depositions.

11  Usually, at this point, when someone places their hands

12  behind their back, at the very minimum, they're being

13  detained.  Would you agree with me on that?

14           MR. FERNANDEZ:  Object to form.

15           MS. WYDLER:  Join.

16           THE WITNESS:  I agree.

17  BY MR. PIERRE:

18      Q.   But would you agree that what you were

19  observing at the 2:17 mark of Plaintiff's Exhibit 4

20  looked like a detention?

21           MR. FERNANDEZ:  Object to form.

22           MS. WYDLER:  Join.

23           THE WITNESS:  Well, detention and detain is

24      two different things.  Detention is when you're

25      actually in jail.  Detained is just you're just

1          going to be there until they finish their

2          investigation, but a detention is you're locked

3          away.  Detained is just you're not locked away.

4          You're just there until they can complete the

5          investigation.

6    BY MR. PIERRE:

7          Q.   Okay.  So at the 2:17 mark of Plaintiff's

8    Exhibit 4, Mr. Scott has been detained, correct?

9               MR. FERNANDEZ:  Object to form.

10              THE WITNESS:  That I don't know.  If they said

11         he was detained, then he was detained.  I mean,

12         yeah, you've got -- I mean, I don't like to make

13         assumptions, but if his hands behind his back and

14         they're putting cuffs on, then yeah, they're call

15         it in, one detained.

16              (Video played.)

17   BY MR. PIERRE:

18         Q.   Which officers stated detain him, detain him?

19         A.   I have no idea.  That could have been Guzman.

20   That could have been Carriel.  I know it definitely

21   wasn't Hernandez for sure.  It was one of the other

22   ones.  I'm not for sure which one it was.

23         Q.   Okay.  So when you hear detain him, detain

24   him, what does that mean to you as a police officer?

25              MR. FERNANDEZ:  Object to form.

```
 1              MS. WYDLER:  Objection, form.
 2              THE WITNESS:  It means that now I have to take
 3         measures in being -- you know, showing a situation
 4         and watching everything these officers do in case
 5         they need assistance with the individual.
 6    BY MR. PIERRE:
 7         Q.   Okay.  Detain him, detain him doesn't mean
 8    that the person is being arrested, correct?
 9              MR. FERNANDEZ:  Object to form.
10              THE WITNESS:  Yeah, that's correct.  That's
11         two different categories.  That's something totally
12         different.
13    BY MR. PIERRE:
14         Q.   Yeah, that's that third category that we
15    talked about, about the probable cause for an arrest,
16    right?
17              MR. FERNANDEZ:  Object to form.
18              THE WITNESS:  I agree.
19    BY MR. PIERRE:
20         Q.   Here, there's just like reasonable suspicion
21    to believe that a crime may or may not have occurred,
22    and we've just got to figure out if this is a person
23    that committed that crime, correct?
24         A.   I agree.
25              (Video played.)
```

1   BY MR. PIERRE:

2        Q.   Officer Bloom, at this point, you are involved

3   in this detainment, correct?

4             MR. FERNANDEZ:  Object to form.

5             MS. WYDLER:  Objection, form.

6             THE WITNESS:  No, I'm not -- I'm not involved

7        in a detainment.  I'm involved in the situation

8        awareness to make sure that everything is going

9        well with the officer as he's talking to the

10       detained personnel.  I mean, that's -- we don't

11       turn our back.  We have to sit and watch him, but I

12       don't have anything to do with the detainment.

13            If you're on the scene, you have to back that

14       officer up.

15   BY MR. PIERRE:

16       Q.   Okay.  Okay.  Are you surrounding Mr. Scott?

17            MR. FERNANDEZ:  Object to form.

18            THE WITNESS:  No, I'm not surrounding him.  I

19       was already there.  Mr. Scott was on the sidewalk,

20       and the officer told him to go over there by my car

21       and put his hands on the car.  So, no, I'm not

22       surrounding him.

23   BY MR. PIERRE:

24       Q.   Okay.  If Mr. Scott would have made a mad dash

25   in your direction, would you have stopped Mr.  Scott?

1          MR. FERNANDEZ:  Object to form.

2          THE WITNESS:  I mean, that's hypothetically

3       speaking, but of course, I would have stopped him.

4       I'm not going to just let him run away.  I mean,

5       that's my responsibility as a police officer to

6       keep him there until they finish the investigation.

7    BY MR. PIERRE:

8       Q.   So you were, in fact, involved in the

9    detainment if you would have prevented Mr. Scott -- you

10   would have prevented Mr. Scott from leaving the scene,

11   correct?

12         MR. FERNANDEZ:  Object to form.

13         MS. WYDLER:  Join.

14         THE WITNESS:  I mean, again, that's

15      hypothetical.  I mean, if I would have caught the

16      Powerball, I wouldn't be here today.  I mean,

17      that's hypothetical.  You can't say what you would

18      or would not have done until it actually happened.

19   BY MR. PIERRE:

20      Q.   If I would have caught the Powerball, I surely

21   would not have been here today.

22      A.   You know.

23      Q.   But I'm asking about this video specifically.

24   What is your -- why are you positioned to the right of

25   Mr. Scott?

1      A.   Well, actually, I'm positioned to the right of

2  him because I was there talking to another officer, and

3  when they said detain him, detain him, whoever that was

4  said detain him, detain him, then I shift my focus to

5  what was going on.  I mean, any officer would do that.

6      Q.   So once they say detain him, detain him, you

7  would now become involved in the detention, correct?

8           MR. FERNANDEZ:  Object to form.

9           MS. WYDLER:  Form, objection, form.

10          THE WITNESS:  Negative.  I'm not involved in

11       the detention.  That's not true.

12  BY MR. PIERRE:

13      Q.   Okay.  So you were just twiddling your fingers

14  while they were detaining him, correct?

15          MR. FERNANDEZ:  Object to form.

16          THE WITNESS:  Negative.  I was staying focused

17       on what was going on.

18  BY MR. PIERRE:

19      Q.   Let's see if you ever reach the level of being

20  involved in the detention.

21           (Video played.)

22  BY MR. PIERRE:

23      Q.   What was going on there between 3:15 and 3:27

24  where Mr. Scott says he has him?

25          MR. FERNANDEZ:  Object to form.

1            MR. PIERRE:  I can play it back.

2            THE WITNESS:  Okay.  So I didn't hear them

3        clearly, the officer and Mr. Scott, but he was just

4        asking him simple basic questions probably about

5        his ID or probably what he had in his pocket.  I

6        really don't know because I really didn't hear it.

7    BY MR. PIERRE:

8        Q.   You actually made a response.  Do you recall

9    what you said?

10       A.   I do recall the response in reference to the

11   ID because I already had one ID, and I believe the

12   officers found another ID.  I was telling him you only

13   can have.  If you have an ID card, then you have an ID

14   card.  If you have a driver's license, you know, that ID

15   card is no longer valid.  You have to get rid of it.

16   Something to that nature, but it had to do with the ID.

17   I knew that for sure because I remember I had his ID in

18   his hand, and then he found another ID.  I don't know if

19   it was a driver's license or what was it, but it was one

20   or the other.

21       Q.   Okay.  Is it criminal in nature to have an ID,

22   two forms of IDs?

23            MS. WYDLER:  Objection, form.

24            MR. FERNANDEZ:  Join.

25            THE WITNESS:  Negative.  It's not criminal in

1          nature to have two forms of ID; however, if you

2          have a Florida ID card, you can't have a Florida ID

3          card and a driver's license.  You have one or the

4          other.

5     BY MR. PIERRE:

6          Q.   Where is that --

7          A.   Not criminal in nature, but you know, you

8     can't have both because one has to be turned in.

9          Q.   Okay.

10         A.   Oftentimes, when they get ID cards, they would

11    say I don't have it and get another ID card and have two

12    and, you know, I don't know why they do that, but a lot

13    of people do that.

14         Q.   Okay.  So there's not like a law that says you

15    can't have multiple IDs.

16         A.   No, there's not a law that says it, but it's

17    in the -- I know it's in the Florida handbook about the

18    driver's license and ID card.  I can't recall exactly

19    what it is, but I know it's one or the other.  You only

20    can have one or the other.

21         Q.   Okay.

22              (Video played.)

23    BY MR. PIERRE:

24         Q.   At any time while your fellow officers were

25    speaking in Spanish, did you tell them, hey, what are

1    you guys saying?

2        A.   No, I did not because all my life, I've heard

3    that.  I mean, if that's their native language, that's

4    their native language.  I don't get involved in that.

5        Q.   You're politically correct.  I'm just asking

6    if you said what are you guys saying because you're at

7    the scene of an incident, so you would be aware of

8    what's actually occurring.

9            MR. FERNANDEZ:  Object to form.

10           THE WITNESS:  No, I didn't say anything to

11           them in reference to what they were saying in

12           Spanish.  I mean, if I were to do stuff like that,

13           I would be doing that for the whole ten hours, I

14           mean, because you know, that's their native tongue.

15           That's their native tongue.  I mean, I can't -- you

16           know, it's -- it doesn't bother me.  It really

17           doesn't.

18   BY MR. PIERRE:

19       Q.   Again, I'm not asking whether it bothers you.

20   I just want to know if you, because you don't speak

21   Spanish, if you asked them at any point what they're

22   saying during the course of this detention.

23       A.   I did not.

24           (Video played.)

25   BY MR. PIERRE:

1      Q.   Okay.  At this point, you would agree with me

2  you, Officer Hernandez, and Officer Carriel are

3  surrounding Mr. Scott while he has his hands on your

4  vehicle, correct?

5           MR. FERNANDEZ:  Object to form.

6           MS. WYDLER:  Join.

7           THE WITNESS:  Negative.  I wouldn't say

8       surround him.  Surrounding, you know, that sounds a

9       little harsh, but you know, it's our duty to pay

10      attention to what's going on in case something bad

11      happens.

12  BY MR. PIERRE:

13     Q.   Okay.  So you're saying that at the 4:53 mark

14  of Plaintiff's Exhibit 4, you, Officer Hernandez, and

15  Officer Carriel are not surrounding Mr. Scott while he

16  has his hands on your vehicle, correct?

17          MR. FERNANDEZ:  Object to form.

18          THE WITNESS:  That's correct.  I'm not

19      surrounding him, and I don't even know where

20      Carriel is because that's a sidewalk on the other

21      side.  So I hear him, but I don't see him.  I

22      don't, you know -- I mean, if we were surrounding

23      him, we would be a lot closer than that.

24          (Video played.)

25  BY MR. PIERRE:

1      Q.   Okay.  It's 4:57.  You start to touch Mr.

2    Scott.  Prior to these officers arriving on the scene,

3    had you touched Mr. Scott before?

4      A.   I did not.

5      Q.   Okay.  So this is the first time that you're

6    patting or touching Mr. Scott, and why did you decide to

7    do that at the 4:57 mark?

8           MR. FERNANDEZ:  Object to form.

9           THE WITNESS:  Okay.  Because he said that

10          we're going to put him in my car, and I said I'm

11          just going to pat you down, okay?  Even though I

12          know they took everything, I just said you're going

13          to sit in my car, I'm going to pat you down.  I

14          don't care if an officer pats you down or not.  I'm

15          going to do it to make myself feel more comfortable

16          with you being in the backseat of my car, and I

17          explained that to him that I'm going to pat him

18          down.

19          I don't just start patting someone down

20          without letting them know I'm going to pat you down

21          for this reason.

22    BY MR. PIERRE:

23      Q.   So would you agree with me, at this point,

24    he's being detained and you're involved in that

25    detainment, correct?

1          MR. FERNANDEZ:  Object to form.

2          THE WITNESS:  Again, he was being detained,

3      detainment, but I'm not involved in detainment.

4      I'm involved in putting someone in the backseat of

5      my vehicle, and I'm going to pat you down.  He

6      stated that he was -- detain him, detain him.  It

7      had absolutely nothing to do with me.  It's their

8      unit and what they're doing.

9  BY MR. PIERRE:

10      Q.   Okay.  So if you put him in the backseat of

11  your vehicle, can he get away?

12          MR. FERNANDEZ:  Object to form.

13          THE WITNESS:  I mean, it depends.  I mean,

14      people have gotten out of police vehicles.

15          (Video played.)

16  BY MR. PIERRE:

17      Q.   So after frisking him, you are saying that you

18  were not involved in the detainment?

19          MR. FERNANDEZ:  Object to form.

20          THE WITNESS:  I'm not sure what your

21      definition is of detainment; however, again, if

22      someone is going to be in my car, I'm going to pat

23      them down, again, before I put them in my vehicle,

24      so I know they were patted down.  I know they don't

25      have anything on them.

1   BY MR. PIERRE:

2        Q.   And when can you pat a person down?

3        A.   Any time that they're being detained.

4        Q.   So by your definition, he has been detained;

5   therefore, you have been involved in the detention,

6   correct?

7             MR. FERNANDEZ:  Object to form,

8        mischaracterizes testimony, asked and answered.

9             Go ahead.

10            THE WITNESS:  Negative.  I mean, he's being

11       detained by the other units, but if he's going to

12       sit in my car, again, I'm going to pat him down or

13       her down -- well, not her, but I would get a female

14       to pat a female down before I put them in my car.

15            I have absolutely nothing to do with the

16       detainment.

17   BY MR. PIERRE:

18        Q.   Okay.  But you have everything to do with the

19   patting and frisking, correct?

20            MR. FERNANDEZ:  Object to form.

21            MS. WYDLER:  Objection, form.

22            THE WITNESS:  Again, I patted him down because

23       they said he was going to be sitting in the

24       backseat of my car, which they changed later and

25       decided no, we'll put him in a vehicle that was

1          bigger, had a bigger backseat.

2     BY MR. PIERRE:

3          Q.   Okay.  I'm not trying to trick you.  I'm not

4     playing got you games.  I just want to get to the point.

5     You cannot pat and frisk somebody if it's a consensual

6     encounter; can you, Officer?

7               MR. FERNANDEZ:  Object to form, hypothetical.

8               Go ahead.

9               MS. WYDLER:  Join.

10              THE WITNESS:  I agree.

11    BY MR. PIERRE:

12         Q.   Meaning, if I came up on the street and I said

13    hi, Officer, how are you doing, you can't just pat and

14    frisk me, correct?

15              MR. FERNANDEZ:  Object to form, hypothetical.

16              THE WITNESS:  I agree.

17    BY MR. PIERRE:

18         Q.   But if I or if someone reported that, hey,

19    there is this black male with a bald head wearing a

20    white tank top and heavyset and possibly crashed another

21    vehicle, I could for the purposes of -- or you could for

22    the purposes of your investigation, detain that

23    individual and then pat and frisk him, correct?

24              MR. FERNANDEZ:  Object to form.

25              THE WITNESS:  Well, the policy states -- our

```
 1          policy states any time somebody is being detained,

 2          you have to pat them down.  You're not going to put

 3          anyone in your vehicle and you didn't pat them

 4          down.  I mean, that -- no, you can lose your life

 5          behind something like that.  You have to pat them

 6          down.

 7               (Video played.)

 8   BY MR. PIERRE:

 9       Q.   Have you ever heard of the fellow officer

10   rule?

11       A.   Have I ever heard of the fellow officer rule?

12   I have no idea what that is.

13       Q.   Okay.  All right.  Well, your attorneys are

14   probably going to use this in an upcoming Motion for

15   Summary Judgment, but here's the fellow officer rule.

16   It's basically that you can rely on the information

17   provided by fellow officers to establish probable cause

18   for an arrest even if you do not know that information.

19   Do you understand?

20               MR. FERNANDEZ:  Object to form.

21               THE WITNESS:  Yes, I do.

22               MS. WYDLER:  Join.

23               THE WITNESS:  Yes, I do.

24   BY MR. PIERRE:

25       Q.   Okay.  I will represent to you that Officer
```

 1    Carriel stated to Officer Guzman that if this -- and I'm

 2    paraphrasing -- if this is the person, that's all you

 3    need.  That's him.  That's him.

 4              What would you interpret that to mean?

 5              MS. WYDLER:  Object to the form of the

 6         question.

 7              THE WITNESS:  Well, I don't really know

 8         exactly what that means, but if he says this is the

 9         person, well, it's the person.  I don't understand

10         what you mean by that.  I have no idea what you're

11         talking about.

12    BY MR. PIERRE:

13         Q.   So did you have any questions on the scene

14    whether Mr. Scott was, in fact, the individual at the

15    other scene, the crash scene?

16              MR. FERNANDEZ:  Object to form.

17              THE WITNESS:  Negative.  I didn't have -- I

18         mean, you know, all the information that I had was

19         about that vehicle and the vehicle that he was

20         reporting -- the vehicle that was at the first

21         scene that he was reporting stolen.  That's all the

22         information that I had.  Again, they had more

23         information than me because they were at the first

24         scene.  I wasn't there, so I don't know.

25    BY MR. PIERRE:

1      Q.   And at this point, did you have an idea why he

2   was being detained at the 6:06 mark of Plaintiff's

3   Exhibit 4?

4           MR. FERNANDEZ:  Object to form.

5           THE WITNESS:  Yes, I did.  When the officer

6      spoke to me, he said this is the guy.  When he said

7      that, I kind of -- you know, I knew exactly what he

8      was talking about.

9   BY MR. PIERRE:

10     Q.   What was that exactly?

11     A.   That's it's a possibility this could be -- not

12  100 percent, but it's a possibility this could be the

13  guy who broke the perimeter, who bailed out.

14          (Video played.)

15  BY MR. PIERRE:

16     Q.   What are you and Officer Miguel Hernandez

17  speaking about between 6:06 and 6:31?

18     A.   I have no idea what we were speaking about.  I

19  mean, again, he was my FTO for a little bit, and that's

20  pretty much -- I mean, I don't really like know him that

21  well, but he was my FTO and we just used to chit chat

22  about, you know, police work and so on and so forth.

23          So at that point, what we were talking about,

24  I had no idea what we were talking about.  We were just

25  chit chatting about something.

1        Q.   Was it about the investigation?

2             MR. FERNANDEZ:  Object to form, asked and

3        answered.

4             MS. WYDLER:  Join.

5             THE WITNESS:  I don't think it was.

6    BY MR. PIERRE:

7        Q.   When you were an FTO trainee and Officer

8    Hernandez was your officer, would he regularly smoke

9    cigars on the job?

10            MS. WYDLER:  Object to form.

11            THE WITNESS:  Well, when you say smoke on the

12       job, I mean, he didn't smoke around me because I

13       don't like cigarette smoke, but we would take a

14       break, of course, he would, you know, smoke outside

15       the vehicle, but he never smoked inside the

16       vehicle.

17   BY MR. PIERRE:

18       Q.   Okay.  When he was smoking during the course

19   of this detention, no one seems alarmed by the fact that

20   he's actually smoking in the course of an arrest.

21            MR. FERNANDEZ:  Object to form.

22            MS. WYDLER:  Objection, form.

23            THE WITNESS:  Well, again, you know, just

24       because it doesn't display that it bothers you, you

25       know, I mean, I don't like to smoke at all.  I

```
1          don't like no one around me smoking.  I mean, he's

2          the senior officer.  You know, he has more time

3          than all of us, so you know, we're not going to say

4          a whole lot to someone that's senior to us.

5    BY MR. PIERRE:

6          Q.   Okay.  So he -- go ahead.

7          A.   Go ahead.  Go ahead.

8          Q.   So Officer Hernandez can just smoke away just

9    because he's a senior officer.

10              MS. WYDLER:  Objection, form.

11              MR. FERNANDEZ:  Object to form.

12              THE WITNESS:  Again, if he wants to kill his

13         lungs, that's his decision.  He's an adult.  You

14         know, we're not going to sit there and debate all

15         of this about cigarettes and cigars and all that.

16         I just won't do it.  I mean, you know, you're an

17         adult.  You know, be an adult, so if that's what he

18         wants to do, that's what he wants to do.  That's no

19         business of mine as long as he doesn't bring it

20         near me, I'm fine because I don't like that crap on

21         my uniform and my hair.

22              MR. FERNANDEZ:  Hey, Faudlin, before you

23         continue, we've been going for over two hours.

24         When you're done with this line of questioning, do

25         you mind if we take a break?
```

1          MR. PIERRE:  Yeah, we can take a five- minute

2          break because I'm trying to just get this over with

3          by 5:00.

4          MR. FERNANDEZ:  Okay.

5          (Off the record.)

6          MR. PIERRE:  I hate to do this to you again.

7          What was the last question?  Thirty minutes is a

8          long time.

9          (Reporter read the record as requested.)

10   BY MR. PIERRE:

11       Q.   Can you see my screen, Officer?

12       A.   I do, yes.

13       Q.   Okay.  Okay.  Take a mental break at 6:37.

14   I'm going to go back to the beginning.  Do you see the

15   timestamp at the top?

16       A.   I see the date.  Oh, yes, I do.  I do.

17       Q.   4511Z?  Do you see that?

18       A.   I do, yes.

19       Q.   Okay.  I will represent to you that this means

20   6:45:11 Eastern Time.  Do you disagree with that?

21       A.   I don't know.  I mean, I don't see 6:45.  It's

22   22:45, but yeah.

23       Q.   Do you know what Zulu Time is?

24       A.   Yes, Zulu -- let me see if I can remember.

25   No, I don't recall.  I don't recall.  I do recall it,

1   but I just don't remember the definition for Zulu.

2        Q.   Yeah, it's in the military.  It's like

3   military time, but it's basically GMT, Greenwich Mean

4   Time.

5             Well, anyway, let's just go --

6        A.   22 is ten o'clock, so I mean, I don't know.

7        Q.   No, 20 -- yes, if this was in military time,

8   it would have been ten o'clock, but this is basically,

9   the British military time.

10       A.   Oh, yeah, I don't know.  I'm not British.

11       Q.   I'm not either.  Okay.  Do you recall your

12   officer worksheet stating that you arrived at 6:30?

13       A.   Yes, I believe that was correct, 6:30.

14       Q.   Okay.  And based off of this body-worn camera,

15   it shows that the officer's arrival, or at least,

16   Carriel's arrival, was around 6:45.  Do you disagree

17   with that?

18       A.   I do not.

19       Q.   So you would agree that they arrived there

20   approximately, and I think this was your estimate, that

21   it was about 10 to 15 minutes.  It seems like it was

22   closer to 15 minutes.

23       A.   Yeah.

24       Q.   Do you agree?

25       A.   I agree.

```
 1        Q.    So let's go back to 6:37.

 2              (Video played.)

 3   BY MR. PIERRE:

 4        Q.    Do you hear -- since you were only a couple

 5   feet away, do you hear where Samuel Scott says why am I

 6   being detained, and the response was I will explain to

 7   you later by Officer Guzman.  Did you hear that?

 8        A.    Yes, I did.

 9        Q.    Okay.  And at that time, what was your belief

10   of the scope of the detention?

11              MR. FERNANDEZ:  Object to form.

12              THE WITNESS:  I didn't have a belief.  I mean,

13         he said he was being detained.  He was being

14         detained.  I mean, I don't really have a belief.  I

15         don't know what he meant by that.  It's just

16         whatever information that he gathered from whoever

17         he was talking to on the radio or cell phone.  I

18         have no idea.

19   BY MR. PIERRE:

20        Q.    What was your understanding of the statement?

21              MR. FERNANDEZ:  Object to form, asked and

22         answered.

23   BY MR. PIERRE:

24        Q.    Yeah, let me rephrase it because I know you

25   stated that you didn't have a belief, so I want to know
```

1   exactly when you heard that transaction between my

2   client and Officer Guzman, what was your understanding

3   of what was being said?

4            MR. FERNANDEZ:  Object to form.

5            MS. WYDLER:  Join.

6            THE WITNESS:  My understanding was, you know,

7        he's going to let him know once he finishes

8        conducting his investigation what's going on.  He

9        couldn't tell him anything until he's 100 percent

10       sure.

11           (Video played.)

12  BY MR. PIERRE:

13       Q.   Okay.  There is a communication that's

14  occurring between yourself and Officer Guzman.  What is

15  that communication?

16       A.   About he was going in my car, and then he told

17  me no, he's not going in my car.  He's going to put him

18  in another vehicle.

19       Q.   Okay.  I'm not hearing that, but I'll play it

20  back and increase the volume.  It's already up.

21           (Video played.)

22  BY MR. PIERRE:

23       Q.   Doesn't he say something about the report

24  because he needs it?

25       A.   I really didn't make out what he was saying.

1    I thought he was telling him to go in my car, but he's

2    at the back door.  I have no idea what he just said.  I

3    can barely make out what he was trying to say.

4          Q.   Oh, okay.

5               (Video played.)

6    BY MR. PIERRE:

7          Q.   Okay.  There's a couple things.  First of all,

8    how often do police officers clap at the end of an

9    arrest?

10               MR. FERNANDEZ:  Object to form.

11               MS. WYDLER:  Objection, form.

12               THE WITNESS:  I've never -- I mean, clap, I

13          have no idea.  I've never.  I just saw that, but I

14          didn't really know what that clap was for.  I don't

15          think that has anything to do with what's going on.

16          I don't know what those guys were talking about.

17    BY MR. PIERRE:

18          Q.   So do you clap after you arrest someone?

19               MR. FERNANDEZ:  Object to form, argumentative.

20               MS. WYDLER:  Join.

21               THE WITNESS:  No, I don't clap when I arrest

22          people.  I only clap on birthdays and holidays and

23          stuff like that.  Pretty much it.

24    BY MR. PIERRE:

25          Q.   Do you smoke cigars after an arrest or during

1    one?

2           MR. FERNANDEZ:  Object to form, asked and

3      answered.

4           MS. WYDLER:  Join.

5           THE WITNESS:  No, sir.  I hate cigars.  I hate

6      cigarettes.  My mom passed away from smoking.

7      That's why I hate it so much.

8    BY MR. PIERRE:

9      Q.   Okay.

10          (Video played.)

11   BY MR. PIERRE:

12     Q.   What are you saying to Officer Hernandez

13   because it seems like you're speaking about this

14   investigation?

15     A.   I was asking him if it's going to be a 22.

16     Q.   And why did you ask him --

17     A.   Because they took over the investigation, and

18   if it's not a 22, then I'm going to have to change the

19   signal.  He said, if I remember correctly, just leave it

20   like that and we'll call you later and tell you what we

21   have.

22     Q.   Okay.  So they --

23     A.   I'm not really sure.  I'm not quite sure in

24   what he was involved in.

25     Q.   Okay.  So you had no idea if there was an

```
 1   arrest that was actually going to happen at this point.

 2            MR. FERNANDEZ:  Object to form.

 3            THE WITNESS:  That's correct.  I had no idea.

 4   BY MR. PIERRE:

 5       Q.   But you did play a role in the detention of

 6   Mr. Scott, correct?

 7            MR. FERNANDEZ:  Object to form, asked and

 8       answered.

 9            MS. WYDLER:  Join.

10            THE WITNESS:  That's incorrect.  I didn't play

11       any role in that.

12   BY MR. PIERRE:

13       Q.   We just watched a 9:15 video.  You were

14   involved.  Would you at least agree with me on that?

15            MR. FERNANDEZ:  Object to form, asked and

16       answered multiple times.

17            You can go ahead and answer.

18            THE WITNESS:  You know, it depends on what you

19       mean by involved.  I mean, of course, if I'm on the

20       scene, I'm involved.  Anybody that's on the scene

21       was involved.  So I'm not really understanding what

22       you're asking.

23            Yes, I mean, if I'm on the scene, of course,

24       I'm involved.

25   BY MR. PIERRE:
```

1        Q.   There's this young lady next to you by the

2   name of Officer Patricia Carriel.  Would you say her

3   involvement was greater than your involvement or less

4   than your involvement?

5             MR. FERNANDEZ:  Object to form.

6             THE WITNESS:  Again, it depends on the

7        definition of involvement.  I mean, she's in

8        training, so you know, it depends on your

9        definition of involvement.  She's in training.  Of

10       course, she's going to be involved in what's going

11       on.  That's the only way she's going to learn how

12       to become a police officer and get out there on her

13       own, so it depends on what your definition is.

14   BY MR. PIERRE:

15       Q.   Okay.

16       A.   I don't quite understand.

17       Q.   Okay.  So did Officer Patricia Carriel

18   surround Mr. Scott?

19             MR. FERNANDEZ:  Object to form.

20             THE WITNESS:  Negative.  Again, it depends on

21       the definition of surround.  To me, when you

22       surround someone or something, you know, you gather

23       to make sure that -- you know, you make a circle

24       around that, whatever it may be, and that's pretty

25       much it.  I don't think she's involved in any type

```
1          of surrounding him.  She was just standing there

2          just taking up post.

3     BY MR. PIERRE:

4          Q.   I agree.

5          A.   That's all she was doing.

6          Q.   I agree with you.  Did Officer Patricia

7     Carriel pat Mr. Scott down?

8               MR. FERNANDEZ:  Object to form.

9               THE WITNESS:  Not that I know of.  I didn't

10          see her pat anybody down.

11    BY MR. PIERRE:

12         Q.   Okay.  Did Officer Patricia Carriel frisk Mr.

13    Scott?

14              MR. FERNANDEZ:  Object to form, asked and

15          answered.

16              THE WITNESS:  Again, frisk search and a pat

17          down is the same definition.  Just a different

18          term, but it's the same thing, so if you didn't

19          frisk, you didn't pat down.

20    BY MR. PIERRE:

21         Q.   Okay.  Did Officer Carriel put handcuffs on

22    Mr. Scott?

23              MR. FERNANDEZ:  Object to form, asked and

24          answered.

25              THE WITNESS:  No, she didn't put any handcuffs
```

1        on him.

2    BY MR. PIERRE:

3        Q.    Did Officer Carriel direct Scott to put his

4    hand behind his back?

5              MR. FERNANDEZ:  Object to form.

6              THE WITNESS:  Negative.  She was in training.

7              She has to go by what her field training officer

8              tells her to do.

9    BY MR. PIERRE:

10       Q.    Okay.  But you did some of those actions; did

11   you not?

12             MR. FERNANDEZ:  Object to form.

13   BY MR. PIERRE:

14       Q.    Correct?

15       A.    It depends on what action you're speaking,

16   obviously.

17       Q.    For example, you patted and frisked Mr. Scott,

18   correct?

19             MR. FERNANDEZ:  Object to form, asked and

20             answered.

21             THE WITNESS:  Again, I patted him down because

22             I know he was going to get in my car.  At least, I

23             thought he was going to be in my car -- get in my

24             car.  If he wasn't going to get in my car, I wasn't

25             going to touch him, and I had absolutely nothing to

```
 1        do with that.  No one is going to be placed in my

 2        car if I don't pat them down because I feel more

 3        comfortable when I do it, and I know I'm

 4        comfortable and I can ride with them in my car

 5        because I know I pat them down.

 6             I don't go by what another officer states.  I

 7        just don't do that.

 8   BY MR. PIERRE:

 9        Q.   Okay.  And you were going to -- you were going

10   to stop Mr. Scott if he decided to escape, correct?

11             MR. FERNANDEZ:  Object to form, asked and

12        answered.  You're actually harassing the witness

13        now.  This is the last time he's going to answer

14        this question.

15             THE WITNESS:  Again, that's being

16        hypothetical.  I mean, you know, what if.  You

17        know, what if I died last night?  I wouldn't be

18        here today giving my statement, so I mean, it's

19        hypothetical.  You can't really go by that what if.

20   BY MR. PIERRE:

21        Q.   No, no, it's not hypothetical because you took

22   a tactical position when you were standing at the scene,

23   and I'll point it directly where you were standing so

24   there's no hypotheticals involved.  At the 2:26 mark, do

25   you see that?
```

```
 1        A.   I do.

 2        Q.   So it's your position or your testimony that

 3   you were just standing in the scene while watching

 4   Officer Miguel Hernandez detain or arrest Mr. Scott,

 5   correct?

 6             MR. FERNANDEZ:  Object to form,

 7        mischaracterizes testimony.  Go ahead.

 8             THE WITNESS:  That's correct.  That's not a

 9        tactical position.  If that was a tactical

10        position, I would be more in the ready position

11        with my hands on my gun belt with my hands together

12        in a defensive mode.  That's not a technical

13        position.  That's just standing.

14   BY MR. PIERRE:

15        Q.   Yeah, but you said you had to be situationally

16   involved.

17             MR. FERNANDEZ:  Object to form.  Go ahead.

18             THE WITNESS:  Again, if an officer is patting

19        someone down, you're not going to turn your back on

20        that officer.  You're going to look and see what's

21        going on in case something bad happens, which it

22        does all the time.

23   BY MR. PIERRE:

24        Q.   So you would agree with me that you were

25   prepared for if something bad happened while he was
```

1    searching Mr. Scott, correct?

2          MR. FERNANDEZ:  Object to form.

3          THE WITNESS:  Of course, I'm going to always

4      be prepared in case something were to happen.  I

5      mean, you're a police officer.  You don't just sit

6      there lollygagging, you know, twiddling your

7      thumbs.  You have to be ready in case something

8      were to happen.

9    BY MR. PIERRE:

10     Q.   So you weren't lollygagging while Mr. Scott

11   was being detained and seized by Officer Hernandez,

12   correct?

13         MR. FERNANDEZ:  Object to form.

14         MS. WYDLER:  Objection, form.

15         MR. FERNANDEZ:  Mischaracterizes the evidence

16     and testimony.  Go ahead.

17         MS. WYDLER:  Join.

18         THE WITNESS:  Again, police work is a very

19     important job.  I mean, you can't sit there, stand

20     there and pretend you're not there.  You know,

21     anything can happen at any given time, so I'm not

22     going to sit there and just pretend like, you know,

23     I'm not going to help out.  Of course, I'm going to

24     help out.  You don't know what can happen.  Bad

25     things happen all the time.  I mean, it's not to

```
 1        say if Mr. Scott were to pull out a weapon and

 2        start firing, then what?

 3   BY MR. PIERRE:

 4        Q.   So you would agree with me then if you were

 5   helping out, you assisted in the detention of Mr. Scott,

 6   correct?

 7             MR. FERNANDEZ:  Object to form.

 8             MS. WYDLER:  Join.

 9             MR. FERNANDEZ:  Go ahead.

10             THE WITNESS:  Negative.  I mean, your

11        definition of detention is totally different than

12        my definition of detention, so no, absolutely not.

13   BY MR. PIERRE:

14        Q.   What is your definition of detention?

15             MR. FERNANDEZ:  Object to form, asked and

16        answered already.  Go ahead.

17             THE WITNESS:  If I were to place that

18        gentleman or whoever it may have been, if I detain

19        them, that's when I'm involved because I'm telling

20        them they're being detained.

21   BY MR. PIERRE:

22        Q.   So your definition of detention doesn't

23   include frisking someone or patting someone down?

24             MR. FERNANDEZ:  Object to form.

25             MS. WYDLER:  Objection, form.
```

```
 1              THE WITNESS:  Absolutely not.  There is many a
 2         times when we pat people down when we're just
 3         taking them from Point A to Point B, something of
 4         that nature.  We're going to always pat you down
 5         prior to you getting inside of our police vehicles.
 6         That's just standard operation and procedures.
 7         Whether you did something or not, we're going to
 8         pat you down.
 9    BY MR. PIERRE:
10         Q.   You would agree with me that you cannot just
11    go around patting and frisking people, correct?
12              MR. FERNANDEZ:  Object to form.
13              MS. WYDLER:  Object to the form.
14              MR. FERNANDEZ:  Asked and answered.
15              THE WITNESS:  Yeah, I agree.  I'll agree with
16         that.
17    BY MR. PIERRE:
18         Q.   So, therefore, if an order to pat and frisk
19    someone, you have to have detained them, correct?
20              MR. FERNANDEZ:  Object to form.
21              MS. WYDLER:  Join.
22              THE WITNESS:  Negative.  Again, I'll give you
23         the example I gave you before.  Oftentimes, we take
24         people who gets lost or they don't know where
25         they're at, and we'll take them to the bus stop or
```

```
 1        wherever they need to go to.  Oftentimes, they

 2        don't really know exactly the address, but they

 3        know a building or, you know, near the hospital or

 4        something of that nature, and we pat them down.  We

 5        pat them down, and then we'll put them in our car

 6        and take them to where they need to go once we

 7        radio it in.

 8             Let them know we've got one male or one female

 9        or whatever it may be.  And a lot of times, you

10        have people that want to go to the VA Hospital.

11        They don't know where it's at.  We'll put them in

12        our car and take them to the VA Hospital.  I mean,

13        you don't have to detain a person to pat them down.

14   BY MR. PIERRE:

15        Q.   But that's when someone actually -- basically

16   allows you to pat and frisk them, correct?

17             MR. FERNANDEZ:  Object to form, hypothetical.

18        Go ahead and answer the question.

19             THE WITNESS:  Not necessarily because

20        oftentimes, people will say, well, that's okay.

21        Don't worry about it.  So I say, hey, I have to pat

22        you down before I put you in the vehicle because

23        that's our policy.  Sometimes, they'll say no,

24        don't worry about it.  I'll just walk.  You know,

25        just let them walk, and sometime they say no
```

```
 1        problem.
 2   BY MR. PIERRE:
 3        Q.   Again, I'm not trying to like beat this.  I'm
 4   just trying to get you to answer.  I think we're saying
 5   the same thing.  If this was a consensual encounter and
 6   basically, he said yes, you can pat me down, you would
 7   pat him down, correct?
 8             MR. FERNANDEZ:  Object to form,
 9        mischaracterizes testimony.  Go ahead.
10             MS. WYDLER:  Join.
11             THE WITNESS:  Yes, I would pat them down.
12        Again, I'm going to pat down everyone.  I don't
13        care if you're a juvenile.  I don't care if you're
14        an adult.  I'm going to pat you down before I put
15        you in my car.
16   BY MR. PIERRE:
17        Q.   And what I'm saying and have been consistently
18   saying, Mr. Scott was detained.  Did he ask you to pat
19   him down?
20             MR. FERNANDEZ:  Object to form.
21             THE WITNESS:  No, why would he ask me to pat
22        him down if the officer is saying I'm going to
23        detain him?  I mean, he don't have to ask me to pat
24        him down.  If you're detained, you're going to get
25        patted down.
```

```
 1              MR. PIERRE:  Hey, let's take a five-minute
 2         break because I have to address something.
 3              (Off the record.)
 4    BY MR. PIERRE:
 5         Q.   I'm going to show you another exhibit.
 6              MR. PIERRE:  Madam Court Reporter, I'm going
 7         to mark this as Plaintiff's Exhibit 5, and for the
 8         record, this is the extraction _1-4.1, and Exhibit
 9         4 was the Axon cam.
10              (Thereupon, Plaintiff's Exhibit 5 was marked
11         for identification.)
12              (Video played.)
13    BY MR. PIERRE:
14         Q.   From what I heard, Officer Guzman says do the
15    report, doesn't he?
16              MR. FERNANDEZ:  Object to form, asked and
17         answered.  Go ahead.
18              THE WITNESS:  No, that was Officer Carriel.
19              (Video played.)
20    BY MR. PIERRE:
21         Q.   So what was that communication that was
22    happening between yourself and Officer Guzman?
23         A.   He asked for a report, but it wasn't a report.
24    It was a stolen vehicle affidavit, which I had in my
25    hand.  I was signing off on it.
```

```
 1                (Video played.)

 2   BY MR. PIERRE:

 3       Q.   All right.  This is a better angle.  Who is

 4   the individual standing on the, for lack of a better

 5   word, sidewalk/pavement area?

 6       A.   That's Carriel.

 7       Q.   And who is the individual that is right next

 8   to my client, Samuel Scott?

 9       A.    It's Officer Hernandez.

10       Q.   And how is the individual that is to the left

11   of Mr. Scott?

12       A.    That's me.

13       Q.   Okay.  So it's still your position that you,

14   Officer Carriel, and Officer Hernandez did not surround

15   my client, Mr. Scott?

16            MR. FERNANDEZ:  Object to form, asked and

17       answered.

18            MS. WYDLER:  Join.

19            THE WITNESS:  Yes, that's correct.

20            (Video played.)

21   BY MR. PIERRE:

22       Q.   Officer Bloom, why didn't you just go into

23   your car once the detention was occurring?

24            MR. FERNANDEZ:  Object to form.

25            MS. WYDLER:  Join.
```

1           THE WITNESS:  No, as a police officer, you

2       don't just go in your car when you have other

3       officers out there.  You know, you stay and you

4       stand by the situation where anything could happen

5       at any given time.  So, no, I wasn't going to go

6       sit in my car.  I don't think any police officer

7       would do that while they try to figure out what

8       they've got.  I don't think anyone would do that.

9   BY MR. PIERRE:

10      Q.   I think Officer Patricia Carriel went into the

11  vehicle.

12          MR. FERNANDEZ:  Object to form.

13          THE WITNESS:  Again, she went in the vehicle

14      because Officer Hernandez gave her an ID card and

15      told her to do a check.  That's the reason why she

16      went in the vehicle.  She can't do it outside the

17      vehicle because the computer is inside the vehicle.

18          MR. FERNANDEZ:  Faudlin, I have the unredacted

19      CAD.

20          MR. PIERRE:  Thank, God.  Okay.  Can you send

21      that over?

22          MR. FERNANDEZ:  Yes, can we take a one- minute

23      break?

24          (Off the record.)

25  BY MR. PIERRE:

1      Q.   The question was you begin to search Mr.

2   Scott at about 4:55 in Exhibit 5, correct?

3           MR. FERNANDEZ:  Object to form.

4           THE WITNESS:  Correct.

5           (Video played.)

6   BY MR. PIERRE:

7      Q.   And by my estimate, you completed your frisk,

8   your search at around 5:13, correct?

9           MS. WYDLER:  Object to form.

10          MR. FERNANDEZ:  Join.

11          THE WITNESS:  Yes, that's what it's showing.

12      I mean, I don't keep up with the time.  I just do a

13      thorough search and pat.  I just take my time to do

14      it.

15          (Video played.)

16  BY MR. PIERRE:

17      Q.   Prior to searching Mr. Scott, did you observe

18   a white shirt beneath his black T-shirt?

19      A.   I did.

20      Q.   When did you observe it before searching him?

21      A.   I don't recall when I observed it prior to

22   searching him, but just in that video, I can see it.

23      Q.   Where in the video did you see it because I

24   couldn't?

25          MR. FERNANDEZ:  Object to form.

```
 1            MS. WYDLER:  Join.
 2            THE WITNESS:  Well, actually, I saw it in the
 3        front of him, and in that other video that you
 4        showed me, then behind him underneath here.
 5   BY MR. PIERRE:
 6        Q.   Okay.  So in front of him in -- but you had to
 7   -- in this video, you actually had to lift his shirt up
 8   to discover the white shirt, correct?
 9            MR. FERNANDEZ:  Object to form,
10        mischaracterizes testimony.
11            MS. WYDLER:  Form.
12            THE WITNESS:  Not necessarily because you
13        could see the white T-shirt on.  You could see the
14        black shirt covering the white shirt.  You can see
15        the neck portion of it.
16   BY MR. PIERRE:
17        Q.   Yeah, but you were to his side, so until you
18   actually searched my client, you didn't see a black -- I
19   mean, a white T-shirt, correct?
20            MR. FERNANDEZ:  Object to form.
21            MS. WYDLER:  Objection, form.
22            THE WITNESS:  That's correct.
23   BY MR. PIERRE:
24        Q.   So your first discovery of the white T-shirt
25   is when you actually searched my client, correct?
```

1              MR. FERNANDEZ:  Object to form.

2              MS. WYDLER:  Objection, form.

3              MR. FERNANDEZ:  Mischaracterizes testimony.

4              THE WITNESS:  I mean, it could have been.

5         It's been a while.  I really can't recall.

6   BY MR. PIERRE:

7         Q.   Initially, you testified that he was wearing a

8   white shirt.  Where did you get that from?

9              MR. FERNANDEZ:  Object to form.

10        Mischaracterizes testimony.

11             MS. WYDLER:  Join.

12             THE WITNESS:  Where did I get that from?  I

13        got that from what I thought he had on at the time

14        that you asked me.  I mean, that's what I recall.

15        You know, I could have been incorrect, but that's

16        what I thought.

17  BY MR. PIERRE:

18        Q.   No, we know you were incorrect.  What I'm

19  asking is where did you get your basis for that

20  incorrectness?

21             MR. FERNANDEZ:  Object to form.

22             THE WITNESS:  I could have got it from the

23        CAD.

24  BY MR. PIERRE:

25        Q.   Which CAD?

1      A.   There is only one CAD.  The CAD that was in my

2   vehicle under the comment section.

3      Q.   Okay.  So you are -- so was that at the time

4   -- I'm confused because -- I'm confused.  Let me take a

5   step back.

6           You're saying that you saw -- you believe that

7   my client was wearing a white shirt when you initially

8   met him or a white tank top because of the CAD, correct?

9           MR. FERNANDEZ:  Object to form.

10           MS. WYDLER:  Join.

11           THE WITNESS:  Well, it's been a long time, and

12           that's what I thought he had on until I saw the

13           video.

14   BY MR. PIERRE:

15      Q.   When was the last time you saw the video,

16   Officer?

17      A.   I only saw it once.  That was about a week

18   ago, three days ago, a week ago.  Something like that.

19      Q.   So you had an opportunity to review the video

20   prior to your testimony, correct?

21      A.   I did.

22      Q.   And all of a sudden, after viewing the video,

23   you still believe that my client was wearing a white

24   shirt despite what your eyes showed you.

25           MS. WYDLER:  Objection, form.

```
 1              MR. FERNANDEZ:  Object to form, argumentative.

 2         Go ahead.

 3              THE WITNESS:  No, I saw the video, and then I

 4         thought that it was white, and then when I saw the

 5         video, I noticed he had on a black shirt.

 6    BY MR. PIERRE:

 7         Q.   Okay.  I know we've talked a lot about colors

 8    today, but a white shirt and a black shirt, wouldn't you

 9    agree, they're complete opposites?

10         A.   I would agree.  I would agree that every color

11    is opposite from the opposite color.  If one is black,

12    one is brown, one is green.  Yes, I do.  I mean, you

13    know, that's just common knowledge.

14         Q.   So there is a distinction on someone wearing a

15    black shirt and a white shirt, agreed?

16              MR. FERNANDEZ:  Object to form.

17              THE WITNESS:  I agree.

18    BY MR. PIERRE:

19         Q.   Okay.  So when you said earlier in the

20    testimony that my client was wearing a white shirt when

21    you first saw him, you really meant black, didn't you?

22              MR. FERNANDEZ:  Object to form.

23              MS. WYDLER:  Object to form.

24              MR. FERNANDEZ:  Mischaracterizes testimony.

25              THE WITNESS:  I meant white because that's
```

1        what I thought he had on.

2    BY MR. PIERRE:

3        Q.   I'm trying to see if I can get your

4    involvement on here.

5             (Video played.)

6    BY MR. PIERRE:

7        Q.   Sorry about the interplay.  I'm just trying to

8    figure out where you come in again.

9             (Video played.)

10   BY MR. PIERRE:

11       Q.   My client specifically -- I think this is a

12   better video.  He says I'm being arrested, and in

13   response, Officer Guzman says being detained.  What is

14   your understanding when that transaction or

15   communication occurred?

16            MR. FERNANDEZ:  Object to form.

17            THE WITNESS:  Well, I don't really know that I

18       heard him say what he said.  I mean, I see it in

19       the video, but I don't see myself near them.  I

20       mean, I could have heard.  I'm not 100 percent sure

21       that I heard that.

22   BY MR. PIERRE:

23       Q.   Okay.

24       A.   But a detainment is just that, a detainment,

25   you know, until they finish their investigation.

1      Q.   Do you know what investigation actually

2  occurred during the course of the detention of my

3  client?

4           MR. FERNANDEZ:  Object to form.

5           THE WITNESS:  No, I don't know what it was.  I

6      mean, I wasn't around them when they did -- when

7      they were conducting their investigation.

8  BY MR. PIERRE:

9      Q.   But in your presence, what investigation was

10  being done?

11          MR. FERNANDEZ:  Object to form.

12          THE WITNESS:  Well, in my presence, there was

13      no investigation being done.  I mean, they were

14      talking to each other in reference to Mr.  Scott.

15      I mean, I had no idea what they were talking about.

16  BY MR. PIERRE:

17     Q.   Okay.  But I mean, we have the video of Mr.

18  Scott.  Were there any questions that were posed by you

19  or any of the other officers --

20     A.   No.

21     Q.   -- to add to his alibi?

22          MR. FERNANDEZ:  Object to form.

23          THE WITNESS:  No, I don't know anything about

24      an alibi.

25          (Video played.)

1    BY MR. PIERRE:

2        Q.   Okay.   This is even better audio.   Officer

3    Guzman is speaking to you directly, and he says I need

4    that report.   What was your understanding by his

5    statement of I need that report?   Do that report?

6            MR. FERNANDEZ:   Object to form, asked and

7            answered.   Go ahead.

8            THE WITNESS:   I know he said a report, but

9            it's not a report.   A report is not done in 20

10           minutes.   It has to be approved by the sergeant and

11           the lieutenant.   He's talking about the stolen

12           vehicle affidavit.   It's not a report.   It's a

13           stolen vehicle affidavit.   He may have used the

14           wrong term, but it's not a report, but I knew what

15           he was talking about.

16           He was talking about the stolen vehicle

17           affidavit that Mr. Samuel filled out, but I still

18           had to sign off on it.   That's what he was talking

19           about, and he said that he needed that.   That's

20           what he was talking about.   He wasn't talking about

21           an actual report because he wasn't given a report.

22           He was only given the stolen vehicle affidavit to

23           add to his investigation.

24           (Video played.)

25           MR. PIERRE:   Madam Court Reporter, which

```
 1       exhibit are we on?

 2            THE REPORTER:  Exhibit 6.  Yeah, Exhibit 6.

 3            (Thereupon, Plaintiff's Exhibit 6 was marked

 4       for identification.)

 5            MR. PIERRE:  Thank you.

 6  BY MR. PIERRE:

 7       Q.   Officer Bloom, do you see my screen?

 8       A.   I do.  It's small, but I see it.

 9       Q.   Okay.  Let's see if we can make it bigger for

10  you.  Can you see it?

11       A.   Yes.

12       Q.   Okay.  This is the unredacted version of the

13  incident search with incident details.  Who is the

14  caller identified as?

15       A.   Samuel.

16       Q.   And do you know what NW 54T means?

17       A.   NW is Northwest, and 54 is 54th.  Do you know

18  why this individual would have been -- why NW 54T would

19  have been connected to the caller?

20            MR. FERNANDEZ:  Object to form.

21            MS. WYDLER:  Objection, form.

22            THE WITNESS:  The callers that make calls,

23       they can say wherever they're at.  I mean, that's

24       where they're saying they were at.

25  BY MR. PIERRE:
```

1        Q.   Okay.  So Northwest 54th Street is where

2   they're at?

3             MR. FERNANDEZ:  Object to form.

4             THE WITNESS:  Well, I see 54, but I'm sure

5        it's probably 54th Street, but that's all I see is

6        54.  I don't see anything after that.

7   BY MR. PIERRE:

8        Q.   Does this say that the caller was somewhere

9   near 71st and Northwest 6th Court or 5th Court?

10             MR. FERNANDEZ:  Object to form.

11             THE WITNESS:  Negative.  It doesn't say that,

12        but the caller can say wherever they're at.  The

13        call taker is just going to take down what they

14        say.  That doesn't necessarily make them there.

15   BY MR. PIERRE:

16        Q.   And does it necessarily make them there if it

17   has -- in your experience, has the call -- the place

18   where the call was -- strike that.

19             Is there a park near Northwest 54th Street?

20        A.   It depends on what avenue you're talking

21   about.

22        Q.   Somewhere in --

23        A.   54th goes a long way.  It goes from Biscayne

24   Boulevard all the way to Hialeah, so I don't know where

25   on 54th Street you're speaking of.

1      Q.   Somewhere near Northwest 6th Court or 6th Ave.

2      A.   6th Avenue, is there a park there?  There's no

3   park there.

4      Q.   Is there any sort of -- were you near 54th

5   Street prior to making contact with my client?

6           MR. FERNANDEZ:  Object to form, asked and

7           answered again.

8           THE WITNESS:  -- where I was at, but I know it

9           didn't take long to get there.  I mean, I was on --

10          I was patrolling.

11   BY MR. PIERRE:

12      Q.   And you had my client's phone number, correct?

13      A.   Do I have your client's phone number?  I don't

14   have the phone number.

15      Q.   On June 1, 2018, when he made the call

16   regarding the stolen vehicle, you had my client's

17   telephone number, correct?

18          MR. FERNANDEZ:  Object to form.  Go ahead.

19          MS. WYDLER:  Join.

20          THE WITNESS:  The number is in the CAD, yes.

21          I thought you were asking do I have his number.  I

22          don't have his number.

23   BY MR. PIERRE:

24      Q.   Okay.  So at the time prior to meeting with my

25   client, you had my client's telephone number at your

1   disposal, correct?

2          MR. FERNANDEZ:  Object to form, asked and

3       answered.

4          MS. WYDLER:  Same.

5          THE WITNESS:  You keep saying I had the phone

6       number.  I don't have the phone number.  The phone

7       number is located -- a phone number is located in

8       the CAD.  That doesn't necessarily make it his

9       phone number.  It's just a number to use.  That

10      doesn't necessarily make it his number.  It could

11      have been someone's phone they borrowed.  It

12      happens all the time.

13  BY MR. PIERRE:

14      Q.   Okay.

15      A.   It doesn't mean it's their number.

16      Q.   Did you call the 786-442-0054 number prior to

17  making contact with my client on June 1, 2018?

18          MR. FERNANDEZ:  Object to form.

19          THE WITNESS:  Negative.  I don't remember

20      calling the number because when I came back around,

21      that's when I saw him walking up the sidewalk.  I

22      thought it was him, and then I realized it was him

23      because he was waving me down.

24  BY MR. PIERRE:

25      Q.   Okay.  So you didn't see another heavyset

1    black male, baldheaded, six foot two wearing a white

2    tank top on that street, did you?

3            MR. FERNANDEZ:  Object to form.

4            MS. WYDLER:  Join.

5            THE WITNESS:  I didn't see anyone in that area

6        but him.

7    BY MR. PIERRE:

8        Q.   So on June 1, 2018, it's your testimony you

9    did not physically arrest Mr. Scott, correct?

10           MR. FERNANDEZ:  Object to form, asked and

11       answered.  This is the last time he's answering

12       this question.  Go ahead.

13           THE WITNESS:  Yes, that's correct.

14   BY MR. PIERRE:

15       Q.   Do you own a home?

16           MR. FERNANDEZ:  Answer the question.

17           THE WITNESS:  I'm sorry, could you repeat the

18       question?  Can you repeat the question?

19   BY MR. PIERRE:

20       Q.   Yeah.  Do you own a home?

21       A.   Yes, I own a home, yes.

22       Q.   How many homes do you own?

23       A.   Just one.

24       Q.   What's the value of the home as we sit here

25   today?

```
 1        A.    Probably about 400,000.

 2        Q.    And what is -- you have a job, so do you make

 3   -- what's your annual salary or gross income from that

 4   job?

 5        A.    Gross income, about 70,000.  Yeah, about

 6   70,000.

 7        Q.    And that's just from the City of Miami,

 8   correct?

 9        A.    That's correct.

10        Q.    Do you work any other jobs besides --

11        A.    No, I don't work overtime.

12        Q.    Do you have any bank accounts?

13        A.    I do.

14        Q.    What is the value of the bank accounts?

15        A.    When you're asking what is the value, are you

16   asking me what is in my accounts?

17        Q.    Yeah.  How much is in your accounts

18   collectively?

19        A.    A little over 100,000.

20        Q.    Do you own any stocks?

21        A.    I do.

22        Q.    What is --

23        A.    Not stocks but I have money in my retirement

24   account from the County.

25        Q.    Okay.  Okay.  I'll get to your retirement
```

1  account, but I want to know so do you own any stocks

2  independent of any IRA retirement accounts, pensions, et

3  cetera?

4      A.   I have a pension from the County, and I have

5  my IRA.

6      Q.   Okay.  So do you have like any brokerage

7  accounts?

8      A.   No, I don't have any brokerage accounts, no.

9      Q.   Okay.  So do you own any bonds?

10     A.   No, I do not.

11     Q.   Do you own any businesses?

12     A.   No, I do not.

13     Q.   Do you own any cars, vehicles and the like?

14     A.   Own any cars vehicles in what?

15     Q.   And the like or anything -- any motor

16 vehicles?

17     A.   Yes, I have a vehicle that I own, yes.

18     Q.   And what is the value of that vehicle as we

19 sit here today?

20     A.   I don't know what the value is.  It's a 2019

21 Cadillac Escalade.  Whatever the Blue Book value is.  I

22 have no idea.

23     Q.   How much did you purchase it for?

24     A.   I think it was 56,000 or something like that.

25     Q.   Okay.  You say you have a retirement account,

1    correct?

2         A.   I do.

3         Q.   And what is the value of your retirement

4    account?

5         A.   I want to say close to 200,000.  Maybe a

6    little bit more.

7         Q.   And that's just from the County, correct?

8         A.   That's from the County, yes.

9         Q.   What about any other retirement accounts

10   besides from the County?

11        A.   Military.

12        Q.   And how much do you have in your military

13   retirement account?

14        A.   Well, I don't really know what's in my

15   military retirement account, but they send me a check

16   every month, so I couldn't really tell you what's in

17   there.  It's until I leave the face of this earth, I'll

18   be getting paid.

19        Q.   Is it life insurance?

20        A.   No, it's not life insurance.  It's a life-long

21   retirement that you would get from the military.

22        Q.   Oh, okay.  So do you receive retirement

23   benefits?

24        A.   Absolutely.

25        Q.   And from the County, how much do you receive?

1      A.   Gross?

2      Q.   Yeah, on an annual basis, how much do you

3  receive?

4      A.   Well, you can multiply it.  It's about 6,200 a

5  month times 12.  Whatever that is.

6      Q.   So 6,200 a month -- I'm just going to go

7  monthly.  Monthly, you receive 6,200 a month from the

8  County, correct?

9      A.   Gross, yes.

10      Q.   Okay.  From the military, how much do you

11  receive monthly from the military?

12      A.   About 2,300.

13      Q.   2,300.  And how much do you receive monthly

14  from the City gross?

15      A.   Honestly, I don't really keep up with the

16  City.  I guess about 26, 28.  Something like that.

17      Q.   So by my estimate, you receive about 11,000 in

18  gross income from your salary as well as your retirement

19  benefits, correct?

20      A.   Give or take, yes.

21      Q.   Do you rent any properties that you own?

22      A.   No, I don't rent anything.

23      Q.   Do you have any assets that are valued in

24  excess of $5,000?

25      A.   I'm not sure what you mean by that.

1      Q.   Meaning do you have anything, any property,

2    anything, land, real estate, personal, any property

3    that's worth more than $5,000?

4      A.   Yes, my home.

5      Q.   Okay.  Besides your home, do you have anything

6    else?

7      A.   Oh, no.  Oh, yeah, my fish tank.

8      Q.   How much is your fish tank worth?

9      A.   It's about $10,000.

10      Q.   Do you have a barracuda in there?

11      A.   No, I have a lot of high-end fish in there,

12    and I have a lot of nice corals.  I don't know if you

13    know anything about corals.  I have a lot of nice

14    corals, so yes, it's about 13,000.

15      Q.   Golly.  And what's the length of your -- like

16    how big is your fish tank?

17      A.   300 gallons.

18      Q.   And what does that look like in feet,

19    centimeters?

20      A.   It's beautiful.  It's eight feet, probably

21    eight feet in length and I'm six-two, so maybe about six

22    feet in height.

23      Q.   And how many fish do you have in there?

24      A.   I can't keep up with them.  I just purchase

25    them as I see fit.  Probably 80.  Maybe 100.  Maybe

1   more.  I don't really know the count.

2       Q.   Sounds like an aquarium to me honestly.

3       A.   Somewhat.  That is -- they're saltwater fish.

4       Q.   Okay.  Do you do any fishing?

5       A.   I do.  I fish quite a bit.

6       Q.   Okay.  Let me see if I have any questions

7   before we kind of wrap this up.

8       A.   Oh, my motorcycle also.  I forgot about that.

9       Q.   Okay.

10          MR. PIERRE:  I'm going to take a two-minute

11      break just to look over my notes before I ask you

12      some questions as to wrapping this up.  I think

13      we're about done here.

14          THE WITNESS:  Okay.

15          (Off the record.)

16   BY MR. PIERRE:

17      Q.   Is there anything you would like to add that's

18   important or relevant?

19      A.   No, sir.

20      Q.   Have you understood all the questions asked?

21      A.   I have.

22      Q.   Have you answered each question truthfully?

23      A.   Yes, I did.

24      Q.   Have you answered each question completely?

25      A.   I have, yes.

```
 1      Q.   At this time, do you want to change or amend

 2  any of your answers?

 3      A.   Negative.

 4      Q.   If this case proceeds to trial or hearing,

 5  will your testimony remain the same?

 6           MR. FERNANDEZ:  Object to form.

 7           THE WITNESS:  Yes, it will.

 8  BY MR. PIERRE:

 9      Q.   If you do recall something different, will you

10  alert your counsel so we can amend the record?

11      A.   Yes, I will.

12      Q.   Okay.

13           MR. PIERRE:  Your counsel or Ms. Wydler may

14      have questions for you.  I may have some follow up

15      after that.

16           MR. FERNANDEZ:  Lourdes, you can go first if

17      you have any questions.

18           MS. WYDLER:  I do.

19                      CROSS EXAMINATION

20  BY MS. WYDLER:

21      Q.   I do.  Hello, Sir.

22      A.   Hi.

23      Q.   I want to introduce myself.  You've been

24  hearing a voice on the other end.  Thank you for your

25  time so far.  I have a few questions, okay?
```

 1        A.    Okay.

 2        Q.    We've been here a long time, but I'm going to

 3   bring up some portions of your testimony if we can go

 4   and do that.

 5              So, earlier, when we first started talking

 6   about this case, you said that there were some portions

 7   of the call that you remember and some that you don't;

 8   is that correct?

 9              MR. PIERRE:  Objection.

10              THE WITNESS:  Yes.

11   BY MS. WYDLER:

12        Q.    And prior to giving your deposition testimony

13   today, you did review the video; is that right?

14        A.    I did, yes.

15        Q.    And would you defer to the video for -- as it

16   speaking for itself?

17              MR. PIERRE:  Objection.

18              THE WITNESS:  Yes.

19   BY MS. WYDLER:

20        Q.    You don't have a basis to dispute anything

21   that is seen on the video; is that correct?

22        A.    That's correct.

23        Q.    And you don't have a basis to dispute anything

24   that is heard on the video; is that correct?

25              MR. PIERRE:  Objection.

```
 1              THE WITNESS:  That's correct.
 2   BY MS. WYDLER:
 3       Q.   Okay.  Earlier in your testimony when you
 4   first encountered the Plaintiff, in this case, Mr.
 5   Scott, you described him as disoriented.  Do you
 6   remember saying that, sir?
 7       A.   Yeah, he seemed a little agitated.  You know,
 8   like something was bothering him.  I wasn't really sure
 9   what it was.
10       Q.   Other than agitated or something bothering
11   him, is there anything else about his presentation of
12   disorientation that you would use to describe him?
13              MR. PIERRE:  Objection.
14              THE WITNESS:  No.
15   BY MS. WYDLER:
16       Q.   You also described the information that he
17   relayed to you about the vehicle as being odd.  Do you
18   remember saying that?
19       A.   The vehicle being odd?
20       Q.   I'm sorry, the information that he gave to you
21   about the vehicle, the story about the vehicle and how
22   it was stolen.
23       A.   Oh, yes.
24       Q.   That you thought it was odd, right?
25       A.   Yes, I thought that was very odd.  Yes, I did.
```

1    Q.   Tell us why, please.

2    A.   Because no one leaves their vehicle in a park

3  that you're not used -- even if you're used to the park

4  or aware of the park, you're not going to leave your key

5  in the vehicle and then walk down the street to your

6  relative's home.  I mean, that's just -- it just seemed

7  pretty odd to me.

8    Q.   All right.

9         MS. WYDLER:  Can I get access to share my

10   screen?

11        THE WITNESS:  Yes.

12        MR. PIERRE:  You should be able to.

13        MS. WYDLER:  Okay.

14  BY MS. WYDLER:

15   Q.   All right.  We've seen this a couple times.

16  This isn't the Plaintiff's marked exhibit, but I believe

17  he marked this either as Exhibit 3 or Exhibit 6.  You've

18  seen this document today already, right?

19   A.   Yes, I have.

20   Q.   Okay.  And at the end here where my cursor is,

21  it says LS at Northwest 6th Ave. and 48th Street.  Do

22  you happen to know what the abbreviation LS means?

23   A.   Last seen.

24   Q.   All right.  Now, give me one moment.  I'm

25  going to share my screen again.  Okay.  Do you see an

1    image to the left and a map to the right?

2         A.   Yes, I do.

3         Q.   Okay.

4              MS. WYDLER:  I'm going to mark this as

5         Defendant's Exhibit Number 1.

6              (Thereupon, Defendant's Exhibit 1 was marked

7         for identification.)

8    BY MS. WYDLER:

9         Q.   Do you remember the location that had the LS

10   in front of it?  Was it Northwest 48th Street and

11   Northwest 6th Ave.?

12        A.   It was Northwest 5th Ave. and 48th Street.

13        Q.   You want me to go back to the document?

14        A.   Yes.

15        Q.   Hold on one second.  Last seen at Northwest

16   6th Ave. and 48th Street.

17        A.   48th, yes.  Okay.  Yes.

18        Q.   Do you agree with me that it's 6th Avenue,

19   right?

20        A.   Yes.

21        Q.   Okay.  Standby.  So going back to what's been

22   marked as Defendant's Exhibit Number 1, it does on the

23   left-hand side here indicate that it's Northwest 48th

24   Street and 6th Avenue; is that correct?

25        A.   That's correct, yes.

1      Q.   Would you agree with me that the image shown,

2   based on this Google Map or street view, is a park?

3           MR. PIERRE:  Objection.

4           THE WITNESS:  Yes, that's the park that it's

5        like some type of canopy or something.  That's a

6        park there, yes.

7   BY MS. WYDLER:

8      Q.   Okay.  And given this is -- I'm going to talk

9   a little over to the right side of the screen, do you

10  see where the red dot is?

11     A.   Yes, I do.

12     Q.   Okay.  Where would have been 463 Northwest

13  48th Street compared to where the red dot is?

14          MR. PIERRE:  Objection.

15          THE WITNESS:  463 would have been just south

16       of there.  It would have been two blocks south of

17       that.

18  BY MS. WYDLER:

19     Q.   Okay.  So am I in the vicinity around here?

20     A.   Yes, yes.

21     Q.   Okay.  So on Northwest 48th Street and a block

22  south; is that correct?

23     A.   Yes.

24     Q.   Okay.  I've just enlarged the picture a little

25  bit.  Is that the park that you drove by?

1      A.   Oh, yes.  Yes, that's the park, yes.

2      Q.   Okay.  And, now, going back, where you ended

3  up seeing Mr. Scott, that would have been if not

4  adjacent to 563 Northwest 48th or could have been right

5  in front of the residence and the sidewalk; is that

6  right?

7      A.   Yes, that's correct.

8      Q.   Okay.  I'm saving this so I can send this to

9  the court reporter.  Give me one moment.

10          All right.  So based on what we saw in close

11  proximity to the house where you actually saw the

12  Plaintiff, isn't the story that he gave you consistent

13  with what the document said his vehicle was last seen

14  at?

15          MR. PIERRE:  Objection.

16          THE WITNESS:  Yes.

17  BY MS. WYDLER:

18      Q.   So Northwest 48th and 6th Ave. is the park,

19  right?

20      A.   Actually, the park is 5th Avenue.  When you

21  get to the stop sign there, where we're at, that's

22  actually -- I mean, 6th Avenue is on the opposite of the

23  expressway and you come south of expressway, it's going

24  to be 5th Avenue.

25      Q.   Do you disagree with the photograph that I

1    just showed you from Google Street Maps that 6th and

2    48th is the location of the park?

3              MR. PIERRE:  Objection.

4              THE WITNESS:  No, I don't disagree.

5    BY MS. WYDLER:

6         Q.   Okay.  So let's just back it up one second.

7    6th and 48th and perhaps a portion of 5th Avenue and

8    48th encompasses the area of the park, correct?

9              MR. PIERRE:  Objection.

10             THE WITNESS:  Yes, that's correct.

11   BY MS. WYDLER:

12        Q.   Okay.  And so the way that the call came in

13   was that he claimed his car was last seen on 6th and

14   48th, which is the park, right?

15             MR. PIERRE:  Objection.

16             THE WITNESS:  That's correct, yes.

17   BY MS. WYDLER:

18        Q.   Okay.  And you testified earlier today that

19   when you made contact with the caller, that individual,

20   Mr. Scott, told you that he left the car running with

21   his keys in it at the park, right?

22             MR. PIERRE:  Objection.

23             THE WITNESS:  Yes, that's exactly what he

24        said, yes.

25   BY MS. WYDLER:

1      Q.   Okay.  So your testimony actually is

2  consistent with the record of the call, of a Signal 22,

3  right?

4      A.   That's correct, yes.

5      Q.   Okay.  Now, he wasn't located at the park when

6  you saw him, right?

7      A.   Right.

8      Q.   Okay.  So what the Plaintiff told you was that

9  from the time that he called, the car was in one

10  location.  He went to his relative's house.  He went

11  back to the park to find his car missing and then was

12  walking around to locate you; is that right?

13          MR. PIERRE:  Objection.

14          THE WITNESS:  That's correct, yes.

15  BY MS. WYDLER:

16      Q.   Okay.  That's odd, isn't it?

17      A.   I thought it was.

18          MR. PIERRE:  Objection.

19  BY MS. WYDLER:

20      Q.   Now, what's the protocol -- strike that.

21          Isn't it the protocol when you've received the

22  stolen vehicle affidavit to call it in?

23      A.   To call in the -- yes, yes, yes, yes.  I mean,

24  not the -- you don't call in the stolen vehicle

25  affidavit.  You call CIS to let them know to put it in

1    the system as being stolen.

2         Q.   Right.  And the information that you relay

3    over the system is the make and model of the car as well

4    as any tag information that the caller may provide you;

5    is that right?

6         A.   That's correct.  Yeah, you have to have that

7    information.

8         Q.   Okay.  And to the best of your knowledge, that

9    information was relayed over the radio.

10        A.   That's correct, yes.

11        Q.   And as a result of that information that was

12   relayed over the radio, you received a call, QSY, right?

13             MR. PIERRE:  Objection.

14             THE WITNESS:  That's correct.

15   BY MS. WYDLER:

16        Q.   Okay.  And you explained to us that QSY means

17   change channels, correct?

18        A.   That's correct, yes.

19        Q.   And when you change channels, at that point in

20   time, there was a communication between you and an

21   unidentified person on the other end, correct?

22        A.   Yes, that's correct, yes.

23        Q.   And to the best of your recollection, what you

24   remember is that someone told you that units were

25   responding to the scene that you were at, right?

1      A.   Yes, that's correct, yes.

2      Q.   Isn't it possible there was additional

3   information that may have been exchanged that today,

4   five years later, you do not remember?

5           MR. PIERRE:  Objection.

6           THE WITNESS:  Yes.

7   BY MS. WYDLER:

8      Q.   All right.  Now, you're on the scene.  You

9   receive the affidavit, and at that point, other officers

10  arrive, correct?

11     A.   Yes.

12     Q.   Okay.  Stepping aside from this particular

13  incident, in general, okay, I'm going to ask you some

14  general questions about policing.

15          In general, if you see someone commit a crime,

16  have you identified that person?

17          MR. PIERRE:  Objection.

18          THE WITNESS:  If I see someone commit a crime?

19  BY MS. WYDLER:

20     Q.   Yes, sir.

21     A.   Yes, I would be able to identify that person.

22     Q.   Right.  And what's another word for an arrest

23  form?

24     A.   We just say A-form for short.

25     Q.   Right.  And aren't A-forms sometimes called PC

1    affidavits?

2        A.    Yes, but not by the police department.

3    Usually, in the state attorney's office, they would say

4    that.  We don't normally say that, but yes, I've heard

5    that term before.

6        Q.    Okay.  And the reason why they may call that a

7    PC affidavit is because probable cause is necessary in

8    order to make an arrest, correct?

9        A.    Oh, yes.  Definitely, yes.

10       Q.    Okay.  Now, if you have seen someone commit a

11   crime as a police officer and you have identified that

12   person as the person committing such a crime, wouldn't

13   you have probable cause to make that arrest?

14           MR. PIERRE:  Objection.

15           THE WITNESS:  Oh, yes.  You definitely have

16       probable cause if I can see them.  Definitely yeah.

17   BY MS. WYDLER:

18       Q.    And that's routinely done every day on every

19   shift; is it not?

20       A.    It is, yes.

21       Q.    Going back to our scene more specific.  The

22   two officers that arrived, we see you on video and we

23   see them talking to you, right?  You remember that?

24       A.    Yes.

25       Q.    All right.  And right now, what I'm referring

1    to is when you're actually sitting in a car and you're

2    approached by the units that you were told were coming

3    to your scene, correct?

4         A.   Correct.

5         Q.   All right.  So once they're there, someone,

6    one of the officers, I believe you may have identified

7    him as Officer Carriel, said that's the guy, that's the

8    bailout.  Do you remember that?

9         A.   Yes, I think that was Officer Guzman.

10        Q.   Okay.  And do you remember actually repeating

11   and saying to him that's the bailout?

12        A.   I do.  I probably did say that.  Yes, yes, I'm

13   almost sure, yes.

14        Q.   So if you repeated that's the bailout, doesn't

15   that mean that you heard him say that?

16        A.   Yes, yes, absolutely.

17        Q.   Okay.  And if someone is telling you that's

18   the bailout, that's the person they were looking for,

19   right?

20             MR. PIERRE:  Objection.

21             THE WITNESS:  Yes.

22   BY MS. WYDLER:

23        Q.   That means that they identified that

24   individual; is that not right?

25             MR. PIERRE:  Objection.

```
 1              THE WITNESS:  Correct, yes.

 2   BY MS. WYDLER:

 3       Q.   As you were sitting in your car, did you have

 4   a reasonable belief that the officers that responded to

 5   the scene believed that they had the suspect from the

 6   bailout in your area?

 7              MR. PIERRE:  Objection.

 8              THE WITNESS:  Yes, yes, I did, yes.

 9   BY MS. WYDLER:

10       Q.   Now, when you got out of the car, you were

11   speaking with Officer Hernandez and the female Officer

12   Carriel.  Do you remember that?

13       A.   I do, yes.

14       Q.   Do you remember that there was a lapse of time

15   of over a little bit less than a minute but more than 30

16   seconds where you all are just talking outside of the

17   car, and the Plaintiff is sitting on the curb?

18       A.   Yes, I do.

19       Q.   Is it possible that you could have relayed

20   that information to Officers Hernandez and Carriel about

21   the bailout?

22              MR. PIERRE:  Objection.

23              THE WITNESS:  Yes, it's possible.

24   BY MS. WYDLER:

25       Q.   As you sit here, do you have an independent
```

1    recollection of it?

2         A.   I do not.

3         Q.   And I understand that.  Do you rely on the

4    video to show that there were conversations happening

5    during that time period?

6              MR. PIERRE:  Objection.

7              THE WITNESS:  Yes.

8    BY MS. WYDLER:

9         Q.   And perhaps you may not have caught it, but do

10   you remember in the video, everyone's head turning to

11   the Plaintiff and Officer Hernandez gesturing the

12   Plaintiff to approach your patrol car?

13        A.   Yes, I do.

14        Q.   Isn't it reasonable to believe that once you

15   relayed some information to Officer Hernandez, that he

16   took initiative as you called him as a senior officer on

17   scene?

18             MR. PIERRE:  Objection.

19             THE WITNESS:  Yes.

20   BY MS. WYDLER:

21        Q.   Was is reasonable for you and Officer

22   Hernandez to believe that because other officers who

23   took over the scene had probable cause?

24        A.   Yes, absolutely.

25        Q.   And isn't it true that they had probable cause

```
 1    to potentially arrest this individual who had bailed out

 2    on them?

 3              MR. PIERRE:  Objection.

 4              THE WITNESS:  Yes.

 5    BY MS. WYDLER:

 6         Q.   Now, generally speaking, as an officer, when

 7    an officer may have probable cause, that doesn't

 8    necessarily mean that they have to make an arrest at

 9    that moment.  Is that fair to say, sir?

10              MR. PIERRE:  Objection.

11              THE WITNESS:  It's very fair.  It's very fair

12         to say.

13    BY MS. WYDLER:

14         Q.   Isn't it true that officers like to shore up

15    their arrests, make sure that they check all their

16    boxes?

17              MR. PIERRE:  Objection.

18              THE WITNESS:  Yes, that's important.

19    BY MS. WYDLER:

20         Q.   In your experience as a police officer, have

21    you contacted your sergeant prior to making a physical

22    arrest of an individual?

23              MR. PIERRE:  Objection.

24              THE WITNESS:  I have.  It depends on what the

25         arrest is, but I have, but very rarely do I contact
```

1        the sergeant because everybody runs to the radio

2        and they would come on the scene just to make sure

3        everything is good.

4   BY MS. WYDLER:

5        Q.   And should an officer be penalized for

6   checking in with his supervisor before making a physical

7   arrest of anyone?

8             MR. PIERRE:  Objection.

9             THE WITNESS:  No, absolutely not.

10  BY MS. WYDLER:

11       Q.   Do you have an independent recollection on

12  scene of Officer Guzman telling his sergeant, Serg,

13  that's the guy, QRS all the way?

14            MR. PIERRE:  Objection.

15            THE WITNESS:  I saw the video, and I saw that,

16       yes.

17  BY MS. WYDLER:

18       Q.   Okay.  But do you --

19       A.   Heard that.  Not saw it.  Not me specifically,

20  no.

21       Q.   But do you remember him saying that

22  independent from reviewing the video?

23       A.   Oh, no, not from that, no.

24       Q.   Okay.  But you rely on the video to help jog a

25  potential memory from that day, correct?

```
 1            MR. PIERRE:  Objection.

 2            THE WITNESS:  Yes, that's correct.

 3  BY MS. WYDLER:

 4       Q.   Okay.  Officer Hernandez didn't place

 5  handcuffs on the Plaintiff, correct?

 6       A.   That's correct.

 7       Q.   You didn't place handcuffs on the Plaintiff,

 8  correct?

 9       A.   That's correct.

10       Q.   In fact, at the time that there was a pat down

11  of the Plaintiff, it is heard on the video that he is

12  being detained, correct?

13       A.   That's correct, yes.

14       Q.   Do you have any independent recollection of

15  the discussions with the Plaintiff about the driver's

16  license versus the Florida identification or any other

17  type of identification?

18       A.   Yeah, I do recall talking about that.  I'm not

19  sure if I had the driver's license or if I had the ID

20  card, but I do recall something -- speaking to him about

21  that, you can't have both.  I do recall that.

22       Q.   Do you have any recollection about the

23  Plaintiff asking the officers to check out his IDs?

24       A.   Not independently, but looking at the video, I

25  heard him say something about the driver's license and
```

1    the ID card.

2         Q.   Do you remember him saying anything about

3    being in the military at any point in time?

4         A.   I did hear him say something about he was in

5    the military or was in the military, rather.

6         Q.   Do you have any recollection of an ID of his

7    military being demonstrated at any point in time on that

8    day?

9         A.   I don't recall.

10        Q.   Fair enough.  There's nothing improper about

11   handcuffing an individual who is being detained,

12   correct?

13             MR. PIERRE:  Objection.

14             THE WITNESS:  That's correct.

15   BY MS. WYDLER:

16        Q.   You as law enforcement officers, in general,

17   can place handcuffs on an individual if they are being

18   detained as part of an investigation; isn't that right?

19        A.   Yes, we do.

20        Q.   You said you worked the bravo shift, right?

21        A.   Yes, I'm B shift, yes.

22        Q.   So B starts at what time?

23        A.   1400 to 2400.  Ten-hour shifts.

24        Q.   You had arrived on the scene at approximately

25   6:30 p.m. based on the documents and based on the video

1    camera that we reviewed today, right?

2        A.   Yes.

3        Q.   Okay.  Had you been listening to the radio in

4    your car up until that point in between service calls?

5            MR. PIERRE:  Objection.

6            THE WITNESS:  Yes, we've got to monitor the

7            radios.  We have to.

8    BY MS. WYDLER:

9        Q.   Isn't it possible that's where you could have

10   learned about a perimeter being set up prior to this

11   call of the stolen vehicle?

12           MR. PIERRE:  Objection.

13           THE WITNESS:  Yes, that's -- yes, that's

14           correct; however, in the roll call, they told us

15           about the perimeter.

16   BY MS. WYDLER:

17       Q.   Okay.  Are you aware if it's the same

18   perimeter that was at issue with respect to these

19   Officers Guzman and Carriel and the investigation that

20   they were conducting of a fleeing individual?

21       A.   Yes, it was the same perimeter because they

22   gave the location.

23       Q.   Do you know that location as you sit here

24   today?

25           MR. PIERRE:  Objection.

```
 1              THE WITNESS:  Not really.  All I know is in
 2         the Model City area.  I can't really say it was,
 3         you know, 2nd Avenue or 7th Avenue.  I can't really
 4         say that, but I know it was in Model City.
 5    BY MS. WYDLER:
 6         Q.   So what's the -- how large is Model City?
 7         A.   Okay.  From the west -- correction, from the
 8    north, Model City goes from 71st all the way south to
 9    40th Street, and then to the south, 18th, 19th Avenue
10    and to the east, 7th Avenue, 6th Avenue.
11         Q.   So in a stretch from north to south, would you
12    say that's about two and a half miles?
13              MR. PIERRE:  Objection.
14              THE WITNESS:  Yes.
15    BY MS. WYDLER:
16         Q.   Okay.  How long had you been patrolling that
17    area prior to June 1, 2018?
18         A.   I want to say a few months.  I'm not like 100
19    percent sure, but I know it was a few months.
20         Q.   When you first saw the Plaintiff, you also
21    described him as being sweaty.  Do you remember that?
22              MR. PIERRE:  Objection.
23              THE WITNESS:  Well, he had sweat on his
24         forehead.
25    BY MS. WYDLER:
```

1     Q.   He had sweat on his forehead?

2     A.   Yes, he did.

3     Q.   Okay.  And did he explain to you or to any of

4     the officers the reason for having sweat on him?

5     A.   No, he didn't explain to me why he was

6     sweating like that.  I just kind of got to the reason

7     why it was there, which was the vehicle being stolen.

8     Q.   Did that seem odd to you that he was sweating

9     when you first made contact at 6:30 in the evening?

10    A.   I mean, not really odd, but you know, because

11    the sun was going down; however, it's still hot here in

12    South Florida.  You know, I just thought that, you know,

13    he's sweating.  Maybe he's upset about his vehicle being

14    -- I mean, I didn't know so I'm not going to say it was

15    odd, but I just -- you know, I just kind of like

16    dismissed it as it's just who he is.

17    Q.   All right.  Now, let's talk about the T-shirt

18    because there was some back and forth on that, and I

19    just want to get it clear for the record.  So when you

20    saw him, he was wearing a black shirt, right?

21         MR. PIERRE:  Objection.

22         THE WITNESS:  That's correct, yes.

23 BY MS. WYDLER:

24    Q.   Okay.  And you know that because that's what's

25    on the video.

```
 1          A.   That's correct, yeah.

 2          Q.   Okay.  Now, you also mentioned, and it can be

 3     -- you also mentioned that you also saw a white shirt

 4     underneath the black shirt, right?

 5          A.   Yes.

 6          Q.   And you could see that coming out from under

 7     the black shirt in different portions of the video.  Do

 8     you remember that?

 9               MR. PIERRE:  Objection.

10               THE WITNESS:  I do, yes.

11     BY MS. WYDLER:

12          Q.   And do you remember testifying that you could

13     see the white shirt coming out from the black shirt on

14     the front and also, on the back of his body?

15               MR. PIERRE:  Objection.

16               THE WITNESS:  Yes.

17     BY MS. WYDLER:

18          Q.   When you conducted the pat down, did you

19     confirm that there was a white shirt underneath his

20     black shirt?

21               MR. PIERRE:  Objection.

22               THE WITNESS:  Yes, I did.

23     BY MS. WYDLER:

24          Q.   Why was that important?

25               MR. PIERRE:  Objection.
```

```
 1              THE WITNESS:  Well, it's always important
 2         because the way the call was -- well, the comments
 3         that were written on the CAD referenced a white
 4         shirt.  Now, when I'm patting him down, I always,
 5         always lift up their shirts when I'm patting them
 6         down.  Always because you never know what can be in
 7         there, and so when I did that, you know, I just
 8         completed my pat down and kind of dismissed that
 9         and just let the officers do what they had to do
10         who was conducting the investigation.
11    BY MS. WYDLER:
12         Q.   Understood.  And I understand you came in for
13    a 22, and they're in the middle of a 13, right?
14         A.   That's correct, yes.
15         Q.   Okay.  Now, you just mentioned something about
16    it was important, and I'm paraphrasing, because that's
17    what was in the CAD, the white T-shirt.  Do you remember
18    that?
19         A.   I do.
20         Q.   Okay.  Did you have access to some kind of
21    dispatch information prior to meeting Mr. Scott?
22              MR. PIERRE:  Objection.
23              THE WITNESS:  Every call that we go on, on the
24         CAD, it's going to talk about the complainant, who
25         the complainant is.  It's going to have their phone
```

1          number.  It really depends what they're wearing or

2          what they -- whoever the complainant is going to

3          say, where they were at and pretty much what

4          happened, but again, we have to wait until we get

5          there to talk with them because a lot of times, the

6          information is not really correct.

7               A complainant could say anything.  That

8          doesn't necessarily make it what it is.  We have

9          numerous times where I went to calls where they

10         said a black male, and I get there, it wasn't a

11         black male caller.  It was a black female.  So you

12         have to get there and do the investigation before

13         you can determine what to do from there.  You can't

14         just necessarily go by the CAD.

15    BY MS. WYDLER:

16         Q.   So when you said the CAD, were you referring

17    to the call that came in from Officer Guzman about the

18    suspect that fled and the description provided, or were

19    you talking about the description that was provided by

20    the caller regarding the stolen vehicle?

21              MR. PIERRE:  Objection.

22              THE WITNESS:  Yes, the description that was

23         provided by the caller.

24    BY MS. WYDLER:

25         Q.   Okay.  All right.  Sir, you don't have any

1    reason to believe that Officer Guzman would identify the

2    Plaintiff as the person who fled from the scene of an

3    accident and it not be true?

4             MR. PIERRE:  Objection.

5             THE WITNESS:  No, not at all.  Not at all.

6    BY MS. WYDLER:

7        Q.   And because he responded to your call, isn't

8    it true that he became the primary officer on that

9    scene?

10            MR. PIERRE:  Objection.

11            THE WITNESS:  That's true.

12   BY MS. WYDLER:

13       Q.   And the reason that he became the primary

14   officer on that scene was because he believed that the

15   person that you had in front of you was the suspect of

16   multiple crimes; is it not?

17            MR. PIERRE:  Objection.

18            THE WITNESS:  Yes.

19   BY MS. WYDLER:

20       Q.   And you knew at the time of the scene -- at

21   the time that the video was rolling and the same video

22   that we watched all day long, that he identified Mr.

23   Scott as the person who crashed and fled from his scene;

24   is it not?

25            MR. PIERRE:  Objection.

1            THE WITNESS:  That's correct.

2            MS. WYDLER:  I don't have any other questions,

3       and I have amused Plaintiff's counsel.  Thank you.

4            MR. PIERRE:  Not you.  The response.

5            MR. FERNANDEZ:  I just have two quick

6       questions.

7                      CROSS EXAMINATION

8    BY MR. FERNANDEZ:

9       Q.   Officer Bloom, Brandon Fernandez.  Thanks for

10   being here.

11           Do you know of Brandon Williams, Officer

12   Brandon Williams?

13      A.   I heard of the name, but I don't have any idea

14   who he is.

15      Q.   In the videos that we watched, have you ever

16   seen him before?

17      A.   I probably have seen him, but I really can't

18   tell you who he is.

19      Q.   The videos that we've seen all day today, did

20   you see a guy named Brandon Williams there?

21      A.   No, no.

22      Q.   Okay.

23      A.   No, I have not.

24      Q.   Do you recall a guy named Brandon Williams

25   ever showing up on the scene where you were at any time

1    that day?

2         A.   I did not, no.

3         Q.   Okay.  There's a couple questions about the

4    state attorney's office.  You stated I think the state

5    attorney called you one time or backup.

6              When this individual ended up getting

7    arrested, did the prosecutor from the state attorney's

8    office ever contact you or anything like that?

9         A.   No.

10        Q.   Okay.  Did you ever call the state attorney's

11   office and say, hey, is this case moving or anything

12   like that?

13        A.   No.

14        Q.   Okay.  Did you go out of your way to try to

15   help the state attorney prosecute this case at all at

16   any point?

17             MR. PIERRE:  Objection.

18             THE WITNESS:  No, absolutely not.

19             MR. FERNANDEZ:  Okay.  I don't have anything

20        else.

21             MR. PIERRE:  Okay.  I have some, so let's get

22        this show on the road.

23                      REDIRECT EXAMINATION

24   BY MR. PIERRE:

25        Q.   Officer, before we start, pretend I'm Ms.

1   Wydler or Mr. Fernandez and just say yes to whatever

2   question I ask.  Can you do that?

3          MR. FERNANDEZ:  Object to form.  Move to

4       strike.  Let's ask a real question, please.

5          MS. WYDLER:  Join.

6   BY MR. PIERRE:

7       Q.   So you stated -- okay.  Let's go to the 48th

8   Street and 6th Street, right?

9       A.   6th Avenue.

10      Q.   6th Avenue.

11      A.   Yes, sir.

12      Q.   When a caller calls in, does that individual

13  type the location where he's at, or is that the

14  dispatcher?

15      A.   Actually, that's the call center.  The call

16  center sends it to the dispatch, and the dispatch sends

17  it to the patrol officer.

18      Q.   Okay.  So there's several things that are

19  working here.  My client calls.  It goes to the call

20  center.  The call center then sends it to the dispatch,

21  and the dispatch sends it to you, the officer, correct?

22      A.   Yes.

23      Q.   So it's like telephone really, the game?

24      A.   Pretty much if that's what you call it.

25      Q.   Yeah.  Like my client doesn't directly speak

```
 1   to you until he actually -- until you actually meet him

 2   on 563 Northwest 48th Street, correct?

 3        A.   Yes.

 4        Q.   So what is being communicated on the CAD in

 5   the dispatch is not necessarily what my client has told

 6   you, correct?

 7             MR. FERNANDEZ:  Object to form.

 8             MS. WYDLER:  Join.

 9             THE WITNESS:  Yes, that's true.

10   BY MR. PIERRE:

11        Q.   Okay.  So as you have previously testified,

12   just because it's on the CAD doesn't mean it's accurate,

13   correct?

14        A.   Yes, they only can put what the caller told

15   them.  That's all they can put.  They can't add anything

16   to it.  Whatever the caller tells them is what they put.

17   That's why --

18        Q.   Was --

19             MR. FERNANDEZ:  Let him finish.  Go ahead.

20             MR. PIERRE:  Go for it.

21             THE WITNESS:  When the officer goes out,

22        that's when he can conduct a thorough investigation

23        of whatever it may have been, whatever the call is

24        about.

25   BY MR. PIERRE:
```

1      Q.   Okay.  So in the CAD that we've -- and I'll

2   show it to you as the exhibit -- okay.  In the CAD,

3   Plaintiff's Exhibit 6, where does it describe --

4      A.   Can you make that a little bit larger, please?

5   I can see it, but it's not really --

6      Q.   This is your world, Officer.  I'm just living

7   in it.

8           So where in the CAD does it describe what Mr.

9   Samuel Scott is wearing?

10     A.   Well, he didn't say what he was wearing.  It's

11  just showing the comments of the caller about the

12  vehicle.

13     Q.   Okay.  It does say Samuel, doesn't it?

14     A.   Yes, I think that's -- yeah.

15     Q.   And it says Northwest 54th.  Not 48th Street,

16  doesn't it?

17          MR. FERNANDEZ:  Object to form.

18          THE WITNESS:  That's correct.

19  BY MR. PIERRE:

20     Q.   It does give you the number about the caller,

21  786-442-0054, correct?

22          MR. FERNANDEZ:  Object to form.

23          THE WITNESS:  That's correct.

24  BY MR. PIERRE:

25     Q.   Okay.  But it doesn't say anything about what

1    he was wearing prior to you actually meeting him,

2    correct?

3         A.   That's correct.

4         Q.   So when you say you got the information on

5    what he was wearing on the CAD, that was not correct,

6    was it?

7              MR. FERNANDEZ:  Object to form.

8              THE WITNESS:  Looking at this, I mean, a lot

9         of times, the information will be in the CAD, but I

10        don't see it on this one, no.

11   BY MR. PIERRE:

12        Q.   Oh, okay.  So on the CAD, you recall them

13   saying he was wearing a white T-shirt.

14             MR. FERNANDEZ:  Object to form.

15             THE WITNESS:  Not looking at the CAD here, I

16        don't see anything with the white T-shirt, but the

17        white T-shirt came from somewhere.  I don't quite

18        remember where, but it came -- I mean, actually, it

19        wasn't a T-shirt.  It was a tank top.

20   BY MR. PIERRE:

21        Q.   Tank top.  Yeah, the white tank top came from

22   the arrest affidavit that you reviewed with your counsel

23   last week, correct?

24             MR. FERNANDEZ:  Object to form.

25             MS. WYDLER:  Objection, form.

```
 1              THE WITNESS:  No, I'm not -- I can't really
 2         say that.  I definitely can't say that because you
 3         get a lot of transmission over the air.  You hear
 4         things, and sometimes, you can retain certain
 5         things.  Certain things you can't retain, and
 6         that's pretty much where I got it from.  It
 7         definitely didn't come from the CAD.
 8    BY MR. PIERRE:
 9         Q.   Okay.  So we now know it didn't come from the
10    CAD.  We know it didn't come from you actually visually
11    seeing him on June 1, 2018, and it didn't come from your
12    preparation with your counsel, correct?
13              MR. FERNANDEZ:  Object to form,
14         mischaracterizes testimony.
15              THE WITNESS:  That's correct.
16    BY MR. PIERRE:
17         Q.   So where did it, in fact, come from?
18         A.   It could have come off the transmission from
19    the radio.  I mean, I'm not quite 100 percent sure.
20    You're talking about five years ago.  I can't even
21    remember what happened last week in certain cases unless
22    I look at the video or somebody refreshes my memory.
23         Q.   Okay.  So your memory lasts about a week.  Is
24    that what you're telling me?
25              MR. FERNANDEZ:  Object to form.
```

1          MS. WYDLER:  Join.

2          THE WITNESS:  It could very well be.  I mean,

3      I don't know.  My memory, I think, is pretty good.

4  BY MR. PIERRE:

5      Q.   So you could have been reconstructing that my

6  client was wearing a white tank top when you saw him

7  based off of information that you have received

8  afterwards, correct?

9          MR. FERNANDEZ:  Object to form.  Wait, wait.

10         Object to form, asked and answered, and

11         mischaracterizes testimony.

12         Go ahead.

13         THE WITNESS:  I disagree with that.

14  BY MR. PIERRE:

15     Q.   Okay.  Then where did the white T-shirt come

16  from?

17         MR. FERNANDEZ:  Object to form, asked and

18         answered multiple times.  This is the last time

19         he's going to answer this question.

20         THE WITNESS:  It could have come off the

21         transmission from the radio that I recall.  Again,

22         I don't quite recall.

23  BY MR. PIERRE:

24     Q.   Okay.  When it says 6AV/48, that means last

25  seen at Northwest 6th Avenue/48th Street.  That's the

1    vehicle, correct?

2              MR. FERNANDEZ:  Object to form.

3              THE WITNESS:  Yes, last seen at North 6th and

4         48th Street.

5    BY MR. PIERRE:

6         Q.   Okay.  Is that an exact location?

7         A.   That's an exact location.  Yes, it is.

8         Q.   And the individual who provided that -- was

9    that location provided to you prior to making contact

10   with my client?

11        A.   The address was five -- I can't remember.

12   Five-something Northwest 48th Street.

13        Q.   Okay.  So why did you go to the park first if

14   the location was at 563 Northwest 48th Street?

15             MR. FERNANDEZ:  Object to form.

16             MS. WYDLER:  Objection, form,

17        mischaracterization of evidence, testimony.

18             THE WITNESS:  I'm looking at 563 48th Street

19        and no one was there, and then I drove around by

20        the park, and I came back and that's when I saw the

21        gentleman walking down -- well, actually, he kind

22        of flagged me down.

23             You always go to the location first.  A lot of

24        times, the locations are not correct.  It could be

25        a bad location.  They could say whatever this one

```
 1          is, 563, and it's probably not at 563, but you

 2          still go to try to make contact.  You don't see

 3          anyone there.  You look for 563 and can't find it?

 4          What do you do?  You go on 8th Street.  Sometimes

 5          they have the streets mixed up with the avenue and

 6          the avenue mixed up with the street when the

 7          complainant is calling in, so a lot of times, they

 8          don't even know where they're at.

 9     BY MR. PIERRE:

10          Q.   Okay.  So you actually first went to the

11     location of 563 Northwest 48th Street, correct?

12          A.   Yes, that's correct.

13          Q.   And you didn't see my client there, correct?

14          A.   I did not.  I didn't see anyone.

15          Q.   Okay.  Then you drove around the block and

16     went to where?

17          A.   Just one block over just to see -- because

18     like I said previously, they are put in -- they say what

19     street it is, and it could be incorrect.  Sometimes they

20     don't know what street they're on, or maybe they're not

21     used to the area.  They don't know what street they're

22     on, so they'll give you something that's close to it or

23     where they think they're at.

24               I mean, usually when you go on a call like

25     that and the person is not there, you just clear the
```

1   call and go on another call, but I was trying to do my

2   due diligence and, you know, find the person so I could

3   make the report for them.

4        Q.   And you called -- and you found him after your

5   second go around the block, correct?

6             MR. FERNANDEZ:  Object to form.

7             THE WITNESS:  That's correct.

8   BY MR. PIERRE:

9        Q.   Okay.  And he waved you down.

10       A.   Correct.

11       Q.   Now, you can truthfully testify he was wearing

12  a black shirt, correct?

13            MS. WYDLER:  Objection, form, argumentative.

14            THE WITNESS:  After looking at the video, I

15       can, yes.

16  BY MR. PIERRE:

17       Q.   Okay.  So there was a series of questions in

18  your initial interaction with my client about him being

19  agitated, and you found that to be -- or him being

20  disorientated/agitated.  That's how you described my

21  client, correct?

22       A.   That's correct.

23       Q.   And the reason why you describe my client as

24  agitated and disoriented is because, well, what are

25  people's behaviors/dispositions when their vehicle has

1   been stolen?

2           MR. FERNANDEZ:  Object to form.

3           MS. WYDLER:  Join.

4           THE WITNESS:  I mean, I don't know.  I had a

5       vehicle stolen from me twice.  I was a little bit

6       mad, but that's about it.

7   BY MR. PIERRE:

8       Q.   You were cool, calm, and collect.

9       A.    Well, I wouldn't say cool, calm, and collect.

10  I mean, no one wants their vehicle stolen, but it's

11  going to be what it's going to be.  It's already done.

12  Do the report.  Just report it and be done with it.

13      Q.   So my client being agitated was not a natural

14  reaction to his vehicle being stolen?

15          MR. FERNANDEZ:  Object to form.  Answer if you

16      can.

17          THE WITNESS:  That's something you have to ask

18      the individual.  Everybody takes things and does

19      things differently, so I can't speak for him.

20  BY MR. PIERRE:

21      Q.   So you didn't describe my client's disposition

22  as being cooler than the other side of the pillow?

23          MS. WYDLER:  Form.

24          THE WITNESS:  I'm not sure what that means,

25      but I can't really answer that.

1    BY MR. PIERRE:

2         Q.    Okay.  So I'm having trouble because this is

3    going to come up trying to figure out what you remember

4    and what you don't remember.  So help me understand what

5    details do you remember without having the video played

6    before you.

7                   MR. FERNANDEZ:  Object to form.  I mean --

8                   MS. WYDLER:  Join.  Outside the scope.

9                   MR. FERNANDEZ:  Yeah, that's really broad.

10                  THE WITNESS:  I remember him saying he left

11           his car at the park with the key in it running, and

12           he walked down the street to the general area where

13           we were at.  I don't know if it was an aunt.  I

14           know it was a relative, and I asked him which

15           house, and he pointed at one house and then he

16           started to point at the next house, and I'm like,

17           you know, if you were there, you don't know which

18           house you came out of.  I remember that.

19   BY MR. PIERRE:

20        Q.    And that's the one thing that you remember,

21   Officer?

22        A.    No, that's not the one thing that I remember.

23        Q.    What else do you remember?

24                  MR. FERNANDEZ:  Object to form.

25                  THE WITNESS:  I remember him filling out the

```
 1        stolen vehicle affidavit.

 2   BY MR. PIERRE:

 3        Q.   Okay.  Do you remember that line of

 4   questioning that Ms. Wydler asked you about police

 5   officers routinely arresting people that they have seen

 6   commit a crime?

 7        A.   I do.

 8        Q.   Okay.  Do police officers routinely arrest

 9   people based on their racial and gender profile?

10             MR. FERNANDEZ:  Object to form.

11             MS. WYDLER:  Form.

12             MR. FERNANDEZ:  Argumentative.

13             THE WITNESS:  Not at all.

14   BY MR. PIERRE:

15        Q.   Okay.  So police officers who aren't really

16   sure of if the person has committed a crime may -- based

17   off of their BOLO description, arrest them, correct?

18             MR. FERNANDEZ:  Object to form, hypothetical,

19             argumentative.  Go ahead.

20             MS. WYDLER:  Join.

21             THE WITNESS:  Every police officer is

22             different.  I can't speak for everyone.  Only I can

23             speak for me.  Every police officer is different.

24   BY MR. PIERRE:

25        Q.   Okay.  Handcuffs are placed on an individual
```

1    and they're simply being detained, meaning that they

2    haven't been arrested yet.  There's no indication that

3    there's probable cause.  Isn't it -- and you've checked

4    for officer safety.  Is it the City of Miami's protocol

5    or procedure to remove the handcuffs?

6              MR. FERNANDEZ:  Object to form.

7              MS. WYDLER:  Objection, form.

8              MR. FERNANDEZ:  Argumentative, compound, and

9         hypothetical.

10             MS. WYDLER:  Vague.

11             THE WITNESS:  Yes, if a person -- if they

12        don't have a PC, you know, of course, they're going

13        to, you know, take the handcuffs off of them and

14        tell them, hey, I apologize for what happened, but

15        we had to make sure that we get the story, and

16        you're free to go if that's the case.

17   BY MR. PIERRE:

18        Q.   But isn't it the handcuffs, when there is no

19   PC, used to address any safety concerns that the

20   officers may or may not have?

21             MR. FERNANDEZ:  Object to form, hypothetical.

22             MS. WYDLER:  Join.

23             THE WITNESS:  Negative.  You use handcuffs for

24        PC, too.  You know, if you have some type of

25        probable cause, of course, you're going to handcuff

```
 1          them.  If not, you're going to just stand there and
 2          talk with them.
 3     BY MR. PIERRE:
 4          Q.   If it's merely a detention and you're
 5     attempting to determine whether or not this person has
 6     committed a crime, you place that individual in
 7     handcuffs?
 8               MR. FERNANDEZ:  Object to form.  I think he's
 9          already answered this question, but go ahead and
10          answer it if you understand the question.
11               THE WITNESS:  No, I don't understand the
12          question.  Could you repeat it?
13     BY MR. PIERRE:
14          Q.   Yeah, I can.  My understanding of when you
15     place handcuffs, and correct me if I'm wrong, is under a
16     temporary detention or brief detention is if it's to
17     address the safety concerns of the individual officers
18     and the public.  Is that your understanding?
19               MR. FERNANDEZ:  Object to form.
20               THE WITNESS:  Yeah, somewhat.  I mean, you can
21          place cuffs on someone if you just take them from
22          Point A to Point B.  We've placed cuffs on people
23          all the time when we take them down to GMH, we take
24          them to GMH Crisis.  We put handcuffs on them, but
25          that doesn't mean they're under arrest.  That's
```

1          just our protocol when we put them in our vehicle.

2    BY MR. PIERRE:

3          Q.   And your perimeter, when you say -- you

4    actually talked about the perimeter and when you learned

5    that information.  You are testifying that you learned

6    that information at roll call, correct?

7               MR. FERNANDEZ:  Object to form.

8               THE WITNESS:  Yes, in roll call.  Roll calls

9          going to always tell you what's going on, actively

10         what's going on in roll call so you can be aware of

11         certain areas we have to stay out of.  They may be

12         conducting some type of investigation, you stay out

13         of certain areas, so yeah, in roll call, they're

14         going to explain to you what's going on.  They have

15         to.  If you don't know, then you can go in the area

16         where they're trying to keep officers out, and you

17         can kind of screw up the investigation, what

18         they're trying to do or what they're trying to

19         apprehend.  So, of course, they have to tell you

20         what's going on.

21   BY MR. PIERRE:

22         Q.   Were you aware that a perimeter was never set

23   up because there wasn't enough men?

24               MR. FERNANDEZ:  Object to form.

25               THE WITNESS:  No, I wasn't aware.  I've never

1    heard that before because there is always going to

2    be enough officers.  Whether they get officers from

3    another district, they're going to always have

4    enough officers to set up perimeter.

5   BY MR. PIERRE:

6        Q.   Okay.  So you're saying that it's not true

7   that a perimeter wasn't set up, correct?

8             MR. FERNANDEZ:  Object to form,

9        mischaracterizes testimony.

10            THE WITNESS:  No, if they need to set a

11       perimeter, there are going to be enough officers

12       even if they don't have enough in that district,

13       which they should, or they will pull you from

14       something that's not important and relevant and

15       send you over to the perimeter.  So any time

16       there's a perimeter, we're going to always have

17       enough officers for sure.  There's no doubt about

18       that.

19  BY MR. PIERRE:

20       Q.   Okay.  Were you aware that as it relates to

21  the crash scene perimeter, there was not a perimeter

22  that was set up?

23            MR. FERNANDEZ:  Answer is you can.

24            THE WITNESS:  No, I wasn't aware of that;

25       however, just because it wasn't set up at that time

```
 1          doesn't mean that they didn't set up a perimeter.

 2          It just means it wasn't set up at that time.

 3     BY MR. PIERRE:

 4          Q.   Okay.  There was questions about the white

 5     shirt and the black shirt.  I just want to make sure

 6     that we're clear on this for the record.  When did you

 7     first discover my client was wearing a white tank top

 8     beneath the black shirt?

 9          MR. FERNANDEZ:  Object to form, asked and

10          answered.  This is like the eighth time you've

11          asked this question, Faudlin.

12          MR. PIERRE:  Problem is Lourdes asked a

13          question that kind of confused the whole testimony,

14          so I get to re-ask it.

15          MR. FERNANDEZ:  I disagree.  This is the last

16          time he's going to answer this question.  Go ahead.

17          THE WITNESS:  Okay.  Again, it could have come

18          over the transmission of the radio in reference to

19          the person who put the BOLO out.  I'm not like 100

20          percent sure because it's been so long.  I just

21          don't remember.

22     BY MR. PIERRE:

23          Q.   Okay.  You also stated you didn't need any

24     backup for your Signal 22, correct?

25          A.   If you look at the CAD, it will show you the
```

 1   disposition, and that's only a one-man call.  That's not

 2   a two-officer call.  It will say 01 or 02 or whatever it

 3   may be.  If it's a two man, they would send two.  There

 4   would have been two of us there, but just for to recover

 5   a vehicle, you don't really need two people for that.

 6   To make a report for a stolen vehicle, you don't need

 7   two people for that.  It's only a one-officer call.

 8       Q.   When you met my client at 563 Northwest 48th

 9   Street, did he look like he just came back from a run?

10            MR. FERNANDEZ:  Object to form.

11            MS. WYDLER:  Join.

12            THE WITNESS:  No, we don't find many people

13            running in jeans and, you know, what he had on.

14            Like he came back from a run, I mean, that's pretty

15            strange.  What are you saying you're coming back

16            from a run if you're at your relative's house?

17            That doesn't make much sense.

18            MR. PIERRE:  Okay.  Officer, thank you for --

19            MR. FERNANDEZ:  I have a few follow ups.  I

20            hate to drag this on, Officer, but I have to ask

21            this question.

22                         RECROSS EXAMINATION

23   BY MR. FERNANDEZ:

24       Q.   You testified earlier that you had roll call

25   at two o'clock.

 1        A.    Yes.

 2        Q.    At six o'clock, there was a dispatch.  I

 3   forget what it was, 6:30 or so.  Do you remember that,

 4   that CAD?

 5        A.    Yes.

 6        Q.    Okay.  From two o'clock to six o'clock, what

 7   is that, four hours?

 8        A.    Four hours, yes.

 9        Q.    Okay.  And when the individual who's the

10   Plaintiff in this case was given four to five different

11   explanations as to where his car was stolen, when you

12   read into him, did he say his car just recently got

13   stolen?  Do you recall how much time had passed?

14            MR. PIERRE:  Objection.

15            THE WITNESS:  I don't recall exactly.

16   BY MR. FERNANDEZ:

17        Q.    Let me ask you this.  It wasn't longer than

18   four hours?  It wasn't a four-hour delay, right?

19        A.    Oh, no.

20        Q.    How many perimeters do you think the City of

21   Miami on any given day could possibly set in one day?

22   More than one?

23            MR. PIERRE:  Objection.

24            THE WITNESS:  It could be more than one.

25   BY MR. FERNANDEZ:

```
1       Q.   Is it possible the perimeter that you were

2   discussing at roll call was another perimeter that had

3   nothing to do with this case?

4            MR. PIERRE:  Objection.

5            THE WITNESS:  They tell us exactly where it

6       was at.  It was the only perimeter that day.

7   BY MR. FERNANDEZ:

8       Q.   And this was this case?

9       A.   Yes, yes, it was only one that day, yes.

10      Q.   Okay.  Are you sure about that?

11      A.   I'm positive.

12      Q.   Okay.  So if the perimeter was at 2:00 -- all

13  right.  So let's play it out.  Let's work out this

14  timeline then.  So if your memory is serving you today,

15  you're saying your recollection of when you learned

16  about the perimeter was at 2:00 p.m., right?

17      A.   Yes.

18      Q.   Okay.  And Plaintiff didn't report his car

19  stolen until later that day, right?

20      A.   Yes.

21      Q.   Okay.  So if Plaintiff didn't report his car

22  stolen until later that day, then how could his car be

23  reported stolen for the perimeter in this case at two

24  o'clock?  Do you see what I'm saying?

25      A.   Yes, I agree.
```

```
1         Q.   Okay.

2         A.   I agree.

3         Q.   Okay.  It's not like Plaintiff was arrested

4    and then his car got stolen, right?

5              MR. PIERRE:  Objection.

6              THE WITNESS:  That's correct, yes.

7    BY MR. FERNANDEZ:

8         Q.   Okay.

9              MR. PIERRE:  Objection.

10   BY MR. FERNANDEZ:

11        Q.   Do you recall what time you started your shift

12   that day?

13        A.   At 1400.  Well, after roll call.  Maybe -- it

14   depends how long roll call is.  Probably about 2:20,

15   2:30.  Something like that.

16        Q.   Okay.  Based on your recollection, when you

17   were on scene where everybody was, right, to your

18   belief, that car wasn't stolen four hours earlier,

19   right?

20             MR. PIERRE:  Objection.

21   BY MR. FERNANDEZ:

22        Q.   It was reported stolen within what, 30 minutes

23   maybe?

24        A.   Yes.

25        Q.   Was Plaintiff specific about how earlier after
```

 1   he called that he reported his car stolen, how much

 2   earlier we found his car that was stolen?  Did he ever

 3   give you any explanation for that?

 4        A.   No, he just said that he was parked at the

 5   park with the key in the car still running, and he was

 6   just walking down the roadway there to -- I don't even

 7   know.  I know it was a relative.  I can't say an aunt's

 8   house, but I know he said it was a relative, and I said

 9   which house, and he pointed here.  I said here?  Then he

10   pointed at the other house.

11        Q.   So you pointed down the street?

12        A.   Well, he was on the sidewalk that it was on

13   right there.  He pointed at a house.

14        Q.   Okay.  But that area wasn't four hours away,

15   right?

16        A.   No.

17        Q.   Of course not.  No.  Okay.

18             MR. FERNANDEZ:  I don't have anything else.

19        You probably will.

20             MR. PIERRE:  Okay.  Again, pretend I'm your

21        counsel and just say yes to whatever I say.

22             MR. FERNANDEZ:  Move to strike again.

23                    FURTHER DIRECT EXAMINATION

24   BY MR. PIERRE:

25        Q.   So, now, you're telling me you are -- the

```
1   perimeter was not told to you at roll call, correct?

2            MR. FERNANDEZ:  Object to form,

3        mischaracterizes testimony.

4            THE WITNESS:  I didn't say that.

5   BY MR. PIERRE:

6        Q.   When was the perimeter revealed to you if it

7   wasn't at roll call?

8            MR. FERNANDEZ:  Object to form.  He's

9        testified to this already.

10           THE WITNESS:  Again, it was during -- I mean,

11       in roll call, they have a lot of stuff they put

12       out.

13  BY MR. PIERRE:

14       Q.   So the perimeter that has to do with this

15  case, you knew to be -- you had that information at roll

16  call, correct?

17           MR. FERNANDEZ:  Object to form, asked and

18       answered.

19           THE WITNESS:  I did.

20           MR. PIERRE:  I have no further questions.  I

21       have a Motion.

22           MR. FERNANDEZ:  All right.  I don't either.

23       We're going to read, and we'll order the transcript

24       as well.

25           (The deposition concluded at 3:58 p.m.)
```

1              (Reading and signing of the transcript was

2         reserved.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF MIAMI-DADE

 5

 6           I, Tyesha Scott, Reporter, Notary Public,

 7        State of Florida, certify that MICHAEL BLOOM

 8        appeared before me on the 13th day of January 2023,

 9        and was duly sworn.

10

11           Signed this 19th day of January 2023.

12

13

14

15
                          Tyesha Scott
16        _____
          Tyesha Scott, Reporter
17        Notary Public, State of Florida
          Commission No.:  HH99623
18        Commission Expires:  06/30/2025

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF MIAMI-DADE

5

6            I, Tyesha Scott, Reporter, certify that I was

7        authorized to and did report the deposition of

8        MICHAEL BLOOM, that a review of the transcript, was

9        reserved, and that the transcript is a true and

10       correct record of my electronic notes.

11           I further certify that I am not a relative,

12       employee, attorney, or counsel of any of the

13       parties, nor am I a relative or employee of any of

14       the parties' attorneys or counsel connected with

15       the action, nor am I financially interested in the

16       action.

17

18           Dated this 19th day of January 2023.

19

20

21

22           _____
                              *Tyesha Scott*
             Tyesha Scott, Reporter
23

24

25

```
 1                    WITNESS NOTIFICATION LETTER

 2

 3   January 18, 2023

 4   MICHAEL BLOOM
     c/o Brandon L. Fernandez, Esquire
 5   Office of the City Attorney
     444 Southwest 2nd Aveue
 6   Miami, Florida 33130

 7   In re:  Samuel Scott, Jr. vs. City of Miami, et al.

 8   Deposition taken on January 13, 2023

 9

10           The transcript of the above proceeding is now

11      available for your review.

12           Please call to schedule an appointment with

13      our office.

14           Please complete your review within 30 days.

15

16           Sincerely,

17

18

19           Tyesha Scott, Reporter
             Scott Reporting
20           954) 383-4955

21

22

23

24

25
```

```
 1                          ERRATA SHEET

 2               DO NOT WRITE ON THE TRANSCRIPT

 3                ENTER CHANGES ON THIS PAGE

 4

 5     IN RE:  SAMUEL SCOTT, JR. vs. CITY OF MIAMI, et al.

 6                         MICHAEL BLOOM

 7                       January 13, 2023

 8

 9     Page No.   Line No.        Change            Reason

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22              Under penalties of perjury, I declare that I
         have read the foregoing document and that the facts
23       stated in it are true.

24

25       _____
         DATE                     MICHAEL BLOOM
```